**Nos. 2022-1147, -1149, -1150, -1151**

# United States Court of Appeals
# for the Federal Circuit

---

**AMGEN INC.,**

*Plaintiff-Cross-Appellant*

**v.**

**SANDOZ INC., ZYDUS PHARMACEUTICALS (USA) INC.,**

*Defendants-Appellants*

**MANKIND PHARMA LTD., TORRENT PHARMACEUTICALS LTD., GLENMARK PHARMACEUTICALS LIMITED, MACLEODS PHARMACEUTICALS LTD., MSN LABORATORIES PRIVATE LTD., ACTAVIS LLC, PRINSTON PHARMACEUTICAL INC., EMCURE PHARMACEUTICALS LTD., HERITAGE PHARMACEUTICALS INC., AUROBINDO PHARMA LTD., AUROBINDO PHARMA USA, INC., ANNORA PHARMA PRIVATE LIMITED, HETERO USA, INC., CIPLA LIMITED, ALKEM LABORATORIES LTD., DR. REDDY'S LABORATORIES, INC., DR. REDDY'S LABORATORIES, LTD., AMNEAL PHARMACEUTICALS LLC, PHARMASCIENCE INC.,**

*Defendants*

---

Appeal from the United States District Court for the District of New Jersey
Case Nos. 3:18-cv-11026-MAS-DEA, 3:18-cv-11267-MAS-DEA,
3:18-cv-11269-MAS-DEA, 3:19-cv-18806-MAS-DEA, Judge Michael A. Shipp

---

**PRINCIPAL BRIEF FOR DEFENDANTS-APPELLANTS**

---

[COUNSEL LISTED ON INSIDE COVER]

MICHAEL J. GAERTNER
DAVID B. ABRAMOWITZ
HUGH S. BALSAM
CAROLYN A. BLESSING
EMILY L. SAVAS
AUGUST M. MELCHER
Locke Lord LLP
111 South Wacker Drive
Suite 4100
Chicago, IL 60606
(312) 443-0700

*Counsel for Zydus Pharmaceuticals (USA) Inc.*

MAUREEN L. RURKA
SAMANTHA M. LERNER
Winston & Strawn LLP
35 West Wacker Drive
Chicago, IL 60601
(312) 558-5600

EIMERIC REIG-PLESSIS
NOOROSSADAT TORABI
Winston & Strawn LLP
101 California Street
San Francisco, CA 94111
(415) 591-1000

*Counsel for Sandoz Inc.*

## U.S. Patent No. 7,427,638, Claims 3 and 6 (Appx10524)

**1.** A pharmaceutical composition comprising stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione, or a pharmaceutically acceptable salt, solvate or hydrate, thereof; and a pharmaceutically acceptable carrier, excipient or diluent.

**2.** The pharmaceutical composition of claim 1 wherein said pharmaceutical composition is suitable for parenteral, transdermal, mucosal, nasal, buccal, sublingual, or oral administration to a patient.

**3.** The pharmaceutical composition of claim 2 wherein said pharmaceutical composition is suitable for oral administration to a patient.

**4.** The pharmaceutical composition of claim 2 wherein the amount of stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione is from 1 mg to 1000 mg.

**5.** The pharmaceutical composition of claim 2 wherein the amount of stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione is from 5 mg to 500 mg.

**6.** The pharmaceutical composition of claim 5 wherein the amount of stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonyl-ethyl]-4-acetylaminoisoindoline-1 ,3-dione is from 10 mg to 200 mg.

**U.S. Patent No. 7,893,101, Claims 1 and 15 (Appx10595)**

**1.** A Form B crystal form of the compound of Formula (I):



(I)

which is enantiomerically pure, and which has an X-ray powder diffraction pattern comprising peaks at about 10.1, 13.5, 20.7, and 26.9 degrees 2θ.

**15.** A solid pharmaceutical composition comprising the crystal form of any one of claims 1 and 2 to 13.

## CERTIFICATE OF INTEREST

Counsel for Defendant-Appellant Sandoz Inc. certifies that the following

information is accurate and complete to the best of counsel's knowledge:

| 1. Represented Entities.<br>Fed. Cir. R. 47.4(a)(1). | 2. Real Party<br>in Interest.<br>Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations<br>and Stockholders.<br>Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. |
| Sandoz Inc. | N/A | Novartis AG |

4.    **Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

Winston & Strawn LLP: George C. Lombardi, Jovial Wong, Karalena Guerrieri, Sharon Lin, Courtney Block

Hill Wallack LLP: Eric I. Abraham

5.    **Related Cases.**  Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.  Do not include the originating case number(s) for this case.  Fed. Cir. R. 47.4(a)(5). *See also* Fed. Cir. R. 47.5(b).

None

6.  **Organizational Victims and Bankruptcy Cases.**  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

None/Not Applicable

/s/ Maureen L. Rurka
MAUREEN L. RURKA
*Counsel for Sandoz Inc.*

January 31, 2022

## CERTIFICATE OF INTEREST

Counsel for Defendant-Appellant Zydus Pharmaceuticals (USA) Inc.

certifies that the following information is accurate and complete to the best of

counsel's knowledge:

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. |
| Zydus Pharmaceuticals (USA) Inc. | N/A | Zydus International Pvt. Ireland and Cadila Healthcare Limited |

4.    **Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

Locke Lord LLP: Jennifer M. Coronel

Epstein, Becker, and Green, P.C.: Theodora McCormick, Lauren Cooper, and Robert Lufrano

5.    **Related Cases.**  Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.  Do not include the originating case number(s) for this case.  Fed. Cir. R. 47.4(a)(5). *See also* Fed. Cir. R. 47.5(b).

None

**6.    Organizational Victims and Bankruptcy Cases.**  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

None/Not Applicable

/s/ Michael J. Gaertner*

MICHAEL J. GAERTNER
*Counsel for Zydus Pharmaceuticals (USA) Inc.*

\* Electronically signed with consent (Fed. Cir. R. 32(g)(3)(B))

January 31, 2022

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. x

GLOSSARY OF ABBREVIATIONS .................................................. xvi

STATEMENT OF RELATED CASES ......................................... xvii

INTRODUCTION ................................................................................ 1

JURISDICTIONAL STATEMENT ....................................................... 5

STATEMENT OF ISSUES ................................................................. 6

STATEMENT OF THE CASE ............................................................ 6

    A.    The '638 Patent ................................................................. 7

        1.    The prior art disclosed apremilast and its purification ..............8

        2.    Purification of stereoisomers by chiral chromatography was a routine and well-known technique to produce stereomerically pure apremilast.................................................10

        3.    Celgene's admissions regarding the scope of the prior art .......11

            a.    Celgene listed the '358 patent in the Orange Book for Otezla® ....................................................................12

            b.    Celgene admitted in the '638 patent specification that apremilast could be isolated by known techniques. ................................................................12

            c.    Celgene's admissions about the scope of the '358 patent ......................................................................13

    B.    The '101 Patent ...............................................................14

        1.    Celgene added substantial information to the specification to obtain claims to Form B that was not in the provisional '515 application.......................................................................15

        2.    The '515 application does not expressly disclose Form B. ......17

# TABLE OF CONTENTS (continued)

3.    Celgene represented that Example 2 results in apremilast forms other than crystalline Form B............................................19

4.    Amgen did not rebut defendants' evidence that the asserted claims of the '101 patent were obvious as of March 2008. ..............................................................21

C.    The litigation ......................................................22

1.    Procedural history ......................................22

2.    Evidentiary disputes ...................................22

3.    Opinion....................................................23

SUMMARY OF ARGUMENT .......................................... 23

ARGUMENT.............................................................. 27

I.    Standards of review ............................................27

II.    The judgment that the asserted claims of the '638 patent would not have been obvious should be reversed...........................................28

A.    The district court applied the wrong legal standards in analyzing reasonable expectation of success. ....................................29

1.    The district court erroneously failed to credit the '638 patent's admission that apremilast could be isolated by techniques known in the art..........................................30

2.    The district court erroneously required enablement of the prior-art '358 patent. ...............................................32

3.    The district court legally erred by excluding Celgene's admission during prosecution of EP '148 that apremilast could be isolated by known techniques. ...................................37

B.    The district court legally erred in failing to find motivation to purify apremilast from a known racemic mixture. ...........................40

# TABLE OF CONTENTS (continued)

**Page**

1.     Motivation to purify does not require biological data on unclaimed clinical properties. .....................................42

2.     There is no legal requirement for a POSA to be motivated to select the closest prior art. .....................................44

C.     The district court legally erred in its analysis of alleged secondary considerations of nonobviousness. ...................................46

1.     The district court legally erred in crediting secondary considerations that lack a nexus to the claims. ........................47

2.     The district erred in relying on a difference in degree rather than a difference in kind. .................................51

III.   The judgment that the asserted claims of the '101 patent would not have been obvious should be reversed. ..........................................52

A.     The district court legally erred in applying the doctrine of inherent disclosure to material claim limitations. ...............................53

B.     The district court clearly erred in finding that the '515 application inherently disclosed Form B. ..........................................56

C.     Defendants' unrebutted evidence shows that the '101 patent would have been obvious as of March 27, 2008. ................................59

CONCLUSION. .................................................. 60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*,
  759 F.3d 1285 (Fed. Cir. 2014) .........................................................38

*In re Adamson*,
  275 F.2d 952 (C.C.P.A. 1960) ....................................................2, 40

*Alcon Research, Ltd. v. Apotex Inc.*,
  687 F.3d 1362 (Fed. Cir. 2012) .........................................................44

*Allergan, Inc. v. Sandoz Inc.*,
  726 F.3d 1286 (Fed. Cir. 2013) ...................................................24, 43

*Alza Corp. v. Mylan Labs., Inc.*,
  464 F.3d 1286 (Fed. Cir. 2006) .........................................................27

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
  314 F.3d 1313 (Fed. Cir. 2003) .............................................3, 23, 33

*In re Anthony*,
  414 F.2d 1383 (C.C.P.A. 1969) ........................................................40

*Asyst Techs., Inc. v. Emtrak, Inc.*,
  544 F.3d 1310 (Fed. Cir. 2008) .........................................................48

*Aventis Pharma Deutschland GmbH v. Lupin, Ltd.*,
  499 F.3d 1293 (Fed. Cir. 2007) ..................................................*passim*

*Bayer Pharma AG v. Watson Labs., Inc.*,
  874 F.3d 1316 (Fed. Cir. 2017) .............................................35, 43, 46

*Beckman Instruments Inc. v. LKB Produkter AB*,
  892 F.2d 1547 (Fed. Cir. 1989) .........................................................33

*Caraco Pharm. Labs., Ltd. v. Forest Labs., Ltd.*,
  527 F.3d 1278 (Fed. Cir. 2008) .........................................................12

*Caterpillar Tractor Co. v. Berco, S.p.A.*,
  714 F.2d 1110 (Fed. Cir. 1983) .........................................................37

# TABLE OF AUTHORITIES (continued)

**Page(s)**

*Constant v. Advanced Micro-Devices, Inc.*,
    848 F.2d 1560 (Fed. Cir. 1988) .......................................................... 30

*Eastman Kodak Co. v. Goodyear Tire, & Rubber Co.*,
    114 F.3d 1547 (Fed. Cir. 1997) .......................................................... 30

*Fiers v. Revel*,
    984 F.2d 1164 (Fed. Cir. 1993) .......................................................... 28

*Forest Labs., Inc. v. Ivax Pharms., Inc.*,
    501 F.3d 1263 (Fed. Cir. 2007) .......................................................... 36

*Galderma Labs., L.P. v. Tolmar, Inc.*,
    737 F.3d 731 (Fed. Cir. 2013) ..............................................25, 47, 51

*Gillette Co. v. Energizer Holdings, Inc.*,
    405 F.3d 1367 (Fed. Cir. 2005) .......................................................... 37

*Glaxo Inc. v. Novopharm Ltd.*,
    52 F.3d 1043 (Fed. Cir. 1995) ........................................................... 59

*In re GPAC, Inc.*,
    57 F.3d 1573 (Fed. Cir. 1995) ........................................................... 47

*Griffin v. Bertina*,
    285 F.3d 1029 (Fed. Cir. 2002) ...................................................53, 54

*In re Harris*,
    409 F.3d 1339 (Fed. Cir. 2005) .......................................................... 51

*Hitzeman v. Rutter*,
    243 F.3d 1345 (Fed. Cir. 2001) ...................................................*passim*

*Hoffmann-La Roche Inc. v. Apotex Inc.*,
    748 F.3d 1326 (Fed. Cir. 2014) ...................................................44, 51

*In re Huai-Hung Kao*,
    639 F.3d 1057 (Fed. Cir. 2011) ........................................25, 47, 49, 50

# TABLE OF AUTHORITIES (continued)

**Page(s)**

*Intelligent BioSys., Inc. v. Illumina Cambridge Ltd.*,
   821 F.3d 1359 (Fed. Cir. 2016) ..................................................33, 42

*Kao Corp. v. Unilever U.S., Inc.*,
   441 F.3d 963 (Fed. Cir. 2006) ...............................................................49

*KSR Int'l Co. v. Teleflex Inc.*,
   550 U.S. 398 (2007)........................................................................41, 50

*Lyons P'ship, L.P. v. Morris Costumes, Inc.*,
   243 F.3d 789 (4th Cir. 2001) ...........................................................27

*In re May*,
   574 F.2d 1082 (C.C.P.A. 1978) ........................................................40

*Merck & Cie v. Gnosis S.p.A.*,
   808 F.3d 829 (Fed. Cir. 2015) ........................................................48

*In re Merck & Co., Inc.*,
   800 F.2d 1091 (Fed. Cir. 1986) ........................................................51

*Merck & Co. v. Biocraft Labs., Inc.*,
   874 F.2d 804 (Fed. Cir. 1989) ........................................................45

*Merck & Co. v. Teva Pharms. USA, Inc.*,
   395 F.3d 1364 (Fed. Cir. 2005) ........................................................43

*Nalpropion Pharms., Inc. v. Actavis Labs. FL, Inc.*,
   934 F.3d 1344 (Fed. Cir. 2019) ........................................................42

*Nat. Alternatives Int'l, Inc. v. Iancu*,
   904 F.3d 1375 (Fed. Cir. 2018) ...........................................28, 55, 56

*Novartis Pharm. Corp. v. W.-Ward Pharms. Int'l Ltd.*,
   923 F.3d 1051 (Fed. Cir. 2019) ........................................................45

*Ormco Corp. v. Align Tech., Inc.*,
   463 F.3d 1299 (Fed. Cir. 2006) ........................................................50

## TABLE OF AUTHORITIES (continued)

**Page(s)**

*In re Paoli R.R. Yard PCB Litig.*,
  35 F.3d 717 (3d. Cir. 1994) ..................................................28

*Par Pharm., Inc. v. TWI Pharms., Inc.*,
  773 F.3d 1186 (Fed. Cir. 2014) ..........................................34

*Pfizer, Inc. v. Apotex, Inc.*,
  480 F.3d 1348 (Fed. Cir. 2007) ..........................3, 34, 35, 45

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*,
  491 F.3d 1342 (Fed. Cir. 2007) ....................3, 23, 31, 32

*PowerOasis, Inc. v. T-Mobile USA, Inc.*,
  522 F.3d 1299 (Fed. Cir. 2008) ..........................................56

*Rogers v. Office of Pers. Mgmt.*,
  87 F.3d 471 (Fed. Cir. 1996) ..............................................60

*Sanofi-Synthelabo v. Apotex, Inc.*,
  550 F.3d 1075 (Fed. Cir. 2008) ....................................36, 40

*Spectrum Pharms., Inc. v. Sandoz Inc.*,
  802 F.3d 1326 (Fed. Cir. 2015) ..........................................40

*Symbol Techs., Inc. v. Opticon, Inc.*,
  935 F.2d 1569 (Fed. Cir. 1991) ..........................................33

*Tanabe Seiyaku Co. v. ITC*,
  109 F.3d 726 (Fed. Cir. 1997) ............................................37

*Tech. Licensing Corp. v. Videotek, Inc.*,
  545 F.3d 1316 (Fed. Cir. 2008) ....................................52, 56

*Teva Pharms. USA, Inc. v. Corcept Therapeutics, Inc.*,
  18 F.4th 1377 (Fed. Cir. 2021) ..........................................27

*Tillotson, Ltd. v. Walbro Corp.*,
  831 F.2d 1033 (Fed. Cir. 1987) ..........................................38

# TABLE OF AUTHORITIES (continued)

**Page(s)**

*Trintec Indus., Inc. v. Top-U.S.A. Corp.*,
    295 F.3d 1292 (Fed. Cir. 2002) .......................................5, 26, 56

*Tronzo v. Biomet, Inc.*,
    156 F.3d 1154 (Fed. Cir. 1998) ...........................................56

*Trustees in Bankr. of N. Am. Rubber Thread Co. v. United States*,
    593 F.3d 1346 (Fed. Cir. 2010) ...........................................60

*UCB, Inc. v. Accord Healthcare, Inc.*,
    890 F.3d 1313 (Fed. Cir. 2018) ...........................................45

*Uniloc 2017 LLC v. Apple Inc.*,
    996 F.3d 1368 (Fed. Cir. 2021) ...........................................38

*United States v. Greenspan*,
    923 F.3d 138 (3rd Cir. 2019) .............................................27

*Yeda Rsch. & Dev. Co. v. Abbott GMBH & Co. KG*,
    837 F.3d 1341 (Fed. Cir. 2016) ...........................................54

**Statutes**

21 U.S.C. § 355(b)(1) ........................................................12

21 U.S.C. § 355(b)(1)(A)(viii) ...............................................12

21 U.S.C. § 355(c)(2).........................................................12

28 U.S.C. § 1295(a)(1)........................................................6

28 U.S.C. § 1338(a) ..........................................................5

35 U.S.C. § 102(b) ...........................................................33

35 U.S.C. § 103...........................................................23, 33

35 U.S.C. § 112...........................................................52, 54

35 U.S.C. § 120..............................................................28

# TABLE OF AUTHORITIES (continued)

**Page(s)**

**Other Authorities**

FED. R. EVID. 703 ..............................................................................*passim*

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| '101 patent | U.S. Patent No. 7,893,101 (Appx10529-10595) |
| '358 patent | U.S. Patent No. 6,020,358 (Appx16507-16519) |
| '515 application | U.S. Provisional Application No. 60/366,515 (Appx12703-12751) |
| '541 patent | U.S. Patent No. 10,092,541 (Appx10619-10640) |
| '638 patent | U.S. Patent No. 7,427,638 (Appx10504-19528) |
| Amgen | Plaintiff-Cross-Appellant Amgen Inc. |
| Celgene | Celgene Corporation, predecessor-in-interest to Amgen |
| Davies | Amgen's medicinal chemist, Stephen Davies, Ph.D., D.S. |
| Defendants | Defendants-Appellants Sandoz Inc. and Zydus Pharmaceuticals (USA) Inc. |
| EP '148 | European Patent No. 1 752 148 B1 (Appx14813-14829) |
| EPO | European Patent Office |
| FDA | U.S. Food and Drug Administration |
| Gribble | Defendants' medicinal chemist, Gordon W. Gribble, Ph.D. |
| Myerson | Amgen's polymorph expert, Allen S. Myerson, Ph.D. |
| PDE4 | phosphodiesterase enzyme 4 |
| POSA | person of ordinary skill in the art |
| Sacchetti | Zydus's polymorph expert, Mark Sacchetti, Ph.D. |
| Steed | Defendants' polymorph expert, Jonathan Steed, Ph.D. |
| WO '606 | International Patent Application Publication WO 01/34606 (Appx16398-16491) |
| XRPD | X-ray powder diffraction |

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 47.5, Defendants-Appellants state as follows:

(a)    No previous appeal has been taken in this action.

(b)    No other case pending in this or any other court or agency will

directly affect or be directly affected by this court's decision in the pending appeal.

# INTRODUCTION

This case involves three follow-on patents originally asserted by Celgene, and later assigned to Amgen, on a known psoriasis drug called apremilast. Celgene first disclosed apremilast in a now-expired patent—the '358 patent—that is prior art to all three patents-in-suit.  Until it expired in 2018, Celgene told FDA and potential generic competitors that the '358 patent covered apremilast. Although Celgene enjoyed the '358 patent's 20-year term, Celgene serially obtained the patents-in-suit, creating a patent estate that would extend to 2034 by claiming three obvious variations of apremilast's prior disclosure: (1) a purified composition, claimed in the '638 patent; (2) a crystalline form, claimed in the '101 patent; and (3) a dose-titration schedule, claimed in the '541 patent.  The district court correctly invalidated the '541 patent as obvious, but it upheld the '638 and '101 patents by applying incorrect legal standards that require reversal.

***The '638 patent*** claims apremilast compositions that are "stereomerically pure," which means they comprise apremilast and are substantially free of apremilast's mirror-image stereoisomer.  Appx64.  It is undisputed that a specific example in the prior-art '358 patent, Example 12, discloses a 50/50 "racemic mixture" of apremilast and its corresponding stereoisomer (which are also called "enantiomers").  Appx68.  Nor is there any dispute that "the '358 Patent claimed apremilast as an isomer within the scope of its inventions."  Appx68-69.  Other

1

prior art confirmed that the class of compounds including apremilast "preferably are administered as a substantially chirally pure isomer."  Appx16410 (12:20-21).

These and other undisputed facts established that the '638 patent's asserted claims would have been obvious.  Indeed, this Court and its predecessor have repeatedly held claims to purified stereoisomers unpatentable under analogous facts.  *See, e.g.*, *Aventis Pharma Deutschland GmbH v. Lupin, Ltd.*, 499 F.3d 1293, 1301 (Fed. Cir. 2007) (reversing judgment of nonobviousness and holding enantiomer "prima facie obvious over the [racemic] mixture even without an explicit teaching that the ingredient should be concentrated or purified"); *In re Adamson*, 275 F.2d 952, 954-55 (C.C.P.A. 1960) (where prior art "would suggest to one skilled in the art that the racemates . . . may be resolved into their [stereo]isomers," purified stereoisomer is "no more than the obvious").

In holding otherwise, the district court relied on Amgen's expert testimony that the '358 patent "does not disclose *how* the POSA could have isolated the [racemic mixture's] enantiomers without undue experimentation," which Amgen's expert deemed "unpredictable" based on his personal experience with unrelated racemic mixtures.  Appx73-74.  But relying on this testimony was legal error because the '638 patent expressly admits that "apremilast 'can be isolated from the racemic compound by techniques known in the art.'"  Appx75 n.17 (quoting Appx10513 (9:13-16)).  Such "[a]dmissions in the specification regarding the prior

2

art are binding on the patentee for purposes of a later inquiry into obviousness," even where a patentee introduces contrary expert testimony. *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1362 (Fed. Cir. 2007) (reversing judgment of nonobviousness).

Apart from this binding admission, it was legal error to discount the '358 patent for not teaching detailed procedures to purify apremilast "without undue experimentation" (Appx73) because enablement of a prior-art reference "is not a requirement" for obviousness, which requires only a reasonable expectation of success. *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1357 (Fed. Cir. 2003) (vacating judgment of nonobviousness where, "[i]n its obviousness inquiry, the district court disregarded [a prior art reference] because it concluded it was not enabled"); *see also Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007) (reversing judgment of nonobviousness—"only a reasonable expectation of success, not a guarantee, is needed").

As discussed below, the district court made additional legal errors in its analysis of motivation, alleged secondary considerations of nonobviousness, and evidentiary rulings excluding expert testimony concerning Celgene's admissions about the prior art. These legal errors provide multiple bases for reversing or at least vacating the district court's judgment as to the '638 patent. *Infra* at 39-52.

3

*The '101 patent* claims a particular crystalline form of apremilast called "Form B." Appx115. At trial, Amgen did not dispute that Form B would have been obvious as of "March 27, 2008, the undisputed date on which the '101 Patent was filed." Appx122. Amgen's only response to obviousness was that the '101 patent is entitled to claim priority to an earlier provisional application filed by Celgene in March 2002. *Id.* It is undisputed that this earlier-filed application "does not, however, explicitly describe the final resulting form of apremilast as a crystalline structure," let alone the claimed Form B. Appx123-124.

To get around this problem, Amgen relied on "inherent disclosure," one of "'the rare exceptions to the rule that a party must show possession of 'every feature' recited'" in the claims to establish a pre-filing priority date. Appx123 (quoting *Hitzeman v. Rutter*, 243 F.3d 1345, 1354-55 (Fed. Cir. 2001)). As a matter of law, however, an "allegedly inherent limitation cannot be material to the patentability of the invention." *Hitzeman*, 243 F.3d at 1355. Here, there is no question that Form B was material to patentability—Celgene relied on Form B and its associated physical properties to overcome prior-art rejections during prosecution of the '101 patent. Appx11383-11384. Yet the district court failed to consider materiality, which is legally fatal to Amgen's theory of inherent disclosure. *See Hitzeman*, 243 F.3d at 1355 (denying priority claim where patentee

4

had "attempted to traverse a prior art rejection in light of" allegedly inherent

limitations, which were "central to the patentability of the invention").

Even apart from the legal bar to inherent disclosure, the district court clearly

erred by finding that Celgene's provisional application inherently disclosed Form

B:  Celgene itself admitted that the application's recited procedure can also result

in other forms of apremilast that are unclaimed.  *E.g.*, Appx14721-14722,

Appx10574 (18:40-45).  This too is fatal to Amgen's inherency claim, which

"requires that the missing descriptive material is necessarily present, not merely

probably or possibly present."  *Trintec Indus., Inc. v. Top-U.S.A. Corp.*, 295 F.3d

1292, 1295 (Fed. Cir. 2002) (internal citations omitted).

Because the March 2002 provisional application does not disclose

(inherently or otherwise) the claimed Form B of apremilast, the '101 patent's

priority date is its March 2008 filing date.  And because Amgen did not dispute

obviousness as of that date, this Court can and should reverse the district court's

judgment; any remand would be futile.  At a minimum, the Court should vacate the

judgment and remand with instructions for the district court to consider the

(unrebutted) obviousness case against the '101 patent.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1338(a) because this

case arises an Act of Congress related to patents.  The district court entered final

judgment as to Zydus on September 28, 2021, and as to Sandoz on October 12,

2021.  Appx1-14.  Zydus and Sandoz filed their respective notices of appeal within

thirty days, on October 27, 2021, and November 9, 2021.  Appx9472-9474,

Appx9479-9480.  Amgen filed its notices of cross-appeal on October 28, 2021, and

November 10, 2021.  Appx9475-9478, Appx9481-9484.  This Court has

jurisdiction based on 28 U.S.C. § 1295(a)(1).

## STATEMENT OF ISSUES

1.    Did the district court commit reversible error in holding that the

asserted claims of the '638 patent would not have been obvious, where it was

undisputed that the prior art discloses the racemic mixture containing apremilast

and a method to purify it, and the '638 patent specification admits that apremilast

could be purified from the mixture using techniques known in the art?

2.    Did the district court commit reversible error in holding that the

asserted claims of the '101 patent would not have been obvious, where Amgen was

not entitled to claim priority to a provisional application dated March 2002 to

antedate the prior art, and Amgen did not attempt to rebut defendants' obviousness

defense as of the '101 patent's effective filing date of March 27, 2008?

## STATEMENT OF THE CASE

This appeal stems from Amgen's efforts to block Zydus and Sandoz from

marketing a generic version of Otezla®, which treats psoriasis and related

6

conditions. Both Otezla® and the asserted patents were previously owned by Celgene, which was the original plaintiff in this case before assigning its rights to Amgen. Appx218-219. At trial, Amgen asserted five patents. Appx47. Two are at issue in this appeal—the '638 patent and the '101 patent—and a third—the '541 patent—is at issue in Amgen's cross appeal.

The active ingredient in Otezla® is apremilast. *Id.* The asserted patents allegedly cover oral pharmaceutical compositions of stereomerically pure apremilast (the '638 patent), polymorphic forms of stereomerically pure apremilast (the '101 patent), and dose titration schedules for administration of stereomerically pure apremilast for the treatment of psoriasis (the '541 patent). Appx47. Defendants appeal the district court's judgment that the '638 patent is not invalid as obvious, and defendant Sandoz appeals the district court's judgment that the '101 patent is not invalid as obvious. Appx3, Appx10.

## A.    The '638 Patent

Asserted claim 3 of the '638 patent is directed to oral pharmaceutical compositions comprising stereomerically pure apremilast and a pharmaceutically acceptable carrier and claim 6 is directed to those pharmaceutical compositions comprising 10 mg to 200 mg of stereomerically pure apremilast. Appx63-64. "A stereoisomer is an isomer in which the same atoms are bonded to the same other atoms, but where the configuration of those atoms in three dimensions differs."

*Aventis*, 499 F.3d at 1295. "Enantiomers are stereoisomers that are mirror images of each other, like left and right hands." *Id*. A racemic mixture or "racemate" is a 50:50 mixture of two enantiomers. Appx52, n.7. Apremilast and its corresponding racemic mixture are phosphodiesterase type 4 ("PDE4") inhibitors, which can be used to treat plaque psoriasis. Appx50, Appx68.

While Amgen asserted in the district court an additional patent related to the '638 patent—U.S. Patent No. 8,455,536—which claims a method of using apremilast to treat psoriasis and other related conditions, there is no recitation in the asserted claims of the '638 patent that the claimed compositions possess any improved pharmacological characteristics, such as potency, safety, or drug-like properties. Appx5976-5977 (1298:22-1299:4) (Davies). At trial, however, Amgen defended the asserted claims by arguing that apremilast possesses unexpected pharmacological characteristics when compared not to the closest prior art (the racemic mixture), but to different, structurally dissimilar PDE4 inhibitors. Appx81.

**1.    The prior art disclosed apremilast and its purification**

In 1998, Celgene filed the first United States patent application covering apremilast, which issued as the '358 patent. Appx16507. The district court found that the '358 patent disclosed seventeen exemplary racemic mixtures, including Example 12, half of which is apremilast. Appx68, Appx16514-16517 (11:5-16:39, 16:62-17:43 (Examples 3-17 and 19-20)). The district court also found that the

8

'358 patent discloses that all of the isomers (i.e., enantiomers) of the racemic mixtures, including apremilast, are part of the invention (compounds described by general Formula I) and that the isomers can be obtained in a form having an optical purity of greater than 95% using chromatography with a chiral absorbant.  Appx92 (quoting Appx16512-16513 (8:63-9:12)).  The district court further found that the '358 patent discloses that the compounds described by general Formula I are useful in the inhibition of PDE4 and can be used in oral dosage forms, including tablets, in the range of 1 to 100 mg.  Appx69 (quoting Appx16513 (9:22-24)), Appx102 (quoting Appx16512 (7:1-3)).

In 2000, Celgene filed another patent application, published as WO 01/34606 ("WO '606"), which the district court found discloses the same family of compounds as general Formula I of the '358 patent and which includes the racemic mixture containing apremilast.  Appx69-70, Appx16398.  In WO '606, Celgene disclosed that the isomers of these compounds are "preferably" administered as substantially chirally pure isomers.  Appx16408-16410 (10:2-12:22).

The district court found that Takeuchi, a prior-art reference published in 1999, teaches how to separate enantiomers of a racemic mixture with similar structures and properties to apremilast with 99% purity.  Appx71, Appx16504-16506.  Defendants' expert, Dr. Gordon Gribble, also testified that a POSA would understand that one enantiomer of the racemic mixture disclosed in Takeuchi was

9

more biologically active than the other.  Appx5171-5172 (610:5-15, 610:22-611:4).

**2.    Purification of stereoisomers by chiral chromatography was a routine and well-known technique to produce stereomerically pure apremilast**

Gribble testified at length as to the well-known and historical use of chiral chromatography, a routine technique identified in the '358 patent as a method to isolate the isomers of the compounds of Formula I and one which he teaches to college sophomores.  Appx5143-5145 (582:18-584:12).  He testified that a specific example of the technique can be found in Takeuchi, which teaches separation of enantiomers with structural commonalities to apremilast using chiral chromatography with a commercially available column and solvent, ethanol.  Appx5170-5172 (609:16-611:4) ("it's a very nice example of how you can separate two enantiomers that are related to apremilast" and "[i]t teaches separation to obtain greater than 99 percent purity").  Gribble further testified that based on the disclosure in the '358 patent and teachings of Takeuchi, a POSA would have had a reasonable expectation that using chiral chromatography would successfully separate apremilast from the racemic mixture disclosed in Example 12 of the '358 patent to at least 99% stereomeric purity.  Appx5172 (611:9-19).

Amgen's medicinal chemistry expert, Dr. Stephen Davies, did not point to any prior art suggesting that stereomerically purified apremilast could not be

10

produced by chiral chromatography or that commercially available materials could

not be used to separate apremilast from Example 12 as of 2001.  Appx6109-6110

(1431:22-1432:16).  Instead, he pointed to unspecified, anecdotal examples from

his own professional experience where his laboratory encountered difficulties

separating enantiomers of structurally different racemic mixtures, none of which

are related to apremilast or any of the class of compounds addressed in the '358

and '638 patents.  Appx6027-6028 (1349:14-1350:5).

### 3.    Celgene's admissions regarding the scope of the prior art

In determining that the '638 patent is not invalid for obviousness, the district

court did not account for statements in the '638 patent disclosing that the

enantiomers of the racemic mixture of Example 12, one of which is apremilast, can

be separated using known techniques.  Appx10513 (9:8-24).  The district court also

excluded evidence and testimony concerning Celgene's statements to the EPO

regarding prior-art disclosure of stereomerically pure apremilast by finding the

statements to be hearsay that was not adopted by Amgen nor of the kind usually

relied upon by a professor in academic research.  Appx34-37.

a.    **Celgene listed the '358 patent in the Orange Book for Otezla®**

Celgene listed the prior-art '358 patent in the FDA's Orange Book for its Otezla® drug product.[1]  Appx6157-6158 (1479:16-1480:14) (Davies), Appx17669. By doing so, Celgene represented to the public that the '358 patent covers Otezla®, which is a tablet containing stereomerically pure apremilast, and obtained the benefits that flow from an Orange-Book listing—namely, notice to potential generic drugmakers that a patent could be asserted against them and potentially an automatic 30-month stay of FDA approval.  *See* 21 U.S.C. § 355(b)(1)(A)(viii).

b.    **Celgene admitted in the '638 patent specification that apremilast could be isolated by known techniques.**

The '638 patent expressly discloses that "Compound A [apremilast] can be isolated from the racemic compound by techniques known in the art." Appx10513 (9:13-14).  But it does not stop there. The '638 patent goes on to identify specific prior-art methods by which apremilast could be isolated from its racemic mixture. Appx10513 (9:14-24).

---

[1] When applying to FDA for approval of a new drug, a company must inform FDA of all patents covering its drug or the methods of using the drug.  21 U.S.C. § 355(b)(1), (c)(2).  "The FDA lists all such patents in a publication titled the 'Approved Drug Products With Therapeutic Equivalence Evaluations.'  This publication is commonly known as the 'Orange Book.'"  *Caraco Pharm. Labs., Ltd. v. Forest Labs., Ltd.*, 527 F.3d 1278, 1282 (Fed. Cir. 2008).

In determining that the asserted claims of the '638 patent would not have been obvious, the district court found that a POSA would not have had a reasonable expectation of success in isolating apremilast based on the disclosures in the '358 patent and would have had to engage in undue experimentation. Appx74-76, Appx93-95. The district court did not consider whether Amgen was bound by inventor admissions, on the face of the '638 patent, of what was disclosed in the prior art.

### c.    Celgene's admissions about the scope of the '358 patent

Celgene filed foreign patent applications based on the same disclosure that supported the application for the '358 patent. Appx5161 (600:4-10) (Gribble), Appx14818 (5:16-24), Appx14822 (9:6-18), Appx16512-16513 (8:63-9:12), Appx16515 (14:34-55). One of these applications issued as the EP '148 patent in Europe with claims reciting stereomerically pure apremilast. Appx14825 (12:41-44), Appx5161 (600:4-10) (Gribble). The prosecution history for EP '148 includes correspondence between Celgene and the EPO, in which Celgene argued that the application's disclosure—the same disclosure as in the '358 patent—supports claims reciting stereomerically pure apremilast. Appx16261-16279. The district court excluded this correspondence as hearsay that was not adopted by Amgen upon acquiring Otezla® and the associated patent portfolio from Celgene. Appx35.

13

Gribble, however, testified about the scientific significance of the disclosures in the European patent application and Celgene's statements regarding the same. Appx5161-5162 (600:13-601:8). Gribble did not provide an opinion on the legal basis or legal significance of Celgene's statements. Instead, he described Celgene's statements as corroborating his opinion that the '358 patent teaches stereomerically pure apremilast. *Id.* The district court excluded this testimony under FRE 703 based on cross-examination testimony that Gribble does not, in his academic work as a professor, typically consult patent lawyer statements in European Office Actions when carrying out his day-to-day research and teaching. Appx35-36, Appx5207 (646:13-16). Gribble did not testify, however, about whether he has ever relied on prosecution histories and inventor admissions when providing opinions in his role as a technical expert in patent litigation.

## B.    The '101 Patent

Apremilast can exist as either a crystalline or amorphous solid. Appx5707-5708 (1072:23-1073:4) (Steed). While the molecules of amorphous solids are bonded irregularly and randomly, crystalline solids have regular, repeating arrangements of their molecules. Appx5708 (1073:10-17) (Steed). Moreover, a crystalline solid substance with a single chemical composition can have its component molecules arranged in different ways. Appx4963 (426:24-427:23) (Myerson), Appx5709 (1074:2-11) (Steed). The capacity of a substance to take

14

multiple crystalline solid forms is known as polymorphism and the individual crystalline forms as polymorphs. *Id.*

Celgene filed the application that issued as the '101 patent on March 27, 2008, as a continuation-in-part application of earlier-filed related applications, including U.S. Provisional Application No. 60/366,515 ("the '515 application"), filed on March 20, 2002. Appx10530, Appx5715-5718 (1080:22-1081:12) (Steed), Appx6286 (1573:12-17) (Myerson). The '101 patent generally relates to solid forms of apremilast and compositions thereof, and specifically claims the apremilast polymorph known as apremilast crystalline Form B. Appx5704 (1069:5-8) (Steed); Appx10595.

Amgen asserted Claims 1 and 15. Appx115. At trial, Zydus was found not to infringe the '101 patent. Appx48. Sandoz did not contest infringement. *Id.* On appeal, Sandoz contends that the district court erred in finding the '101 patent nonobvious based on a March 20, 2002, priority date.

> **1.    Celgene added substantial information to the specification to obtain claims to Form B that was not in the provisional '515 application.**

Celgene obtained the '101 patent with its specific claims to Form B only after adding substantial information that was not in the provisional specification that it originally filed in March 2002. Appx5725 (1090:8-14) (Steed), Appx6286 (1573:18-23) (Myerson). The original specification described only the preparation

and methods of using enantiomerically pure apremilast, without reference to the physical form of apremilast.  Appx12705 (1:5-8), Appx12707 (3:31-32), Appx5718 (1083:11-15) (Steed).  It was not until March 27, 2008, that Celgene added several columns of new information and data to the specification of the application that issued as the '101 patent describing the preparation, identification, and characterization of one amorphous solid form of apremilast and seven crystalline forms (A-G), including crystalline Form B.  *Compare* Appx10530, Appx10533-10560, Appx10570-10572 (10:39-13:5), Appx10574-10579 (17:10-27:48), Appx10590-10594 (50:49-57:40) *with* Appx12705 (1:5-8), Appx12709-12712 (5:13-8:18), Appx12712-12714 (8:20-10:15), Appx12744-12745; *see also* Appx5716-5717 (1081:16-1082:24), Appx5719-5720 (1084:1-1085:11), Appx5721-5722 (1086:19-1087:14), Appx5723-5725(1088:11-1090:7) (Steed). Celgene cited this newly added information as support when it first added claims directed to Form B, which eventually issued as claims 1-15 of the '101 patent, without citing any disclosure in the original '515 application.  Appx11328-11330; *compare* Appx11079-11081 (newly added paragraphs ¶¶ [0121]-[0127]) *with* Appx10575-10576 (19:60-21:22).

During prosecution, Celgene relied on Form B and its associated x-ray powder diffraction ("XRPD") peaks to distinguish the claims of the '101 patent from the prior art.  XRPD is a method of identifying and characterizing crystalline

solid forms using x-rays to map how molecules are arranged in a crystal structure. Appx4966 (429:6-25) (Myerson), Appx5759-5760 (1124:21-1125:2) (Steed). The XRPD peaks of each crystalline form of a substance are unique. Appx5760 (1125:3-5) (Steed). Initially, the Examiner rejected the claims as anticipated by and obvious over the prior-art '358 patent. Appx11343-11347. In response, Celgene distinguished the alleged invention of the '101 patent by arguing that the '358 patent "does not disclose the enantiomerically pure crystal form of the compound of formula (I) [apremilast Form B] as recited in claim 47 [issued claim 1]" and that the '358 patent "is also silent as to the XRPD data recited in the claim." Appx11383-11384; *see also* Appx11387-11388. The Examiner accepted Celgene's arguments and noted in the Reasons for Allowance that the prior-art '358 patent did not disclose the XRPD data of the compound claimed in the '101 patent. Appx11441-11442.

### 2. The '515 application does not expressly disclose Form B.

Despite the substantial information Celgene added to the specification in March 2008 and later relied on to obtain claims to Form B, Amgen argued at trial that claims 1 and 15 of the '101 patent are entitled to a March 2002 priority date based on the filing date of the '515 application. It is undisputed, however, that the '515 application does not explicitly describe Form B. Appx123-124, Appx5728-5729 (1093:12-1094:1), Appx5745 (1110:1-12) (Steed), Appx6336-6337

17

(1623:24-1624:22) (Myerson).  Instead, Amgen argued that Example 2 of the '515

application (Appx12730-12732) inherently discloses Form B because, allegedly,

practicing Example 2 necessarily results in Form B rather than any of the other

solid forms of apremilast identified in the '101 patent (i.e., crystalline forms A or

C-G or the amorphous form).  Appx10591, Appx6289 (1576:8-9) (Myerson).

Example 2 discloses a four-step procedure for preparing apremilast but does

not describe the form of apremilast that results from the procedure beyond

identifying it as a "solid."  Appx123-124; Appx12730-12732, Appx5730-5732

(1095:4-1097:11), Appx6289-6290 (1576:4-7, 1576:15-1577:1).  The final step in

Example 2 is a recrystallization step that involves dissolving the residue formed in

the preceding step in a solvent solution and then precipitating more pure apremilast

from the solution.  Appx12731, Appx5732-5734 (1097:8-1099:5) (Steed).

Although it discloses a solvent ratio of 2:1 ethanol to acetone, Example 2 leaves

out any further details about how to perform this recrystallization step.

Appx12731, Appx5734 (1099:6-15), Appx5735-5736 (1100:23-1101:14) (Steed),

Appx6332 (1619:6-14) (Myerson).

Considering this ambiguous disclosure, a POSA practicing Example 2 could

vary several experimental parameters in the recrystallization step such as the order

in which solvents are added, the temperature the solution is heated to, the

temperature the solution is cooled to, the rate of cooling, or whether filtration is

used.  Appx5735-5736 (1100:23-1101:14) (Steed), Appx6332 (1619:6-14)

(Myerson).  The experts agreed that variations in these unstated parameters can

affect the form of apremilast that is produced.  Appx5740 (1105:11-23) (Steed),

Appx6310 (1597:3-10) (Myerson).

### 3.    Celgene represented that Example 2 results in apremilast forms other than crystalline Form B.

Contrary to Amgen's litigation assertion that practicing Example 2 of the

'515 patent necessarily results in Form B, Celgene previously admitted that

practicing Example 2 can result in other forms of apremilast identified in the '101

patent, including Form A and Form C.

First, Celgene represented to the EPO that Example 2 leads to Form C.

Appx14721-Appx14722, Appx5741 (1106:6-14), Appx5742-5744 (1107:4-1109:8)

(Steed); Appx6333 (1620:1-6) (Myerson).  When defending the claims of a

European counterpart against invalidity, Celgene submitted data from experiments

it maintained replicated Example 2's recrystallization step in three different ways,

all of which led to Form C.  *Id*.  Amgen disavowed these representations, which

the patentee made to defend the claims from validity challenges, to assert

infringement.  Rather than accept the patentee's own statements about the results

of an experimental procedure it designed, the district court credited Amgen's

expert, Dr. Myerson's, post hoc explanation that Celgene "just made a mistake" in

19

its representations to the EPO because Form C involves the use of toluene solvate and toluene is not mentioned in Example 2.  Appx125-126.

Second, the '101 patent itself explains that Form A "can be obtained from various solvents including but not limited to solvent systems comprising acetone, ethanol, and mixtures thereof," "using a fast cooling crystallization process." Appx10574 (18:40-45), Appx5720-5721 (1085:18-1086:17) (Steed).  The method described in the '101 patent for preparing Form A falls within the general procedure described in Example 2 of the '515 application.  Appx5740 (1105:11-23) (Steed), *see also* Appx6328 (1615:2-16) (Myerson).  The district court did not address the express disclosure of the '101 patent and instead credited Amgen's expert's testimony that a 2:1 ratio of ethanol to acetone always results in Form B. Appx126.

Despite Celgene's representations, the district court accepted Amgen's argument that Example 2 always results in Form B based on data from thirteen experiments purportedly replicating Example 2 that were submitted to the EPO by generic pharmaceutical companies.  Appx127-128.  Amgen did not present evidence that these experiments covered a representative sample, let alone all, of the possible variations of Example 2's recrystallization step.  *See e.g.*, Appx6290-6291 (1577:25-1578:6), Appx6292 (1579:2-22), Appx6293-6296 (1580:15-1583:21), Appx6335-6336 (1622:21-1623:14), Appx6337-6338 (1624:23-1625:2)

(Myerson).  Nevertheless, the district court found that the asserted claims were

entitled to a March 2002 priority date because Example 2 of the '515 patent

inherently disclosed Form B and, because defendants' obviousness case relied on

art published after that date, found the asserted claims valid.  Appx128-129.

### 4. Amgen did not rebut defendants' evidence that the asserted claims of the '101 patent were obvious as of March 2008.

Defendants' expert offered uncontroverted evidence that the asserted claims

of the '101 patent would have been obvious in view of several references—U.S.

Patent Application No. 2003/0187052 A1, Brittain 1997, the ICH Guidelines,

Guillory, and Brittain 1999, each of which is prior art as of March 2008—and the

knowledge of a POSA.  Appx5746 (1111:10-16), Appx5747-5763 (1112:4-

1128:15) (Steed), Appx16520-Appx16541, Appx16253-16259, Appx16347,

Appx16363, Appx16295, Appx16302, Appx17988-Appx17992.  Amgen offered

no evidence to rebut defendants showing that claims 1 and 15 of the '101 patent

were obvious over the prior art as of March 2008 and no evidence of any objective

indicia of nonobviousness. Appx5746 (1111:20-1112:1) (Steed), Appx6326

(1613:7-17) (Myerson), Appx4067-4068.  Amgen's only response to defendants'

obviousness defense was the alleged March 2002 priority date.

### C.    The litigation

#### 1.    Procedural history

Defendants filed paragraph IV certifications as part of their abbreviated new drug applications seeking FDA approval for generic apremilast tablets. Celgene, the original plaintiff, initiated this litigation by July 2018, asserting infringement of multiple patents, including the '638 and '101 patents. Appx14825 (12:41-44), Appx5161 (600:4-10) (Gribble). After the '541 patent issued, Celgene amended its complaint to also assert infringement of the '541 patent. Appx562-563, Appx10119-10120.

In February 2020, Amgen substituted as the plaintiff after acquiring the rights to the Otezla® NDA and the associated patent portfolio. Appx1324-1326.

#### 2.    Evidentiary disputes

Amgen filed a motion in limine to preclude Gribble from providing purported "legal opinions" regarding Celgene's statements in the prosecution history of EP '148. Appx1622-1677. In a memorandum opinion, the district court denied this motion in limine without prejudice. Appx19-21.

At trial, Amgen renewed the motion in limine and filed a bench brief expanding its request to include Celgene's correspondence in the prosecution history of EP '148. Appx3404-3413, Appx3421-3445, Appx5119-5120 (558:17-559:23). The district court excluded the documentary evidence as hearsay and excluded Gribble's testimony under FRE 703. Appx19-21.

22

### 3.    Opinion

The district court issued a written opinion finding the '638 patent not invalid as obvious or anticipated, the '101 patent not invalid as obvious or anticipated, and the '541 patent invalid as obvious, as well as the '101 patent not infringed by Zydus.  Appx46-136.  After the court entered final judgment, all parties filed notices of appeal that have been consolidated into this single proceeding.  Appx9472-9484.

## SUMMARY OF ARGUMENT

The district court's judgment of nonobviousness as to the '638 and '101 patents should be reversed, or at least vacated, for multiple reasons.

*The '638 patent.*  First, the district court legally erred in holding that a POSA would not have had a reasonable expectation of success in purifying apremilast.  The district court's holding contradicts the '638 patent's admission that "[c]ompound A [apremilast] can be isolated from the racemic compound by techniques known in the art" (Appx10513 (9:13-14)), which is "binding on the patentee for purposes of a later inquiry into obviousness." *PharmaStem*, 491 F.3d at 1362.  Independently, the district court legally erred in holding that the '358 patent would not have enabled a POSA to purify apremilast "without undue experimentation" (Appx73), which "is not a requirement to prove invalidity under § 103." *Amgen*, 314 F.3d at 1357.  Moreover, the district court legally erred by

23

excluding Celgene's admission that the European counterpart to the '358 patent, which has an identical specification as the '358 patent, discloses stereomerically pure apremilast, which further confirms a reasonable expectation of success.

Second, the district court legally erred in failing to find a motivation to purify apremilast from the known racemic mixture. Despite Example 12's known therapeutic utility, the district court required motivation to be based on "biological data" related to Example 12's "PDE4 potency, safety, tolerability, selectivity, or drug-like properties." Appx72. Yet the claims of the '638 patent do not recite such properties, which are prerequisites for FDA approval, not a POSA's motivation. *See Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1292 (Fed. Cir. 2013) ("There is no requirement in patent law that the person of ordinary skill be motivated to develop the claimed invention based on a rationale that forms the basis for FDA approval."). Compounding its error, the district court accepted Davies's testimony that a POSA would not have been motivated to "go off and make [the] 17 racemates" disclosed in the '358 patent's examples and separate them all, which would take "a huge amount of time and effort." Appx73. But that was not the relevant question. As the district court acknowledged, a lead compound analysis is not required in this case (Appx65 n.16), so the only question was whether it would have been obvious to separate the racemic mixture in Example 12 itself—not all the other examples in the '358 patent.

Third, the district court legally erred in its analysis of secondary considerations. Throughout its analysis, the district court credited alleged secondary considerations comparing apremilast to unrelated PDE4 inhibitors instead of the closest prior art—the known racemic mixture of Example 12. Appx81. In doing so, the district court ignored that objective evidence must have "a nexus to some aspect of the claim not already in the prior art." *In re Huai-Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011). The only time the district court compared apremilast to Example 12 was in its analysis of unexpected results. Appx80. Even there, however, the district court erred by crediting a difference in the degree of potency between the two compounds—not a probative difference in kind. *See Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 739 (Fed. Cir. 2013) ("Unexpected results that are probative of nonobviousness are those that are different in kind and not merely in degree from the results of the prior art.").

**The '101 patent.** First, the district court legally erred in holding that Amgen was entitled to claim priority to the provisional '515 application filed in March 2002 under a theory of inherent disclosure. Appx123-127. Legally, inherent disclosure cannot apply to a limitation that is "material to the patentability of the invention." *Hitzeman*, 243 F.3d at 1355. Here, Form B and its associated XRPD peaks are unquestionably material because Celgene relied on them to distinguish prior art during prosecution. *Supra* at 16-17. That is fatal to Amgen's priority

25

claim because the '515 application "does not [ ] explicitly describe the final resulting form of apremilast as a crystalline structure."  Appx123-124.

Second, at a minimum, the district court clearly erred in finding inherency, which "requires that the missing descriptive material is necessarily present." *Trintec*, 295 F.3d at 1295.  Amgen only showed that thirteen particular experiments, carried out by third parties, that varied certain parameters of Example 2 in the '515 application produced Form B, not that Form B is *necessarily* produced.  On the contrary, Celgene repeatedly told the EPO that practicing Example 2 results in Form C—not Form B—and the '101 patent itself shows that the same procedures can result in form A.  *Supra* at 19-20.  Because practicing the '515 application can result in other crystalline forms of apremilast, it does not inherently disclose Form B.

Third, the district court's errors require reversal because Amgen's only response to obviousness was its priority claim to the '515 application, which is legally and factually flawed.  Any remand would be futile because Amgen did not present any evidence disputing that the '101 patent would have been obvious as of its filing date in March 2008.  At a minimum, the Court should vacate the district court's judgment, which is based solely on an incorrect priority date.

# ARGUMENT

## I.    Standards of review

"Obviousness is a question of law, reviewed *de novo*, based upon underlying factual questions which are reviewed for clear error following a bench trial." *Aventis,* 499 F.3d at 1300 (quoting *Alza Corp. v. Mylan Labs., Inc.*, 464 F.3d 1286, 1289 (Fed. Cir. 2006)).   The presence or absence of a motivation to arrive at the claimed invention, and of a reasonable expectation of success in doing so, are questions of fact.   *Alza Corp.*, 464 F.3d at 1289.   Whether the district court "applied the correct standard" in assessing these issues, however, "is a question of law that [this Court] review[s] de novo."   *Teva Pharms. USA, Inc. v. Corcept Therapeutics, Inc.*, 18 F.4th 1377, 1381 (Fed. Cir. 2021).

A district court's "hearsay ruling [that] rests on a question of law" is reviewed de novo.   *United States v. Greenspan*, 923 F.3d 138, 148 (3rd Cir. 2019); *see also Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 804 (4th Cir. 2001) (reversing district court's finding that evidence was hearsay as legal error). Similarly, when considering exclusion of expert testimony concerning hearsay deemed unreliable under FRE 703, a district court's ruling on admissibility of evidence is reviewed for abuse of discretion, "but to the extent the district court's ruling turns on an interpretation of a Federal Rule of Evidence[,] [the Court's]

review is plenary." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 749 (3d. Cir. 1994) (quotation omitted).

"Entitlement to priority under §120 is a legal determination based on underlying fact findings.  When the underlying facts are undisputed, priority date determination is purely a legal question." *Nat. Alternatives Int'l, Inc. v. Iancu*, 904 F.3d 1375, 1379 (Fed. Cir. 2018) (internal citations omitted).  Where there are no disputed facts relevant to a priority determination, this Court reviews the district court's legal determinations de novo. *See id.*  To the extent relevant, compliance with the written description requirement is a question of fact, which this Court review for clear error.  *Fiers v. Revel*, 984 F.2d 1164, 1170 (Fed. Cir. 1993).

## II.    The judgment that the asserted claims of the '638 patent would not have been obvious should be reversed.

Under the district court's own findings, Celgene's '358 patent taught all that was necessary for a POSA to obtain stereomerically pure apremilast:  disclosure of the racemic mixture containing apremilast in Example 12 and identification of a known technique for its stereomeric purification, chiral chromatography, which the '638 patent admits was "known in the art."  Appx75, n.17.  *See Aventis*, 499 F.3d at 1302 ("If it is known how to perform such an isolation, doing so is likely the product not of innovation but of ordinary skill and common sense.") (quotation omitted).  The experts agreed a POSA would have recognized apremilast as one of two enantiomers of '358 patent Example 12 and that the '358 patent teaches that

28

the disclosed racemic mixtures can be separated to greater than 95% optical purity by chiral chromatography. Appx5152(591:20-23), Appx5155-5156 (594:8-595:13) (Gribble), Appx6059 (1381:22-25), Appx6078-6079 (1400:15-1401:17), Appx6082-6083 (1404:24-1405:18), Appx6068 (1408:5-25), Appx6088-6089 (1410:13-1411:24) (Davies). Nevertheless, the district court found non-obviousness by erroneously applying the legal principles governing (1) reasonable expectation of success; (2) motivation to combine; and (3) secondary considerations. As discussed below, each of these errors warrants reversing or, at a minimum, vacating the district court's judgment.

A.    **The district court applied the wrong legal standards in analyzing reasonable expectation of success.**

The district court failed to properly assess under controlling legal standards whether a POSA would have reasonably expected to succeed in purifying apremilast from Example 12. First, the district court legally erred by disregarding the admission in the '638 patent specification that apremilast could be purified from Example 12 by routine techniques known in the art. Second, the district court legally erred by applying too stringent a standard for reasonable expectation of success, essentially requiring defendants to prove that the '358 patent provided absolute predictability for isolating apremilast from Example 12, when all that is required is a reasonable expectation of success. Finally, the district court legally erred by excluding Gribble's testimony regarding an admission by Celgene in

29

prosecution of a European patent application that was the counterpart to the '358 patent.

### 1. The district court erroneously failed to credit the '638 patent's admission that apremilast could be isolated by techniques known in the art.

The district court failed to hold Amgen to the inventors' admission in the '638 patent specification that "Compound A [apremilast] can be isolated from the racemic compound *by techniques known in the art*." Appx10513 (9:13-14) (emphasis added). This admission is dispositive on the issue of reasonable expectation of success. This Court has long held that "[a] statement in a patent that something the prior art is binding on the applicant and patentee for determinations of anticipation and obviousness." *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1570 (Fed. Cir. 1988). Under this precedent, the district court was required to accept the sworn statement of the inventors that separating and purifying apremilast from its racemic compound would have been routine.[2] Instead, the district court erroneously credited Amgen's expert's testimony that separating enantiomers requires extensive experimentation. Appx74-76.

---

[2] Amgen cannot escape Celgene's admissions simply because it is an assignee of the '638 patent. Celgene's statements and actions before the patent office are binding admissions upon an assignee. *E.g.*, *Eastman Kodak Co. v. Goodyear Tire, & Rubber Co.*, 114 F.3d 1547, 1559 (Fed. Cir. 1997).

To be sure, such factual determinations are normally for the district court. But where, as here, the inventors have expressly defined the scope of the prior art, their statements are legally binding.  *See*, *e.g.*, *PharmaStem*, 491 F.3d at 1360-62 (district court erred in holding expert evidence supported finding of no reasonable expectation of success where expert testimony was contrary to statements regarding the scope of the prior art in the patent's specification).

*PharmaStem* is on point.  There, this Court held that the district court erred in crediting expert testimony that a POSA would not have a reasonable expectation of success in practicing the claimed invention because the "presence of stem cells in cord blood" was unknown.  *Id.* at 1361-62.  This Court found the expert testimony irreconcilable with the binding statement in the specification that "stem cells have been demonstrated in human umbilical cord blood."  *Id.*  Because of this admission, the Court held that the specification's disclosure established a reasonable expectation of success and no reasonable factfinder could have found the invention nonobvious.  *Id.* at 1362-63.

This case is no different.  Davies's claim that extensive experimentation and luck would be required to isolate apremilast cannot be squared with the specification's binding admission that apremilast "can be isolated from the racemic compound by techniques known in the art."  *E.g.*, Appx6028 (1350:6-13), Appx10513 (9:13-14).  Moreover, holding Amgen to the inventors' admission

31

would not be unfair to Amgen, because, just as in *Pharmastem*, the prior art substantiates the inventors' admission. *Pharmastem*, 491 F.3d at 1362. There is no dispute at all that chiral chromatography would have worked to isolate apremilast from Example 12, and that it was a known process for resolving enantiomers before the priority date. (*See supra* at 8-11; *infra* at 39-41.)

While the district court mentioned, in a footnote, that the '638 patent contains this admission (Appx75, n.17), it failed to address the legal issue that this admission is binding on Amgen for purposes of reasonable expectation of success. This constitutes reversible legal error. Amgen, like the patentee in *PharmaStem*, should be held to the consequences of the inventors' sworn admissions, made to obtain the patent, and it was legal error for the district court to conclude otherwise.

## 2. The district court erroneously required enablement of the prior-art '358 patent.

As an independent basis for reversal, the district court, contrary to this Court's authority, demanded that defendants establish that the '358 patent is fully enabled to prove the '638 patent claims obvious. But under this Court's established precedent, it was error for the court to have erected this barrier to proving obviousness, which requires only a reasonable expectation of success.

In assessing whether the '358 patent was enabled in connection with its obviousness inquiry, the court required that this prior-art reference disclose every last granular step and variable necessary to separate apremilast from its enantiomer

32

by column chromatography.  Appx73-74 (concluding that the '358 patent "does not disclose *how* the POSA could have isolated the Example 12 enantiomers without undue experimentation").  But this Court's authority dictates that any one single prior-art reference used in an overall obviousness analysis need not be established as enabled.  *See Amgen*, 314 F.3d at 1357 (vacating judgment of nonobviousness:  "Under § 103, however, a reference need not be enabled; it qualifies as a prior art, regardless, for whatever is disclosed therein."); *Symbol Techs., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1578 (Fed. Cir. 1991) ("While a reference must enable someone to practice the invention in order to anticipate under § 102(b), a non-enabling reference may qualify as prior art for the purpose of determining obviousness under § 103."); *see also Beckman Instruments Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1551 (Fed. Cir. 1989) ("Even if a reference discloses an inoperative device, it is prior art for all that it teaches.").

The '358 patent does not need to disclose every detail on how to isolate apremilast.  All that is required is a reasonable expectation of success based on the disclosures and knowledge in the art as a whole.  *See Intelligent BioSys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1367 (Fed. Cir. 2016) ("The reasonable expectation of success requirement refers to the likelihood of success in combining references to meet the limitations of the claimed invention."); *see also id.* (the "correct inquiry" is whether there would have been "a reasonable expectation of

achieving what is claimed in the patent-at-issue"). And reasonable expectation of success does not require absolute predictability. *See, e.g.*, *Par Pharm., Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186, 1198 (Fed. Cir. 2014) ("The reasonable expectation of success requirement for obviousness does not necessitate an absolute certainty for success."); *see also Pfizer*, 480 F.3d at 1364 ("[C]ase law is clear that obviousness cannot be avoided simply by a showing of some degree of unpredictability in the art so long as there was a reasonable probability of success.").

Rather than analyzing reasonable expectation of success based on the combined prior art and all of the knowledge in the art, the district court narrowly focused on whether a POSA attempting to purify apremilast based solely on the '358 patent would have required "undue experimentation" to arrive at stereomerically pure apremilast. Appx73-78. The district court expressly found both Amgen's and defendants' experts credible, but relied on vague, conclusory testimony from Davies regarding *his own* personal experiences with specific instances where his laboratory had difficulty isolating unrelated enantiomers— ones that Davies did not identify—and concluded based on those unrelated compounds that isolating apremilast from Example 12 would require "undue experimentation." Appx75-78.

34

Davies and the court focused on the number of options a POSA might have to try resolving the enantiomers. *Id*. But, importantly, neither Davies nor the district court ever addressed the correct test for obviousness in this case—if the experimentation required to separate the enantiomers of Example 12 would have been routine, it would not have mattered how many experiments were needed. *See Aventis*, 499 F.3d at 1302. A POSA would have needed only a reasonable expectation that the routine method would successfully achieve that goal regardless of how many experiments were necessary to do so. *See Pfizer*, 480 F.3d at 1367 ("[M]any techniques that require extensive time, money, and effort to carry out may nevertheless be arguably 'routine' to one of ordinary skill in the art.").

To find obviousness, it is sufficient that a POSA could have obtained the purified compound (stereomerically pure apremilast) through routine experimentation. *See Bayer Pharma AG v. Watson Labs., Inc.*, 874 F.3d 1316, 1323 (Fed. Cir. 2017) (finding that it is unnecessary to "delve deeply" into the meaning of prior-art references where a party and its expert succinctly address the purpose of the disclosures in the obviousness analysis). By requiring the prior art to describe the purification experiment with exacting specificity, the district court erred by elevating the burden from a reasonable expectation of success utilizing routine experimentation to a guarantee of success on the first try.

A closer look at *Forest*, which the district court relied on, reveals few facts in common with the present case—here, there is no inventor testimony addressing any difficulty with resolving apremilast, and there is no expert testimony that as a technique, HPLC is unpredictable. *Forest Labs., Inc. v. Ivax Pharms., Inc.*, 501 F.3d 1263, 1266-67 (Fed. Cir. 2007). The district court's reliance on *Sanofi* is likewise misplaced. In *Sanofi*, the separation method was diastereromeric salt separation, and the court found that the enantiomer in question had structural characteristics that would have made separation using this method difficult. *Sanofi-Synthelabo v. Apotex, Inc.*, 550 F.3d 1075, 1088 (Fed. Cir. 2008). Here, in contrast, no one disputes that a POSA could purify apremilast from the Example 12 mixture using chiral chromatography—a technique expressly disclosed in the '358 patent and other prior art as useful for the compounds of Formula I. Appx6028-6029 (1350:16-1351:3), Appx6068-6069 (1408:9-1409:20) (Davies) Appx16512-16513 (8:63-9:3).

The district court's application of the wrong legal standard for analyzing reasonable expectation of success is an independent basis for reversal of the district court's opinion and warrants, at a minimum, a remand.

**3.    The district court legally erred by excluding Celgene's admission during prosecution of EP '148 that apremilast could be isolated by known techniques.**

The district court's validity ruling was infected by its erroneous refusal to admit and consider expert testimony about certain statements that Celgene made about the scope of the prior art.  Celgene, the original patent holder, Otezla® NDA holder, and original plaintiff to this action, represented to the EPO that a patent specification identical to that of the '358 patent disclosed the exact subject matter claimed by the '638 patent—stereomerically pure apremilast.  Appx16261-16279 (identifying Example 12 of the '358 patent and description of individual enantiomers as being within the scope of the invention to support claim to "optically pure," i.e., stereomerically pure, apremilast).

This Court routinely considers a party patentee's representations made during the prosecution of foreign counterparts.  *See Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1374 (Fed. Cir. 2005); *see also Tanabe Seiyaku Co. v. ITC*, 109 F.3d 726, 733 (Fed. Cir. 1997) ("[T]he representations made to foreign patent offices are relevant to determine whether a person skilled in the art would consider butanone or other ketones to be interchangeable with acetone in Tanabe's claimed N-alkylation reaction."); *Caterpillar Tractor Co. v. Berco, S.p.A.*, 714 F.2d 1110, 1116 (Fed. Cir. 1983) (when a "representation to foreign patent offices" is relevant and not unique to issues of foreign law, it "must be considered").

37

The district court, however, excluded these statements to the EPO as hearsay and excluded under FRE 703 Gribble's expert testimony about their significance in interpreting the teachings of '358 patent.

In excluding this testimony, the court misapplied FRE 703. That Rule provides that "[i]f experts in the particular field would reasonably rely on those kinds of facts . . . in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." FED. R. EVID. 703. Here, Amgen never established that experts in the field would not rely on such highly relevant statements. And, under the Rule, the fact that the district court believed them to be hearsay also did not preclude their admission.

Courts routinely consider testimony from technical experts relying on domestic and foreign prosecution files in reaching their decisions on claim construction, claim scope, and patent validity. *See Tillotson, Ltd. v. Walbro Corp.*, 831 F.2d 1033, 1039 (Fed. Cir. 1987) ("Evidence, including expert testimony, will likely be helpful in determining the thrust and meaning of the prosecution histories and the prior art.") (citations omitted). In fact, this Court has faulted reliance on expert testimony that did *not* consider the relevant prosecution history. *See Uniloc 2017 LLC v. Apple Inc.*, 996 F.3d 1368, 1375 n.4 (Fed. Cir. 2021) (upholding decision "not to give substantial weight" to expert declaration in part because expert "failed to consider the full disclosure and prosecution history"); *AbbVie*

*Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1294 (Fed. Cir. 2014) (noting that party's expert "did not review the ex parte prosecution history").

For over a year and a half, there was no question that these statements were party admissions, and had Celgene remained a party to this case, there would have been no question at trial that these representations would have been binding party admissions to inform the invalidity of the '638 patent. It cannot be that these statements by the patentees can go from binding admissions to inadmissible by the simple expedient of party substitution where the patent and the prior art remain the same.

Had the district court considered Gribble's testimony regarding the European counterpart to the '358 patent, it would have found that his technical opinions regarding the disclosures of the '358 patent mirror Celgene's arguments about identical disclosures in the European counterpart. Appx5160 (599:5-7), Appx5161-5162 (600:13-601:8).

\* \* \*

Because the district court legally erred in its analysis of reasonable expectation of success, this Court should reverse the district court's judgment and find the asserted claims of the '638 patent invalid as obvious. At a minimum, the Court should remand for further findings applying the correct legal standards.

**B.** **The district court legally erred in failing to find motivation to purify apremilast from a known racemic mixture.**

The district court's failure to find a motivation to purify apremilast was also legal error. This Court has repeatedly found a motivation to purify racemic mixtures where, as here, methods for doing so were known. As this Court explained in *Aventis*, "isolation of interesting compounds is a mainstay of the chemist's art. If it is known how to perform such an isolation, doing so is likely the product not of innovation but of ordinary skill and common sense." 499 F.3d at 1302 (quotation omitted); *see also Spectrum Pharms., Inc. v. Sandoz Inc.*, 802 F.3d 1326, 1334 (Fed. Cir. 2015) ("the claimed substantially pure compound would have been obvious over . . . the 50/50 mixture"); *cf. Sanofi*, 550 F.3d at 1086 (district court assumed "a *prima facie* case of obviousness based on . . . disclosure of the [] racemate . . . and the general knowledge that enantiomers may be separated and may differ from each other in biological properties").[3]

---

[3] The same standard has long been applied in the examination context. *See In re Anthony*, 414 F.2d 1383, 1386 & n.2 (C.C.P.A. 1969) ("a stereoisomer is not patentable over its known racemic mixture unless it possesses unexpected properties not possessed by the racemic mixture"); *In re Adamson*, 275 F.2d at 954-55 (where the prior art "would suggest . . . that the racemates of the [prior art] references may be resolved into their [individual] isomers," to claim the stereoisomer is to "do[] no more than the obvious"); *cf. In re May*, 574 F.2d 1082, 1086-87, 1089 (C.C.P.A. 1978) (unexpected results rebutted "*prima facie* case of obviousness" where references "expressly disclose . . . the racemate").

The district court's own factual findings confirm a motivation to purify apremilast under this Court's precedent.  As the district court found, "Example 12 of the '358 patent is a racemic mixture that is 50% . . . apremilast," and "the '358 patent claimed apremilast as an isomer within the scope of its inventions," which was directed to inhibiting PDE4.  Appx68-69.  Moreover, defendants presented expert testimony, which the district court found credible (Appx76), that a POSA would have had an "inherent motivation . . . to separate racemic mixtures," including Example 12 (Appx73).  That testimony was reinforced by WO '606's teaching that Formula I compounds (which undisputedly include Example 12) "preferably are administered as a substantially chirally pure isomer."  Appx16410 (12:20-21).  Indeed, even Davies wrote in a 1989 article that "in the near future it will be common practice to synthesize new drugs as single enantiomers and there is already pressure from regulatory agencies in this direction."  Appx18020, Appx18015.  These uncontroverted facts were more than enough to establish motivation.  *See Aventis*, 499 F.3d at 1301 (reversing holding that there was an "absence of a clear and convincing showing of motivation" because "[r]equiring an explicit teaching to purify the [ ] stereoisomer from a mixture in which it is the active ingredient is precisely the sort of rigid application of the TSM test that was criticized in *KSR*").

Despite this uncontroverted evidence, the district court failed to find a motivation to separate Example 12 by making additional findings regarding (a) the lack of clinical data in the prior art concerning properties of apremilast that are not claimed in the asserted claims of the '638 patent; and (b) the time and effort involved in selecting Example 12 out of the 17 examples recited in the '358 patent. As shown below, however, these additional findings—even if accepted—are irrelevant and do not alter the motivation to separate racemic mixtures under the correct legal standard.

### 1. Motivation to purify does not require biological data on unclaimed clinical properties.

First, the district court found that the prior art lacked "biological data" on the "PDE4 potency, safety, tolerability, selectivity, or drug-like properties" of apremilast. Appx72. But the asserted claims do not recite any such properties; they merely recite pharmaceutical compositions and dosage forms of apremilast. As a matter of law, obviousness requires only that "one must have a motivation to combine accompanied by a reasonable expectation of achieving what is claimed in the patent-at-issue." *Intelligent Bio-Sys.*, 821 F.3d at 1367. Thus, it "is of no moment that" the prior art lacks data about clinical properties that are "simply not required by the claim." *Id.*

In adding a host of new requirements to the claims—"PDE4 potency, safety, tolerability, selectivity, or drug-like properties"—the district court erroneously

elevated the burden for establishing obviousness of an enantiomer from a reasonable expectation of utility to data-backed certainty of FDA approval.  Yet this Court has repeatedly held drug products obvious even if they would "not have been entitled to FDA approval" because "'[t]here is no requirement in patent law that the person of ordinary skill be motivated to develop the claimed invention based on a rationale that forms the basis for FDA approval.'"  *Nalpropion Pharms., Inc. v. Actavis Labs. FL, Inc.*, 934 F.3d 1344, 1354 (Fed. Cir. 2019) (quoting *Allergan*, 726 F.3d at 1292); *see also Bayer*, 874 F.3d at 1324 ("The motivation to combine inquiry is not limited to what products are forthcoming or currently available on the market" in "the pharmaceutical industry.").

Here, under the district court's own findings, the prior art provided the same expectation of therapeutic utility for apremilast that the asserted claims require.  As the district court recognized, "[t]he '358 Patent broadly asserts that '[t]he compounds of the present invention are useful in the inhibition of phosphodiesterases, particularly PDE III and PDE IV, and in the treatment of disease states mediated thereby,'" and "the '358 Patent claimed apremilast as an isomer within the scope of its inventions."  Appx68-69.  Nor was there any dispute that the '358 patent would have taught a POSA that "Example 12 . . . had therapeutic utility."  Appx69.

The asserted claims of the '638 patent recite nothing more than this undisputed therapeutic utility. In demanding that the prior art recite data on "PDE4 potency, safety, tolerability, selectivity, or drug-like properties" (Appx72), the district court required more evidence of apremilast's pharmacological properties and clinical utility than is recited in the '638 patent itself, which is reversible error. *See Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1374 (Fed. Cir. 2005) ("the district court clearly erred in finding any difference between the claimed invention and the [prior art]" based on the prior art's lack of clinical data, where the asserted "patent sets forth no human clinical or laboratory data showing the safety and tolerability of the treatment methods claimed by the patent" and thus "adds nothing beyond the teachings" of the prior art); *Hoffmann-La Roche Inc. v. Apotex Inc.*, 748 F.3d 1326, 1331 (Fed. Cir. 2014) (rejecting argument that the prior art lacked "antifracture efficacy" data where the asserted "patents do not themselves present data demonstrating antifracture efficacy"); *Alcon Research, Ltd. v. Apotex Inc.*, 687 F.3d 1362, 1369 (Fed. Cir. 2012) (rejecting argument that prior art lacked safety data because "neither does the [asserted] patent," which was "not based on testing in humans").

### 2. There is no legal requirement for a POSA to be motivated to select the closest prior art.

Second, the district court credited Davies's testimony that a POSA would not have been motivated to "go off and make 17 racemates" and separate them,

which he characterized as "a huge amount of time and effort." Appx73. Yet whether it would have been obvious to separate 17 racemates is not the question. The asserted claims are directed to apremilast, and only Example 12 of the '358 patent contains apremilast as a relevant enantiomer. The "amount of time and effort" to separate 16 other racemates is simply irrelevant.

In presuming that a POSA would have needed to separate all 17 examples of the '358 patent before selecting Example 12, Davies erroneously applied a lead compound analysis that this Court's precedent does not require. As the district court acknowledged, "the Federal Circuit has not required a lead compound analysis in cases involving the separation of enantiomers from racemic mixtures when 'in the inventing process, there was no lead compound.'" Appx65 n.16 (quoting *UCB, Inc. v. Accord Healthcare, Inc.*, 890 F.3d 1313, 1329 (Fed. Cir. 2018) (obviousness instead "may be based on the closest prior art, which may not have been a lead compound that the inventor had in mind")). Because no lead compound analysis applies, Example 12 is the relevant starting point for obviousness—not the other examples in the '358 patent. *See Novartis Pharm. Corp. v. W.-Ward Pharms. Int'l Ltd.*, 923 F.3d 1051, 1060 (Fed. Cir. 2019) (in a case that "does not require lead compound analysis," "[t]o the extent the district court required a showing that a person of ordinary skill would have selected [the relevant compound] over other prior art compounds, it erred").

Moreover, given that a POSA would have had a reasonable expectation of success, the mere "time and effort" involved in separating racemates, without more, cannot rebut the motivation to do so. *See Merck & Co. v. Biocraft Labs., Inc.*, 874 F.2d 804, 809 (Fed. Cir. 1989) (finding obviousness where, "though requiring time and care, the experimentation needed to arrive at the claimed dosages was nothing more than routine"); *Pfizer*, 480 F.3d at 1367 ("[M]any techniques that require extensive time, money, and effort to carry out may nevertheless be arguably 'routine' to one of ordinary skill in the art.").

In short, under the correct legal standard, the district court's own factual findings and the undisputed evidence establish a motivation to purify a known enantiomer (apremilast) from a known racemate (Example 12), consistent with this Court's precedent. In holding otherwise, the district court legally erred. At a minimum, the district court clearly erred in finding a lack of motivation, and the judgment should be reversed, or at least vacated and remanded.

## C. The district court legally erred in its analysis of alleged secondary considerations of nonobviousness.

In addition to finding no reasonable expectation of success or motivation, the district court relied on purported secondary considerations of nonobviousness. Appx78-Appx91. Given defendants' strong obviousness case, the district court's legal errors above are sufficient to reverse the judgment and hold the asserted claims of the '638 patent invalid. *See, e.g., Bayer*, 874 F.3d at 1328 (reversing

46

district court's judgment and holding claims obvious despite evidence of "copying and unexpected results that weigh in favor of a conclusion of nonobviousness"). Nevertheless, the district court committed additional errors on secondary considerations that further support reversal.

As discussed below, in all but one instance, the district court's analysis of secondary considerations impermissibly credited evidence lacking any nexus to the novel aspects of the '638 patent that, as such, cannot support a finding of nonobviousness. *See In re Kao*, 639 F.3d at 1069. Even when the district court appropriately considered evidence related to the novel features of the claim in its unexpected results analysis, it erroneously held that a difference of degree rather than kind amounted to unexpected results. *See Galderma*, 737 F.3d at 739. When these errors are accounted for, there are no probative objective indicia of nonobviousness that support the asserted claims of the '638 patent.

### 1. The district court legally erred in crediting secondary considerations that lack a nexus to the claims.

In finding that objective evidence supported a finding of nonobviousness, the district court legally erred in crediting evidence that has no nexus to the novel features of the '638 patent. For objective evidence to be probative, "there must be a nexus to some aspect of the claim not already in the prior art." *In re Kao*, 639 F.3d at 1069. "Where the offered secondary consideration actually results from something other than what is . . . *novel* in the claim, there is no nexus." *Id.* at 1068

47

(emphasis in original); *see also In re GPAC, Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995) ("For objective evidence to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the claimed invention.").

Here, it is undisputed that the prior-art '358 patent discloses the racemic mixture containing apremilast and its use in pharmaceutical formulations. Appx68-69.  Whatever advantages apremilast may have, the racemic mixture was previously disclosed by the '358 patent.  Thus, the only claimed contribution of the '638 patent is the use of stereomerically pure apremilast rather than its racemic mixture.  None of the evidence the district court relied on to establish long-felt but unmet need, failure of others, or skepticism is attributable to this difference. Likewise, nearly all of the evidence the district court credited in finding unexpected results has no nexus to the novel aspects of the asserted claims.

***Long-felt but unmet need.***  The district court focused on whether there was a "long-felt need for a psoriasis treatment that was suitable for oral administration to a patient and without the risks and barriers to adherence that were common other psoriasis treatments."  Appx82.  The asserted claims of the '638 patent, however, are not directed to the treatment of any particular condition, any particular safety or efficacy, or any purported adherence barrier.  Appx10524 (31:37-39, 32:9-12). Where, as here, objective evidence relates to "something other than what is both

48

*claimed and novel* in the claim, there is no nexus to the merits of the claimed invention." *Merck & Cie v. Gnosis S.p.A.,* 808 F.3d 829, 837 (Fed. Cir. 2015) (quotation omitted; some emphasis added); *see also Asyst Techs., Inc. v. Emtrak, Inc.*, 544 F.3d 1310, 1316 (Fed. Cir. 2008) ("[O]bjective evidence of non-obviousness must be commensurate in scope with the claims which the evidence is offered to support.").

Moreover, the district court considered only whether other FDA-approved psoriasis treatments fulfilled an unmet need. Appx82-84. Although the district court found that apremilast has some advantages over other drugs in general, there is no evidence those advantages result from the differences between stereomerically pure apremilast and the racemic mixture disclosed in the '358 patent. *See In re Kao*, 639 F.3d at 1069 ("there must be a nexus to some aspect of the claim not already in the prior art"). The district court never addressed whether there was a long-felt, unmet need for compositions containing *stereomerically pure* apremilast—the '638 patent's claimed novelty—nor whether there was a long-felt need to purify apremilast from the racemic mixture disclosed in the '358 patent.

***Unexpected results.*** Here too, the district court erroneously credited evidence of the improved efficacy and tolerability of apremilast compared to other PDE4 inhibitors. Appx81. Because there is no evidence these alleged improvements are attributable to the differences between apremilast and its

49

racemic mixture, this evidence has no nexus to the claims. *See Kao Corp. v. Unilever U.S., Inc.*, 441 F.3d 963, 970 (Fed. Cir. 2006) ("[W]hen unexpected results are used as evidence of nonobviousness, the results must be shown to be unexpected compared with the closest prior art.").[4]

**Failure of others.**  The district court found that others failed to develop other PDE4 inhibitors.  Appx85-86.  But this is not the relevant inquiry.  If a failure of others with a nexus to the asserted claims existed, it would be a failure to purify apremilast from the racemic mixture of the '358 patent. *See, e.g., Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1313 (Fed. Cir. 2006) ("With respect to 'failures of others,' . . . the evidence does not suggest that these prior attempts failed because the devices lacked the claimed features.").  The district court never identified such a failure.

**Skepticism.**  The district court focused on skepticism about the safety of apremilast because of its relationship to the known teratogenic compound thalidomide.  Appx86-89.  Once again, the district court credited evidence lacking a nexus to the novel aspect of the '638 patent—the isolation of stereomerically pure apremilast. *See In re Kao*, 639 F.3d at 1068-69.  The district court never

---

[4] As discussed below, while the district court also evaluated the differences between apremilast and its racemic mixture, it erred in that analysis as well.

identified examples of skepticism about whether apremilast could be purified from a racemic mixture.

In sum, because the district court failed to find a nexus to the novel feature of the claimed invention, the district court's findings related to these secondary considerations add no "light to the circumstances surrounding the origin of the subject matter sought to be patented." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 399 (2007) (quotation omitted).

### 2.    The district erred in relying on a difference in degree rather than a difference in kind.

Solely for unexpected results, the district court also analyzed the differences between stereomerically pure apremilast and the racemic mixture disclosed in the '358 patent. Appx80. In doing so, however, the district court erred in finding that the increased potency of apremilast—a mere difference in degree rather than a difference in kind—supports a finding of unexpected results. *Id.*

"Unexpected results that are probative of nonobviousness are those that are different in kind and not merely in degree from the results of the prior art." *Galderma*, 737 F.3d at 739 (Fed. Cir. 2013) (quotation omitted). As relevant here, drug products exhibit only "differences in degree" where they produce "the same type of biological activity" to a different extent. *In re Merck & Co., Inc.*, 800 F.2d 1091, 1099 (Fed. Cir. 1986). Thus, it is of no moment that the inventors expected a two-fold rather than a 20-fold increase in the potency of isolated apremilast.

51

Appx80.  Under this Court's precedent, increased potency—the only alleged

improvement of apremilast over its racemate that the district court relied on—is a

difference in degree that does not support nonobviousness.  *See In re Harris*, 409

F.3d 1339, 1344 (Fed. Cir. 2005) ("32-43% increase in stress-rupture life . . . d[id]

not represent a 'difference in kind' that is required to show unexpected results");

*Hoffmann-La Roche*, 748 F.3d at 1334 ("[E]vidence of superior efficacy does

nothing to undercut the showing that there was a reasonable expectation of

success[,] . . . even if the level of success may have turned out to be somewhat

greater than would have been expected.").

<p style="text-align:center">* * *</p>

For the reasons above, no probative secondary considerations support the

asserted claims of the '638 patent, which would have been obvious to a POSA.

Thus, this Court may reverse the district court's judgment without the need for

remand.  For at least these reasons, this Court should reverse the district court's

judgment and find the asserted claims of the '638 patent invalid as obvious.

## III.    The judgment that the asserted claims of the '101 patent would not have been obvious should be reversed.

The district court legally and clearly erred in accepting Amgen's alleged

priority date of March 2002 for the '101 patent based on its determination that the

'515 application inherently disclosed apremilast's Form B.  Appx127-128.  To

claim priority to the '515 application filed on March 2002, Amgen needed to

<p style="text-align:center">52</p>

produce evidence that the '515 application "meets the requirements of 35 U.S.C. §112, including the written description requirement, with respect to [the asserted] claim[s]." *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1326 (Fed. Cir. 2008). Under this Court's case law, Amgen failed to do so.

This Court should reverse the district court's holding on priority for two independent reasons. First, the district court legally erred by applying the doctrine of inherent disclosure to material limitations of the '101 patent claims, contravening this Court's precedent. Second, even if Amgen were allowed to rely on inherency, it failed to establish that practicing Example 2 of the '515 application necessarily results in Form B, and the district court clearly erred in holding otherwise. Under the correct priority date, there is no dispute that the asserted claims of the '101 patent are invalid as obvious.

### A.     The district court legally erred in applying the doctrine of inherent disclosure to material claim limitations.

The district court failed to apply the appropriate standard for determining whether Amgen could rely on a theory of inherent disclosure. As discussed above, it is undisputed that the '515 application fails to explicitly disclose apremilast Form B. *E.g.*, Appx5728-5729 (1093:12-1094:1), Appx5745 (1110:1-12) (Steed), Appx6336-6337 (1623:24-1624:22) (Myerson). Thus, to attempt to claim priority to the '515 application's filing date, Amgen relied solely on the doctrine of inherent disclosure, which the district court applied. Appx127. Under the proper

53

analysis, however, Amgen is barred from relying on inherent disclosure because the undisputed evidence shows that Form B and the XRPD peaks of claims 1 and 15 were material to the patentability of the claims and are not duplicative of other recited limitations.

This Court has held that "[i]n the context of priority determinations, the allegedly inherent limitation cannot be material to the patentability of the invention." *Hitzeman*, 243 F.3d at 1355; *see also Griffin v. Bertina*, 285 F.3d 1029, 1034 (Fed. Cir. 2002) ("A party seeking to show that it need not establish reduction to practice of every feature recited in the count based on the alleged inherency of some of those features must show that the 'inherent' properties add nothing to the count beyond the other recited limitations and are not material to the patentability of the invention."). In *Hitzeman*, the Federal Circuit found that properties that would necessarily be produced by the claimed invention in a scientific sense were, nevertheless, not "inherent in a legal sense" because (1) the patentee relied on the limitations to distinguish the claims from the prior art, which meant they were material to patentability; and (2) the limitations were not redundant of the remainder of the claims. *Id.*

Although *Hitzeman* involved inherent conception, this Court has applied *Hitzeman*'s materiality test to evaluate whether the specification of a purported priority application satisfies the written-description requirement of 35 U.S.C.

54

§ 112. *See Yeda Rsch. & Dev. Co. v. Abbott GMBH & Co. KG*, 837 F.3d 1341, 1345 (Fed. Cir. 2016). The same issue is presented here. It was legal error for the district court not to undertake or even address the materiality analysis called for by *Hitzeman* and *Yeda*. At a minimum, the district court clearly erred in failing to address an issue squarely presented by defendants. Appx18894, Appx3922-3923. Under the proper legal standard, Amgen cannot rely on inherent disclosure.

It is undisputed that, during the prosecution of the '101 patent, Celgene relied on Form B and the XRPD peaks recited in the asserted claims to overcome prior-art rejections. *Supra* at 16-17. Thus, like the limitations in *Hitzeman*, Form B and the recited XRPD peaks were "material to the patentability" of Celgene's alleged invention. *See* 243 F.3d at 1355. Likewise, Form B and the XRPD peaks add subject matter to the claims and are not redundant of the claims' enantiomerically pure apremilast limitation. *See id.* Thus, these limitations are not "inherent in a legal sense" to Example 2 of the '515 application. *See id.*

Because Form B and the XRPD peaks recited in the asserted claims are material to the patentability of the claimed invention, Amgen cannot rely on the doctrine of inherent disclosure to argue the '515 application disclosed those limitations. This Court should reverse the district court's finding that the '515 application inherently discloses Form B and hold that the priority date for the asserted claims of the '101 patent is March 27, 2008—the filing date of the '101

55

patent and the undisputed date on which Form B was first expressly disclosed. *Supra* at 15-16. *De novo* review is appropriate here because there are no disputed facts relevant to a priority determination on this issue. *See Nat. Alternatives*, 904 F.3d at 1379. At a minimum, the Court should vacate and remand with instructions for the district court to address whether Form B and the XRPD peaks are material to patentability such that inherent disclosure does not apply.

**B.    The district court clearly erred in finding that the '515 application inherently disclosed Form B.**

Even assuming that Form B and its associated XRPD peaks were immaterial to patentability, the district court clearly erred in finding that the '515 application inherently disclosed Form B. For a disclosure to be inherent, "the missing descriptive matter must necessarily be present in the parent application's specification." *Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1159 (Fed. Cir. 1998). Inherency "requires that the missing descriptive material is necessarily present, not merely probably or possibly present." *Trintec*, 295 F.3d at 1295. Example 2 of the '515 application fails to meet this standard.

First, the district court erred in finding that Amgen met its burden of coming forward with evidence that it was entitled to rely on the '515 application's filing date. Appx126; *see also Nat Alt. Int'l Inc.*, 904 F.3d at 1380. Amgen was required to establish why the written description in the earlier application supports the claims. *See Tech. Licensing Corp.*, 545 F.3d at 1327. In the context of inherent

disclosure, Amgen was required to come forward with evidence that Example 2 *necessarily* disclosed Form B.  *See Trintec*, 295 F.3d at 1295; *see also PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1305–06 (Fed. Cir. 2008) (Patentee has the burden "to come forward with evidence to prove entitlement to claim priority to an earlier filing date.").

Amgen fell short.  At most, Amgen presented evidence that thirteen third-party experiments varying some of the undisclosed parameters of Example 2 resulted in Form B.  Appx6290-6291 (1577:25-1578:6), Appx6292 (1579:2-22), Appx6293-6296 (1580:15-1583:21), Appx6335-6336 (1622:21-1623:14), Appx6337-6338 (1624:23-1625:2) (Myerson).  There was a dispute among the experts as to whether these examples faithfully replicated Example 2.  Appx5823-5824 (1187:6-1188:22) (Sacchetti).  In any case, even if Amgen's evidence established that Example 2 sometimes produces Form B, Amgen presented no evidence or testimony establishing that Example 2 *always* produces Form B as is required to establish written description by inherent disclosure.  It is undisputed that there are gaps in the procedure outlined in Example 2 and that a POSA could vary multiple parameters while faithfully executing Example 2.  Appx5735-5736 (1100:23-1101:14) (Steed), Appx6332 (1619:6-14) (Myerson).  These gaps are unsurprising because the purpose of Example 2 is simply to synthesize apremilast, not to obtain any particular form of apremilast, crystalline or otherwise.  Appx5736

57

(1101:15-25) (Steed). Amgen's expert did not testify that the thirteen examples on which he relied covered all possible variations of the undisclosed parameters of Example 2, or even a representative sampling of them.

Second, the district court erred in disregarding clear admissions from the patentee that Example 2 produces forms of apremilast other than Form B. Celgene and the named inventors stated in the '101 patent specification that Form A can be obtained using procedures that fall within the procedure described in Example 2. Appx10574 (18:40-45), Appx5720-5721 (1085:18-1086:17), Appx5740 (1105:11-23) (Steed), *see also* Appx6328 (1615:2-16) (Myerson). The district court erroneously ignored the disclosures of the patent itself in favor of Amgen's expert's contrary testimony. Appx128. Moreover, the Court erred by allowing Amgen to disavow Celgene's own pre-litigation representations that practicing Example 2 led to Form C. *Id.* Prior to filing this lawsuit, Celgene represented to the EPO that it replicated Example 2 three different ways, each of which produced Form C. Appx14721-Appx14722, Appx5741 (1106:6-14), Appx5742-5744 (1107:4-1109:8); Appx6333 (1620:1-6). As the patentee, Celgene clearly knew how to perform its own Example 2 procedure. Appx5743 (1108:2-9). Yet the district court instead credited Amgen's litigation expert's explanation that "Celgene just made a mistake" in its representations to the EPO. Appx128. The district court was apparently convinced by Amgen's expert's testimony that Form

C could not result from Example 2 because Form C is a toluene solvate and Example 2 does not disclose the use of toluene. Appx125. But nothing in the '101 patent limits Form C to toluene solvates. Appx10576 (21:67-22:22) (disclosing only that "[i]n certain embodiments, Form C is a toluene solvate").

On this record, the district court clearly erred in finding that defendants failed to produce clear and convincing evidence that Form B is not inherent in Example 2. Appx128. When Celgene's representations that Form A or Form C can result from Example 2 are afforded proper weight, Amgen's inherent disclosure argument fails, even if Example 2 sometimes results in Form B. *Glaxo Inc. v. Novopharm Ltd.*, 52 F.3d 1043, 1047 (Fed. Cir. 1995) (holding no inherent disclosure where 13 experiments practicing the prior art resulted in the claimed polymorph, but one experiment did not). Thus, the district court's finding that the '515 patent inherently discloses Form B should be reversed, and this Court should find that the priority date for the '101 patent is March 27, 2008.

## C. Defendants' unrebutted evidence shows that the '101 patent would have been obvious as of March 27, 2008.

The district court did not address whether the '101 patent was invalid as of its filing date of March 27, 2008. Appx129. However, defendants presented unrebutted, clear and convincing evidence that the '101 patent was obvious by that date. Appx5746 (1111:10-16), Appx5747-5763 (1112:4-1128:15) (Steed), Appx16520-Appx16541, Appx16253-16259, Appx16347, Appx16363,

59

Appx16295, Appx16302, Appx17988-Appx17992. Amgen had the opportunity to counter this evidence at trial but declined to do so. Appx5746 (1111:20-1112:1) (Steed), Appx6326 (1613:7-17) (Myerson), Appx4067-4068. Thus, it is effectively undisputed that the '101 patent is invalid if the March 2008 priority date applies. In this instance, remand would be futile because Amgen has no evidence with which to rebut defendants' showing of obviousness. *See Trustees in Bankr. of N. Am. Rubber Thread Co. v. United States*, 593 F.3d 1346, 1357 (Fed. Cir. 2010) ("Because remand would be futile, we do not remand for further proceedings."); *Rogers v. Office of Pers. Mgmt.*, 87 F.3d 471, 476 (Fed. Cir. 1996) (holding that there is "no need to remand when the record clearly shows that only one result would satisfy the standard of review."). Accordingly, this Court should enter judgment that the '101 patent is invalid as obvious based on the undisputed evidence presented at trial.

## CONCLUSION

The district court's judgment that the asserted claims of the '638 patent and '101 patent are not invalid for obviousness should be reversed, or at least vacated.

Respectfully submitted,

/s/ Michael J. Gaertner*

MICHAEL J. GAERTNER
DAVID B. ABRAMOWITZ
HUGH S. BALSAM
CAROLYN A. BLESSING
EMILY L. SAVAS
AUGUST M. MELCHER
Locke Lord LLP
111 South Wacker Drive
Suite 4100
Chicago, IL 60606
(312) 443-0700

*Counsel for Zydus Pharmaceuticals (USA) Inc.*

* Electronically signed with
consent (Fed. Cir. R. 32(g)(3)(B))

/s/ Maureen L. Rurka

MAUREEN L. RURKA
SAMANTHA M. LERNER
Winston & Strawn LLP
35 West Wacker Drive
Chicago, IL 60601
(312) 558-5600

EIMERIC REIG-PLESSIS
NOOROSSADAT TORABI
Winston & Strawn LLP
101 California Street
San Francisco, CA 94111
(415) 591-1000

*Counsel for Sandoz Inc.*

January 31, 2022

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

2021-09-28 Final Judgment as to Zydus (Dkt. No. 516) ................................Appx1

2021-10-12 Final Judgment as to Sandoz (Dkt. No. 525)...............................Appx9

2021-07-02 Memorandum Order (Dkt. No. 465) .........................................Appx 34

2021-09-20 Opinion (Dkt. No. 510) ............................................................Appx 46

2021-09-20 Order (Dkt. No. 511) ..............................................................Appx 137

2021-09-23 Text Order (Dkt. No. 513), amending Dkt. No. 510 and 511..Appx 139

JTX-0003 Certified Copy of U.S. Patent No. 7,427,638 ........................Appx10504

JTX-0005 Certified Copy of U.S. Patent No. 7,893,101 ........................Appx10529

JTX-0013 Certified Copy of U.S. Patent No. 10,092,541 ......................Appx10619

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| AMGEN INC.,<br><br>   Plaintiff,<br><br>  v.<br><br>SANDOZ INC., *et al.*,<br><br>   Defendants. | Civil Action No. 18-11026 (MAS) (DEA)<br>(Consolidated) |
| AMGEN INC.,<br><br>   Plaintiff,<br><br>  v.<br><br>ZYDUS PHARMACEUTICALS (USA)<br>INC.,<br><br>   Defendant. | Civil Action No. 18-11267 (MAS) (DEA) |
| AMGEN INC.,<br><br>   Plaintiff,<br><br>  v.<br><br>ZYDUS PHARMACEUTICALS (USA)<br>INC.,<br><br>   Defendant. | Civil Action No. 19-18806 (MAS) (DEA) |

DC: 7652775-2

Appx1

## FINAL JUDGMENT

This matter having come before the Court on the merits of all remaining issues in the above-captioned cases as relating to Plaintiff Amgen Inc. ("Amgen") and Defendant Zydus Pharmaceuticals (USA) Inc. ("Zydus"), pursuant to Rule 58 of the Federal Rules of Civil Procedure, and for the reasons stated in the Court's Opinion dated September 20, 2021 (ECF No. 510), and all prior rulings, orders, judgments, and findings, it is ordered, adjudged, and decreed as follows:

1.      The Court has jurisdiction over the subject matter of the above-captioned case pursuant to 28 U.S.C. § 1331 and 1338(a).

2.      The Court has personal jurisdiction over the parties, and venue is proper as to all parties pursuant to 28 U.S.C. § 1391(b), (c), and 1400(b).

3.      The Court retains jurisdiction to enforce or supervise performance under this Final Judgment.

4.      Zydus's submission of Abbreviated New Drug Application ("ANDA") No. 211859 is an act of infringement with respect to claims 3 and 6 of U.S. Patent No. 7,427,638 (the '638 Patent); ZSF (A2) ¶ 14 (ECF No. 422).

5.      Zydus's submission of ANDA No. 211859 is an act of infringement with respect to claim 6 of U.S. Patent No. 8,455,536 (the "'536 Patent"); ZSF (A2) ¶ 14 (ECF No. 422).

6.      Zydus's submission of ANDA No. 211859 is not an act of infringement with respect to claims 1 and 15 of U.S. Patent No. 7,893,101 (the "'101 Patent").

7.      Zydus's submission of ANDA No. 211859 is an act of infringement with respect to claims 2 and 27 of U.S. Patent No. 8,093,283 (the "'283 Patent"); ZSF (A2) ¶ 14 (ECF No. 422).

Appx2

8.     Zydus's submission of ANDA No. 211859 is an act of infringement with respect to claims 2, 19, and 21 of U.S. Patent No. 10,092,541 (the "'541 Patent") (*but see infra* ¶ 18); ZSF (A2) ¶ 14 (ECF No. 422).

9.     Zydus's commercial manufacture, use, sale or offer for sale in the United States, or importation into the United States, of the products that are the subject of ANDA No. 211859 would infringe claims 3 and 6 of the '638 Patent; ZSF (A2) ¶ 15 (ECF No. 422).

10.     Zydus's commercial manufacture, use, sale or offer for sale in the United States, or importation into the United States, of the products that are the subject of ANDA No. 211859 would infringe claim 6 of the '536 Patent; ZSF (A2) ¶ 15 (ECF No. 422).

11.     Zydus's commercial manufacture, use, sale or offer for sale in the United States, or importation into the United States, of the products that are the subject of ANDA No. 211859 would not infringe claims 1 and 15 of the '101 Patent.

12.     Zydus's commercial manufacture, use, sale or offer for sale in the United States, or importation into the United States, of the products that are the subject of ANDA No. 211859 would infringe claims 2 and 27 of the '283 Patent; ZSF (A2) ¶ 15 (ECF No. 422).

13.     Zydus's commercial manufacture, use, sale or offer for sale in the United States, or importation into the United States, of the products that are the subject of ANDA No. 211859 would infringe claims 2, 19, and 21 of the '541 Patent (*but see infra* ¶ 18); ZSF (A2) ¶ 15 (ECF No. 422).

14.     Claims 3 and 6 of the '638 Patent are not invalid.

15.     Claim 6 of the '536 Patent is not invalid.

16.     Claims 1 and 15 of the '101 Patent are not invalid.

17.     Claims 2 and 27 of the '283 Patent are not invalid.

Appx3

18.    Claims 2, 19, and 21 of the '541 Patent are invalid as obvious under 35 U.S.C. § 103.

19.    Judgment is entered in favor of Amgen and against Zydus regarding Amgen's claims for infringement of claims 3 and 6 of the '638 Patent, claim 6 of the '536 Patent, and claims 2 and 27 of the '283 Patent.

20.    Judgment is entered in favor of Zydus and against Amgen regarding Amgen's claim for infringement of claims 2, 19, and 21 of the '541 Patent.

21.    Judgment is entered in favor of Zydus and against Amgen regarding Amgen's claim for infringement of claims 1 and 15 of the '101 Patent.

22.    Pursuant to 35 U.S.C. § 271(e)(4)(A), the effective date of any final approval by the Food and Drug Administration ("FDA") of Zydus's ANDA No. 211859, including any amendments or supplements thereto, shall be a date that is not earlier than the date of expiration of the last to expire of the '638 Patent (including the patent term extension granted under 35 U.S.C. § 156 and the patent term adjustment granted under 35 U.S.C. § 154), the '536 Patent, and the '283 Patent (currently **February 16, 2028**), including any extensions or additional periods of exclusivity (including pediatric exclusivity) to which Amgen is or becomes entitled.  Zydus shall notify FDA of this judgment within two (2) business days of its entry.

23.    Pursuant to 35 U.S.C. § 271(e)(4)(B), Zydus and each of its officers, directors, agents, servants, employees, parents, subsidiaries, affiliates, other related business entities, and all other persons and entities acting in concert, participation, or in privity with Zydus, and their successors or assigns, are enjoined from commercially manufacturing, using, selling or offering for sale in the United States, or importing into the United States, or inducing or contributing to any such conduct, the products that are the subject of ANDA No. 211859, including any amendments

Appx4

or supplements thereto, until the date of expiration of the last to expire of the '638 Patent (including

the patent term extension granted under 35 U.S.C. § 156 and the patent term adjustment granted

under 35 U.S.C. § 154), the '536 Patent, and the '283 Patent (currently **February 16, 2028**),

including any extensions or additional periods of exclusivity (including pediatric exclusivity) to

which Amgen is or become entitled.

24.    The following Counts of Amgen's Second Amended Complaint for Patent

Infringement in C.A. No. 3:18-cv-11267 (ECF No. 26) shall be dismissed as moot:  Count 1

(Infringement of the '940 Patent); Count 2 (Declaratory Judgment of Infringement of the '940

Patent); Count 5 (Infringement of the '302 Patent); Count 6 (Declaratory Judgment of Infringement

of the '302 Patent); Count 11 (Infringement of the '243 Patent); Count 12 (Infringement of the

'243 Patent); Count 13 (Infringement of the '330 Patent); Count 14 (Declaratory Judgment of

Infringement of the '330 Patent).

25.    The following Counts of Amgen's Complaint for Patent Infringement in C.A. No.

3:19-cv-18806 (ECF No. 1) shall be dismissed as moot:  Count 3 (Infringement of the '173 Patent)

and Count 4 (Declaratory Judgment of Infringement of the '173 Patent).

26.    In the event that any party timely appeals this Final Judgment, any motion for

attorneys' fees and/or costs, including but not limited to any motion that this case is exceptional

under 35 U.S.C. § 285, shall be considered timely if filed and served within thirty (30) days after

the Federal Circuit issues its mandate disposing of any such appeal.

27.    In the event that no party appeals this Final Judgment, any motion for attorneys'

fees and/or costs, including but not limited to any motion that this case is exceptional under 35

U.S.C. § 285, shall be considered timely if filed and served within thirty (30) days after the

expiration of the time for filing a notice of appeal under Federal Rules of Appellate Procedure 3

and 4.

By: *s/Theodora McCormick*
Theodora McCormick
Lauren B. Cooper
Robert Lufrano
**Epstein Becker & Green, P.C.**
150 College Road West, Suite 301
Princeton, New Jersey 08540
Telephone: (609) 455-1540

Michael J. Gaertner
David B. Abramowitz
Carolyn A. Blessing
Emily L. Savas
Jennifer M. Coronel
August Melcher
**Locke Lord LLP**
111 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 443-0700
Facsimile: (312) 443-0336

*Attorneys for Defendant Zydus
Pharmaceuticals (USA) Inc.*

By: *s/Charles H. Chevalier*
Charles H. Chevalier
J. Brugh Lower
Christine A. Gaddis
Rachel Johnston
GIBBONS P.C.
One Gateway Center
Newark, NJ 07102-5310
(973) 596-4611
cchevalier@gibbonslaw.com
cgaddis@gibbonslaw.com

*Cf Counsel:*
George F. Pappas
Michael N. Kennedy
Kevin B. Collins
Jeffrey B. Elikan
Jay Alexander
Priscilla Dodson
Alexander Trzeciak
Philip S. May
Antonio J. Carvalho
Joseph Hykan
Priscilla N.A. Nyankson
Daniel H. Lee
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000

Alexa Hansen
David S. Denuyl
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street
San Francisco, CA 94105
(415) 591-7035

Robert Zhou
COVINGTON & BURLING LLP
3000 El Camino Real
Palo Alto, CA 94306
(650) 632-4700

Steven J. Horowitz

Appx7

SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
(312) 853-7000

Sue Wang
SIDLEY AUSTIN LLP
555 California Street Suite 2000
San Francisco, CA 94104
(415) 772-1200

Wendy A. Whiteford
Eric M. Agovino
C. Nichole Gifford
Dennis Smith
Gregory Bonifield
AMGEN INC.
One Amgen Center Drive
Thousand Oaks, CA 91320-1789

*Attorneys for Plaintiff*
*Amgen, Inc.*

September 28th, 2021

SO ORDERED this 28th day of September 2021.

**Michael A. Shipp**
**United States District Judge**

8

Appx8

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| _____ ) | |
| ) | |
| AMGEN INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 18-11026 (MAS) (DEA) |
| v. ) | (Consolidated) |
| ) | |
| SANDOZ INC., *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| _____ ) | |

## <u>FINAL JUDGMENT</u>

This matter having come before the Court on the merits of all remaining issues in the above-captioned case as it relates to Plaintiff Amgen Inc. ("Amgen") and Defendant Sandoz Inc. ("Sandoz"), pursuant to Rule 58 of the Federal Rules of Civil Procedure, and for the reasons stated in the Court's Opinion dated September 20, 2021 (ECF No. 510), and all prior rulings, orders, judgments, and findings, it is ordered, adjudged, and decreed as follows:

1.      The Court has jurisdiction over the subject matter of the above-captioned case pursuant to 28 U.S.C. § 1331 and 1338(a).

2.      The Court has personal jurisdiction over the parties, and venue is proper as to all parties pursuant to 28 U.S.C. § 1391(b), (c), and 1400(b).

3.      The Court retains jurisdiction to enforce or supervise performance under this Final Judgment.

4.      Sandoz's submission of Abbreviated New Drug Application ("ANDA") No. 211658 is an act of infringement with respect to Claims 3 and 6 of U.S. Patent No. 7,427,638 (the "'638 Patent"); SSF (A3) ¶ 9 (ECF No. 422).

5.      Sandoz's submission of ANDA No. 211658 is an act of infringement with respect to Claim 6 of U.S. Patent No. 8,455,536 (the "'536 Patent"); SSF (A3) ¶ 9 (ECF No. 422).

6.      Sandoz's submission of ANDA No. 211658 is an act of infringement with respect to Claims 1 and 15 of U.S. Patent No. 7,893,101 (the "'101 Patent"); SSF (A3) ¶ 9 (ECF No. 422).

7.      Sandoz's commercial manufacture, use, sale or offer for sale in the United States, or importation into the United States, of the products that are the subject of ANDA No. 211658 would infringe Claims 3 and 6 of the '638 Patent; SSF (A3) ¶ 10 (ECF No. 422).

8.      Sandoz's commercial manufacture, use, sale or offer for sale in the United States, or importation into the United States, of the products that are the subject of ANDA No. 211658 would infringe Claim 6 of the '536 Patent; SSF (A3) ¶ 10 (ECF No. 422).

9.      Sandoz's commercial manufacture, use, sale or offer for sale in the United States, or importation into the United States, of the products that are the subject of ANDA No. 211658 would infringe Claims 1 and 15 of the '101 Patent; SSF (A3) ¶ 10 (ECF No. 422).

10.     Claims 3 and 6 of the '638 Patent are not invalid.

11.     Claim 6 of the '536 Patent is not invalid.

12.     Claims 1 and 15 of the '101 Patent are not invalid.

13.     Claims 2, 19, and 21 of the '541 Patent are invalid as obvious under 35 U.S.C. § 103.

Appx10

14.     Judgment is entered in favor of Amgen and against Sandoz regarding Amgen's claims for infringement of claims 3 and 6 of the '638 Patent, claim 6 of the '536 Patent, and claims 1 and 15 of the '101 Patent.

15.     Judgment is entered in favor of Sandoz and against Amgen regarding Sandoz's counterclaim for invalidity of claims 2, 19, and 21 of the '541 Patent.

16.     Pursuant to 35 U.S.C. § 271(e)(4)(A), the effective date of any final approval by the Food and Drug Administration ("FDA") of Sandoz's ANDA No. 211658, including any amendments or supplements thereto, shall be a date that is not earlier than the date of expiration of the last to expire of the '638 Patent (including the patent term extension granted under 35 U.S.C. § 156 and the patent term adjustment granted under 35 U.S.C. § 154), the '536 Patent, or the '101 Patent (including the patent term adjustment granted under 35 U.S.C. § 154) (currently **February 16, 2028**), including any extensions or additional periods of exclusivity (including pediatric exclusivity) to which Amgen is or becomes entitled.  Sandoz shall notify FDA of this judgment within two (2) business days of its entry.

17.     Pursuant to 35 U.S.C. § 271(e)(4)(B), Sandoz and each of its officers, directors, agents, servants, employees, parents, subsidiaries, affiliates, other related business entities, and all other persons and entities acting in concert, participation, or in privity with Sandoz, and their successors or assigns, are enjoined from commercially manufacturing, using, selling or offering for sale in the United States, or importing into the United States, or inducing or contributing to any such conduct, the products that are the subject of ANDA No. 211658, including any amendments or supplements thereto, until the date of expiration of the last to expire of the '638 Patent (including the patent term extension granted under 35 U.S.C. § 156 and the patent term adjustment granted under 35 U.S.C. § 154), the '536 Patent, or the '101 Patent (including the patent term adjustment

granted under 35 U.S.C. § 154) (currently **February 16, 2028**), including any extensions or additional periods of exclusivity (including pediatric exclusivity) to which Amgen is or becomes entitled.

18.     The following Counts of Amgen's Second Amended Complaint against Sandoz (ECF No. 42) shall be dismissed as moot:  Count 1 (Infringement of the '940 Patent); Count 2 (Declaratory Judgment of Infringement of the '940 Patent); Count 7 (Infringement of the '302 Patent); Count 8 (Declaratory Judgment of Infringement of the '302 Patent); Count 15 (Infringement of the '243 Patent); Count 16 (Declaratory Judgment of Infringement of the '243 Patent); Count 19 (Infringement of the '330 Patent); Count 20 (Declaratory Judgment of Infringement of the '330 Patent).

19.     The following Counts of Sandoz Inc.'s Answer, Affirmative Defenses, and Counterclaims to Celgene's Second Amended Complaint (ECF No. 49) shall be dismissed as moot:  Count 1 (Declaratory Judgment of Noninfringement and/or Invalidity of the '940 Patent); Count IV (Declaratory Judgment of Noninfringement and/or Invalidity of the '302 Patent); Count VIII (Declaratory Judgment of Noninfringement and/or Invalidity of the '243 Patent).

20.     In the event that any party timely appeals this Final Judgment, any motion for attorneys' fees and/or costs, including but not limited to any motion that this case is exceptional under 35 U.S.C. § 285, shall be considered timely if filed and served within thirty (30) days after the Federal Circuit issues its mandate disposing of any such appeal.

21.     In the event that no party appeals this Final Judgment, any motion for attorneys' fees and/or costs, including but not limited to any motion that this case is exceptional under 35 U.S.C. § 285, shall be considered timely if filed and served within thirty (30) days after the

Appx12

expiration of the time for filing a notice of appeal under Federal Rules of Appellate Procedure 3

and 4.


By: *s/Charles H. Chevalier*
    Charles H. Chevalier
    J. Brugh Lower
    Christine A. Gaddis
    Rachel Johnston
    GIBBONS P.C.
    One Gateway Center
    Newark, New Jersey 07102-5310
    (973) 596-4611

    *Of Counsel:*
    George F. Pappas
    Michael N. Kennedy
    Kevin B. Collins
    Jeffrey B. Elikan
    Jay Alexander
    Priscilla Dodson
    Alexander Trzeciak
    Philip S. May
    Antonio J. Carvalho
    Joseph Hykan
    Priscilla N.A. Nyankson
    Daniel H. Lee
    COVINGTON & BURLING LLP
    One CityCenter
    850 Tenth Street, NW
    Washington, DC 20001
    (202) 662-6000

    Alexa Hansen
    David S. Denuyl
    COVINGTON & BURLING LLP
    Salesforce Tower
    415 Mission Street
    San Francisco, California 94105
    (415) 591-7035

    Robert Zhou
    COVINGTON & BURLING LLP
    3000 Camino Real

By: *s/Eric Abraham*
    Eric I. Abraham
    Hill Wallack, LLP
    21 Roszel Road
    Princeton, New Jersey 08543
    (609) 924-0808

    *Of Counsel:*
    George Lombardi
    Maureen L. Rurka
    Samantha Maxfield Lerner
    Winston & Strawn LLP
    35 West Wacker Drive
    Chicago, Illinois 60601
    (312) 558-6463

    Jovial Wong
    Sharon Lin
    Winston & Strawn LLP
    1901 L Street, NW
    Washington, DC 20036
    (202) 282-5000

    Noori Torabi
    Winston & Strawn LLP
    101 California St, 35th Floor
    San Francisco, California 94111
    (415) 591-1000

    *Attorneys for Defendant Sandoz Inc.*

Appx13

Palo Alto, California 94306
(650) 632-4700

Steven J. Horowitz
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
(312) 853-7000

Sue Wang
SIDLEY AUSTIN LLP
555 California Street Suite 2000
San Francisco, California 94104
(415) 772-1200

Wendy A. Whiteford
Eric M. Agovino
C. Nichole Gifford
Dennis Smith
Gregory Bonifield
AMGEN INC.
One Amgen Center Drive
Thousand Oaks, California 91320-1789

*Attorneys for Plaintiff
Amgen, Inc.*

October 7, 2021


SO ORDERED this 12th day of October 2021.

Michael A. Shipp
**United States District Judge**

6

Appx14

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

AMGEN, INC.,

          Plaintiff,

          v.

SANDOZ INC., et al.,

          Defendants.

Civil Action No. 18-11026 (MAS) (DEA)
(consolidated)

**MEMORANDUM ORDER
FILED UNDER SEAL**

This matter came before the Court for a bench trial from June 14, 2021 through June 25, 2021. Throughout the course of that trial, the parties made several motions to strike testimony and filed bench briefs in support of those motions. The Court makes the following determinations with respect to those motions.

**A.      Celgene's Statements to the European Patent Office**

On June 18, 2021, the Court heard testimony from Defendants' witness Dr. Gordon Gribble. Dr. Gribble testified that his review of the prosecution history of European Patent 1752148 ("EP '148") confirmed his view that U.S. Patent No. 6,020,358 patent was invalid. (June 18, 2021 Trial Tr. 599:18-601:6.) His review relied on certain statements made by Celgene, Amgen's predecessor in interest to the patents-in-suit, in correspondence to the European Patent Office ("EPO"). (*Id.* at 601:3-6 (citing Exs. DTX-105 & DTX-106).) According to Dr. Gribble, "Claim 2 of the '148 simply says the optical purity plus isomer of apremilast is mentioned. And then also you can read what they did, they had to change throughout the claims the compound 5 [acetylaminoisoindoline]-1,3-dione was replaced by the 4 isomer, which is apremilast." (*Id.* at 600:12-18.) Relatedly, Dr. Gribble testified that a person of ordinary skill in the art would

Case 3:18-cv-11026-MAS-DEA   Document 465 *SEALED*   Filed 07/02/21   Page 2 of 9
PageID: 10586

conclude from statements in exhibits DTX-105 and DTX-106 that "steromerically pure apremilast . . . is present in the '358 and, of course, the '148" patents. (*Id.* at 601:3-6.)

At trial, Plaintiff objected to DTX-105 and DTX-106's admission into evidence as unexcepted hearsay. (*Id.* at 559:6-21.) Plaintiff also submitted a bench brief in support of its objection (ECF No. 434). Defendants submitted their own opposition brief (ECF No. 440), and Plaintiff replied (ECF No. 441). Plaintiff then made another submission on this topic (ECF No. 445), and Defendants responded to that submission (ECF No. 447).

As to DTX-105 and DTX-106, the Court finds that these documents are inadmissible hearsay. These documents are excerpts of statements Celgene made to the European Patent Office. The Court has previously found that "Amgen is the transferee of Celgene's entire interest in the patents-in-suit." (ECF No. 195.) The Third Circuit has held, however, that "statements made by a predecessor in interest . . . are not admissible under Rule 801(d)(2)(A)['s]" party opponent rule. *Three Rivers Confections, LLC v. Warman*, 660 F. App'x 103, 109 (3d Cir. 2016). Defendants direct the Court to *Pfizer Inc. v. Teva Pharms. USA, Inc.*, a case in which a drug company attempted to use certain expert affidavits "to support *its* European patent application and then den[ied] that it accept[ed] the truth of the information contained therein." 2006 WL 3041102, at *5 (D.N.J. Oct. 26, 2006) (emphasis added). That scenario is distinguishable from the facts before the Court. Here, it is undisputed that Amgen has never owned EP '148 or otherwise been involved in that patent's prosecution history. "The proponent of admission . . . has the burden of proving by a preponderance of the evidence that the other party's conduct manifested an intent to adopt the statement." *Id.* at *4. Because nothing in the record suggests that Amgen intended to adopt the statements in DTX-105 and DTX-106, these documents will be excluded.

With respect to Dr. Gribble, the parties acknowledge that experts can rely on hearsay in forming their opinions. Nevertheless, at trial, Amgen renewed its objection to Dr. Gribble's testimony to the extent his opinions reference certain Celgene statements made to the EPO. (ECF No. 434.) In its earlier in limine challenge, Amgen asserted that Dr. Gribble was attempting to opine on European law. In considering the earlier challenge, the Court held that it was "not convinced that Dr. Gribble's opinion raises questions of European patent law, as opposed to a question about whether Celgene made certain admissions of scientific fact to the EPO." (Mem. Op. 8, ECF No. 405.)

Since the Court's in limine opinion, however, Amgen has refocused its challenge to Dr. Gribble by instead arguing that Dr. Gribble's reliance on the EPO statements are inappropriate under Rule 703. "That Rule provides that an expert may base his opinions on otherwise inadmissible evidence so long as other 'experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject.'" *Langbord v. Dep't of Treasury*, 832 F.3d 170, 195 (3d Cir. 2016) (quoting Fed. R. Evid. 703)). With the benefit of the complete trial record, the Court agrees with Amgen that Defendants have not demonstrated that statements to the EPO are the kinds of facts or data on which a witness with Dr. Gribble's expertise would reasonably rely. *In re Biogen '755 Patent Litig.*, 2018 WL 3613162, at *1 (D.N.J. July 26, 2018) ("The party offering the expert testimony bears the burden of proving [that] the testimony is admissible, which requires proof, by a preponderance of the evidence, that the testimony is reliable." (citation omitted)). As Plaintiff notes, on-cross examination, Dr. Gribble acknowledged that in his work as a chemist and professor, he does not analyze the statements of patent lawyers, nor train his students to do so. (Pl.'s June 23, 2021 Correspondence, ECF No. 445 (citing June 18,

Appx36

2021 Trial Tr. 646:9-16.) Accordingly, the Court will not consider Dr. Gribble's testimony to the

extent he cites correspondence to the EPO as confirming his opinion.[1]

**B.    DTX-092**

At trial, Plaintiff also objected to Defendants' introduction of DTX-092, a printout from a

website called Clincaltrials.gov. (June 21, 2021 Trial Tr. 53:12-23 (Rough).) According to

Plaintiff, the document "purports to compare two versions of a clinical trial as of two different

dates, and DTX-092 displays along the edge of its pages what appears to be the date it was printed:

January 15, 2019—several years after the priority date of the '541 patent." (Bench Br. 2-11, ECF

No. 436.) At trial, Plaintiff argued that DTX-092 could not be authenticated, and even if it could,

Plaintiff asserted that it contained hearsay. (June 21, 2021 Trial Tr. 53:12-23 (Rough) (citing

Bench Br., ECF No. 436).)

In response, Defendant elicited testimony from Dr. Gilmore that interpreted a 2012 article

from Schett. According to Dr. Gilmore, Schett's article relied on a study with "identifier

NCT0045692." (*Id.* at 55:8-16.) Based on her knowledge of clinical trial research data, Dr.

Gilmore credibly testified that the study identified as NCT0045692 in the Schett paper was

archived by Clinicaltrials.gov, a government run clinical trial repository. Furthermore, Dr.

Gilmore testified that the study identified as NCT0045692 reported on a titration schedule for

treating psoriasis with apremilast. (*Id.* at 52:19-53:9; 55:17-20.) According to Dr. Gilmore,

Exhibit DTX-092 was the study discussed in Schett and archived on ClinicalTrials.gov under the

---

[1] The Court previously granted Plaintiff's request to "receive [Christopher] Mercer's testimony
and any documents introduced through him conditionally, subject to the Court's later rulings on
the evidence" from Dr. Gribble that "Mr. Mercer is being offered to rebut." (Pl.'s June 23, 2021
Correspondence; June 24, 2021 Trial Tr. 3:5-6 (Rough).) Because Dr. Gribble's testimony
regarding Celgene's statements to the EPO will be stricken, Mr. Mercer's testimony and any
documents introduced through Mr. Mercer will be withdrawn from evidence.

NCT0045692 identifier. (*Id.* at 58:21-59:4.) As Defendants assert, Dr. Gilmore "testified that she uses ClinicalTrials.gov and would expect a POSA would have been able to access the clinical study protocol underlying Schett (NCT '092) on ClinicalTrials.gov, including information about data gathered during the trial and about administration of the doses and titration of the doses." (Defs.' Bench Br. 4, ECF No. 458; *see also* June 21, 2021 Trial Tr. (Rough) 58:15-16; 55:8-16.) Accordingly, the Court finds that a proper foundation has been laid for the admission of DTX-092 and the Court will take judicial notice of the facts contained therein when rendering its decision in this matter. *Abely v. Aeterna Zentaris, Inc.*, No. 12-4711, 2013 WL 2399869, at \*21 (S.D.N.Y. May 29, 2013) (holding that exhibited studies "available online through the National Institutes of Health at ClinicalTrials.gov . . . are published by government sources from which the [c]ourt may appropriately take judicial notice").

### C.    Dr. Clive Page's Testimony on Discontinuation of Unknown Drug Development Project

At trial, Defendants' expert Dr. Clive Page testified that he had "personally encountered situations in which a drug development project was discontinued for reasons other than safety and efficacy." (June 18, 2021 Trial Tr. 742:21-24.) As an example, Dr. Page recalled that sometime in the 1990s, he had "advised Zambon in Italy, which is an Italian pharmaceutical company who had a program actually developing orally active PDE4 inhibitors." (*Id.* at 742:24-743:2.) According to Dr. Page, the Italian company "took the decision to really curtail their in-house, or a lot of their in-house research, including stopping their PDE4 program despite it looking promising because the family set up" a separate "organization which . . . allowed them to invest in projects outside of the company and work with others to form that kind of research." (*Id.* at 743:4-11.) On cross-examination, Dr. Page admitted that he did not discuss the Italian company's discontinued drugs in his pre-trial expert reports. (*Id.* at 764:6-7 ("Q: you did [not] discuss that Italian drug in

5

Case 3:18-cv-11026-MAS-DEA    Document 465 *SEALED*    Filed 07/02/21    Page 6 of 9
PageID: 10590

your expert report. A: That's correct.").)  Plaintiff has moved to strike this portion of Dr. Page's testimony.  (*Id.* at 764:8-9 ("your Honor, at this time we renew the motion to strike that testimony as beyond the scope"); *see generally* Bench Br., ECF No. 454.)

Here, the Court will strike the portion of Dr. Page's testimony relating to the discontinued Italian drug development project.  "Under Rule 37, district courts are authorized to exclude evidence if a party violates the requirements of Rule 26(a)."  *Lamb v. Montgomery Twp.*, 734 F. App'x 106, 110 (3d Cir. 2018) (citing Fed. R. Civ. P. 37(c)(1)); *see also* F. R. Civ. P. 26(a)(2)(D) ("[a] party must make these disclosures at the times and in the sequence that the court orders"). "A party can overcome Rule 37 sanctions by demonstrating that a Rule 26 violation was 'substantially justified or harmless.'"  *Lamb*, 734 F. App'x at 110 (quoting Fed R. Civ. P. 37(c)(1)). The Court finds that Dr. Page's failure to disclose his opinions on why these unknown products' development was discontinued prejudiced Plaintiff by depriving them of an opportunity to explore this topic during expert discovery.  Moreover, the Court finds the excluded evidence to be of limited importance to Defendants in light of other testimony from Dr. Page on examples of other compounds discontinued for reasons other than safety and efficacy. *See, e.g.*, June 18, 2021 Trial Tr. 762:5-764:7.)  For the same reasons, Defendants will be little prejudiced by the exclusion of this evidence and can cure any prejudice by reference to these other compounds. *See Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904-05 (3d Cir. 1977) (listing factors a trial court should consider when deciding whether evidence should be stricken for failure to disclose the evidence in discovery). Accordingly, Plaintiff's motion to strike Dr. Page's testimony on this topic is granted.

Case 3:18-cv-11026-MAS-DEA    Document 465 *SEALED*    Filed 07/02/21    Page 7 of 9
PageID: 10591

**D.    Dr. Allen Myerson's June 24, 2021 Validity Testimony**

For the reasons asserted in Defendant Zydus's June 25, 2021 bench brief, Dr. Myerson's testimony at lines 97:24-100:6 and 102:25-103:14 will be stricken. At the outset of Dr. Myerson's testimony, Plaintiff represented to the Court that Dr. Myerson would present his opinions on "the validity of claims 1 and 15 of the '101 patent, claims 2 and 27 of the '283 patents and respond to the testimony of Professor Steed and Dr. Sacchetti." (June 24, 2021 Trial Tr. 67:18-21 (Rough).) In presenting these opinions, Dr. Myerson relied on DTX-Zydus-56 when discussing whether certain experiments combining ethanol and acetone may or may not produce Form A or Form B apremilast. (Trial Tr. 93:1-16; 97:21-99:2 (Rough).) Nevertheless, it is undisputed that it was only on the eve of his validity testimony at trial that Amgen disclosed that Dr. Myerson might give opinions on validity related to DTX-Zydus-56 or experiments involving ethanol and acetone that might implicate validity. Accordingly, the Court will strike this testimony. In response to Defendants' objection to this testimony, Plaintiff asserts that Defendants "opened the door" to this testimony, either through the prior testimony from Dr. Sacchetti or from testimony Zydus elicited from Dr. Myerson on June 16th. (June 24, 2021 Trial Tr. 103:17-25 (Rough).) Plaintiff also argues that DTX-Zydus-56 had already been "admitted without limitation." (Trial Tr. 94:11-15 (Rough).)

The Court agrees with Defendants that regardless of whether DTX-Zydus-56 was admitted into evidence or whether other Defendants' experts gave testimony touching on the challenged validity arguments, trial should not proceed by ambush. Dr. Myerson may not give validity opinions without prejudicing Defendants unless those opinions were first contained in pre-trial disclosures. *See Pennypack*, 559 F.2d at 904-05; *Lamb*, 734 F. App'x at 110-11. Plaintiff argues that the challenged testimony from Dr. Myerson "was Amgen's *first and only* opportunity to rebut

7

Zydus's untimely arguments" because these arguments "were first offered after expert reports had

been exchanged." (Bench Br. 1, ECF No. 459.)  Specifically, Plaintiff takes issue with Zydus

eliciting direct examination testimony from Dr. Sacchetti in which he answered in the negative

when asked "Amgen [has] implied that persons of ordinary skill in the art might not believe the

description of how to make Form A set forth in the '283 Patent. Do you agree with that?" (June

22, 2021 Trial Tr. 164:14-21.)    Although Plaintiff argues that Dr. Sacchetti's assertions

"mischaracterize[s]" Amgen's validity arguments in support of the '283 Patent and were "late-

disclosed," (Bench Br. 3-6, ECF 459), Plaintiff's remedy is to make a timely objection, rather than

attempt to elicit opinions from Dr. Myerson that were not appropriately disclosed during expert

discovery.

      Similarly, to the extent Dr. Myerson's June 24, 2021 trial testimony was offered to rebut

Dr. Sacchetti's "seeding" theories that were allegedly "not in his report and was advanced only at

his deposition," (Bench Br. 6-7, ECF No. 459; June 24, 2021 Trial Tr. 102:25-103:14 (Rough)),

Plaintiff's remedy is to make a timely motion to exclude that testimony.  Plaintiff argues that "facts

show, Amgen's counsel during deposition did not invite Dr. Sacchetti to offer brand new opinions

about seeding" and "Amgen could not have anticipated a new opinion in response to a simple yes

or no question." (Bench Br. 9, ECF No. 459).  Prior to trial, however, the Court ruled on pretrial

motions from Defendants to strike testimony from Drs. Myerson and Gozzo's on similar grounds.

(Mem. Op. 8-14, ECF No. 405.)  If Plaintiff had a similar objection to Dr. Sacchetti's testimony,

its remedy was not to elicit opinions from its experts that were not previously disclosed to

Defendants, but to instead move to strike Dr. Sacchetti's testimony.  Accordingly, the Court finds

that the prejudice and surprise to Defendants of Dr. Myerson's late-disclosed validity arguments

Appx41

and the disruptive nature of the testimony at trial were not substantially justified or harmless, and

thus the Court strikes this testimony. *See Pennypack*, 559 F.2d at 904-05.

Accordingly, for the reasons set forth above, and for other good cause shown,

**IT IS SO ORDERED** on this 2nd day of **July 2021**.

**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**

9

Appx42

<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| AMGEN, INC.,<br><br>         Plaintiff,<br><br>         v.<br><br>SANDOZ INC., *et al.*,<br><br>         Defendants. | Civil Action No. 18-11026 (MAS) (DEA)<br>(Consolidated)<br><br>**OPINION**<br>(Filed under Seal) |

<u>**SHIPP, District Judge**</u>

       This matter arises from Hatch-Waxman Act patent infringement claims brought by Plaintiff

Amgen, Inc. ("Amgen") against Defendants Dr. Reddy's Laboratories, Inc. and Dr. Reddy's

Laboratories, Ltd. (together, "DRL"), Sandoz Inc., and Zydus Pharmaceuticals (USA) Inc.

("Zydus") (collectively, "Defendants"). The Court has subject matter jurisdiction under 28 U.S.C.

§§ 1331 and 1338, as well as under 28 U.S.C. §§ 2201 and 2202. The Court conducted a nine-day

bench trial in this matter from June 14, 2021, to June 25, 2021.[1] (*See* ECF Nos. 479-87.) The

parties submitted post-trial briefing, proposed findings of fact, and proposed conclusions of law

on July 8, 2021. (ECF Nos. 467-71.) Closing arguments were heard on July 28, 2021. (ECF No.

492.)

---

[1] The Court consolidated docket numbers 18-11026, 18-11267, 18-11269, and 19-18806 for trial. (Stipulation & Order regarding Case Consolidation for Trial, ECF No. 424.) Docket number 18-11026 is the lead matter. (*Id.*)

Amgen has asserted five patents against Defendants: U.S. Patent No. 7,427,638 (the "'638 Patent"), U.S. Patent No. 8,455,536 (the "'536 Patent"), U.S. Patent No. 10,092,541 (the "'541 Patent"), U.S. Patent No. 7,893,101 (the "'101 Patent"), and U.S. Patent No. 8,093,283 (the "'283 Patent") (collectively, the "patents-in-suit"). The asserted patents concern stereomerically pure apremilast, associated methods and dosages for using stereomerically pure apremilast to treat psoriasis, and several crystalline forms of apremilast. Defendants have sought approval from the U.S. Food and Drug Administration ("FDA") to market generic versions of apremilast. Amgen alleges that Defendants' generics will infringe the patents-in-suit.

This Opinion constitutes the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a). In evaluating the witnesses appearing at trial, and after the Court had the opportunity to hear their testimony and observe their demeanor, the Court undertook an individualized credibility assessment of each witness. The Court's findings of fact are based on those observations and credibility determinations of the witnesses, as well as a thorough review of the evidence admitted at trial. For the reasons stated below, the Court holds as follows:

1.  <u>As to the '638 Patent</u>, Defendants have not met their burden of proving by clear and convincing evidence that the '638 Patent is invalid. As Defendants stipulated to infringement of the '638 Patent,[2] judgment of infringement will be entered in favor of Amgen on the '638 Patent.

2.  <u>As to the '536 Patent</u>, Defendants have not met their burden of proving by clear and convincing evidence that the '536 Patent is invalid. As Defendants stipulated to infringement of the '536

---

[2] (Zydus Stipulation of Facts ¶¶ 14-15, Exhibit A2 of the Final Pretrial Order, ECF No. 422-1; DRL & Sandoz Stipulation of Facts ¶¶ 9-12, Exhibit A3 of the Final Pretrial Order, ECF No. 422-2.)

Patent,[3] judgment of infringement will be entered in favor of Amgen
on the '536 Patent.

3.  <u>As to the '541 Patent</u>, Defendants have met their burden of proving
by clear and convincing evidence that the '541 Patent is invalid. As
such, judgment of non-infringement will be entered in favor of
Defendants on the '541 Patent.

4.  <u>As to the '101 Patent</u>, Amgen has not met its burden of showing
Zydus's infringement by a preponderance of the evidence. As such,
judgment of non-infringement will be entered in favor of Zydus on
the '101 Patent.

5.  <u>As to the '101 Patent</u>, DRL and Sandoz have not met their burden
of proving by clear and convincing evidence that the '101 Patent is
invalid. As DRL and Sandoz stipulated to infringement of the '101
Patent,[4] judgment of infringement will be entered in favor of Amgen
on the '101 Patent.

6.  <u>As to the '283 Patent</u>, Zydus has not met its burden of proving by
clear and convincing evidence that the '283 Patent is invalid. As
Zydus stipulated to infringement of the '283 Patent,[5] judgment of
infringement will be entered in favor of Amgen on the '283 Patent.

## I.   BACKGROUND AND FINDINGS OF FACT

### A.   The Parties

Plaintiff Amgen is a corporation organized under the laws of Delaware, with a principal

place of business at One Amgen Center Drive, Thousand Oaks, California 91320. (Stipulation of

Facts ¶ 1, Final Pretrial Order, ECF No. 425.)

Defendant Dr. Reddy's Laboratories, Inc. is a corporation organized under the laws of New

Jersey, with a place of business at 107 College Road East, Princeton, New Jersey 08540. (*Id.* ¶ 3.)

---

[3] (Zydus Stipulation of Facts ¶¶ 14-15, Exhibit A2 of the Final Pretrial Order, ECF No. 422-1;
DRL & Sandoz Stipulation of Facts ¶¶ 9-12, Exhibit A3 of the Final Pretrial Order, ECF No.
422-2.)

[4] (DRL & Sandoz Stipulation of Facts ¶¶ 9-12.)

[5] (Zydus Stipulation of Facts ¶¶ 14-15.)

Defendant Dr. Reddy's Laboratories, Limited is a company organized and existing under the laws of India, with a place of business at 8-2-337, Road No. 3. Banjara Hills, Hyderabad, Telangana 500034, India. (*Id.*)

Defendant Sandoz is a corporation organized under the laws of Delaware, with a place of business at 100 College Road West, Princeton, New Jersey 08540. (*Id.* ¶ 7.)

Defendant Zydus is a corporation organized under the laws of New Jersey, with a principal place of business at 73 Route 31 North, Pennington, New Jersey 08534. (*Id.* ¶ 8.)

**B.      Plaque Psoriasis, Psoriatic Arthritis, and Behçet's Disease**

Plaque psoriasis is a chronic inflammatory or immune-mediated disorder of the skin, characterized by red, scaly patches (called plaques) that form on the skin. (Trial Tr. 276:12-23, 278:22-25 (Alexis).) Plaque psoriasis affects approximately three percent of the U.S. population. (Trial Tr. 277:18-21 (Alexis).) The condition can cause intense itching and discomfort. (Trial Tr. 277:2-3 (Alexis).) When psoriasis patients scratch or peel off the plaques, the plaques can easily bleed. (Trial Tr. 277:4 (Alexis).) Plaques can spontaneously shed, causing patients to complain about flakes on their clothing or other surfaces. (Trial Tr. 276:12-277:1 (Alexis).) Because of the visibility of plaques and the flaking, patients can also have negative social and psychological impacts. (Trial Tr. 284:23-285:24 (Alexis).) When the plaques affect patients' hands or feet, the plaques can impact their mobility and ability to perform common tasks at home. (Trial Tr. 276:10-277:14 (Alexis).) Additionally, psoriasis can affect patients' joints, resulting in stiffness, pain, and reduced mobility in the form of psoriatic arthritis, which in turn affects about one-third of psoriasis patients. (Trial Tr. 277:10-14 (Alexis).) Another complication caused by psoriasis is Behçet's disease, an incurable illness that causes painful oral ulcers. (Trial Tr. 278:7-16, 278:22-25 (Alexis).)

Case 3:18-cv-11026-MAS-DEA    Document 510 *SEALED*    Filed 09/20/21    Page 5 of 91
PageID: 16900

### C.    Otezla®

Amgen holds approved New Drug Application No. 205437 for 10 mg, 20 mg, and 30 mg,

oral apremilast tablets, which are sold in the United States under the trademark Otezla® ("Otezla").

(Stipulation of Facts ¶ 10, Final Pretrial Order.) Under the prescribing information approved as of

June 2020, Otezla tablets are FDA-approved to treat adult patients with moderate to severe plaque

psoriasis who are also candidates for certain types of therapy, adult patients with active psoriatic

arthritis, and adult patients with oral ulcers associated with Behçet's Disease. (*Id.* ¶ 11.)

The active ingredient in Otezla is apremilast. (*Id.* ¶ 12.) Apremilast can be represented by

the    chemical    name    "(+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-

acetylaminoisoindoline-1,3-dione" and the chemical structure shown below:



(*Id.* ¶ 13.) Apremilast is what's known as a phosphodiesterase type 4 ("PDE4") inhibitor. (*Id.* ¶ 14.)

PDE4 is a part of "11 families of phosphodiesterase," including, for example, PDE3 and PDE7.

(Trial Tr. 142:6-12 (Schafer).) Apremilast treats plaque psoriasis by entering cells in the body,

selectively inhibiting PDE4, and blocking the production of inflammatory cytokines such as

Tumor Necrosis Factor alpha or TNFα; the result is an anti-inflammatory effect. (Trial Tr.

Appx50

135:22-25, 136:20-137:12, 140:24-141:3, 168:19-169:2 (Schafer).) At the time of trial, apremilast was the only PDE4 inhibitor approved to treat psoriasis. (Trial Tr. 169:3-9 (Schafer), 304:9-305:2 (Alexis).)

### D.    Apremilast's Discovery and Relationship to Thalidomide

In the 1990s, Celgene Corporation ("Celgene"), then a small pharmaceutical company,[6] operated a drug discovery program for "selective cytokine inhibitory drugs" or SelCIDS. (Trial Tr. 135:12-14 (Schafer).) Celgene conducted the SelCID program as part of its strategy to use the chemical structure of thalidomide molecules as a template for potential anti-inflammatory drugs. (Trial Tr. 131:2-15 (Schafer).) By 1999, it was known that thalidomide inhibited TNFα. (JTX-69_1, JTX-69_4.) It was also generally "known that TNF-alpha inhibition could be a way to treat diseases like psoriasis." (Trial Tr. 137:7-13 (Schafer).)

Notwithstanding its place in Celgene's SelCID research program, thalidomide was better known for its tragic role in medical history. In the 1950s and 1960s, thalidomide had been approved in Europe and elsewhere to treat morning sickness in pregnant women. (Trial Tr. 101:20-24 (Davies).) Thalidomide was later found to have teratogenic effects in fetuses—meaning it led to "debilitating, severe birth defects" in children after being taken by pregnant women. (Trial Tr. 101:17-24 (Davies).) It is undisputed that by 1999, although "there were several theories about the mechanism of teratogenicity[,] . . . essentially it was not known" how thalidomide caused birth defects. (Trial Tr. 132:5-10 (Schafer).) Furthermore, as late as 2004, it was not known "which part of the thalidomide molecule was responsible for teratogenicity." (Trial Tr. 102:23-25 (Davies).)

---

[6] Celgene was later acquired by Bristol Myers Squibb. (Trial Tr. 169:10-14 (Schafer).)

It was understood, however, that thalidomide is a racemic compound.[7] (Trial Tr. 103:4-11 (Davies).) It was also believed that thalidomide's teratogenic effect was caused by its S-enantiomer. (Trial Tr. 105:6-20 (Davies).) Although the S-enantiomer of thalidomide was generally considered to be the cause of teratogenicity, the R- and S-enantiomers of thalidomide readily interconvert in the body due to the structure of thalidomide, which has an acidic hydrogen at the chiral center. (Trial Tr. 108:2-4 (Davies).) Indeed, scientific literature from 2001 rejected the suggestion that "the administration of a single thalidomide enantiomer rather than the racemic mixture . . . would improve [thalidomide's] side effect profile" because "thalidomide rapidly undergoes racemisation under both in vitro and in vivo conditions[,] making administration of a single isomer non-viable." (JTX-66_3-4.) Because of the interconversion of the R- and S-enantiomers of thalidomide, it was very difficult to separate the teratogenic properties of thalidomide from its therapeutic properties. (Trial Tr. 105:12-20, 106:10-24 (Davies).)

The evidence at trial established that Dr. Hon-Wah Man, a Celgene researcher and chemist, synthesized apremilast on October 21, 1999 as a part of the SelCID research program. (JTX-148_1 (Dr. Man's Compound Submission form for apremilast, known internally at Celgene as "CC-10004"); JTX-210_44 (Celgene-created a slide deck presenting the history of apremilast);

---

[7] A racemic compound is also called a "racemate." (Stipulation of Facts ¶ 112.) A racemate is a compound that is composed of a 50:50 mixture of two enantiomers. (Trial Tr. 94:12-14 (Davies).) Enantiomers are mirror-image molecules connected in the same sequence with different three-dimensional arrangements. (Trial Tr. 578:20-579:4 (Gribble).) Enantiomers can be differentiated experimentally by exposure to polarized light because a pair of mirror image enantiomers will rotate polarized light in different directions. (Trial Tr. 93:9-15 (Davies).) A chemist may refer to the enantiomer that rotates polarized light clockwise as the plus (+) enantiomer, and the enantiomer that rotates polarized light counterclockwise as the minus (-) enantiomer. (Trial Tr. 93:16-19 (Davies).) Alternatively, under a second convention, chemists may name an enantiomer with the labels "R" or "S." (Trial Tr. 93:21-25, 94:1-10 (Davies).) "A racemic compound is a mixture of equal parts of enantiomers that is an equimolar mixture of two enantiomers such that the optical rotation is zero." (Stipulation of Facts ¶ 111.)

Case 3:18-cv-11026-MAS-DEA    Document 510 *SEALED*    Filed 09/20/21    Page 8 of 91
PageID: 16903

Trial Tr. 136:8-15, 144:2-3 (Schafer), 1303:16-1304:5, 1306:1-10 (Davies).) As discussed below,

apremilast is an S-enantiomer of a racemic mixture known internally at Celgene as CC-7085. (Trial

Tr. 143:22-144:1 (Schafer).) Apremilast's chemical structure has "what is called a phthalimido

group, which is a common part between apremilast and the two enantiomers of thalidomide." [8]

(Trial Tr. 103:1-11 (Davies).) Unlike thalidomide however, the "apremilast chiral center is not

acidic and thus not readily racemizable like the chiral center found in thalidomide." (Trial Tr.

108:1-4, 107:21-25 (Davies) ("[T]he glutarimide ring, which is a key pharmacophore[9] for

thalidomide analogs is not present in apremilast.").) Accordingly, despite its structural similarities

to thalidomide, apremilast does not racemize inside humans like thalidomide and is "not

contraindicated for women of childbearing potential." (Trial Tr. 301:16-17 (Alexis).)

### E.    Apremilast's Efficacy, Safety, Potency, and Tolerability

Dr. Peter H. Schafer was a Celgene researcher involved in the SelCID program and an

inventor listed on several of the patents-in-suit. (Trial Tr. 129:8-9, 136:10-15 (Schafer).) At trial,

Dr. Schafer explained that selectivity for PDE4 was important to Celgene's SelCID program

because "if you hit other PDEs, like PDE3 or PDE7 or any of the others, you may have additional

side effects." (Trial Tr. 142:6-12 (Schafer).) The uncontradicted evidence at trial was that by 1999,

it was uncommon for companies that were researching PDE4 inhibitors to also focus on TNF$\alpha$

inhibitors. (*See, e.g.*, 141:19-142:2 (Schafer).) In addition to PDE4 selectivity, Dr. Schafer testified

---

[8] Experts at trial alternatively referred to this group as "the thalimido group." (*See, e.g.*, Trial Tr. 658:2-3 (Gribble) (referring to "the phthalimide ring [that] is shared by both groups of compounds"), 1314:5-10 (Davies) (referring to the same group as a "thalimido group" which "is also present in thalidomide").)

[9] A pharmacophore is a part of a molecule that is thought to be at least in part responsible for the effect that the molecule has on a receptor within the body and is at least partly responsible for the observed biological effect. (Trial Tr. 108:16-22 (Davies).)

Case 3:18-cv-11026-MAS-DEA   Document 510 *SEALED*   Filed 09/20/21   Page 9 of 91
PageID: 16904

that the SelCID program was also searching for drugs with sufficient "potency," "other drug-like properties, like absorption, stability," "activity in vivo in an animal model," and "safety in the animals." (Trial Tr. 142:19-22 (Schafer).) Related to safety, Celgene also sought to develop anti-inflammatory drugs with sufficient "tolerability"—that is, drugs that avoided less serious side effects such as headaches or nausea. (Trial Tr. 143:1-7 (Schafer).)

Celgene's 1999 synthesis of apremilast was preceded by its 1998 synthesis of a compound identified internally by the company as "CC-7085." (Trial Tr. 139:11-24.) CC-7085 was the compound later identified as "Example 12" in U.S. Patent No. 6,020,358 (the "'358 Patent"), which was filed with the Patent Office in 1998 by Celgene. (Trial Tr. 1370:20-24 (Davies).) "CC-7085 is a racemic [compound] . . . which would be an equimolar ratio of the R[-] and S-enantiomer with the S-enantiomer being what is now known as apremilast." (Trial Tr. 520:23-521:3 (Muller Dep. Designation), 143:22-144:1 (Schafer) (testifying that CC-7085 is related to apremilast in that "apremilast is an S-enantiomer with a structure that is related to the structure of CC-7085, which is a racemic mixture").)

Early pre-clinical testing of apremilast demonstrated that it had greater potential use as an anti-inflammatory drug over CC-7085. According to a November 1999 report, preclinical studies indicated apremilast had a lower $IC_{50}$—a measure of inhibitory potency—in both the $TNF\alpha$ and PDE4 assays than CC-7085. (Trial Tr. 146:20-147:8 (Schafer).) Dr. Schafer testified that this meant "that the S-isomer of CC-7085," identified internally by Celgene as "CC-10004, which is apremilast, was more active" than CC-7085 and other tested compounds. (Trial Tr. 146:22-147:5; JTX-106_2.)

Another presentation reported experiments on PDE4A4 ratios associated with apremilast. A PDE4A4 ratio was a predictor of apremilast "being better tolerated." (Trial Tr. 233:2-3

(Knowles); JTX-208_14.)[10] Through these experiments, Celgene learned that apremilast had a low PDE4A4 ratio compared to the PDE4 inhibitors that were then under development by other companies. "Apremilast had a PDE4A4 ratio that was very low, 0.15, and that was more than ten-fold lower than Ariflo which was a PDE4 inhibitor that had made it furthest along in clinical development up to that point in time." (Trial Tr. 151:10-16 (Schafer); JTX-208_14.) Similarly, rolipram, an older PDE4 inhibitor, had an even higher PDE4A4 ratio. (Trial Tr. 151:18-20 (Schafer).) In addition to performing better than other companies' PDE4 inhibitors' PDE4A4 ratios, apremilast also performed ten-fold better than the CC-7085 racemate. (Trial Tr. 153:1-10 (Schafer).) At trial, Professor Richard Knowles, Amgen's expert in biochemistry, pharmacology, drug discovery, and PDE4 inhibitors, credibly testified that the PDE4A4 experiments would have been unexpected because "[t]here was no data to provide . . . anyone . . . to think that that might be the result." (Trial Tr. 195:4-8, 197:5-17, 198:10-16, 237:10-15 (Knowles).)

Early murine shock model studies for apremilast also confirmed that in mice, apremilast was more than twenty-fold more potent than CC-7085. (Trial Tr. 154:9-25; JTX-114_18.) As Dr. Schafer explained, in those studies, it appeared that a given dose of apremilast could produce a "50 percent reduction of TNFα production in the mouse." (Trial Tr. 154:11-18 (Schafer).) At trial, Dr. Schafer recounted his and his colleague's surprise: "[w]e were, frankly, very surprised at how much better apremilast was than the racemate . . . . Normally, if a racemate is a 50/50 mixture of two enantiomers, you might expect a two-fold difference in potency, all things being equal." (Trial Tr. 155:1-15.) As Dr. Knowles explained, for apremilast to achieve such a large reduction in TNFα over the racemate "suggests that the other enantiomer is blocking the effect of apremilast in some

---

[10] Researchers believed that the ratio of binding to the low affinity versus high affinity isoforms could predict whether nausea and vomiting were side effects associated with apremilast. (Trial Tr. 150:17-151:3 (Schafer); JTX-208_14.)

10

way. So that's really important. It tells you that you shouldn't expect to get good optimal effects with apremilast in the form of a racemate. You will get much better effects as a single enantiomer." (Trial Tr. 240:2-8.)

Celgene's study of apremilast's effects on ferrets also produced unexpected results. By 1999, researchers understood that nausea and vomiting were among the most common side effects associated with PDE4 inhibitors. (Trial Tr. 250:21-251:1 (Knowles); JTX 67_7.) Ferret studies helped researchers because the studies evaluated both a compound's anti-inflammatory effect in ferrets' lungs and whether the compound produced vomiting. (Trial Tr. 157:11-23 (Schafer).) The ferret studies also helped researchers determine what's known as a "therapeutic index," which is a measure reflecting the balance between a drug's comparative efficacy and its safety and tolerability. (Trial Tr. 158:1-19 (Schafer), 207:4-25 (Knowles).) Celgene's 2001 ferret studies unexpectedly determined that apremilast had a better than thirty-fold difference from the therapeutic index of comparable PDE4 inhibitors like cilomilast. (Trial Tr. 156:22-160:3 (Schafer), 236:15-19 (Knowles).)

The parties do not dispute that as of 1999 or 2002, the foregoing data relating to apremilast's potency, selectivity, safety, tolerability, and drug-like properties were not publicly available outside of Celgene to persons of ordinary skill in the relevant arts. (Trial Tr. 1690:4-1691:10 (Knowles).)

**F.    Competing Psoriasis Treatments**

The FDA approved Otezla as an oral treatment for psoriasis in 2014. (Trial Tr. 279:3-6 (Alexis).)

Evidence at trial established that other pre-Otezla treatments for moderate to severe psoriasis had several risks and compliance barriers for patients. Amgen's dermatology expert, Dr. Andrew Alexis, testified that older oral systemics such as methotrexate, acitretin, and cyclosporine

11

Appx56

require "ongoing monitoring in the form of blood work and in some cases taking blood—measuring blood pressure." (Trial Tr. 289:18-21 (Alexis).) Methotrexate's label warns that patients treated with this drug "should be closely monitored for bone marrow, liver, lung, and kidney toxicities." (Trial Tr. 293:20-21 (Alexis); PTX-413_1.) Indeed, patients treated with methotrexate are recommended to have a liver biopsy after a certain cumulative dose. (Trial Tr. 291:2-5 (Alexis).) Dr. Alexis also testified that methotrexate is associated with lymphoma and pulmonary fibrosis. (Trial Tr. 294:7-12 (Alexis).) Additionally, both methotrexate and acitretin are associated with fetal death and birth defects. (Trial Tr. 290:1-3.) Indeed, evidence at trial established that methotrexate is contraindicated for pregnant women and is rarely appropriate for women of childbearing potential. (Trial Tr. 295:23-296:12 (Alexis); PTX-413_1.)

Further, for acitretin, initial lab work is needed to establish the patient's baseline lipid profile and liver function. (Trial Tr. 1755:2-19 (Alexis).)  Cyclosporine is associated with a risk of cancer and a risk of permanent kidney damage, the latter risk increasing if the patient is treated with cyclosporine for longer than one year. (Trial Tr. 290:5-8, 291:6-12 (Alexis).) Dr. Alexis also described other barriers to treatment for methotrexate and acitretin, including that patients receiving those medications must abstain from drinking alcohol. (Trial Tr. 302:14-18 (Alexis).) Collectively, these pre-existing oral therapies were also known to suppress the immune system such that they were contraindicated for patients with other underlying diseases such as HIV, Hepatitis B, and Hepatitis C. (Trial Tr. 289:15-290:1, 304:16-19 (Alexis).)

Topical treatments such as creams, ointments, and gels were also available to treat psoriasis before Otezla's 2014 approval. (Trial Tr. 287:12-21 (Alexis).) Topical treatments had their own adherence barriers, including patient difficulty in applying the topicals to the skin, and the tendency of the topicals to transfer to clothing and other surfaces once applied. (Trial Tr. 289:511

Case 3:18-cv-11026-MAS-DEA   Document 510 *SEALED*   Filed 09/20/21   Page 13 of 91
PageID: 16908

(Alexis).) Relatedly, topical treatments were often not suitable for widespread psoriasis outbreaks because it was impractical for patients to apply the topicals to large areas of the affected skin. (Trial Tr. 288:14-17, 289:5-9 (Alexis).) Additionally, topical treatments had no efficacy in addressing psoriatic arthritis. (Trial Tr. 288:18-21 (Alexis).) Furthermore, topical treatments were not effective for patients with moderate and severe psoriasis, and topical corticosteroids lost their efficacy over time. (Trial Tr. 288:22-289:4 (Alexis).)

Moreover, as of 2002, biologics, "which are injectable or infused medications," were also available to treat psoriasis. (Trial Tr. 287:12-25 (Alexis).) The biologic Remicade "is administered via intravenous infusion at an infusion center," which can be a treatment barrier for patients because it is not something that can be done at home. (Trial Tr. 291:14-19 (Alexis).) Other biologics such as Humira, Enbrel, and Stelara were self-administered by patients through subcutaneous injection. (Trial Tr. 290:13-16, 315:11-17 (Alexis).) Whether delivered by self-injection or intravenous infusion, Dr. Alexis testified that for many of his patients, these methods are a "significant barrier" because they may have a "phobia to needles or just simply have negative perceptions or just general concerns about a drug that has to be administered in that form." (Trial Tr. 300:2-15 (Alexis).) Dr. Alexis testified that at least ten percent of his moderate to severe plaque psoriasis patients could not be convinced to undergo injectable therapies. (Trial Tr. 302:24-303:13 (Alexis).) The trial record established that, when biologics first became available for the treatment of psoriasis, they were distributed in pre-filled syringes that required the patient to be manually injected with a needle. (Trial Tr. 324:17-24.) Eventually, however, psoriasis biologics were sold in "auto-injectors" that "resemble pens" and where the needle "is more concealed than the traditional syringe." (Trial Tr. 324:25-325:8 (Alexis).) Defendants' dermatology expert, Dr. Elaine Gilmore, testified that these devices deploy a small needle relative

to the size of the syringe, which patients can barely feel and do not have to watch go into their skin. (Trial Tr. 885:4-14 (Gilmore).) In this way, biologics administered through auto injectors can help combat the needle hesitancy described by Dr. Alexis. (Trial Tr. 885:13-15 (Gilmore).)

Still, biologics involved other barriers and risks for patients. For example, biologics risked "reactivation of [latent] tuberculosis, and malignancies including lymphoma," as well as the risk of "serious infection." (Trial Tr. 291:20-25 (Alexis).) Biologics also required periodic blood test monitoring and refrigeration. (Trial Tr. 291:25-292:12 (Alexis).) Notably, to the contrary, Dr. Gilmore testified that she saw very little incidence of patients rejecting biologic psoriasis treatments because they viewed lab monitoring as inconvenient. (Trial Tr. 894:24-895:11 (Gilmore).) Dr. Gilmore explained that this was because lab monitoring is "not something that is done super frequently. It's certainly not a weekly thing. It's not necessarily a monthly thing. Or even sometimes it's once a year." (Trial Tr. 895:3-7 (Gilmore).) Moreover, Dr. Gilmore testified that the risks from biologics identified by Dr. Alexis such as serious infection, reactivation of tuberculosis, and malignancies "are very low risks" that treating physicians are capable of managing. (Trial Tr. 894:10-23 (Gilmore).)[11]

Whatever the relative barriers and risks patients faced in using biologics, the record establishes that several biologics were more efficacious than Otezla. The record establishes that

---

[11] It appears that Otezla itself had its own treatment barriers and risks to patients. According to Dr. Gilmore, forty to fifty percent of her patients treated with Otezla declined to continue with therapy due to associated gastrointestinal side effects that include nausea, vomiting, and diarrhea. (Trial Tr. 891:6-10.) Dr. Gilmore also testified that Otezla is associated with a "risk of an increase of adverse reactions of depression associated with Otezla therapy." (Trial Tr. 890:4-22 (citing JTX-110).) Moreover, as Dr. Gilmore noted, Otezla "is dosed twice daily," once in the morning and once at night, which can be a barrier to treatment adherence for patients. (Trial Tr. 897:1-7 (Gilmore).) By contrast, after loading dose periods, biologics such as Humira and Enbrel are ultimately dosed every other week or weekly respectively. (Trial Tr. 896:16-22.) According to Dr. Gilmore, Stelara is injected with a syringe in the physician's office once every three months. (Trial Tr. 885:16-23 (Gilmore).)

14

clinical studies of Otezla found that the drug had a PASI-75 score of 33.1% and 28.8% after two

separate sixteen-week studies. (JTX-110_12.)[12] Enbrel, Remicade, Humira, and Stelara, which

were approved before Otezla, each had higher PASI scores than Otezla:

| Drug | Approval (psoriasis) | PASI-75 (%) |
|---|---|---|
| Enbrel® | 2004 | 47% |
| | | 46% |
| Remicade® | 2006 | 80% |
| | | 75% |
| | | 88% |
| Humira® | 2008 | 71% |
| | | 78% |
| Stelara® | 2009 | 66% |

(Trial Tr. 327:13-328:5, 330:18-331:7 (Alexis), 887:21-888:20 (Gilmore); DTX-372_4-8;

JTX-110_12.)

> **G. Defendants' ANDAs**

DRL, Sandoz, and Zydus have each submitted Abbreviated New Drug Applications

("ANDAs") to the FDA under 21 U.S.C. § 355(j), ANDAs Nos. 211756, 211658, and 211859,

---

[12] A "PASI" score is a metric commonly used in clinical trials to measure a dermatologic treatment's efficacy. (Trial Tr. 319:21-320:1 (Alexis).) "PASI" stands for "Psoriasis Area and Severity Index." (Trial Tr. 319:10-11.) A PASI score "takes into account the size of the area involved, as well [as the] redness of the plaques, thickness of the plaques, and scaling." (Trial Tr. 823:1-4 (Gilmore).) "The scale goes from 0 to 72." (Trial Tr. 823:10-12 (Gilmore).) "[I]n general, mild scores are defined by PASI scores of less than 10; moderate psoriasis would be considered a PASI score of 10 to 50; and greater than 50 would be reflective of a severe psoriasis level of involvement." (Trial Tr. 823:12-16 (Gilmore).) A "PASI-75" score in a clinical trial refers to what percentage of people who were treated with a certain drug in a study achieved a seventy-five percent or greater reduction in their baseline PASI score at a certain endpoint (e.g., twelve or sixteen weeks) when compared to the patient's PASI score at the beginning of the trial. (Trial Tr. 886:24-887:8 (Gilmore), Trial Tr. 319:9-13, 320:2-21 (Alexis).)

respectively. (Stipulation of Facts ¶¶ 74, 90, 94.) These applications seek FDA approval to engage

in the commercial manufacture, use, and/or sale of apremilast tablets, generic versions of Amgen's

Otezla products. (*Id.*)

Defendants' ANDAs each assert that several of Amgen's apremilast-related patents are

invalid, unenforceable, or will not be infringed by the manufacture, use, offer for sale and/or

importation of their respective ANDA products. Each of DRL's, Sandoz's, and Zydus's ANDAs

assert that Amgen's '638 Patent, '536 Patent, '541 Patent, and '101 Patent are invalid,

unenforceable, or will not be infringed by the manufacture, use, offer for sale, sale, or importation

of DRL's ANDA products. (Stipulation of Facts ¶¶ 76-77, 92-93, 96-97.)

## II.    **LEGAL STANDARD**

Amgen must prove infringement by a preponderance of the evidence. *See Octane Fitness,*

*LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 557-58 (2014) (citing *Bene v. Jeantet*, 129

U.S. 683, 688 (1889)); *Integrated Tech. Corp. v. Rudolph Techs., Inc.*, 734 F.3d 1352, 1356 (Fed.

Cir. 2013); *Siemens Med. Sols. USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d

1269, 1279, 1283 (Fed. Cir. 2011); *Mannesmann Demag Corp. v. Engineered Metal Prods. Co.*,

793 F.2d 1279, 1282 (Fed. Cir. 1986); *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 758

(Fed. Cir. 1984*); Curlin Med. Inc. v. Acta Med., LLC*, 228 F. Supp. 3d 355, 358 (D.N.J. 2017)

(citing *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1327 (Fed. Cir. 2008)).

"Determination of infringement is a factual question." *Cross Med. Prods., Inc. v. Medtronic*

*Sofamor Danek, Inc.*, 424 F.3d 1293, 1302 (Fed. Cir. 2005) (citation omitted).

"[A] patent is presumed valid, and this presumption exists at every stage of the litigation."

*Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1375 (Fed. Cir. 2006) (citation omitted).

Defendants must prove invalidity by clear and convincing evidence. *See* 35 U.S.C. § 282 ("The

burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting

Case 3:18-cv-11026-MAS-DEA    Document 510 *SEALED*    Filed 09/20/21    Page 17 of 91
PageID: 16912

such invalidity."); *Microsoft Corp. v. i4i Ltd.*, 564 U.S. 91, 102 (2011) (citation omitted); *Amgen Inc. v. F. Hoffman-La Roche Ltd.*, 580 F.3d 1340, 1362 (Fed. Cir. 2009) (quoting *PharmaStem Therapeutics, Inc. v. Viacell, Inc.*, 491 F.3d 1342, 1360 (Fed. Cir. 2007)); *Tech. Licensing Corp.*, 545 F.3d at 1327; *Purdue Pharm. Prods. L.P. v. Actavis Elizabeth LLC*, No. 12-5311, 2015 WL 5032650, at *10 (D.N.J. Aug. 25, 2015) (quoting *Linear Tech Corp. v. Int'l Trade Comm'n*, 566 F.3d 1049, 1066 (Fed. Cir. 2009)).

When considering invalidity under an obviousness theory, the Court considers the totality of the prior art. *Bristol-Myers Squibb Co. v. Teva Pharm. USA, Inc.*, 752 F.3d 967, 973 (Fed. Cir. 2014). "Obviousness is a question of law based on underlying facts." *Cross Med. Prods.*, 424 F.3d at 1302 (quoting *Grp. One Ltd. v. Hallmark Cards, Inc.*, 407 F.3d 1297, 1303 (Fed. Cir. 2005)). When making an obviousness determination, courts must consider secondary considerations or objective indicia of non-obviousness. *See id.* at 1321-22. "[A] patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007); *see also Senju Pharm. Co. v. Lupin Ltd.*, 780 F.3d 1337, 1341 (Fed. Cir. 2015). "Thus, a defendant asserting obviousness in view of a combination of references has the burden to show by clear and convincing evidence that a person of ordinary skill in the [art] [("POSA")] . . . had reason to combine the elements in the manner claimed." *Senju Pharm. Co.*, 780 F.3d at 1341 (citing *KSR Int'l Co.*, 550 U.S. at 418-19). Additionally, "a defendant must also demonstrate that a [POSA] would have [had] a reasonable expectation of success in combining the elements." *Id.* (citing *PharmaStem Therapeutics, Inc.*, 491 F.3d at 1360).

Furthermore, in making obviousness determinations, courts must avoid hindsight analysis. *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063,

Case 3:18-cv-11026-MAS-DEA   Document 510 *SEALED*   Filed 09/20/21   Page 18 of 91
PageID: 16913

1070-71 (Fed. Cir. 2012) (holding that courts should reject "hindsight claims of obviousness" where "a defendant urges an obviousness finding by merely throwing metaphorical darts at a board in hopes of arriving at a successful result, but the prior art gave either no indication of which parameters were critical or no direction as to which of many possible choices is likely to be successful" (internal quotations and alteration omitted) (quoting *In re Kubin*, 561 F.3d 1351, 1359 (Fed. Cir. 2009))); *see also Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1377 (Fed. Cir. 2012); *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1364 (Fed. Cir. 2008) (hindsight is "always inappropriate for an obviousness test").

"A determination that a patent is invalid as being anticipated under 35 U.S.C. § 102 requires a finding that each and every limitation is found either expressly or inherently in a single prior art reference." *Sanofi-Synthelabo*, 470 F.3d at 1375 (internal quotations and citation omitted). "Anticipation is a question of fact." *Cross Med. Prods.*, 424 F.3d at 1302 (citation omitted).

## III.    DISCUSSION AND CONCLUSIONS OF LAW

### A.    The '638 Patent

The '638 Patent is entitled "(+)-2-[1-(3-Ethoxy-4-Methoxyphenyl)-2-Methylsulfonylethyl]-4-Acetylaminoisoindoline-1,3-Dione, and Methods of Synthesis and Compositions Thereof." (Stipulation of Facts ¶ 18.) The '638 Patent issued on September 23, 2008, from a patent application filed on April 13, 2005. (*Id.* ¶¶ 19, 22.) Peter H. Schafer, George W. Muller, and Han-Wah Man, were among the named inventors of the '638 Patent. (*Id.* ¶ 20.)

In the present litigation, Amgen, as the current assignee of the '638 Patent, asserts claims 3 and 6 of the '638 Patent against Defendants alleging infringement of the '638 Patent. (*Id.* ¶¶ 21, 23.) Claim 3 of the '638 Patent recites as follows: "[t]he pharmaceutical composition of claim 2 wherein said pharmaceutical composition is suitable for oral administration to a patient." (*Id.*

¶ 28.)[13] Claim 6 of the '638 Patent recites: "[t]he pharmaceutical composition of claim 5 wherein the amount of stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione is from 10 mg to 200 mg." (*Id.* ¶ 31.)[14] As to claims 3 and 6, the parties have stipulated and agreed to the following claim construction: "a composition that comprises one stereoisomer of a compound and is substantially free of other stereoisomers of that compound, wherein that one stereoisomer is (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione." (*Id.* ¶ 73.)

### 1.     Obviousness and the '638 Patent

At trial, Defendants attempted to demonstrate that claims 3 and 6 of the '638 Patent are invalid as obvious. The Court finds that Defendants have failed to meet their burden of showing by clear and convincing evidence that the '638 claims are invalid under an obviousness theory. *See UCB, Inc. v. Accord Healthcare, Inc. ("UCB II")*, 890 F.3d 1313, 1323 (Fed. Cir. 2018) (holding that invalidity under a theory of obviousness must be established by clear and convincing evidence).

---

[13] Claim 2 of the '638 Patent recites as follows: "[t]he pharmaceutical composition of claim 1 wherein said pharmaceutical composition is suitable for parenteral, transdermal, mucosal, nasal, buccal, sublingual, or oral administration to a patient." (*Id.* ¶ 27.) Claim 1 of the '638 Patent is an independent claim and recites as follows: "[a] pharmaceutical composition comprising stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione, or a pharmaceutically acceptable salt, solvate, or hydrate, thereof; and a pharmaceutically acceptable carrier, excipient or diluent." (*Id.* ¶ 26.)

[14] Claim 5 of the '638 Patent recites as follows: "[t]he pharmaceutical composition of claim 4 wherein the amount of stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione is from 5 mg to 500 mg." (*Id.* ¶ 30.) Claim 4 of the '638 Patent recites: "[t]he pharmaceutical composition of claim 2 wherein the amount of stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione is from 1 mg to 1000 mg." (*Id.* ¶ 29.)

Appx64

35 U.S.C. § 103 provides that a patent may be invalidated if its claims are obvious in light of the prior art.[15] Under the pre-AIA version of Section 103,

> A patent may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

35 U.S.C. § 103(a).

The obviousness determination "is centered on four factual inquiries, known as the *Graham* factors: '(1) the scope and content of prior art, (2) differences between claims and prior art, (3) the level of ordinary skill in pertinent art, and (4) secondary considerations such as commercial success and satisfaction of a long-felt need.'"[16] *Mitsubishi Tanabe Pharma Corp. v. Sandoz*, --- F. Supp. 3d ---, 2021 WL 1845499, at *10 (D.N.J. Apr. 7, 2021) (Wolfson, C.J.) (quoting *Procter & Gamble Co. v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009)); *In re Ethicon, Inc.*, 844 F.3d 1344, 1349 (Fed. Cir. 2017) ("[T]he obviousness inquiry must 'guard against slipping into use of

---

[15] The parties agree that the Court's '638 obviousness determination is controlled by the pre-Leahy-Smith America Invents Act ("AIA") version of 35 U.S.C. § 103 "because the patents-at-issue have effective filing dates prior to the March 16, 2013 effective date of the AIA". (Defs.' Proposed Conclusions of Law ¶ 121 n.1, ECF No. 468; Pl.'s Proposed Conclusions of Law ¶ 67.)

[16] The Court notes Amgen's argument that the Federal Circuit's controlling case law requires that the lead compound analysis be performed "in a case involving a new chemical compound." (Pl.'s Post-Trial Br. 20, ECF No. 469.) As Defendants rightly note, however, the Federal Circuit has not required a lead compound analysis in cases involving the separation of enantiomers from racemic mixtures when "in the inventing process, there was no lead compound." *UCB II*, 890 F.3d at 1313 ("We are not aware of any authority holding that a lead compound analysis is or is not required in cases involving purifying mixtures. *Aventis* simply required proving that a person of ordinary skill in the art would have been motivated to purify a mixture of compounds based on some known desirable property."); *see also Janssen Biotech, Inc. v. Celltrion Healthcare Co.*, No. 17-1108, 2018 WL 10910845 (D. Mass. July 30, 2018) ("[T]he Federal Circuit also held that while it was permissible to apply the lead compound test in the circumstances of *UCB*, the district court was not required to do so."). Nothing before the Court suggests that Celgene's work began with a lead compound as a starting point.

hindsight and . . . resist the temptation to read into the prior art the teachings of the invention at issue.'" (quoting *Graham v. John Deere Co.*, 383 U.S. 1, 36 (1966))).

The Federal Circuit has provided the following guidance to district courts performing an obviousness analysis as relating to purified and racemic compounds:

> Where a claimed composition is a purified form of a mixture that existed in the prior art and "if the prior art would provide a person of ordinary skill in the art with *reason to believe* [it had desirable properties], the purified compound is prima facie obvious over the mixture even without an explicit teaching that the ingredient should be concentrated or purified."

*UCB II*, 890 F.3d at 1323 (alteration in original) (quoting *Aventis Pharma Deutschland GmbH v. Lupin*, 499 F.3d 1293, 1301 (Fed. Cir. 2007)). "Such a purified compound is not always prima facie obvious over the mixture," however, if, "for example, it may not be known that the purified compound is present in or an active ingredient of the mixture, or the state of the art may be such that discovering how to perform the purification is an invention of patentable weight in itself." *Aventis*, 499 F.3d at 1301. Furthermore, "in cases involving new chemical compounds, it remains necessary to identify some reason that would have led a chemist to modify a known compound in a particular manner to establish prima facie obviousness of a new claimed compound." *Takeda Chem. Indus., Ltd. v. Alphapharm Pty.*, 492 F.3d 1350, 1357 (Fed. Cir. 2007).

"[E]ven though a patentee never must submit evidence to support a conclusion by a judge or jury that a patent remains valid, once a challenger introduces evidence that might lead to a conclusion of invalidity"—a prima facie case—"the patentee 'would be well advised to introduce evidence sufficient to rebut that of the challenger.'" *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1360 (Fed. Cir. 2007) (quoting *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1570 (Fed. Cir. 1986)). Such rebuttal evidence may include "a comparison of test data showing that the claimed composition[] possess[es] unexpectedly improved properties or properties that the

prior art does not have." *In re Dillon*, 919 F.2d 688, 692-93 (Fed. Cir. 1990). Additionally, obviousness can be rebutted by showing that "the prior art teaches away from the claimed invention." *In re Geisler*, 116 F.3d 1465, 1471 (Fed. Cir. 1997); *see also Cheese Sys., Inc. v. Tetra Pak Cheese & Powder Sys., Inc.*, 725 F.3d 1341, 1352 (Fed. Cir. 2013) ("[E]ven when all claim limitations are found in prior art references, the fact-finder must determine what the prior art teaches, whether prior art teaches away from the claimed invention, and whether there was motivation to combine teachings from separate references.").

   *a.*   Graham *Framework: Level of Ordinary Skill in the Art*

   "Whether prior art invalidates a patent claim as obvious is determined from the perspective of one of ordinary skill in the art." *Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1374 (Fed. Cir. 2011) (citing *KRS Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 420 (2007) ("The question is not whether the combination was obvious to the patentee but whether the combination was obvious to a person with skill ordinary in the art."). The parties submit competing definitions of a POSA for the purposes of determining the validity or invalidity of the '638 Patent. (*Compare* Pl.'s Proposed Findings of Fact ¶¶ 270-72, ECF No. 470, *with* Defs.' Proposed Findings of Fact ¶¶ 400-03, ECF No. 467.) Nevertheless, Amgen submits that its experts' obviousness opinions would not change even accepting Defendants' definition of a POSA. (Pl.'s Proposed Findings of Fact ¶¶ 271-72.) Accordingly, the Court will use Defendants' definition of a POSA when considering the validity of the '638 Patent. That definition construes a POSA as follows:

> [A] scientist with a Ph.D. in a field such as chemistry, medicinal chemistry, solid-state chemistry, pharmaceutics, pharmacology or the like, with one or two years of experience in the research, development, or characterization of pharmaceutical compounds, including chiral synthesis and resolution of stereomeric compounds or analytical methods (e.g., X-ray crystallography) for characterizing solid materials, or with an M.S. or similar degree and an additional three or more years of experience in the research, development, or characterization of pharmaceutical compounds.

(Defs.' Proposed Findings of Fact ¶ 400.)

        *b.*     Graham *Framework: Scope and Content of the Prior Art*

      According to Defendants, the '638 Patent claims "would have been obvious to a POSA over (1) the '358 patent and WO '606 and the knowledge of a POSA and (2) the '358 patent and Takeuchi and the knowledge of a POSA." (Defs.' Post-Trial Br. 28, ECF No. 467.)

      The '358 Patent is not among the patents-in-suit in the matter now before the Court. Celgene is the assignee of the '358 Patent. (DTX-174_1.) Drs. George W. Muller and Hon-Wah Man, who were co-inventors of the '638 Patent, were also inventors of the '358 Patent. (*Id.*) The '358 Patent preceded the '638 Patent and was filed on October 30, 1998, and issued on February 1, 2000. (*Id.*) The '358 Patent broadly asserts that "[t]he compounds of the present invention are useful in the inhibition of phosphodiesterases, particularly PDE III and PDE IV, and in the treatment of disease states mediated thereby." (DTX-174_4, at 4:28-32; *see also* Stipulation of Facts ¶ 128 (same).) As Amgen frequently noted at trial, the '358 Patent discloses Formula I compounds, which cover billions of compounds. (*See, e.g.*, Trial Tr. 619:13-19 (Gribble), 1313:11-15 (Davies).) Nevertheless, as Defendants often noted in response, the '358 Patent identifies seventeen example compounds that fall within the scope of the Formula I compounds, all of which are racemates. (Trial Tr. 619:9-12, 662:25-663:5 (Gribble), 1315:1-17 (Davies).)

      Example 12 is one of these seventeen exemplar compounds. (Trial Tr. 594:23-24 (Gribble), 1398:16-20 (Davies).) Example 12 of the '358 Patent is a racemic mixture that is 50% of the (+) isomer (which is apremilast) and 50% the (-) isomer. (Trial Tr. 591:18-23, 624:12-13 (Gribble), 1315:8-1316:3 (Davies).) The '358 Patent states that "[t]he compounds of Formula I possess a center of chirality and can exist as optical isomers. Both the racemates of these isomers and the individual isomers themselves, as well as diastereomers when there are two chiral centers, are

within the scope of the present invention." (DTX-174_6, at 8:63-67; Trial Tr. 594:6-17 (Gribble),
1406:6-1408:8 (Davies).) Although the '358 Patent claimed apremilast as an isomer within the
scope of its inventions, it did not note any therapeutic utility in apremilast specifically. Nor did the
'358 Patent suggest that apremilast was the active ingredient in the racemic mixture that had
therapeutic utility. The '358 Patent noted only that Example 12 was one of seventeen racemic
mixtures that had therapeutic utility.

Furthermore, although the '358 Patent does assert that certain of the example compounds
can be used in "oral dosage forms includ[ing] tablets, capsules, dragées, and similar shaped,
compressed pharmaceutical forms containing from 1 to 100 mg of drug per unit dosage,"
(DTX-174_7, at 9:22-24), the '358 Patent makes no particular claims as to the suitability of
apremilast for oral administration, as opposed to administration via intravenous or rectal
administrations (*id.*). Without considering apremilast, however, the '358 Patent noted that Formula
I racemates "can be used as such or can be separated into their individual isomers mechanically as
by chromatography using a chiral absorbent" and "so as to obtain either or both substantially free
of the other, i.e., in a form having optical purity of >95%." (Trial Tr. 594:6-22 (Gribble);
DTX-174_6-7, at 8:67-9:12; DTX-174_9, at 14:34-55.) Furthermore, evidence at trial established
that the Patent Office considered the '358 Patent during the prosecution of the '638 Patent and
found that the latter was neither anticipated nor rendered obvious by the '358 Patent.
(JTX-16_271-73; Trial Tr. 679:1-13 (Gribble).)

Defendants assert that the WO 01/34606 ("WO '606") patent is prior art to the '638 Patent
that "reinforces the teachings of the '358 Patent." (Defs.' Post-Trial Br. 30.) WO '606 was
published on May 17, 2001. (DTX-159_1.) Man and Muller were also named inventors of WO
'606, and Celgene is listed as the applicant on its cover. (*Id.*) Like the '358 Patent, WO '606

Appx69

Case 3:18-cv-11026-MAS-DEA    Document 510 *SEALED*    Filed 09/20/21    Page 25 of 91
PageID: 16920

discloses a class of compounds called Formula I. (DTX-159_11.) WO '606 "teach[es] the Formula I compounds in the '606 are useful to inhibit PDE4" and that "you can separate the individual isomers and obtain them substantially free of the other enantiomer in a form having an optical purity of greater than 95 percent." (Trial Tr. 605:23-606:4 (Gribble).) Similar to the '358 Patent, WO '606 teaches that Formula I compounds "can be typified by oral dosage forms that include tablets, capsules, dragées, and similar shaped, compressed pharmaceutical forms obtaining from 1 to 100 mg of drug per unit dosage." (DTX-159_25, at 24:1-3; Trial Tr. 605:23-606:10 (Gribble).) Also like the '358 Patent, WO '606 notes non-oral methods of administering Formula I compounds. (DTX-159_25, at 24:4-8.) It is undisputed that "there is overlap between the compounds of WO '606 and the '358 Patent, and Example 12 is within the scope of Formulae I," as described in both WO '606 and the '358 Patent. (Pl.'s Post-Trial Br. 33, ECF No. 469.) It is also undisputed, however, that unlike the '358 Patent, WO '606 fails to explicitly mention Example 12. (*See, e.g.*, Trial Tr. 1320:20-21 (Davies) ("Q: Is Example 12 one of the 60 or so example compounds in WO '606? A: It is not, no.").)

As for Takeuchi, which Defendants rely on as a part of their theory of obviousness, that paper is a 1999 academic publication in *Organic Letters*. (*See generally* DTX-168.) It is undisputed that Takeuchi does not describe Patent '358's Example 12 or any other compound listed in the '358 Patent. (Trial Tr. 1322:18-20 (Davies), 669:13-17 (Gribble).) Additionally, unlike the '358 Patent, Takeuchi does not provide any information about PDE4 inhibition. Takeuchi does, however, teach preparation of 3-fluorothalidomide, "a nonracemizable isoteric analogue of thalidomide." (DTX-168_1 ( abstract).) Takeuchi discloses that "[i]n strategies designed to develop drugs that might have the beneficial effects of thalidomide without the teratogenic side effects, synthesis of nonracemizable analogues of thalidomide has attracted much attention."

25

Appx70

Case 3:18-cv-11026-MAS-DEA   Document 510 *SEALED*   Filed 09/20/21   Page 26 of 91
PageID: 16921

(DTX-168_1.) Takeuchi teaches how to separate enantiomers of a compound that has a phthalimide ring, just as disclosed in the '358 Patent and with a separation greater than 99% purity. (Trial Tr. 610:6-15, 612:4-11 (Gribble).) The paper teaches preparation of 3-fluorothalidomide where the fluorine replaces the unstable hydrogen molecule in thalidomide and further teaches that 3-fluorothalidomide does not racemize. (Trial Tr. 609:10-23 (Gribble).) Takeuchi also teaches separation of the R- and S-enantiomers of 3-fluorothalidomide using a commercial chiral column and eluting with ethanol as the solvent, and that each enantiomer was obtained with an optical purity of more than 99%. (Trial Tr. 609:12-610:4.)

> c.    Graham *Framework: Differences between Claims and Prior Art*

The Federal Circuit has held that "[i]n cases involving the patentability of a new chemical compound, prima facie obviousness under the third *Graham* factor generally turns on the structural similarities and differences between the claimed compound and the prior art compounds." *UCB II*, 890 F.3d at 1328 (citation omitted). "[S]tructural similarity between claimed and prior art subject matter, proved by combining references or otherwise, where the prior art gives reason or motivation to make the claimed compositions, creates a prima facie case of obviousness." *Aventis*, 499 F.3d at 1301. Indeed, as the Federal Circuit has explained,

> [I]f it is known that some desirable property of a mixture derives in whole or in part from a particular one of its components, or if the prior art would provide a person of ordinary skill in the art with a reason to believe that this is so, the purified compound is prima facie obvious over the mixture even without an explicit teaching that the ingredient should be concentrated or purified.

*Id.*

Here, the Court finds that Defendants have failed to meet their burden of establishing that the prior art gave the POSA reason or motivation to resolve the Example 12 racemate into its enantiomers. Notwithstanding some indication of Example 12's therapeutic benefits as described

Case 3:18-cv-11026-MAS-DEA   Document 510 *SEALED*   Filed 09/20/21   Page 27 of 91
PageID: 16922

in the '358 Patent, Defendants have not presented the Court with sufficient evidence to conclude that a POSA would have had reason to believe that the desirable properties of Example 12 derived in whole or in part from the apremilast isomer. Nor have Defendants demonstrated that the POSA would have had a reasonable expectation of success in resolving Example 12 in either 1999 or 2002.

The evidence at trial confirms these findings. The evidence established that the '358 Patent included "absolutely no biological data" on any of its example compounds, including Example 12. (Trial Tr. 1683:8-23 (Knowles).) Relatedly, the trial record also established that as of 1999 or 2002, there was no publicly available data concerning PDE4 potency, safety, tolerability, selectivity, or drug-like properties on any of the enantiomers of the '358 Patent's example compounds. (Trial Tr. 1690:20-1691:6 (Knowles).) Specifically, although the '358 Patent broadly discloses that the example compounds are "useful in the inhibition of phosphodiesterases, particularly PDE III and PDE IV, and in the treatment of disease states mediated thereby," (DTX-174_4, at 4:28-32), evidence at trial established that such a claim would not provide a POSA with sufficient reason to expend significant resources exploring the potential therapeutic utility of apremilast (*see* Trial Tr. 1370:6-15 (Davies)). Nor would this disclosure provide the POSA with information or reason to necessarily believe that an enantiomer of Example 12 had any such characteristics. As Amgen's synthetic, organic, and medicinal chemistry expert Dr. Stephen Davies explained, "[A]nything is possible really, so the racemate may have the same biological properties as the two enantiomers. It may have different biological properties." (Trial Tr. 96:17-21 (Davies).) Moreover, having a PDE4-inhibiting racemate in hand would not reliably inform a POSA of either the potency or toxicity of either or both of its enantiomers. (Trial Tr. 96:21-24

27

(Davies) ("[T]he potency of one enantiomer—the potency might reside in one enantiomer, the toxicity might reside in the other, the potency and the toxicity might reside in both or just one.").)

In rebutting the uncertain therapeutic value of a racemate versus its enantiomers, the Court finds Amgen's expert Dr. Davies more persuasive than Defendants' expert. Defendants' chemistry expert, Dr. Gordon Gribble, asserted that whenever one creates racemic mixtures of "any type in any kind of situation, the motivation is to separate those two compounds because you're dealing with a mixture of two things. You want to see what each enantiomer in this case is and what the biological activity is for each enantiomer." (Trial Tr. 604:18-605:1 (Gribble).) This, according to Dr. Gribble, is "inherent motivation. There's never motivation not to separate racemic mixtures." (Trial Tr. 605:1-3 (Gribble).) To the contrary however, Dr. Davies rejected the view that there would have been inherent motivation to resolve the Example 12 racemate, or any of the other example compounds referenced in the '358 Patent:

> The idea that a POSA would go off and make 17 racemates, resolve 17 compounds through—each of which might take a huge amount of time and effort when they have no information about the . . . racemate . . . if they were working for me in academia in one of my companies, they wouldn't be working for me much longer. The amount of effort and time and resources they would have wasted doing that would be unacceptable.
>
> . . . .
>
> [I]f your racemate has some bad effects that you can't get around, then maybe it's a good idea to resolve it, if you know some information about the racemate that is bad for you. But if the racemate's fine, you would just carry on with the racemate.

(Trial Tr. 1366:18-1367:5, 1487:19-1488:2.)

Relatedly, Amgen argues that even though the '358 Patent discloses that apremilast can be isolated from Example 12 by techniques known in the art, it does not disclose *how* the POSA could have isolated the Example 12 enantiomers without undue experimentation. Amgen notes that the

'358 Patent does not provide a specific method for making stereomerically pure apremilast. (Trial Tr. 630:4-7 (Gribble).)

The evidence before the Court establishes that resolving a racemic mixture is a difficult process based on trial-and-error experimentation. (*See, e.g.*, Trial Tr. 1350:6-13 (with Dr. Davies testifying that making enantiomers is "unpredictable. It's—it's trial and error. You have to do a lot of experimentation. Unless you're very lucky, you have to do a lot of experimentation to make enantiomers."); JTX-181_8 ("Although an experienced investigator can develop a 'feel' for the resolution of a racemic mixture, in practice working out the experimental conditions is still a process of trial and error."); JTX-181_8 ("Selection of a resolution system is still a matter of trial and error and some resolutions have defied solution even after trying many different resolving agents and solvents."); JTX-183_10 ("As of now, an optical resolution carried out in the usual manner is an empirical process."). To be sure, Dr. Davies explained that virtually his entire academic career has involved projects to make single enantiomers and that he was often unsuccessful in these efforts. (Trial Tr. 1349:14-19 (Davies).)

Further, in the battle of the experts regarding the process of separating enantiomers, the Court finds Dr. Davies more persuasive than Dr. Gribble. As a threshold matter, both Amgen's and Defendants' experts appear to agree that the formation of chiral salts was not a viable method for separating the enantiomers of Example 12, notwithstanding the '358 Patent's representation to the contrary. (Trial Tr. 1363:5-14 (Davies), 645:15-19 (Gribble) ("Q: And, in fact, Example 12 is not amenable to the use of a chiral acid salt to isolate its enantiomers from the racemate; is that right? A: It is not an acid or not amine, not a base. So one cannot make a conjugate acid-base salt

Case 3:18-cv-11026-MAS-DEA    Document 510 *SEALED*    Filed 09/20/21    Page 30 of 91
PageID: 16925

with Example 12.").)[17] Instead, Dr. Gribble asserts that chiral chromatography is the best and most efficient method for separating enantiomers of a racemic mixture. (Trial Tr. 586:9-12 (Gribble).) Dr. Gribble testified that separation of enantiomers using chiral chromatography is routine, standard experimentation taught in sophomore organic chemistry. (Trial Tr. 582:18-584:12, 593:4-594:5.) Drs. Gribble and Davies disagreed as to whether using chiral chromatography to resolve Example 12 is a mechanical separation requiring no chemical modification (Trial Tr. 585:20-586:1 (Gribble)), or whether such a resolution would be a chemical modification (Trial Tr. 1337:17-23 (Davies)). In any event, the parties appear to agree that chiral chromatography takes advantage of the selective interaction of enantiomers with a chiral adsorbent in the column. (Trial Tr. 585:20-586:1 (Gribble), 1356:14-21 (Davies).)

As Dr. Davies explained, however, to utilize chiral chromatography to resolve Example 12, the POSA would have needed to find an appropriate solvent system for the chiral column to separate the enantiomers, and there were many such systems from which a POSA might have chosen in either 1999 or 2002. (Trial Tr. 1359:8-24 (Davies).) In determining how likely a given system was to succeed in accomplishing the selection, Dr. Davies testified that "nothing is predictable. You have to try. Trial and error." (Trial Tr. 1355:10-13.) The POSA would have needed to consider the temperature, pH of the solvent system, and flow rate of the mobile phase in developing a chiral chromatography route. (Trial Tr. 1360:2-11 (Davies).) The conditions as to each of these variables would also have needed to be determined through experimentation. (Trial Tr. 1364:13-20 (Davies).)

---

[17] The '638 Patent provides that apremilast "can be isolated from the racemic compound by techniques known in the art. Examples include, but are not limited to, the formation of chiral salts and the use of chiral or high performance liquid chromatography 'HPLC' and the formation and crystallization of chiral salts." (JTX-3_10, at 9:13-16.)

Case 3:18-cv-11026-MAS-DEA   Document 510 *SEALED*   Filed 09/20/21   Page 31 of 91
PageID: 16926

Moreover, notwithstanding Takeuchi and its teaching on the ability to separate two enantiomers with a phthalimide ring with 99 percent purity using ethanol as a solvent, (Trial Tr. 610:5-15), Dr. Davies testified that he performed a literature search to see if he could find any reference or guidance to either the resolution of Example 12 and apremilast, or the resolution of any structural analogs via chiral chromatography; Dr. Davies found no such literature. (Trial Tr. 1363:19-23.) Whatever the teachings of Takeuchi, the Court cannot find that Defendants have met their burden of explaining how Takeuchi would have made the resolution of Example 12 via chiral chromatography obvious.

Significantly, in resolving the disputes between Dr. Davies and Dr. Gribble, the Court finds that, although both experts were credible, Dr. Davies's testimony was more persuasive. Dr. Gribble has had a long history of researching, teaching, and publishing in the fields of organic and medicinal chemistry, including synthesizing pharmaceuticals that eventually received FDA approval. (Trial Tr. 569:7-574:9 (Gribble).) Yet much of Dr. Davies's long career has involved practical experience specifically focused on separating enantiomers. (Trial Tr. 1490:8-10 (Davies).) His experience included establishing a company in 1992 called Oxford Asymmetry with the goal of helping pharmaceutical companies prepare single enantiomers. (Trial Tr. 1490:11-23.) Dr. Davies's experience has involved several successful resolution attempts and failures. (*See, e.g.*, Trial Tr. 1349:14-1350:5 ("Well, there's one compound that I've been trying to resolve for at least two decades, and—and people . . . who join my research group, I get them to have a go . . . try a technique they want to try, whatever. And we have—we never succeeded in doing that.").)

The matter before the Court is distinguishable from *Aventis*. In *Aventis*, the Federal Circuit considered whether a stereoisomer, in a form substantially free of other isomers, was obvious over the prior art disclosing its racemic mixture. 499 F.3d at 1301-03. The Federal Circuit ultimately

Case 3:18-cv-11026-MAS-DEA Document 510 *SEALED* Filed 09/20/21 Page 32 of 91
PageID: 16927

concluded that the patent was invalid as obvious because at the time the racemic mixture was synthesized, it was understood that the stereoisomer was the racemic mixture's therapeutically active ingredient. *Id.* at 1302. Unlike in the present case, the prior art in *Aventis* provided the POSA with sufficient reasons to investigate the claimed stereoisomer because the prior art taught that there were substantial differences in its potency compared to the other stereoisomer. *Id.* ("[T]he Merck article taught that the SSS configuration of enalapril is 700 times as potent as the SSR form. The close structural analogy between 5(S) and SSSSR ramipril and SSS and SSR enalapril would have led a person of ordinary skill to expect 5(S) and SSSSR ramipril to differ similarly in potency.").

The case here is more like *Forest Laboratories, Inc. v. Ivax Pharmaceuticals, Inc. ("Forest Labs I")*, 438 F. Supp. 2d 479, 492 (D. Del. 2006), *aff'd*, 501 F.3d 1263, 1269 (Fed. Cir. 2007). In that case, the patent in dispute covered a substantially pure (+) enantiomer of citalopram, which was the active ingredient in an antidepressant. *Id.* The defendants contended that the patent was invalid as prima facie obvious based on an earlier patent that claimed racemic citalopram and disclosed its use as an antidepressant. *Id.* The defendants contended "that (+)-citalopram is structurally similar to racemic citalopram and is used to treat the same condition as racemic citalopram, and therefore, one skilled in the art would have been motivated to make the claimed compound." *Id.*

The district court rejected that argument. It noted that "even [d]efendants' experts acknowledged that the resolution of racemic compounds is difficult to achieve in today's world, and the activity of a particular enantiomer could not be known until it was actually separated and tested." *Id.* at 493. The Court had also heard evidence of the "unpredictable nature of the separation techniques and separation results of racemates in general." *Id.* Considering these challenges, the

32

Case 3:18-cv-11026-MAS-DEA    Document 510 *SEALED*    Filed 09/20/21    Page 33 of 91
PageID: 16928

district court concluded that defendants had "not demonstrated by clear and convincing evidence that one skilled in the art would have been motivated to resolve citalopram." *Id.* Moreover, the district court concluded that "a person skilled in the art seeking such a resolution would not have a reasonable expectation of success without undue experimentation." *Id.* The Federal Circuit affirmed the district court's holding. *Forest Lab'ys, Inc. v. Ivax Pharms., Inc. ("Forest Labs II")*, 501 F.3d 1263, 1269 (Fed. Cir. 2007) ("These findings fully support the conclusion that the claimed subject matter would not have been obvious to one of ordinary skill in the art.").

Similarly, here, the Court finds that with limited publicly available data to a POSA in 1999 or 2002 on the biological effects of the '358 example compounds, the POSA would have had little reason or motivation to attempt to separate the compounds' enantiomers—let alone a reason to try to separate or synthesize the enantiomers of Example 12. That is especially so given the unpredictable "trial and error" nature of resolving racemic compounds. (Trial Tr. 1350:6-13.)[18] The Court, accordingly, finds that this factor weighs against an obviousness finding in Defendants' favor.

#### d.    Graham *Framework: Objective Evidence of Non-Obviousness*

A court's evaluation of the "secondary considerations" or "objective indicia of non-obviousness" "is not just a cumulative or confirmatory part of the obviousness calculus but [rather] constitutes independent evidence of non-obviousness." *Ortho-McNeil Pharm., Inc.*, 520 F.3d at 1365. Indeed, consideration of these criteria "help[s] inoculate the obviousness analysis

---

[18] The POSA also would have had limited motivation or reason to try and separate the enantiomers because a racemate may have either the same or different biological properties from the enantiomers. (*See* Trial Tr. 96:14-24; *Sanofi-Synthelabo v. Apotex, Inc.*, 550 F.3d 1075, 1088 (Fed. Cir. 2008) (affirming district court finding that separation of enantiomers was not obvious because it "was not a simple or routine procedure and that success in separation, as well as the allocation of properties, was unpredictable").)

against hindsight." *Mintz*, 679 F.3d at 1378. Because the obviousness inquiry is "expansive and flexible," *KSR Int'l Co.*, 550 U.S. at 415, there are a variety of secondary considerations that may be "utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented," including, but not limited to, "meeting a long-felt need, the inventors' success despite the failure of others, commercial success, copying, praise and recognition for the invention, unexpected results, and significant effort and serendipity." *Teva Neuroscience, Inc. v. Watson Labs., Inc.*, No. 10-5078, 2013 WL 12318005, at *7 (D.N.J. Sept. 20, 2013) (citing *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 660-62 (Fed. Cir. 2000)). "For objective evidence of secondary considerations to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the *claimed invention*." *In re Huai-Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011) (quoting *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010)). "[A] court need not find that all factors are present to determine that the objective considerations support a finding of non-obviousness." *Mitsubishi*, 2021 WL 184599, at *21. "Although secondary considerations must be taken into account, they do not necessarily control the obviousness conclusion." *Apotex, Inc.*, 480 F.3d at 1372 (citing *Newell Cos., Inc. v. Kenney Mfg. Co.*, 864 F.2d 757, 768 (Fed. Cir. 1988)).

i.    Unexpected Results

"To be particularly probative, evidence of unexpected results must establish that there is a difference between the results obtained and those of the closest prior art, and that the difference would not have been expected by one of ordinary skill in the art at the time of the invention." *Bristol-Myers Squibb Co.*, 752 F.3d at 977. "While a marked superiority in an expected property may be enough in some circumstances to render a compound patentable, a mere difference in degree is insufficient." *Id.* (citations and internal quotation omitted).

34

The parties disagree as to what is the closest prior art for the purposes of an unexpected results analysis. (*See* Pl.'s Post-Trial Br. 44 ("Defendants' argument that unexpected results can be compared only to data from the racemate, and not cilomilast, [is] baseless"); Defs.' Post-Trial Br. 50 ("Cilomilast was not the closest prior art, which would have been Example 12 of the '358 [P]atent.").) The Court's review of *UCB* indicates that it need not limit its analysis of unexpected results to apremilast's improvements over the Example 12 racemate. *UCB, Inc. v. Accord Healthcare, Inc. ("UCB I")*, 201 F. Supp. 3d 491 (D. Del. 2016) (analyzing an enantiomer claimed by the patent-in-suit for unexpected results over several other anti-epilepsy drugs, not just the enantiomer's racemate, which had been disclosed by prior art), *aff'd*, 890 F.3d 1313 (2018). Nevertheless, even accepting the premise that the Court's unexpected results analysis should be limited to considering evidence of apremilast's unexpected improvements over Example 12, evidence at trial supports finding in Amgen's favor. At trial, Dr. Schafer explained that in early murine shock model studies, it appeared that the chosen dose of apremilast could produce a "50 percent reduction of TNFα production in the mouse." (Trial Tr. 154:11-18 (Schafer).) According to Dr. Schafer, "[w]e were, frankly, very surprised at how much better apremilast was than the racemate. We didn't expect a 20-fold difference in potency. . . . Normally, if a racemate is a 50/50 mixture of two enantiomers, you might expect a two-fold difference in potency, all things being equal." (Trial Tr. 155:3-15; *see Sanofi-Synthelabo*, 492 F. Supp. 2d at 390 (finding unexpected results where "the prior art did not enable a [POSA] to predict with a reasonable expectation of success whether one enantiomer . . . would have better pharmaceutical properties than the racemate itself, whether one enantiomer would have all of the activity and none of the toxicity of the racemate as a whole," or "whether a single enantiomer would have both all of the activity and all of the toxicity").)

In all events, the trial record establishes that apremilast unexpectedly made substantial improvements over other PDE4 inhibitors in terms of efficacy and tolerability. A drug's "PDE4A4 ratio . . . was a predictor of being better tolerated" (Trial Tr. 233:1-2 (Knowles).) Another drug, Ariflo, also known as cilomilast, had a PDE4A4 ratio of 1.84 and rolipram had a PDE4A4 ratio of 3.64. (JTX-208_14.) Apremilast's PDE4A4 ratio was tenfold better than Ariflo and twenty-fold better than rolipram. (Trial Tr. 152:17-18 (Schafer).) Regarding apremilast's therapeutic index for vomiting, Celgene's 2001 ferret studies unexpectedly determined that apremilast had a better than thirty-fold difference from the therapeutic index of cilomilast. (Trial Tr. 158:2-19 (Schafer), 236:15-19 (Knowles).) Based on the foregoing, the Court finds that apremilast's efficacy and tolerability over the Example 12 racemate and other PDE4 inhibitors was an "unexpected success . . . especially taking into account the lack of prior art directing a [POSA] to that particular outcome." *Sanofi-Synthelabo*, 492 F. Supp. 2d at 392; *cf. UCB I*, 201 F. Supp. 3d at 520-21, 543 (finding that unexpected results as to a drug's "increased therapeutic index" support a finding of unexpected results).

As for nexus, the Court agrees with Amgen that there is a nexus between the unexpected potency and side-effect profile of apremilast and claims 3 and 6 of the '638 Patent. In particular, the evidence before the Court establishes that apremilast's unexpected potency over the Example 12 racemic mixture derives from its separation from the other enantiomer (*see* Trial Tr. 155:3-15, 239:22-240:8), which is linked to the stipulated '638 Patent construction (*see* Stipulation of Facts ¶ 73 ("[A] composition that comprises one stereoisomer of a compound and is substantially free of other stereoisomers of that compound, wherein that one stereoisomer is (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione.").

ii.    Long-Felt, Unmet Needs

Next, with respect to long-felt but unmet needs, the record before the Court establishes that, before apremilast, there was a long-felt need for a psoriasis treatment that was suitable for oral administration to a patient and without the risks and barriers to adherence that were common with other psoriasis treatments. (*See* Trial Tr. 241:12-242:20 (Knowles).)

As discussed above, Amgen's dermatology expert, Dr. Alexis, testified that prior to 1999 or 2002 (the parties' competing proposed priority dates) and as late as Otezla's 2014 approval, topical treatments such as creams and ointments had several drawbacks for patients suffering from moderate to severe psoriasis, including topicals' messiness, patients' difficulty in applying them to large areas of affected skin, topicals' inability to treat psoriatic arthritis, and topicals' tendency to lose efficacy over time. (Trial Tr. 288:14-289:11 (Alexis).) Nevertheless, as Defendants argue, oral systemics such as methotrexate, acitretin, and cyclosporine predated apremilast. (Defs.' Post-Trial Br. 56-57.) And those drugs lacked the barriers to treatment present in topicals. (*Id.*)

But the older oral systemics had their own compliance barriers. The record establishes that older oral treatments like methotrexate had a similar efficacy in treating moderate to severe psoriasis as Otezla. (Trial Tr. 879:9-16 (Gilmore).) As Amgen demonstrated at trial, however, older oral systemics such as methotrexate, acitretin, and cyclosporine "require lab monitoring before and during and sometimes after" treatment. (Trial Tr. 290:21-291:1, 289:15-21 (Alexis).) Evidence at trial also established that older oral treatments like "methotrexate and cyclosporine . . . suppress the immune system" such that they were contraindicated for patients with other underlying diseases such as HIV, or those having underlying infectious conditions such as Hepatitis B, Hepatitis C, or latent tuberculosis. (Trial Tr. 289:15-290:1, 304:16-19 (Alexis).) Unlike these drugs, apremilast is not immunosuppressive and instead reduces inflammation, at least in part, through PDE4 inhibition. (Trial Tr. 169:3-9 (Schafer), 304:9-305:2 (Alexis).) The

37

record at trial also establishes that older oral systemics such as methotrexate and acitretin are associated with fetal death and birth defects. (Trial Tr. 290:1-3 (Alexis).) In addition, Dr. Alexis testified that methotrexate is associated with lymphoma and pulmonary fibrosis. (Trial Tr. 294: 7-12 (Alexis).) Cyclosporine is also associated with a risk of cancer and permanent kidney damage, the latter risk increasing if the patient is treated with cyclosporine for longer than one year. (Trial Tr. 290:5-8, 291:6-12 (Alexis).) Similarly, patients treated with methotrexate are recommended to have a liver biopsy after a certain cumulative dose of the drug. (Trial Tr. 291:2-5 (Alexis).)

Moreover, the older oral systemics' risks and adherence barriers for psoriasis patients are documented in academic literature. As late as 2012, one academic wrote that apremilast's "lack of need for monitoring of liver and kidney function[] suggest that apremilast offers an efficacious treatment option with an acceptable safety and tolerability profile and improved convenience compared with present options and could help fill a gap in the management of psoriasis." (DTX-153_8.) To be sure, on cross-examination, Defendants' expert, Dr. Gilmore, agreed with the foregoing assessment that as late as 2012, apremilast possibly helped fill a gap in the treatment options for psoriasis. (Trial Tr. 944:7-18 (Gilmore).)

Nor do the newer biologics help show unmet needs. Newer biologics like Enbrel, Remicade, Humira, and Stelara, were FDA approved and effective for systemically treating psoriasis without the above risks and treatment barriers as early as 2004, before Otezla's 2014 FDA approval. (Trial Tr. 827:22-24, 828:10-11, 888:5-15 (Gilmore), 279:5-6 (Alexis).) It is undisputed, however, that the biologics had not begun to receive FDA approval for psoriasis before 1999 and 2002. (Trial Tr. 287:24-25, 299:10-14 (Alexis).) Defendants do not appear to argue, and cite no authority for the proposition, that the availability of biologic psoriasis treatments *after* the proposed priority dates for apremilast can nullify a demonstration of unmet need that existed prior

38

Case 3:18-cv-11026-MAS-DEA    Document 510 *SEALED*    Filed 09/20/21    Page 39 of 91
PageID: 16934

to those priority dates. *See Bristol-Myers Squibb Co. v. Teva Pharms. USA, Inc.*, 923 F. Supp. 2d

602, 683 (D. Del. 2013) ("The Federal Circuit has recently explicitly stated that a court is to assess

whether a long-felt and unmet need existed as of the 'filing date of the challenged invention,' not

as of 'the time the invention becomes available on the market, when it can actually satisfy that

need.'" (quoting *Procter & Gamble Co.*, 566 F.3d at 998)).

Indeed, in *Bristol-Myers*, the district court considered whether a Hepatitis B drug, invented

in 1990, entecavir, met a long-felt and unmet need. At the time of its invention there was no

FDA-approved drug for the treatment of Hepatitis B. There were, however, "at least three other

drugs . . . invented before entecavir that went on to gain FDA approval and be used with significant

success to treat Hepatitis B (adefovir, tenofovir, and lamivudine)." *Id.* at 683. Notwithstanding

these earlier drugs, the district court held that because it was not until 1991 that the first FDA

approved drug for treating Hepatitis B came onto the market, "in this sense, there was a long-felt

need for a drug that could be effective against Hepatitis B at [the] time entecavir was invented (a

need that had not been met by any available drug that was actually in use)." *Id.* Similarly, here, the

Court finds that because the biologics only became available for treating psoriasis after the

invention of apremilast, the biologics do not nullify the long-felt and unmet need for an improved

psoriasis medication at the time of apremilast's invention.

All in all, the Court agrees with Amgen that apremilast satisfied a long-felt and unmet need

that existed in either 1999 or 2002. The Court also finds a nexus between the '638 Patent claims

at issue in this matter and the unmet need. As Amgen argues, Otezla has met the need for an

improved psoriasis treatment because of its active ingredient, stereomerically pure apremilast, as

claimed in the '638 Patent. (*See* Trial Tr. 310:22-311:22 (Alexis).) Although the patentee generally

bears the burden of establishing a nexus between satisfaction of long-felt, unmet needs and the

merits of the patented invention, this nexus is presumed where, as here, "the patentee shows that the asserted objective evidence is tied to a specific product and that product 'is the invention disclosed and claimed in the patent.'" *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1329 (Fed. Cir. 2016) (quoting *J.T. Eaton & Co. v. Atl. Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997)); *see also Brown & Williamson Tobacco Co. v. Phillip Morris Inc.*, 229 F.3d 1120, 1130 (Fed. Cir. 2000) ("[I]f the marketed product embodies the claimed features, and is coextensive with them, then a nexus is presumed and the burden shifts to the party asserting obviousness to present evidence to rebut the presumed nexus."); (Trial Tr. 278:20-21 (Alexis) (testifying that the active ingredient of Otezla is apremilast); JTX-110_8.)

### iii.    Others in the Field Tried and Failed to Develop PDE4 Inhibitors

Whether others failed to receive FDA approval for similar pharmaceutical compositions is also relevant evidence of a claimed pharmaceutical composition's non-obviousness. *See, e.g.*, *Knoll Pharm. Co., Inc. v. Teva Pharm. USA, Inc.*, 367 F.3d 1381, 1385 (Fed. Cir. 2004) (finding that the failure of two pharmaceutical companies to obtain FDA approval for similar pharmaceutical compositions was evidence of non-obviousness).

The record before the Court establishes that as of 1999 or 2002, "there were a lot of companies who were developing PDE4 inhibitors at that point in time." (Trial Tr. 747:3-6 (Page).) Nevertheless, "a lot of them failed or didn't progress." (Trial Tr. 747:17-18 (Page).) For example, as of 1999, atizoram, a PDE4 inhibitor developed by Pfizer, was discontinued because it was not effective at tolerable doses. (Trial Tr. 223:19-224:13, 225:4-8 (Knowles); JTX-67_11; JTX-67_7.) Additionally, CD-840, a selective PDE4 inhibitor, "was discontinued in 1996 due to disappointing efficacy." (Trial Tr. 224:14-20 (Knowles); JTX-67_7.) By 1999, more than one hundred PDE4 inhibitor candidates had been discussed in the published literature. (Trial Tr. 221:3-13 (Knowles).)

40

But as of 1999, at least six PDE4 inhibitors had been discontinued. (Trial Tr. 214:3-19, 221:25-225:14 (Knowles).) And by March 2002, at least thirteen PDE4 inhibitors had been discontinued. (Trial Tr. 215:18-216:4, 221:25:14 (Knowles).) Ultimately, by the time of trial, at least 37 PDE4 inhibitors had been discontinued. (Trial Tr. 227:12-24 (Knowles).) Indeed, at the time of trial, "only two oral PDE4 inhibitors [had] been approved": apremilast and roflumilast. (Trial Tr. 747:19-23 (Page).) The Court finds persuasive Dr. Knowles's opinion that if a PDE4 inhibitor was under development over a decade ago but has not yet been approved by the FDA, it is likely to have been discontinued. (Trial Tr. 227:17-21 (Knowles).) Moreover, the Court finds persuasive Dr. Knowles's testimony that even where it is not known why a drug was discontinued, it is unlikely that a drug "with good properties of efficacy, safety, drug-like properties, [etc.]" would be discontinued "for reasons unrelated to shortcomings with that compound." (Trial Tr. 227:25-228:14.)

Notwithstanding the success of roflumilast, overall, the Court finds that the foregoing evidence establishes that the failure of other PDE4 inhibitors to receive FDA approval supports apremilast's non-obviousness as an orally administered pharmaceutical composition.

### iv.    Industry and Regulatory Skepticism

The Court also looks to "skepticism of skilled artisans before the invention." *Cheese Sys., Inc. v. Tetra Pak Cheese & Powder Sys. Inc.*, 725 F.3d 1341, 1352-53 (Fed. Cir. 2013). At trial, Amgen introduced evidence that the FDA and the pharmaceutical industry were skeptical about the safety of apremilast because of its relationship to thalidomide.

The uncontradicted evidence at trial established that the structures of apremilast and thalidomide are related to each other in that they both contain a phthalimido group. (Trial Tr. 103:2-11 (Davies).) As discussed above, thalidomide has a well-known history of teratogenic effects by causing birth defects when administered to pregnant women. (Trial Tr. 101:19-24

41

(Davies).) At trial, the parties' witnesses explained that as of 1999 or 2002, the mechanism of action for the teratogenicity of thalidomide was not known. (Trial Tr. 132:5-10 (Schafer), 658:23-25 (Gribble).) Nor was it known which part of the thalidomide molecule was responsible for teratogenicity. (Trial Tr. 102:23-25 (Davies).)

Amgen rightfully observes that the FDA's correspondence to Celgene about apremilast's structural relationship to thalidomide occurred in this context. In August 2004, in response to the Investigational New Drug Application Celgene was required to submit to the FDA before beginning a clinical trial for apremilast, the FDA asked Celgene to address several "safety concerns" at a then-upcoming teleconference. (PTX-833_2.) These "safety concerns" included that "women of child-bearing potential" participating in the clinical study "should be using 2 acceptable forms of birth control." (Id.) Additionally, the FDA asked Celgene to "comment regarding possible structural similarities of [apremilast] to thalidomide," "assess whether interconversion of the S-isomer [apremilast] to the R-isomer occurs in humans," and also comment on "[t]he fate of the metabolites of the parent drug" and "their potential for teratogenicity." (PTX-833_2-3; see also Trial Tr. 97:17-19 ("The FDA was skeptical about apremilast's structural relationship to thalidomide, raising concerns about teratogenicity and racemization.").) The Court finds persuasive Dr. Davies's explanation that here, the FDA was "worried that apremilast, like thalidomide, may cause severe toxicity, particularly birth defects. And that apremilast, like thalidomide, may racemize in the body and that the resulting mixture—the racemic mixture, which would contain the opposite enantiomer may cause toxicity, particularly birth defects. And the toxicity may not be discovered until human studies." (Trial Tr. 106:10-17 (Davies).) Celgene's minutes from the teleconference report that George Muller, one of the apremilast inventors, explained that apremilast's "chiral center was not acidic and thus not readily racemizable like the

chiral center found in thalidomide"; nor had the data collected up to that point shown teratogenic effects. (JTX-281_3.) Celgene's minutes further note that the "FDA seemed satisfied with Celgene's responses and said that they would convey them to the chemist," who, presumably prompted the FDA to raise these concerns. (*Id.*; Trial Tr. 108:23-109:13 (Davies).)

Notwithstanding the minutes' estimate that the FDA seemed satisfied with Celgene's responses, the Court finds that the fact that the FDA raised concerns about apremilast's connection to thalidomide is sufficient to establish skepticism by skilled artisans about apremilast before its invention. *Cf. Bayer Intell. Prop. GmbH v. Aurobindo Pharm. Ltd.*, 2018 WL 3410020, at *14 (D. Del. July 13, 2018) (finding indicia of skepticism where, "[i]n particular, the European Medicines Agency (the European equivalent of the [FDA]) was skeptical" of a drug's safety profile due to its chemical structure and demanded that the patentee "demonstrate that there was no antibacterial effect. Chemists also expressed concern that the five-chlorothiophene moiety would produce toxic metabolites."); *Allergan, Inc. v. Sandoz*, 726 F.3d 1286, 1291-92 (Fed. Cir. 2013) (holding that "FDA approval may be relevant to the obviousness inquiry" and "[t]he potential for FDA approval also may properly be considered . . . in determining whether . . . there was skepticism regarding the efficacy of such a product").

The Court also finds that evidence at trial established skepticism from the pharmaceutical industry toward apremilast. At trial, Dr. Schafer testified that between early 1999 and 2004, Celgene attempted to license its SelCID program, including apremilast, to other companies. (Trial Tr. 164:21-165:13 (Schafer).) Celgene sought to license its SelCID program because "Celgene was a small company" and it was "not able to really perform this drug development [of SelCIDS] on its own." (Trial Tr. 165:4-5 (Schafer).)

Appx88

GlaxoSmithKline ("GSK") was one of several pharmaceutical companies that declined to license Celgene's SelCID compounds, and apremilast specifically. (Trial Tr. 156:22-157:10 (Schafer) ("We were hoping that [GSK] would be interested in the SelCID compounds and apremilast specifically and take a license to develop them or—or apremilast as a drug.").) Amgen's biochemistry, pharmacology, and drug discovery expert, Dr. Richard Knowles, testified that as a GSK employee at the time, he was involved in evaluating the apremilast licensing opportunity presented to GSK by Celgene. (Trial Tr. 228:15-231:22 (Knowles).) Knowles recalled that in several of GSK's anti-inflammatory effect and tolerability studies, apremilast performed "outstanding[ly]." (Trial Tr. 230: 6-19 (Knowles).) Nevertheless, "[t]here was a mixture of views" in GSK about going forward with apremilast, with some in "the late development and commercial end of the organization in particular" believing "that the association with thalidomide was extremely unhelpful," potentially "giving rise to an actual risk that apremilast might also be teratogenic-like thalidomide." (Trial Tr. 231:19-24 (Knowles).) Dr. Knowles further explained that some GSK officials were concerned about "the reputational risks associated with something that had a strong link to thalidomide and a structural element that was shared with thalidomide" and thought that licensing apremilast "was a significant risk to take." (Trial Tr. 231: 24-232:6 (Knowles).) Ultimately, GSK declined to go forward with apremilast. (Trial Tr. 232:7-9 (Knowles).) Considering Dr. Knowles's testimony about GSK's consideration of apremilast licensing opportunities, the Court finds that there is evidence in the record of industry skepticism toward apremilast. *Cf. UCB I*, 201 F. Supp. 3d at 517 (finding indicia of industry skepticism where, "[c]ompanies rejected [a class of compounds] because," among other things, "the compounds had not yet demonstrate[d] a lack of toxicity" (internal quotations omitted)).

44

v.    <u>Commercial Success</u>

As Amgen's economic expert Dr. Chris Vellturo explained, there is little doubt that Otezla has achieved commercial success since receiving FDA approval. Roughly 1.7 million prescriptions were written for Otezla between the drug's 2014 launch and April 2020. (Trial Tr. 353:22-354:1 (Vellturo).) Within a year of its approval for psoriasis, Otezla had the highest share of prescriptions for systemic treatments among treatment-naïve patients for psoriasis, i.e., patients who are either initiating systemic therapy for the first time or who are restarting therapy after an extended absence. (Trial Tr. 350:16-21, 356:10-15 (Vellturo).) In 2019, Otezla's prescription share among systemic psoriasis treatments surpassed methotrexate, even though methotrexate is available in generic form from a number of suppliers, and as a result has significant cost and insurance advantages over branded products like Otezla. (Trial Tr. 350:10-15 (Vellturo).)

Defendants do not appear to dispute that Otezla has been a commercial success. Rather, Defendants assert that Amgen cannot demonstrate a nexus between Otezla's marketplace performance and the patented attributes of stereomerically pure apremilast. (Defs.' Post-Trial Br. 60-63 ("Commercial success is relevant 'only if there is proof that the sales were a direct result of the unique characteristics of the claimed invention—as opposed to other economic and commercial factors unrelated to the quality of the patented subject matter.'" (quoting *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996)).) Defendants assert that (1) "any evidence of Otezla's marketplace performance is not relevant to the non-obviousness inquiry because the '358 [P]atent was a blocking patent that precluded others from bringing a product like Otezla to the market" (Defs.' Post-Trial Br. 60); (2) "Amgen has not established a nexus between the commercial success and any novel aspects of the ['638] and ['536] Patents claims" (*id.* at 61); and (3) "Otezla's marketplace performance is also attributable to its marketing and promotional expenditures" (*id.* at 62).

45

e.     *Summary of the Court's Obviousness Findings*

Even assuming without deciding that Defendants' nexus arguments are meritorious with respect to commercial success, the Court would still find that the objective indicia weigh strongly in favor of non-obviousness. *See Mitsubishi*, 2021 WL 1845499, at \*21 ("[A] court need not find that all factors are present to determine that the objective considerations support a finding of non-obviousness."). With respect to other objective indicia in the record, including regulatory and industry skepticism toward apremilast because of its structural similarities to thalidomide, satisfaction of long-felt but unmet needs for oral psoriasis treatments, the failure of others to develop effective, safe, and tolerable PDE4 inhibitors that received FDA approval, and the unexpected success of apremilast over other PDE4 inhibitors, the Court finds a nexus between these indicia and the novel features of the '638 Patent. The Court also finds that although there is evidence that the prior art taught that thalidomide analogues could be useful in treating inflammatory diseases, the prior art also taught away from thalidomide analogues as a pharmaceutical composition based on its safety profile. *Star Sci., Inc.*, 655 F.3d at 1374-75 ("[T]he fact-finder must not only determine what the prior art teaches, but whether prior art teaches away from the claimed invention and whether there is a motivation to combine teachings from separate references." (citation omitted)).

After careful consideration of the *Graham* factors, the objective indicia, and the complete trial record, the Court finds that Defendants have failed to establish the obviousness of the '638 Patent by clear and convincing evidence.

2.     **Anticipation and the '638 Patent**

Defendants' argument that the '638 Patent is invalid under a theory of anticipation also fails. "Claimed subject matter is 'anticipated' when it is not new; that is, when it was previously known." *Sanofi-Synthelabo*, 550 F.3d at 1082. "Invalidation on this ground requires that every

46

element and limitation of the claim was previously described in a single prior art reference, either

expressly or inherently, so as to place a person of ordinary skill in possession of the invention."

*Id.* "An anticipating reference must be enabling; that is, the description must be such that a person

of ordinary skill in the field of the invention can practice the subject matter based on the reference,

without undue experimentation." *Id.* The Federal Circuit has held that "[t]he knowledge that

enantiomers may be separated is not 'anticipation' of a specific enantiomer *that has not been*

*separated, identified, and characterized.*" *See UCB II*, 890 F.3d at 1330 (alteration in original)

(emphasis added) (quoting *Sanofi-Synthelabo*, 550 F.3d at 1084).

The record before the Court establishes that the '358 Patent was filed with the Patent Office

in 1998. (Trial Tr. 1319:16-18 (Davies).) It generally stated that the '358 Patent Formula I

compounds:

> possess a center of chirality and can exist as optical isomers. Both
> the racemates of these isomers and the individual isomers
> themselves, as well as diastereomers when there are two chiral
> centers, are within the scope of the present invention. The racemates
> can be used as such *or can be separated* into their individual isomers
> mechanically as by chromatography using a chiral absorbant.
> Alternatively, the individual isomers can be prepared in chiral form
> or separated chemically from a mixture by forming salts with a
> chiral acid, such as the individual enantiomers of
> 10-camphorsulfonic acid, camphoric acid, α-bromocamphoric acid,
> methoxyacetic acid, tartaric acid, diacetyltartaric acid, malic acid,
> pyrrolidone-5-carboxylic acid, and the like, and then freeing one or
> both of the resolved bases, optionally repeating the process, so as
> [to] obtain either or both substantially free of the other; i.e., in a form
> having an optical purity of >95%.

(DTX-174_6-7, at 8:63-9:12 (emphasis added).) Although this statement applied to the seventeen

example compounds enumerated in the '358 Patent, it also applies generally to all compounds with

a center of chirality, including the billions of compounds of Formula I. (Trial Tr. 620:1-22

(Gribble).) But the evidence at trial established that stereomerically pure apremilast had been

47

Case 3:18-cv-11026-MAS-DEA    Document 510 *SEALED*    Filed 09/20/21    Page 48 of 91
PageID: 16943

synthesized no earlier than October 21, 1999. (JTX-210_44; JTX-148_1; Trial Tr. 144:2-3 (Schafer), 1303:5-1304:5 (Davies).) Accordingly, it appears that the above passage merely repeated the general knowledge that individual enantiomers *can be* separated from racemic mixtures.

Like the patent found valid in *UCB II*, the Court finds that the '358 Patent's disclosure of Example 12 "does not disclose its separation into individual enantiomers nor does it disclose any pharmaceutical data" of the apremilast enantiomer. *UCB II*, 890 F.3d at 1330. Because apremilast was not synthesized until a year after the filing of the '358 Patent, the prior art '358 Patent appears to report that Celgene prepared the Example 12 racemic compound "rather than the individual enantiomers." *Id.* (emphasis omitted). The Court, accordingly, cannot find that the above passage from the '358 Patent anticipated the '638 Patent's claims as a matter of law.

Furthermore, the Court finds that Defendants have not demonstrated by clear and convincing evidence that the '358 Patent is enabled as to the separation of the Example 12 enantiomers. *See Forest Labs II*, 501 F.3d at 1268 ("A reference that is not enabling is not anticipating."). Defendants assert that prior art references are presumed enabled. (Defs.' Post-Trial Br. 27 (citing *Procter & Gamble Co. v. Nabisco Brands, Inc.*, 711 F. Supp. 759, 772 (D. Del. 1989)).) Nevertheless, "[a]ny presumption of enablement of prior art does not exclude consideration of whether undue experimentation would be required to achieve enablement." *Sanofi-Synthelabo*, 550 F.3d at 1085. The Federal Circuit has instructed district courts to look to the factors described in *In re Wands* for guidance as to whether undue experimentation would be required to achieve enablement. *Id.* ("The factors relevant to whether experimentation is undue are discussed in, *e.g.*, *In re Wands*" and include "the quantity of experimentation that was actually needed, the amount of guidance provided in the reference, the presence or absence of actual

48

Case 3:18-cv-11026-MAS-DEA    Document 510 *SEALED*    Filed 09/20/21    Page 49 of 91
PageID: 16944

examples of the experimental procedure, the state of the knowledge already available concerning the subject matter at issue, and the predictability or unpredictability in the specific area of science or technology").

The Court finds that the *Wands* factors weigh in favor of a finding that undue experimentation was required to enable the '358 Patent. First, as to the quantity of experimentation that was needed to make apremilast, Dr. Davies persuasively explained that "the time and cost of any necessary experimentation" in pursuing "[a]ny of the general routes listed in the '358 [P]atent would have required substantial time to make stereomerically pure apremilast." (Trial Tr. 1387:5-9 (Davies).) Next, evidence at trial established that there was no guidance in the prior art as to a method for making stereomerically pure apremilast specifically. (Trial Tr. 1363:15-24 (Davies).) As for predictability or unpredictability, this factor weighs against a finding of enablement as the Court has already credited Dr. Davies's testimony that resolving a racemic mixture is a difficult process based on trial-and-error experimentation. (*See, e.g.*, Trial Tr. 1350:6-13 (Davies).) Similarly, with respect to whether the '358 Patent discloses actual examples of the experimental procedure by which a POSA could make stereomerically pure apremilast, the Court finds such examples lacking. (*See* Trial Tr. 1387:23-1388:1 (Davies).)

Relatedly, as to the amount of guidance provided in the reference, the Court finds that the '358 Patent's guidance was minimal as to how to resolve Example 12. The '358 Patent states that the Formula I racemates "can be separated into their individual isomers mechanically as by chromatography using a chiral absorbant. Alternatively, the individual isomers can be prepared in chiral form or separated chemically from a mixture by forming salts with a chiral acid . . . ." (DTX-174_6-7, at 8:67-9:5).) The parties' competing experts appear to agree that the POSA would have known that the chiral acid salt separation route referenced in the '358 Patent would not work

to separate the enantiomers of the racemate described in Example 12, because Example 12 is not a base. (Trial Tr. 1363:5-14, 1409:24-25 (Davies), 645:15-19 (Gribble).) As for chromatography or other methods, evidence at trial established that "[t]he '358 Patent does not provide any guidance in making stereomerically pure apremilast specifically." (Trial Tr. 1388:3-5 (Davies).)

In finding that undue experimentation would have defeated enablement with respect to the '358 Patent as prior art, the Court's decision is consistent with *Forest Labs I* and *Sanofi-Synthelabo*. Defendants argue that "these two cases are factually distinguishable and legally inapposite" because in both cases, the asserted prior art references failed to disclose how to isolate or separate the isomers. (Defs.' Post-Trial Br. 25-26.) Here, Defendants assert that unlike the prior art at issue in *Forest Labs I* and *Sanofi-Synthelabo*, "the '358 [P]atent explicitly teaches that compounds of Formula I can be separated into individual isomers using chiral chromatography." (*Id.* at 26.) But as frequently noted at trial, the Formula I compounds disclosed by the '358 Patent cover billions of compounds. (Trial Tr. 619:13-19 (Gribble), 1313:11-15 (Davies).) A statement that some indeterminate number of these compounds can be separated into individual isomers using chiral chromatography, without any additional guidance whatsoever as to the other variables such as temperature, pH of the solvent system, and flow rate of the mobile phase in developing a chiral chromatography route, (Trial Tr. 1360:2-11 (Davies)), is hardly instruction "such that a person of ordinary skill in the field of the invention can practice the subject matter based on the reference, without undue experimentation." *Sanofi-Synthelabo*, 550 F.3d at 1082.

### 3.    Priority Date of the '638 Patent

A patent is entitled to priority as of the date of conception of the invention, coupled with a reasonable diligence in reducing the invention to practice. *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1577 (Fed. Cir. 1996) ("[T]he person who first conceives, and in a mental sense, first invents . . . may date his patentable invention back to the time of its conception, if he connects the

50

Appx95

conception with its reduction to practice by reasonable diligence on his part, so that they are substantially one continuous act." (second alteration in original) (internal quotations and citation omitted)). "To establish an actual reduction to practice . . . 'the inventor must prove that (1) he constructed an embodiment or performed a process that met all the limitations of the claim; and (2) he determined that the invention would work for its intended purpose." *E.I du Pont De Nemours & Co. v. Unifrax I LLC*, 921 F.3d 1060, 1075 (Fed. Cir. 2019) (alterations omitted) (citation omitted). "[A]ctual reduction to practice, which constitutes in law the final phase of invention, cannot be established absent a showing of practical utility." *Fujikawa v. Wattanasin*, 93 F.3d 1559, 1563 (Fed. Cir. 1996). "[W]hen testing is necessary to establish utility, there must be recognition and appreciation that the tests were successful for reduction to practice to occur." *Estee Lauder Inc. v. L'Oreal, S.A.*, 129 F.3d 588, 594-95 (Fed. Cir. 1997).

The Court finds that the composition claimed in the '638 Patent was first conceived on October 21, 1999. "Conception of a chemical substance requires knowledge of both the specific chemical structure of the compound and an operative method of making it." *Fina Oil & Chem. Co. v. Ewen*, 123 F.3d 1466, 1473 (Fed. Cir. 1997). "Conception does not occur unless one has a mental picture of the structure of the chemical, or is able to define it by its method of preparation, its physical or chemical properties, or whatever characteristics sufficiently distinguish it." *Amgen, Inc. v. Chugai Pharm. Co.*, 927 F.2d 1200, 1206 (Fed. Cir. 1991). The evidence at trial established that Dr. Hon-Wah Man synthesized apremilast on October 21, 1999, at which time he had knowledge of the specific chemical structure of the chemical. (JTX-148_1 (Dr. Man's Compound Submission Form for apremilast, known internally at Celgene as "CC-10004"); JTX-210_44 (Celgene-created slide deck presenting the history of apremilast); Trial Tr. 144:2-3 (Schafer), 1303:16-1304:5 (Davies).) The Court also notes that Dr. Man was "a member of a medicinal

51

Appx96

Case 3:18-cv-11026-MAS-DEA    Document 510 *SEALED*    Filed 09/20/21    Page 52 of 91
PageID: 16947

chemistry group whose goal was to synthesize compounds to be administered to . . . human

beings," a fact which supports the Court's finding that by October 21, 1999, its inventors had

conceived of apremilast as a pharmaceutical for human consumption. (Trial Tr. 1306:1-10

(Davies).) Furthermore, the fact that Celgene first successfully synthesized apremilast in October

1999, and then began testing apremilast "for enzymatic (PDE4) and cellular (TNF inhibition)

activity" in November 1999, convincingly demonstrates that the company was in possession of an

operative method for making the composition. (Trial Tr. 1306:1-10; JTX-210_44; *see, e.g., Merck*

*Sharp & Dohme Corp. v. Actavis Lab'ys FL, Inc.*, No. 15-6075, 2017 WL 4366720, at *18 (D.N.J.

Sept. 29, 2017) ("[T]here was substantial corroborating evidence, such as contemporaneous

documentation and testimony, to show that the inventors of the '151 patent had an 'operable route'

to synthesizing posaconazole.").)

 "Reduction to practice follows conception. To show actual reduction to practice, an

inventor must demonstrate that the invention is suitable for its intended purpose." *Mahurkar*, 79

F.3d at 1578 (citation omitted). "Depending on the character of the invention and the problem it

solves, this showing may require test results." *Id.* (citation omitted). Demonstrating reduction to

practice also requires "the existence of sufficient evidence to corroborate inventor testimony

regarding these events." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1169 (Fed. Cir. 2006).

Courts have held that documents showing in vivo tests of drugs are adequate corroborative

evidence of reduction to practice. *See, e.g., Purdue Pharma L.P. v. Boehringer Ingelheim GMBH*,

237 F.3d 1359, 1366 (Fed. Cir. 2001) (finding that evidence of "*in vivo* test use of the[]

formulations in five randomized crossover bioavailability studies," among other evidence,

"constitutes adequate proof of conception and reduction to practice").

Here, Amgen has provided documentary evidence showing that the '638 claims had been reduced to practice by December 1999 following its October 1999 synthesis. *Mahurkar*, 79 F.3d at 1577 ("[T]he person who first conceives. . . may date his patentable invention back to the time of its conception, if he connects conception with its reduction to practice . . . so that they are substantially one continuous act." (citation omitted)). At trial, Dr. Schafer testified as to a December 1999 internal Celgene report documenting the results of a murine shock model study. (Trial Tr. 147:21-24, 148:9-14 (Schafer); JTX-156_1.) Other internal reports from Celgene documented the results of the same murine shock model study, including the study's finding that apremilast could result in a "50 percent reduction of TNF-alpha production in the mouse." (Trial Tr. 154:11-18 (Schafer); JTX-114_18; JTX-114_20).) This study showed apremilast was twenty-fold more potent than its racemate. (Trial Tr. 154:9-155:15 (Schafer).) Evidence at trial established that this result "implies that . . . there's enough compound there to have a sustained and potent anti-inflammatory effect. That may not translate one to one to human study, but it predicts a dose range which would be effective in human studies." (Trial Tr. 239:9-19 (Knowles).)

Obviously, demonstrating apremilast's potency in mice is not the same as demonstrating its efficacy as a pharmaceutical composition suitable for oral administration to a patient as claimed in the '638 Patent. Nevertheless, evidence at trial established that the murine shock model was "the very first animal model that [Celgene] would test the compounds in," and was "part of the necessary regimen of testing to determine if a compound can be absorbed through the gut, if it's stable, if it reaches the target tissue in the cells, and if it has the desired effect." (Trial Tr. 173:18-174:25 (Schafer).) Dr. Schafer credibly testified that if apremilast failed to work in that model, it would not go on for further testing in humans. (Trial Tr. 174:1-10 (Schafer).) Because animal studies such as the murine shock study described by Dr. Schafer are an essential part of

Appx98

reducing stereomerically pure apremilast to practice as a pharmaceutical composition suitable for patients within the dosage range claimed by claims 3 and 6 of the '638 Patent, and because this reduction occurred as early as December 1999, shortly after its October 21, 1999 synthesis, the Court is satisfied that Amgen is entitled to an October 21, 1999 priority date. *Cf. Cross v. Iizuka*, 753 F.2d 1040, 1050-51 (Fed. Cir. 1985) (acknowledging "*in vivo* utility as sufficient to establish a practical utility," and explaining that "[t]his *in vivo* testing is but an intermediate link in a screening chain which may eventually lead to the use of the drug as a therapeutic agent in humans").

### 4.    Obviousness Type Double Patenting

The '283 Patent was filed on November 12, 2010 and issued on February 10, 2012. (Trial Tr. 1563:4-9 (Smith).) Defendants assert that claim 31 of the '283 Patent, like claims 3 and 6 of the '638 Patent, each state pharmaceutical compositions of stereomerically pure apremilast suitable for oral administration, with overlapping dosage ranges of 1 mg to 200 mg. (Trial Tr. 615:20-616:9 (Gribble); JTX-6_66-67, at 59:20-45, 61:1-3; JTX-3_21, at 31:27-39, 32:9-12.) At trial, Dr. Gribble testified that a POSA would "understand claim 31 to be within the scope of claims 3 and 6." (Trial Tr. 616:14-16 (Gribble).) According to Dr. Gribble, the only difference between claim 31 of the '283 Patent and claims 3 and 6 of the '638 Patent is that claim 31 describes a crystalline form of apremilast whereas claims 3 and 6 do not specify the crystalline form. (Trial Tr. 616:10-13 (Gribble).) The FDA's Orange Book lists the expiration date of the '283 Patent as March 19, 2023. (Stipulation of Facts ¶ 58.) The '283 Patent claims priority to the application for U.S. Patent No. 6,962,940 (the "'940 Patent"), which was filed on March 19, 2003. (*See* PTX-1320.)

For its part, the '638 Patent issued on September 23, 2008, from a patent application filed on April 13, 2005. (Stipulation of Facts ¶¶ 19, 22.) Like the '283 Patent, the '638 Patent claims

priority to the application for the '940 Patent. (*See* PTX-1320.) The FDA's Orange Book lists the expiration date of the '638 Patent as February 16, 2028. (Stipulation of Facts ¶ 25.) Although the '638 Patent issued earlier than the '283 Patent, the Orange Book lists it as expiring later than the '283 Patent. (*See* Defs.' Post-Trial Br. 38 ("Yet claim 31 of the '283 Patent expires on March 19, 2023, and claims 3 and 6 of the '638 patent expire on February 16, 2028.").) Amgen argues that "the *only* reason the '638 Patent expires later than the '283 Patent is because" Amgen "received two statutorily authorized, and properly calculated, term extensions: a patent-term adjustment (or "PTA") of 609 days, under 35 U.S.C. § 154(b), and a patent-term extension (or "PTE") of 1,186 days, under 35 U.S.C. § 156." (Pl.'s Post-Trial Br. 52-53 (citations omitted).) At trial, Amgen presented evidence that each of these statutory time extensions were "properly awarded . . . for delays outside Celgene's control." (*Id.* at 56 (citing, among other things, Trial Tr. 1539:18-1540:12 (Smith).) It is undisputed that the two statutorily authorized time extensions that the '638 Patent received were properly calculated and awarded under applicable Patent Office policies, practices, and procedures. (Trial Tr. 1555:2-9, 1558:21-1559:4 (Smith); PTX-1318; PTX-1319.)

Regardless of the reasons for which Amgen was awarded these adjustments, Zydus asserts that "Amgen's patents run afoul of the axiom that a patentee may not claim the same invention in different patents with different expiration dates under the judicially created doctrine of obviousness-type double patenting." (Defs.' Post-Trial Br. 37.)[19] Accordingly, Zydus argues that the patent-term adjustment awarded to Amgen under section 154(b) should be reduced by 609 days. (*Id.* at 39.)

Notwithstanding these arguments, the Court finds that these statutorily authorized time extensions do not cause a patent to be invalid for obviousness-type double patenting ("ODP").

---

[19] Defendant Sandoz does not join this double-patenting defense. (Defs.' Post-Trial Br. 37 n.8.)

ODP is a "judicially created doctrine intended to prevent improper timewise extension of the patent right." *In re Braat*, 937 F.2d 589, 592 (Fed. Cir. 1991) (emphasis omitted). A difference in expiration dates between two patents that arises solely from a statutorily authorized time extension, such as a patent-term adjustment pursuant to 35 U.S.C. § 154(b) or a patent-term extension pursuant to 35 U.S.C. § 156, cannot be the basis for an application of ODP. *Novartis AG v. Ezra Ventures, LLC*, 909 F.3d 1367, 1372-75 (Fed. Cir. 2018) (rejecting attempt to use "a judge-made doctrine" to "cut off a statutorily-authorized time extension"); *Mitsubishi*, 2021 WL 1845499, at *29-30. The '283 Patent is not a proper ODP reference for the '638 Patent because the difference in expiration dates between the '638 and '283 Patents arises solely from two statutorily authorized time extensions: a patent-term adjustment under 35 U.S.C. § 154(b) and another under 35 U.S.C. § 156.

Even if the '283 Patent were a proper ODP reference for the '638 Patent, the Court would exercise its equitable discretion not to apply the doctrine of ODP under the circumstances of this case because the difference in expiration dates between the '638 and '283 Patents is not the result of prosecution gamesmanship or any improper conduct by Celgene. *Immunex Corp. v. Sandoz, Inc.*, 964 F.3d 1049, 1059 (Fed. Cir. 2020) (noting that ODP is an "equitable doctrine"); *Novartis Pharm. Corp. v. Breckenridge Pharm., Inc.*, 909 F.3d 1355, 1364 (Fed. Cir. 2018) (declining to apply ODP when difference in expiration dates was due to "happenstance of an intervening change in patent term law," rather than "prosecution gamesmanship" by the patentee); *Gilead Scis., Inc. v. Natco Pharma Ltd.*, 753 F.3d 1208, 1210 (Fed. Cir. 2014) (applying ODP when patentee engaged in prosecution gamesmanship by structuring priority claims); *In re Braat*, 937 F.2d at 593.

**B.    The '536 Patent**

Amgen asserts claim 6 of the '536 Patent against DRL, Sandoz, and Zydus. (Stipulation of

Facts ¶ 37.) Amgen is the current assignee of the '536 Patent, which issued on June 4, 2013, from

U.S. Patent Application No. 12/630,788, filed on December 3, 2009. (*Id.* ¶¶ 35-36.) Claim 6 recites

"[t]he method of claim 1, wherein the stereomerically pure compound comprises greater than about

97% by weight of (+) isomer based on the total weight percent of the compound." (*Id.* ¶ 41.)[20]

In response to Amgen's assertion, Defendants challenge the validity of the '536 Patent,

arguing that "[t]he clear and convincing evidence presented at trial renders claim 6 of the '536

[P]atent invalid for anticipation and/or obviousness" as of its March 20, 2002 priority date for

many of the same reasons discussed above with respect to the '638 Patent." (Defs.' Post-Trial Br.

39.)[21]

1.    **Anticipation and the '536 Patent**

For the reasons discussed above with respect to the '638 Patent, the Court finds that the

'358 Patent does not anticipate Claim 6 of the '536 Patent. (*See* Defs.' Post-Trial Br. 39-41.)

Defendants again point to general statements in the '358 Patent that the billions of "compounds of

Formula I," including the seventeen examples listed, "are used . . . to inhibit the undesirable effects

of TNFα and PDE IV" and can be "administered orally, rectally, or parenterally, alone or in

---

[20] Claim 1, in turn, recites "[a] method of treating psoriasis, which comprises orally administering to a patient having psoriasis about 10 mg to about 200 mg per day of stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione, wherein the compound is administered in the form of a tablet or capsule as either a single dose or a divided dose." (*Id.* ¶ 40.)

[21] Amgen does not appear to contest Defendants' proposed priority date for the '536 Patent. (*See* Defs.' Proposed Findings of Fact ¶ 707 (noting that both Amgen and Defendants' experts used a priority date of March 20, 2002 for the '536 patent, which is the effective filing date of Provisional Application No. 60/366,515. (Trial Tr. 699:5-11 (Page), 866:16-18 (Gilmore), 1746:5-8 (Alexis).)

57

combination with other therapeutic agents including antibiotics, steroids, etc., to a mammal in need

of treatment." (DTX-174_5, at 7:1-6.) Additionally, Defendants direct the Court to statements in

the '358 Patent that generally observe that "[d]ecreasing TNFα levels" and "inhibiting PDE IV

thus constitutes valuable therapeutic strategies for the treatment of many inflammatory, infectious

immunological or malignant diseases" including "psoriasis," among many others. (DTX-174_5,

at 4:35-49.) As discussed at length above, although apremilast's racemate is the Example 12

compound given in the '358 Patent, the '358 Patent "does not disclose its separation into individual

enantiomers, nor does it disclose any pharmaceutical data" on the apremilast enantiomer's ability

to treat psoriasis. *UCB II*, 890 F.3d at 1330. Once again, "[t]he knowledge that enantiomers may

be separated is not 'anticipation' of a specific enantiomer that has not been separated, identified,

*and characterized.*" *Id.* at 1323 (alteration in original) (emphasis added) (citation omitted).

### 2.    Obviousness and the '536 Patent

Regarding obviousness combinations, in some respects Defendants' proposed '536 Patent

obviousness combinations overlap with the '638 Patent discussed above. Defendants, however,

also assert additional prior art references. (Defs.' Post-Trial Br. 41 (asserting that the '358 Patent

"not only anticipates the asserted claim of the '536 Patent, but also renders it obvious, as of the

'536 patent's priority date," when "viewed in combination with the knowledge of a POSA and the

teachings of: (1) WO '606, Dyke 1999, and Marriott 2001; (2) Takeuchi, Dyke 1999, and Marriott

2001; and/or (3) Dyke 1999, Marriott 2001, and Muller 1998").)

Hazel Dyke & John Montana, The Therapeutic Potential of PDE4 Inhibitors ("Dyke 1999")

is a 1999 article that provides a comprehensive review of the therapeutic potential of selective

PDE4 inhibitors in a variety of diseases. (Trial Tr. 710:21-711:8 (Page). *See generally* JTX-67.)

At trial, Defendants' pharmacology and drug discovery expert, Dr. Clive Page, testified that Dyke

1999 gave psoriasis "its own section in this review, suggesting that people working in this industry

at this time were considering this as a sensible disease area to use PDE4 inhibitors as a possible treatment." (Trial Tr. 711:23-712:5 (Page).) Defendants note that Dyke 1999 asserts "the potential utility of PDE4 inhibitors in [rheumatoid arthritis] and the broad-spectrum anti-inflammatory action of such compounds suggests that they have the potential to provide a beneficial treatment for psoriasis." (JTX-67_12; Trial Tr. 712:8-18 (Page).) Dyke 1999 also disclosed an instance of PDE4 inhibitors being used to treat psoriasis. (JTX-67_12.) In that instance, topical administration of "[t]he selective PDE4 inhibitor Ro20-1724, was investigated in two double-blind studies." (*Id.*; Trial Tr. 712:20-713:4 (Page).) The studies showed that PDE4 inhibition "improve[d] psoriatic lesions" and "had no adverse systemic or cutaneous effects, suggesting the therapeutic potential of such compounds in the treatment of psoriasis." (JTX-67_12; Trial Tr. 712:20-713:4 (Page).)

J. Blake Marriott et al., Immunotherapeutic and Antitumor Potential of Thalidomide Analogues ("Marriott 2001"), is a 2001 article. (Trial Tr. 715:14-716:3. *See generally* JTX-66.) Marriott 2001 generally discloses that thalidomide was "established as an effective immunomodulatory and anti-inflammatory drug" that "show[ed] potential for the treatment of a range of conditions, including rheumatoid arthritis." (JTX-66_2-3; Trial Tr. 716:15-20 (Page).) According to Marriott 2001, thalidomide had been shown to inhibit synthesis of TNFα, which is "a key regulator of other pro-inflammatory cytokines and leukocyte adhesion molecules and therefore represents a therapeutic target in a number of conditions where the overproduction of TNFα is associated with a pathological inflammatory cascade." (JTX-66_3.) Marriott 2001 reported that "[i]n the last few years two anti-TNFα biological agents have received FDA approval. Enbrel, a TNFα receptor received approval for the treatment of [rheumatoid arthritis] and infliximab, a TNFα antibody received approval for Crohn's disease." (*Id.*) Additionally, Marriott 2001 reported on a SelCID that had entered into clinical development and that this SelCID, a

59

Celgene compound known as CDC-801, had "successfully completed two Phase I clinical trials in the UK," with no serious adverse events reported in the second trial. (JTX-66_6; Tr. 717:22-718:18 (Page); Trial Tr. 1718:19-1720:25 (Knowles).)

George Muller et al., Thalidomide Analogs and PDE4 Inhibition ("Muller 1998"), is a 1998 article authored by one of the inventors of the '536 Patent, George Muller. (Trial Tr. 713:10-24 (Page). *See generally* JTX-69.) Muller 1998 describes Celgene's efforts to prepare several analogs of thalidomide and increase their ability to inhibit $TNF\alpha$ and PDE4 *in vitro* as well as decrease their teratogenic potency. (JTX 69_1-2; Trial Tr. 713:25-714:20.) Muller reviews several thalidomide analogs and concludes that "these thalidomide analogs are potent inhibitors of PDE4" and "control $TNF\alpha$ levels by inhibition of PDE4." (JTX 69_2, _5.)

The Court finds that the foregoing prior-art references, combined with the '358 Patent, do not make claim 6 of the '536 Patent obvious to the POSA "at the time the invention was made." *Mitsubishi*, 2021 WL 1845499, at *11 (emphasis omitted) (quoting pre-AIA version of 25 U.S.C. § 103). Once again, to invalidate the '536 Patent for obviousness, Defendants must demonstrate that "a person having ordinary skill in the art would have had 'reason to attempt to make the composition'" known as stereomerically pure apremilast to treat psoriasis and "a reasonable expectation of success in doing so." *Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 995 (Fed. Cir. 2009) (citation omitted). For the reasons discussed above regarding the '638 Patent, the Court finds that Defendants have failed to demonstrate that with the limited public data available to a POSA in 2002 on the feasibility of treating psoriasis with any of the '358 Patent example compounds, the POSA would have had a reason or motivation to attempt to separate or synthesize the compounds' enantiomers, let alone a reason to try and separate or synthesize the enantiomers of Example 12 to invent such a treatment. (*But see* Trial Tr. 1487:17-1488:2 (Davies)

("[I]f your racemate has some bad effects that you can't get around, then maybe it's a good idea to resolve it, if you know some information about the racemate that is bad for you. But if the racemate's fine, you would just carry on with the racemate.").) Even if a POSA would have been motivated to try to isolate and study apremilast to treat psoriasis based on the prior art discussed above, the POSA would not have had a reasonable expectation of success in doing so without undue experimentation. Similarly, the Court finds that the objective indicia of non-obviousness weigh in Amgen's favor for the reasons discussed above regarding the '638 Patent.

**C.    The '541 Patent**

The Court reaches a different result, however, for the '541 Patent. The '541 Patent issued on October 9, 2018 from U.S. Patent Application No. 14/826,027, filed on August 13, 2015 and has an effective filing date of August 15, 2014. (Stipulation of Facts ¶¶ 63-66.) To show obviousness, Defendants must prove by clear and convincing evidence that "the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. § 103(a) (post-AIA).

Amgen asserts claims 2, 19, and 21 of the '541 Patent against Defendants. (Stipulation of Facts ¶ 67.)[22] Claim 2 of the '541 Patent recites as follows:

> [a] method of treating a patient with stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione, wherein the patient is suffering from psoriasis, the method consisting of: (a) administering to a patient stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-

---

[22] Before trial, the parties stipulated that if the '541 Patent was valid, Defendants' ANDA products would infringe claims 2, 19, and 21 of the '541 Patent. (Stipulation of Facts ¶¶ 14-15, Exhibit A2 of the Final Pretrial Order, ECF No. 422-1; Stipulation of Facts ¶¶ 9-12, Exhibit A3 of the Final Pretrial Order, ECF No. 422-2.)

Appx106

2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione in an initial titration dosing schedule consisting of (i) 10 mg in the morning on the first day of administration; (ii) 10 mg in the morning and 10 mg after noon on the second day of administration; (iii) 10 mg in the morning and 20 mg after noon on the third day of administration; (iv) 20 mg in the morning and 20 mg after noon on the fourth day of administration; (v) 20 mg in the morning and 30 mg after noon on the fifth day of administration; and (b) on the sixth and every subsequent day, administering to the patient 30 mg in the morning and 30 mg after noon of stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione.

(*Id.* ¶ 70.)[23] Defendants assert that these claims are directed to a method of treating a patient's psoriasis according to the following twice daily apremilast dosing schedule (which culminates in a 30 mg, twice-per-day maintenance dose):

|          | Day 1  | Day 2  | Day 3  | Day 4  | Day 5  | Day 6  |
|----------|--------|--------|--------|--------|--------|--------|
| a.m.     | 10 mg  | 10 mg  | 10 mg  | 20 mg  | 20 mg  | 30 mg  |
| p.m.     |        | 10 mg  | 20 mg  | 20 mg  | 30 mg  | 30 mg  |

(Defs.' Post-Trial Br. 3.)

Defendants challenge the validity of the '541 Patent, arguing that prior art "disclosed a fixed dosing titration schedule for apremilast up to a maintenance dose of 60 mg per day within five days." (Defs.' Post-Trial Br. 6.) "In general terms, dose titration refers to the process of

---

[23] Claim 19 of the '541 Patent recites as follows: "[a] method as in any one of claims 1–14, wherein the stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione comprises greater than about 98% by weight of the (+) isomer of 2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione based on the total weight of 2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione." (Stipulation of Facts ¶ 71.) Claim 21 of the '541 Patent recites as follows: "[a] method as in any one of claims 1–14, wherein the stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione is administered in tablet form." (*Id.* ¶ 72.) There is little dispute between the parties as to the obviousness of these claims. Considering preceding patents such as the '536 Patent, which taught a method of treating psoriasis using stereomerically pure apremilast in tablet or capsule form as either a single or divided dose (JTX-7_20-21; Trial Tr. 833:22-834:2), the Court finds these claims obvious based on the analysis of claim 2 in the '541 Patent that follows.

initiating treatment at a given dose" but adjusting the dose over a period of time "until a desired

target dose is reached." (Trial Tr. 1753:20-1754:3 (Alexis).) "Typically," physicians initiate

treatment at a lower dose before "gradually increasing that dose," although the concept of dose

titration is "agnostic to direction." (Trial Tr. 1753:23-1754:1 (Alexis).) Defendants assert that the

prior art teaches that "dose titration can be used to mitigate adverse events." (Defs.' Post-Trial Br.

7 (citations omitted).) Defendants maintain that a POSA would have been motivated to modify

prior art to arrive at the six-day titration schedule disclosed by the '541 Patent and to do so with a

reasonable expectation of arriving at a more effective psoriasis treatment. (*Id.* at 19-21.)

Defendants, accordingly, assert that the '541 Patent claims were obvious. (*Id.* at 21.) The Court

agrees.

### 1.    *Graham* Framework: Level of Ordinary Skill in the Art

The Court adopts Amgen's proposed definition of a POSA for purpose of the '541 Titration

Patent. (*See* Pl.'s Proposed Findings of Fact ¶ 1545 ("The person of ordinary skill in the art for

purposes of the '541 Titration Patent would have been a physician with training and experience in

treating psoriasis or psoriatic arthritis, including experience evaluating clinical study results, and

with access to someone with expertise in chemistry." (citing Trial Tr. 1751:19-1752:3 (Alexis))).)

Defendants maintain that their proposed POSA definition is not materially different from

Amgen's. (Defs.' Proposed Findings of Fact ¶¶ 1800-01 (citing Trial Tr. 831:5-14 (Gilmore)).)

### 2.    *Graham* Framework: Scope and Content of the Prior Art

#### a.    *Papp 2012*

A 2012 *Lancet* article entitled "Efficacy of Apremilast in the Treatment of Moderate to

Severe Psoriasis" ("Papp 2012") is relevant, close prior art to the '541 Patent. (DTX-153_1; Trial

Tr. 832:1-10, 834:22-835:7 (Gilmore).) The article reports the results of a clinical trial

investigating the "clinical efficacy and safety of different doses of apremilast in the treatment of

patients with moderate to severe plaque psoriasis." (DTX-153_1.) Evidence at trial established that

the named inventor of the '541 Patent, Robert Day, is listed as one of the authors of Papp 2012.

(*Compare* DTX-153_1, *with* JTX-13_2, *and* Trial Tr. 1825:13-25.) The study reported by Papp

2012 was also funded by Celgene. (DTX-153_1.) After investigating 10 mg, 20 mg, and 30 mg

twice daily target doses of apremilast, Papp 2012 reports that apremilast, "given orally at 20 mg

or 30 mg twice daily, seems to be efficacious, safe, and tolerable for patients with moderate to

severe plaque psoriasis." (DTX-153_1.) In terms of the efficacy of a 20 mg dose versus a 30 mg

dose, Papp 2012 concludes that "[a]lthough no statistical comparisons between apremilast doses

were done, apremilast 30 mg had the most favourable outcome and this dose is being investigated

for patients with moderate to severe plaque psoriasis." (DTX-153_7.) Based on the foregoing, the

Court finds that Papp 2012 teaches a POSA that a 30 mg twice-daily maintenance dose produces

the most favorable outcome for patients with moderate to severe plaque psoriasis.

In initiating apremilast treatment, Papp 2012 reports that patients' doses were "titrated in

the first week to mitigate potential dose-dependent adverse events of apremilast; all patients

reached the target dose by day 5." (DTX-153_2.) As discussed above regarding Otezla, *see, supra*,

n.3, apremilast, Otezla's active ingredient, is associated with significant gastrointestinal-related

side-effects such as nausea and diarrhea. (DTX-153_1; DTX-162_1.) And as the parties' experts

explained at trial, "potential dose-dependent adverse events" means "as the dose increases,

sometimes patients have more side effects." (Trial Tr. 839:6-12 (Gilmore), 1828:19-1829:4

(Alexis) (testifying that a dose-dependent adverse event means "there's a dose response

relationship in the frequency or severity of adverse events; meaning that if the dose increases, the

likelihood of an event would increase too").) It is generally known in the art that a POSA can "try

to mitigate those side effects by slowly increasing the dose of the medication." (Trial Tr. 839:6-14

64

Case 3:18-cv-11026-MAS-DEA   Document 510 *SEALED*   Filed 09/20/21   Page 65 of 91
PageID: 16960

(Gilmore).) The following chart summarizes the twice-daily 30 mg target dose titration schedule disclosed by Papp 2012:

| | 1st Dose (mg) | 2nd Dose (mg) | Total dose (per day) |
|---|---|---|---|
| Day 1 | 10 | 10 | 20 |
| Day 2 | 10 | 10 | 20 |
| Day 3 | 20 | 20 | 40 |
| Day 4 | 20 | 20 | 40 |
| Day 5 | 30 | 30 | 60 |
| Day 6 (and thereafter) | 30 | 30 | 60 |

(See Trial Tr. 840:14-841:3 (Gilmore), 1835:21-25 (Alexis) (admitting that "this is the dosing schedule used in the clinical trial that Papp 2012 published in a manuscript in 2012 about in the Lancet"), 1836:9-18 (agreeing that on days 1-2 of the clinical trial protocol underlying Papp 2012, patients were administered 10 mg in the morning and 10 mg in the evening, for a total dose of 20 mg per day, on days 3-4 patients were administered 20 mg in the morning and 20 mg in the evening, for a total dose of 40 mg per day, and on day 5 patients were administered the maintenance dose of 30 mg twice a day, for a total dose of 60 mg per day).) Notwithstanding this dose titration schedule, Papp 2012 reports that 18% of patients in the 30 mg twice-daily treatment group experienced nausea, 16% experienced upper respiratory tract infections, 14% experienced diarrhea, and 16% experienced tension headaches. (DTX-153_6 (Table 2); Trial Tr. 848:7-25 (Gilmore).)

> b.    Schett 2012

A 2012 article entitled "Oral Apremilast in the Treatment of Active Psoriatic Arthritis: Results of a Multicenter, Randomized, Double-Blind, Placebo-Controlled Study" ("Schett 2012"), is also relevant close prior art to the Court's obviousness analysis. (See generally DTX-162.) Schett 2012 reports on a study of apremilast where patients were given a target dose of "40

milligrams per day, which could have been given as a single dose, or as 20 milligrams twice per day." (DTX-162_1; Trial Tr. 1776:1-5 (Alexis), 850:5-11 (Gilmore).) Although not a study of plaque psoriasis patients, like Papp 2012, the study described by Schett 2012 implemented a "[d]ose escalation" protocol "during the first 7 days of treatment in an attempt to decrease the likelihood of adverse events (AEs) related to treatment initiation." (DTX-162_2; Trial Tr. 850:16-23.) The protocol associated with Schett 2012 provides additional detail on the study's dose escalation, disclosing that in the first week of the study, patients received a fixed dose titration of 10 mg once a day for days one through three followed by 20 mg once a day for days four through seven, during the first week of dosing to "ameliorate the dose dependent adverse events of [apremilast] (headache and GI disturbances)." (DTX 92_3; Trial Tr. 850:19-854:9, 857:7-17.)

c.    *Pathan 2012*

Finally, the Court finds that the 2012 article entitled "Efficacy and Safety of Apremilast, an Oral Phosphodiesterase 4 Inhibitor, in Ankylosing Spondylitis" is relevant prior art to the '541 Patent. (*See generally* DTX-157.) In that study, patients "were started on apremilast 10 mg twice daily or placebo and the dose was titrated by 20 mg every 2 days until the maximum dose of 30 mg twice daily was achieved on day 5." (DTX-157_2; Trial Tr. 845:20-846:4 (Gilmore), 1840:7-18 (Alexis).)

**3.    *Graham* Framework: Differences between Claims and Prior Art**

Here, the Court is confronted with close prior art, each teaching fixed dosing schedules with some version of a twice-daily dosing option. Papp 2012 taught a POSA that a twice-daily 30 mg apremilast maintenance dose produces the most favorable outcome for patients with moderate to severe plaque psoriasis. Papp 2012 also taught a five-day schedule for reaching that dose. Schett 2012 taught that initiating apremilast treatment with a 10 mg dose of the drug before titrating up in 10 mg increments during the first week of treatment is a strategy for ameliorating dose

66

dependent adverse events. The evidence at trial also established that none of the peer reviewed literature teaches a dosing titration schedule that extended beyond eight days before reaching the target apremilast dose. (Trial Tr. 1845:15-23 (Alexis).) Moreover, evidence at trial established that it was well within a POSA's ability to titrate an apremilast dose for a patient presenting with psoriasis, and that doing so is a "routine aspect of treating psoriasis with any of those drugs that require dose titration." (Trial Tr. 858:11-20 (Gilmore), 1812:15-1813:22 (Alexis).) On these facts, the Court finds that a twice-daily, six-day, fixed apremilast dosing schedule, initiating treatment at 10 mg and increasing toward a 30 mg target dose in 10 mg increments is rendered obvious by the prior art. *Cf. KRS Int'l Co.*, 550 U.S. at 417 ("If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability.").

As Defendants argue, *Hoffman-La Roche* is strikingly similar to this case. In that case, the Federal Circuit considered "whether it would have been obvious at the time of invention to select a once monthly oral dosing regimen" of a drug to treat a disease, and "whether it would have been obvious to set that dose at 150 mg." *Hoffman La Roche v. Apotex*, 748 F.3d 1326, 1329 (Fed. Cir. 2014). To treat the disease with the drug, a tablet needed "to be taken in a fasting state at least 30 minutes before eating or drinking." *Id.* at 1328. This requirement was an "inconvenience" that "created problems of patient compliance." *Id.* "Researchers in the field believed that less-frequent dosing would result in patients continuing the treatment for the long term, which is required for bisphosphonate treatments to be successful." *Id.*

At the same time, the prior art suggested that a less frequent cumulative monthly dose rather than continuous daily dosing could successfully treat the disease. *Id.* at 1330-31. Furthermore, among the studied daily doses, "only the 2.5 and 5 mg doses showed positive outcome in all regions." *Id.* at 1332. Although "the 5 mg dose did not demonstrate greater efficacy

than the 2.5 mg dose, it was still deemed an equivalently effective dose so that someone scaling it to a single monthly dose of 150 mg (5 mg/day x 30 days/month) would have anticipated equivalent success" in treating the disease. *Id.* Accordingly, the Federal Circuit found that "the prior art pointed to a monthly treatment of 150 mg of ibandronate. At the very least, the 150 mg dose was obvious to try: There was a need to solve the problem of patient compliance by looking to less-frequent dosing regiments." *Id.* The Court noted that although the efficacy of a once monthly dose at 150 mg had never been precisely studied in the prior art, "[c]onclusive proof of efficacy is not necessary to show obviousness. All that is required is a reasonable expectation of success." *Id.* at 1331.

Similarly, based on the record before the Court, it appears that the efficacy of a six-day, fixed titration schedule for an apremilast treatment for moderate to severe plaque psoriasis treatment had not been studied in the prior art. Nevertheless, as Amgen's expert acknowledged, the POSA would have had a reasonable expectation of success treating psoriasis by titrating up the apremilast dose to 30 mg given twice daily on the sixth day of treatment. (Trial Tr. 859:4-12 (Gilmore), 1848:8-25 (Alexis) (admitting that the "efficacy of the maintenance dose of 60 milligrams a day, we are informed of that efficacy by the Papp 2012 article. If the titration schedule is extended by one day . . . I personally would not have the expectation that it would not have efficacy").) Also like *Hoffman-La Roche*, in selecting a target dose of 30 mg twice daily, adding an additional day to the Papp 2012 schedule and titrating up in 10 mg increments per day instead of Papp 2012's 20 mg increments, were obvious solutions to try because "there were only a 'finite number of identified, predictable solutions'" in the prior art for managing tolerability concerns while also delivering efficacious treatment. 748 F.3d at 1332 (quoting *KRS Int'l Co.*, 550 U.S. at 421); *see also In re Copaxone Consol. Cases*, 906 F.3d 1013, 1025 (Fed. Cir. 2018) ("Here, the

68

Appx113

prior art focused on two critical variables, dose size and injection frequency, and provided clear direction as to choices likely to be successful in reducing adverse side effects and increasing patient adherence."). As Dr. Gilmore explained, titrating up by 10 mg per day instead of 20 mg per day as used in Papp 2012 "is like tak[ing] the stairs one at a time instead of two at a time" (Trial Tr. 861:19-863:7 (Gilmore)), an obvious way to avoid the strain of dose dependent side effects while taking a longer time to arrive at the ultimate target dose.

And plainly, in prescribing a drug with dose-dependent adverse events in the early weeks of treatment, the POSA would have been motivated to try to extend the Papp 2012 schedule and titrate up in smaller amounts. Dr. Gilmore credibly testified that many of her patients "decided not to continue with treatment" because of gastrointestinal-related side effects from apremilast. (Trial Tr. 877:11-23 (Gilmore).) Relatedly, evidence at trial suggested that Celgene was concerned that "GI tolerability is a major clinical barrier to starting and keeping patients on Otezla." (JTX-100_25.) Because the prior art provides dose titration as a method of reducing these side effects, a POSA would have been motivated to look to a six-day titration schedule as a strategy for increasing patient compliance.

Amgen has elected not to present objective indicia of non-obviousness. (Pl.'s Post-Trial Br. 89 n.33 ("Amgen cannot be faulted for choosing not to put forward evidence of objective indicia supporting non-obviousness of the '541 Patent claims in order to focus its trial presentation.").)

Based on the foregoing, the Court finds that claims 2, 19, and 21 of the '541 Patent are invalid as obvious.

**D.     The '101 Form B Patent**

Amgen also asserts that DRL, Sandoz, and Zydus's proposed ANDA products infringe

claims 1 and 15 of the '101 Patent. Claim 1 recites "[a] form B crystal form of the compound of

Formula (1):



which is enantiomerically pure, and which has an x-ray powder diffraction pattern comprising

peaks at about 10.1, 13.5, 20.7, and 26.9 degrees 2θ." (Stipulation of Facts ¶ 50.) Claim 15 recites

"[a] solid pharmaceutical composition comprising the crystal form of any one of the claims 1 and

2 to 13." (*Id.* ¶¶ 47, 51.)

**1.     Infringement of the '101 Patent**

In response to Amgen's infringement assertions, Zydus maintains that Amgen "has failed

to establish that, more likely than not, Zydus's proposed ANDA product, as it would be made,

used, offered for sale, or sold in the United States or imported into the United States, will contain

70

crystalline apremilast Form B." (Defs.' Post-Trial Br. 77; [24] *see Glaxo, Inc. v. Novopharm, Ltd.,* 110 F.3d 1562, 1570 (Fed. Cir. 1997) ("The relevant inquiry is whether the patentee has proven by a preponderance of the evidence that the alleged infringer will likely market an infringing product.").) Here, the Court agrees with Zydus that Amgen has failed to meet its burden of demonstrating infringement.

The parties do not dispute that "[a]premilast has several crystal forms, or polymorphs, including a polymorph referred to as 'Form B.'" (Zydus Stipulation of Facts ¶ 16.) Polymorphism occurs when a given atom or molecule can crystallize into more than one crystalline form. (Trial Tr. 426:5-427:3 (Myerson).) The specific crystalline form of an active pharmaceutical compound may impact its pharmaceutical properties, including bioavailability, manufacturability, and shelf-life. (Trial Tr. 428:9-23 (Myerson), 1075:5-21 (Steed), 1169:19-1170:3 (Sacchetti).)

Synchrotron X-ray Powder Diffraction ("XRPD") is an analytical technique for distinguishing polymorphic forms. (Trial Tr. 1221:11-1222:7 (Miller).) In this process, x-rays are shone on a powder sample of interest and the x-rays diffract based on how the powder's molecules are arranged into crystals. (Trial Tr. 428:25-429:20 (Myerson).) Diffraction is measured with a diffractometer on a detector. (Trial Tr. 429:11-16 (Myerson).) A "diffractogram" is a graphical depiction of the measured x-ray diffraction when shone on the powder sample. (Trial Tr. 429:7-20 (Myerson).) "Each one of the peaks" in a diffractogram's "diffraction pattern is a direct function of the lattice spacing and orientation of the lattice planes in the crystal structure. And there are many lattice planes in a crystal structure." (Trial Tr. 1222:20-23 (Miller).) As Zydus's polymorph

---

[24] Both DRL and Sandoz stipulate that submission of their ANDAs to the FDA seeking approval and subsequent manufacture and sale of their ANDA products will infringe claims 1 and 15 of the '101 Patent if those claims are not found to be invalid or unenforceable. (DRL and Sandoz Stipulation of Facts ¶¶ 9-12.)

Appx116

expert, Dr. Steven Miller, explained, "[e]ach polymorph has its own unique x-ray powder diffraction pattern." (Trial Tr. 1138:18-19 (Miller).) And because some of the diffractogram's peak locations are unique, "diffraction patterns with relation to polymorphic forms" can operate similar to a "fingerprint" analysis. (Trial Tr. 1223:7-17 (Miller).) Dr. Miller credibly explained that in performing this analysis it is important to try and "identify as many of the peaks or match as many of the peaks as possible," so as to have multiple points of comparison. (Trial Tr. 1223:7-24 (Miller).) As Dr. Miller testified, like fingerprints, "we certainly wouldn't want to, you know, convict somebody of a single point of match . . . in a fingerprint." (Trial Tr. 1223:23-24 (Miller).)

The parties also do not contest that Zydus's proposed ANDA product and its apremilast active pharmaceutical ingredient ("API") includes Form A apremilast. (Trial Tr. 439:9-21 (Myerson).) This version of apremilast differs from the Form B version of apremilast at issue in claims 1 and 15. (Trial Tr. 1248:3-1249:3 (Miller).) Although Amgen asserts that Zydus's ANDA product also includes Form B apremilast generating certain claimed peaks, proving this assertion via a diffractogram is complicated because "it is possible to get mixtures of polymorphic forms, or of any different, you know, crystalline compound. And then, you have to think of that like as overlapping fingerprints, which obviously complicates the matter quite a bit." (Trial Tr. 1224:1-5 (Miller).)

Based on its experts' analysis, Amgen introduced the following diffractogram that it asserts demonstrates that Zydus's API generates Form B XRPD peaks at 10.1 and $13.5 \pm 0.2°\ 2\theta$, thereby allegedly infringing the '101 Patent. In the following diffractograms, the green patterns represent Zydus's proposed ANDA product, the black lines represent Zydus's API, the red lines represent the Form A reference standard, and the blue patterns represent the Form B reference standard.[25]

---

[25] Color versions of the diffractograms appear in the Court's slip opinion.



FIGURE 28A



(Trial Tr. 1242:4-1243:15 (Miller); PTX-1238_38 (Gozzo Diffractograms).)

As Dr. Miller convincingly explained, however, both Form A and B peaks at 10.1 and 13.5

overlap with each other. (Trial Tr. 1241:9-1242:2 ("[W]e actually do have peaks roughly at that

73

Appx118

Case 3:18-cv-11026-MAS-DEA    Document 510 *SEALED*    Filed 09/20/21    Page 74 of 91
PageID: 16969

position of 10.1 degrees. However, you can see that these peaks coincide with the red diffractogram

for the Form A reference standard. No one at this point has disputed that Form A is present in these

samples."), 1242:22-1243:19 (Miller) (providing a similar explanation as to the peak at 13.5

degrees, noting that in the blue line representing the Form B reference standard, there is a

"doublet," featuring two peaks right next to each other near 13.5 degrees, which is not present in

the samples, thus "support[ing] the notion that the Form A is present and that's what's generating

that peak at 13.5 degrees.").) Accordingly, without more, a diffractogram demonstrating the

presence of both of these peaks does not prove by a preponderance of evidence the presence of

Form B as opposed to Form A. This is especially true where, as here, it is undisputed that Form A

is present in Zydus's ANDA product and API.

Amgen also produced the following evidence as to the claimed 20.7 and 26.9 ± 0.2° 2θ

peaks:



FIGURE 28B

20 (CuKalpha_scale)

Appx119

Case 3:18-cv-11026-MAS-DEA    Document 510 *SEALED*    Filed 09/20/21    Page 75 of 91
PageID: 16970



(Miller Tr. 1233:17-1236:12; PTX-1238_39 (Gozzo Diffractograms).) The Court finds persuasive

Dr. Miller's testimony that "for 20.7 and 26.9, there are, in fact, no peaks actually present." (Trial

Tr. 1232:24-1233:10 (Miller).) As for the peak at 26.9, on cross-examination, Amgen's expert Dr.

Myerson appeared to agree with Zydus's counsel that "the peak list from the Zydus sample shows

no peak at 26.96." (Trial Tr. 481:16-23 (Myerson) ("Right.").) Although Dr. Myerson attempted

to explain the absence of that peak by opining "that peak is probably not resolvable because of the

broadness of the big—the big peak at 26.880," Dr. Myerson did little to explain the import of the

alleged "broadness" of a neighboring peak. (Trial Tr. 480:18-23 (Myerson).)

   As for the peak at 20.7, Dr. Myerson acknowledged that that peak was absent from the

Zydus samples. (Trial Tr. 483:1-3 ("Q: And if you look at those peak lists, there [are] no peaks

within plus or minus .2 of 20.7, correct? A: That's correct.").) Dr. Myerson attempted to explain

away this peak's absence by referencing a concept in XRPD testing known as "limit of detection." (Trial Tr. 487:18-488:6 (Myerson).) In Dr. Myerson's explanation, the 20.7 peak could not be measured by the diffractometer "because of background noise in a diffractogram." (Trial Tr. 487:18-488:6 (Myerson).) Dr. Miller offered his own definition of limit of detection as "the smallest detectable amount of a particular substance given the instrumentation and procedures used" and "the number at which you can distinguish its detectability and the absence of a substance." (Trial Tr. 1238:10-23 (Miller).)

But as Dr. Miller explained, "a peak is either there or it is not there. . . . [T]he test either results in a peak, or it doesn't result in a peak." (Trial Tr. 1241:4-6 (Miller).) And as Dr. Miller further explained, "if nothing shows up in the test, i.e., a peak in the case of XRPD, then the assumption is that it's not there." (Trial Tr. 1239:11-13 (Miller).) Moreover, as Zydus notes, Dr. Myerson's assertion that the 20.7 peak is below the limit of detection is especially bald considering his failure to opine on what the limit of detection may have been for the 20.7 Form B peak in the context of Dr. Gozzo's experiments. (Trial Tr. 480:18-23 (Miller).) And in all events, it is Amgen's burden to demonstrate the existence of the claimed '101 Patent peaks in Zydus's samples. *Glaxo*, 110 F.3d at 1565-66 (affirming a district court's finding that a plaintiff failed to meet its infringement burden where it failed to show that the defendant's product "met substantially all of the limitations of" a "claimed 29-peak spectrum").

Finally, Zydus presented evidence at trial of its own internal polymorph testing of its apremilast API and proposed ANDA product. (Trial Tr. 1256:7-25 (Miller); JTX-900_3-18; JTX-901_15-21; JTX-902_3-31.) Dr. Miller credibly testified that based on his review of these reports, Zydus's internal testing shows that its sample API and ANDA product contain Form A and do not contain Form B apremilast. (Trial Tr. 1256:7-1257:10 (Miller).) Based on his extensive

experience with XRPD testing in the pharmaceutical context, including his experience analyzing approximately 50 XRPD patterns per week, the Court finds Dr. Miller's testimony persuasive in this regard. (Trial Tr. 1216-20, 1219:1-1220:11 (Miller).)

The Court, accordingly, finds that Amgen has failed to meet its burden of proving Zydus's infringement of the '101 Patent.[26]

### 2.    Obviousness and the '101 Patent

The Court next considers whether the '101 Patent claims are invalid for obviousness. To start, the parties dispute the priority date to which the '101 Patent is entitled. Amgen maintains that the claims asserted in the '101 Patent are entitled to a March 2002 priority date. (Pl.'s Post-Trial Br. 68.) According to Amgen, the '101 Patent issued from a continuation in part application that cited a March 20, 2002 '515 Provisional Patent on its face. (*Id.*; *see also* JTX-5_2.) The '515 Provisional Patent, Amgen argues, "provides written description and enablement support for claims 1 and 15." (Pl.'s Post-Trial Br. 68-69.) Amgen invokes the doctrine of inherent disclosure in arguing that the '515 Provisional Patent satisfies the written description requirement for claims 1 and 15. (*Id.* at 69.) For their part, Defendants assert that Amgen is not entitled to the March 20, 2002 priority date because it cannot satisfy the prerequisites for inherent disclosure. (Defs.' Post-Trial Br. 71.) Accordingly, Defendants argue, the obviousness of Amgen's '101 Patent claims must be considered as of March 27, 2008, the undisputed date on which the '101 Patent was filed. (*Id.* at 63.) For the reasons set forth below, the Court agrees that Amgen is entitled to the March 2002 priority date.

---

[26] Because the Court finds that Amgen has failed to prove Zydus's infringement, the Court declines to consider Zydus's alternative argument that Amgen's infringement case fails because it allegedly tested unrepresentative ANDA and API samples. Accordingly, Zydus's Motion for a Directed Verdict as to claims 1 and 15 of the '101 Patent claims (Trial Tr. 515:7-9) is denied as moot.

The Federal Circuit has held that under the "doctrine of inherent disclosure, when a specification describes an invention that has certain undisclosed yet inherent properties, that specification serves as adequate written description to support a subsequent patent application that explicitly recites the invention's inherent properties." *Yeda Rsch. & Dev. Co. v. Abbott GMBH & Co. KG*, 837 F.3d 1341, 1345 (Fed. Cir. 2016). "'Inherent' properties, . . . are the rare exceptions to the rule that a party must show possession of 'every feature' recited in the count and that 'every limitation' of the count must have been known to the inventor at the time of the alleged conception." *Hitzeman v. Rutter*, 243 F.3d 1345, 1354-55 (Fed. Cir. 2001) (citation omitted). Inherency "requires that the missing descriptive material is necessarily present, not merely probably or possibly present, in the prior art." *Trintec Indus., Inc. v. Top-U.S.A. Corp.*, 295 F.3d 1292, 1295 (Fed. Cir. 2002) (internal quotation marks omitted). "[I]f the teachings of the prior art can be practiced in a way that yields a product lacking the allegedly inherent property, the prior art in question does not inherently anticipate." *In re Armodafinil Patent Litig. Inc.*, 939 F. Supp. 2d 456, 465 (D. Del. 2013) (citing *Glaxo Inc. v. Novopharm Ltd.*, 52 F.3d 1043, 1047-48 (Fed. Cir. 1995) (finding no inherency where prior art example could yield crystals of either the claimed polymorph or a different polymorph)).

Here, the parties do not dispute that the '515 Provisional Patent filed on March 20, 2002 discloses a synthetic chemical procedure for preparing apremilast identified as Example 2. (*See* Trial Tr. 1576:15-1577:1 (with Dr. Myerson testifying that Example 2 is a "synthetic procedure, a chemical procedure . . . . It's a recipe for preparing Compound A"), 1572:25-73:1 ("Example 2 is entitled 'Preparation of Compound A,' Compound A being apremilast"), 1088:2-7 (Steed) ("[Example 2] is the recipe, if you like, by which the apremilast molecule can be made"); JTX-43_29.) Example 2 does not, however, explicitly describe the final resulting form of

apremilast as a crystalline structure—only as a solid. (Trial Tr. 1093:12-1094:1, 1110:10-12

(Steed) ("Example 2 of that '515 application does not explicitly disclose a crystalline solid of

apremilast. All we know is that it's a solid"); Trial Tr. 1576:4-7 (Myerson) ("[A]ll experts agree

that a POSA would have understood on March 20th, 2002, that Example 2 results in *some solid*

form of apremilast." (emphasis added)).)[27] Nevertheless, as Dr. Steed explained at trial, in

chemistry, "typically there are two kinds of solid forms . . . . They can either be crystalline or

amorphous." (Trial Tr. 1072:25-1073:4 (Steed).) Indeed, as Defendants note, the '101 Patent itself

provides that apremilast may be found in seven different crystalline forms and one amorphous

form. (*See* JTX-5_63, at 52:57:60; Trial Tr. 1088:25-1089:12.)

The final step of Example 2 provides that "the residue recrystallized from a binary solvent

containing ethanol (150 mL) and acetone (75 mL)." (JTX-43_29; Trial Tr. 1596:1-7 (Myerson).)

Amgen asserts that from this disclosure, a POSA would have understood that the '515 Provisional

Patent inventors were in possession of a crystalline form of apremilast. (Pl.'s Post-Trial Br. 70.)

At trial, Amgen's expert, Dr. Myerson, testified that "Example 2 inherently produces crystalline

Form B whenever followed by a POSA." (Trial Tr. 1576:8-9 (Myerson).) As Defendants note,

however, Dr. Myerson did not cite any disclosure in Example 2 or within the '515 Provisional

Patent application to support the assertion that the '515 Provisional Patent inventors would have

produced Form B apremilast from Example 2. (Trial Tr. 1623:21-1624:22, 1625:14-1626:2

---

[27] In performing its obviousness analysis of the '101 Patent, the Court accepts Amgen's definition
of the POSA as an individual with a bachelor's degree in chemistry, chemical engineering, or a
related discipline, with some knowledge of crystalline solid forms and their characterization, and
several years of experience in the pharmaceutical industry; or an advanced degree in the above
listed disciplines, with some knowledge of solid-state chemistry or analytical chemistry and less
experience. (Pl.'s Proposed Findings of Fact ¶ 1204.) Defendants assert that their proposed
definition of a POSA for purposes of the '101 Patent is not "materially different" from Amgen's.
(Defs.' Proposed Findings of Fact ¶¶ 1400-02.)

(Myerson) (noting that he did not "have any data that would demonstrate what form [Celgene] made," he hasn't "seen any lab notebooks" to determine what form Celgene made, and has seen no analytical data for the product of Example 2 in the '515 application). On the other hand, Dr. Myerson cited thirteen experiments performed by Teva, Zentiva, and Lek that replicated the procedures outlined in Example 2. (Trial Tr. 1577:25-1578:17; JTX-225_1-2.) The results of these replications were ultimately submitted to the European Patent Office ("EPO") as part of a proceeding unrelated to this case. (Trial Tr. 1577:25-1578:17 (Myerson).) According to Dr. Myerson, each experiment performed by these companies replicated Example 2 and resulted in Form B. (Trial Tr. 1587:18-19 (Myerson).)

In response to the Example 2 replications submitted to the EPO, Defendants assert that "evidence presented at trial showed that following Example 2 does not always lead to the claimed apremilast crystalline Form B—rather it could lead to Form A or Form C." (Defs.' Post-Trial Br. 72.) Indeed, Defendants introduced evidence at trial that Celgene itself represented to the EPO that following Example 2 would lead to apremilast crystalline Form C, not Form B. (JTX-225_14-15; Trial Tr. 1106:6-16; 1108:2-9 (Steed) ("Celgene itself represented to the [EPO] that following the teachings of Example 2 including that recrystallization step results in crystalline Form C . . . not Form B. And Celgene is the patent [proprietor], so they should know what they're doing."), 1108:17-1109:8 (explaining that Celgene submitted data from experiments that Celgene maintained replicated the Example 2 recrystallization step in three different ways, all of which led to Form C); *see also* Trial Tr. 1620:1-6 (Myerson) (acknowledging the same).) Notwithstanding this representation to the EPO, however, Dr. Myerson's uncontradicted trial testimony was that although Celgene once claimed that it made Form C following Example 2, Form C involves the use of toluene solvate, which becomes a part of the crystal structure that makes up Form C. (Trial

80

Tr. 1586:18-1587:4 (Myerson).) Nevertheless, toluene is not mentioned in Example 2 of the '515

Provisional Patent. (Trial Tr. 1587:6-10 (Myerson).) The Court, accordingly, finds persuasive Dr.

Myerson's testimony that "Celgene just made a mistake" in representing that Example 2 could

produce Form C apremilast. (Trial Tr. 1587:5 (Myerson).)

Defendants' expert Dr. Steed also disputed whether or not Example 2 inherently produced

the Form B apremilast claimed in the '101 Patent. Dr. Steed testified that "depend[ing] upon how

the person of skill chose to do the recrystallization step . . . Form A can result from ethanol and

acetone if fast crystallization is used, Form B from slow, and any one of the other crystalline forms

could also result." (Trial Tr. 1105:18-21 (Steed).) Amgen's expert Dr. Myerson, however, testified

that in several of the Example 2 replications submitted to the EPO, the companies used fast cooling

but nevertheless produced Form B apremilast. (*See, e.g.*, Trial Tr. 1581:6-1582:3 (Myerson).) In

Dr. Myerson's opinion, "[a]s we saw in the EPO data, if you're using a 2:1 ratio of ethanol to

acetone, you use fast cooling or slow cooling, you always get Form B." (Trial Tr. 1596:19-22

(Myerson).)

In deciding the question of the '101 Patent's priority date, the Court is mindful of each

party's evidentiary burdens. Here, "for a patent's claims to be entitled to an earlier priority date,

the patentee must demonstrate that the claims meet the requirements of 35 U.S.C. § 120." *Nat. Alt.

Int'l, Inc. v. Iancu*, 904 F.3d 1375, 1380 (Fed. Cir. 2018). "Accordingly, claims in a patent or

patent application are not entitled to priority under § 120 at least until the patent owner proves

entitlement to the PTO, the Board, or a federal court." *Id.*; *see also Tech. Licensing Corp. v.

Videotek, Inc.*, 545 F.3d 1316, 1327 (2008) (requiring patentees filing continuation-in-part

applications to "show not only the existence of the earlier application, but why the written

description in the earlier application supports the claims").

81

Appx126

The Court finds that based on the testimony of Dr. Myerson and his descriptions of the thirteen successful replications of Example 2 submitted to the EPO, Amgen has shown that Example 2 of the '515 Provisional Patent inherently produces Form B apremilast as disclosed in the '101 Patent. Moreover, as Dr. Myerson explained, "[a] POSA would understand that the powder diffraction peaks, the XRPD peaks," recited in claims 1 and 15 of the '101 Patent "are an inherent property of Form B." (Trial Tr. 1587:13-24.) Accordingly, Amgen has met its burden of showing that the '101 Patent is entitled to the '515 Provisional Patent's March 20, 2002 priority date. *Yeda Rsch. & Dev. Co.*, 837 F.3d at 1345 (holding that under the "doctrine of inherent disclosure, when a specification describes an invention that has certain undisclosed yet inherent properties, that specification serves as adequate written description to support a subsequent patent application that explicitly recites the invention's inherent properties."); *Allergan, Inc.*, 796 F.3d at 1309 ("A claim that recites a property that is necessarily inherent in a formulation that is adequately described is not invalid as lacking written description merely because the property itself is not explicitly described.").

Having demonstrated its entitlement to the earlier priority date, "the burden of going forward again shifts to the proponent of the invalidity defense, [Defendants], to convince the [C]ourt that [Amgen] is not entitled to the benefit of the earlier filing date." *Tech. Licensing Corp.*, 545 F.3d at 1328-29 ("[B]ecause an issued patent is by statute presumed valid, a challenger has the burden of persuasion to show by clear and convincing evidence that the contrary is true"). "'Convince' is the operative word, because if the court is not persuaded by clear and convincing evidence that [Defendants are] correct, [Defendants have] failed to carry [their] ultimate burden of persuasion, and [their] defense of invalidity . . . fails." *Id.* at 1328.

Appx127

Defendants assert that "[e]ven if following Example 2 under certain circumstances using undisclosed parameters may lead to Form B, it does not follow that Example 2 would *always* result in Form B." (Defs.' Post-Trial Br. 72; *see Peshlakai v. Ruiz*, No. 13-752, 2013 WL 6503604, at *14 n.6 (D.N.M. Nov. 20, 2013) (observing that an inference that "all swans are white" from past observations that "all observed swans have been white" is "vulnerable to a later specific observation that undermines the inferred conclusion—for example, later observing a black swan." (citations omitted)). But Amgen's evidence has shifted the burden of production to Defendants and they must produce evidence that Form B is not inherent in Example 2. Although Defendants assert that where Example 2 is practiced with fast cooling, Form B does not necessarily result (Trial Tr. 1105:13-22 (Steed)), the Court is not convinced of this argument considering Dr. Myerson's rebuttal testimony based on his review of the data submitted to the EPO reproducing the process outlined in Example 2. Based on this review, Dr. Myerson persuasively testified that "if you're using a 2:1 ratio of ethanol to acetone, you use fast cooling or slow cooling, you always get Form B." (Trial Tr. 1596:19-22.) And as noted above, the Court finds persuasive Dr. Myerson's testimony that to the extent Celgene represented to the EPO that Example 2 could yield Form C, that representation was mistaken. Accordingly, for these reasons, and upon review of the complete trial record, the Court finds that Defendants have failed to persuade the Court that Amgen's claim to the earlier '515 Provisional Patent priority date is unwarranted. *Tech. Licensing Corp.*, 545 F.3d at 1327 ("Failure to prove the matter as required by the applicable standard means that the party with the burden of persuasion loses on that point—thus, if the [fact-finder] is left uncertain, the party with the burden loses.").

Furthermore, Defendants fail to argue that art prior to March 2002 renders the '101 Patent invalid for obviousness. (*See* Defs.' Post-Trial Br. 63-74.) Indeed, as Amgen argues, it appears

Case 3:18-cv-11026-MAS-DEA   Document 510 *SEALED*   Filed 09/20/21   Page 84 of 91
PageID: 16979

that "Defendants' obviousness arguments . . . reduce to a question of whether claims 1 and 15 of the '101 Patent are entitled to claim priority to March 20, 2002 through the '515 Provisional." (Pl.'s Post-Trial Br. 68.) The Court, accordingly, finds that the '101 Patent is valid.

### E.    The '283 Form A Patent

Finally, the Court considers Zydus's assertion that the '283 Patent is invalid for both anticipation and obviousness. The '283 Patent was issued on January 10, 2012 from an application filed on November 12, 2010. (Stipulation of Facts ¶¶ 53, 56.) The FDA's Orange Book lists the expiration of the '283 Patent as March 19, 2023. In the instant action, Amgen asserts claims 2 and 27 of the '283 Patent against Zydus. (*Id.* ¶ 57.) Claim 2 of the '283 Patent recites "[t]he crystal form of claim 1, wherein the crystal form is Form A, which has an X-ray powder diffraction pattern comprising peaks at about 8.1, 14.4, 17.4, 23.6, and 25.1 degrees 2θ." (*Id.* ¶ 60.) For its part, claim 1 of the '283 Patent recites "[a]n unsolvated crystal form of the compound of Formula (I):



which is enantiomerically pure, wherein the crystal form is Form A, which has an X-ray powder diffraction pattern comprising peaks at 8.1, 14.4, 17.4, 23.6 and 25.1 degrees 2θ, or Form F, which has an X-ray powder diffraction pattern comprising peaks at about 8.1, 15.6, 17.3, and 25.4 degrees

2θ." (*Id.* ¶ 59.) Claim 27 of the '283 Patent is an independent claim and recites: "[a] solid

pharmaceutical composition comprising the crystal form of claim 2." (*Id.* ¶ 61.)

### 1. Obviousness as to the '283 Form A Patent

To show obviousness, Zydus must prove by clear and convincing evidence that "the

differences between the subject matter sought to be patented and the prior art are such that the

subject matter as a whole would have been obvious at the time the invention was made to a" POSA.

35 U.S.C. § 103(a) (pre-AIA). Here, the parties stipulate to a March 27, 2008 priority date for the

'283 Patent. (Stipulation of Facts ¶ 107.) Amgen argues that Zydus failed to show that a POSA

would have had a reasonable expectation of success in obtaining Form A as of March 27, 2008.

(Pl.'s Post-Trial Br. 77.)

Zydus's '283 obviousness combinations principally rely on U.S. Patent Application

Publication No. U.S. 2003/0187052 A1 ("the '052 Publication"), which was published on October

2, 2003. (Stipulation of Facts ¶ 153.) The uncontradicted trial testimony established that the '052

Publication is "what the '515 application eventually was published as." (Trial Tr. 1113:9-10

(Steed).) The '052 Publication teaches that after the chemical synthesis of apremilast, the crude

apremilast residue was purified using a 2:1 mixture of ethanol and acetone as solvents.

(DTX-179_15, ¶ [0103]); Trial Tr. 1112:12-1123:7 (Steed).) Furthermore, the '052 Publication

discloses examples of preclinical testing performed on enantiomerically pure apremilast

(DTX-179_15-19 (Examples 3-8); Trial Tr. 1628:22-1629:18 (Myerson).) The '052 Publication

teaches that incorporating enantiomerically pure apremilast into pharmaceutical compositions and

single unit dosage forms is "useful in "treating and/or preventing disorders ameliorated by the

reduction of levels of TNF-alpha or the inhibition of PDE4." (DTX-179_1 (abstract).)

Before the '283 Patent, recognizing the utility of stereomerically pure apremilast as

disclosed in the '052 Publication, a POSA would have been motivated to perform a polymorph

85

Case 3:18-cv-11026-MAS-DEA   Document 510 *SEALED*   Filed 09/20/21   Page 86 of 91
PageID: 16981

screen on the stereomerically pure apremilast disclosed in the '052 Publication.[28] (Trial Tr. 1629:2-1630:13 (Myerson).) By that time, polymorph screening was a "routine task of pharmaceutical pre-formulation." (Trial Tr. 1115:1-8 (Steed).) A polymorph screen typically includes a series of "experiments in which . . . the compound is crystallized under a variety of different conditions to see what solid forms . . . it has." (Trial Tr. 1077:1-9 (Steed).) These experiments can be as simple "as just dissolving the compound solution. It could even be water and letting it cool and crystalize and then analyzing the outcome." (Trial Tr. 1077:1-9 (Steed).) The purpose of that screening would have been to "see what crystalline or amorphous solids [apremilast] actually forms. So, they could select amongst them which would be the most appropriate to formulate into a single unit dosage form." (Trial Tr. 1114:17-1115:10 (Steed).) At trial, Amgen's expert, Dr. Myerson, agreed, testifying that a POSA "would be interested in finding a crystalline solid form that met a series of properties, one of which would be polymorph stability among other properties that are very important in choosing a solid form." (Trial Tr. 1629:19-1630:8; *see also* DTX-98_1 (1997 academic publication observing "[a] full evaluation of possible variations in crystallography that might be encountered is now essential for the development for a new drug compound because the Food and Drug Administration (FDA) requires that analytical procedures be used to detect polymorphic, hydrated, or amorphous forms of the drug substance").)

At trial, Dr. Steed explained that prior art such as the J. Keith Guillory chapter from Harry G. Brittain's 1997 "Polymorphism in Pharmaceutical Solids," (DTX-125_14), taught the POSA

---

[28] The Court adopts the '101 Patent's POSA definition for its '283 obviousness determination. (*See* Pl.'s Proposed Findings of Fact ¶ 1465 ("the person of ordinary skill in the art for purposes of the '283 Patent is the same as the POSA for the '101 Patent"); Defs.' Proposed Findings of Fact ¶ 1723 ("The '283 is invalid for obviousness whether the Court adopts Dr. Sacchetti's or Dr. Myerson's definition of a POSA.").

Case 3:18-cv-11026-MAS-DEA   Document 510 *SEALED*   Filed 09/20/21   Page 87 of 91
PageID: 16982

that the first step in conducting a polymorph screen is to use "solvents that are used in the processing of the drug substance in the first place. And so a [POSA] would be aware of the '052 [P]ublication. And the '052 [P]ublication is a roadmap basically that teaches that apremilast can be recrystallized from a binary solvent containing ethanol and acetone." (Trial Tr. 1122:16-24.) As Dr. Steed testified, although "a polymorph screen is a campaign of experimental tests that can include hundreds or thousands of experiments," these tests are "very trivial experiments so robotic normal produced screens can easily run into the thousands." (Trial Tr. 1155:9-15 (Steed).)

At trial, Zydus's expert also testified that fast cooling would inherently produce apremilast Form A crystals exhibiting the five peaks in claim 2 of the '283 Patent. (Trial Tr. 1190:24-1191:2 (Sacchetti).) Furthermore, Dr. Sacchetti testified that other prior art such as 1994 publications from Feiser, Guillory, and Byrn describe recrystallization by fast cooling. (Trial Tr. 1190:24-1191:2, 1188:23-1189:19 (Sacchetti); DTX-101_3-6 (Byrn 1994); DTX-125_9-16 (Guillory); JTX-178_5-9, (Fieser).) According to Dr. Sacchetti, based on the therapeutic utility of apremilast as described in the '052 Publication, a POSA would have been motivated to formulate enantiomerically pure apremilast, and would have tried the fast cooling method. (Sacchetti Tr. 1191:5-17.) Amgen's expert, Dr. Myerson, disputed Dr. Sacchetti's conclusion that Example 2 in the '052 Publication could produce apremilast Form A when combined with a fast cooling method. Dr. Myerson testified that the 2:1 acetone-ethanol ratio described in Example 2 would "clearly not" produce Form A, although, in the right ratio, particularly a 10:1 ethanol-acetone ratio, fast cooling could make Form A. (Trial Tr. 1614:9-20 (Myerson).) With respect to the '283 Patent claims, Dr. Myerson testified that in data from thirteen experiments submitted to the EPO reproducing the process outlined in Example 2, "if you're using a 2:1 ratio of ethanol to acetone, you use fast cooling or slow cooling, you always get Form B." (Trial Tr. 1596:19-22.)

Nevertheless, as Zydus notes, Dr. Myerson conceded on cross-examination that a "POSA seeing [the] preclinical examples here in '052 would have been motivated to do a polymorph screen." (Trial Tr. 1630:9-13 (Myerson).) In doing that screening, the POSA would have looked to "the only example for how to make enantiomerically pure apremilast" in the '052 Publication, Example 2. (Trial Tr. 1630:14-18 (Myerson).) Evidence at trial established that Guillory taught a POSA that in conducting a polymorph screen, "a screen should include solvents encountered during formulation and processing," meaning acetone and ethanol in the context of the '052 Publication. (Trial Tr. 1628:3-11.) Amgen's expert agreed that a POSA would have been able to design a polymorph screen using ethanol, acetone, and mixtures thereof, and varying cooling rates, including fast cooling. (Trial Tr. 1631:20-25 (Myerson).)

On the other hand, as the evidence at trial established, crystallization and polymorphism are highly unpredictable. (Trial Tr. 1609:16:23 (Myerson) ("At any date you wish to pick, 2002, 2008, or today" one "can't predict whether a compound has multiple crystalline forms" or "[t]he properties of those forms including the XRPD peaks, what . . . specific crystalline form, and how the many experimental variables impact whether a crystal will form, and if so, what specific crystalline form"). And although Zydus cites the '052 Publication in its obviousness combinations, that reference "teaches the 2:1 ratio of ethanol to acetone as the final crystallization step." (Trial Tr. 1630:23-1631:3 (Myerson).) But as discussed above with respect to the '101 Patent, the Court has already credited Dr. Myerson's testimony that "[a]s we saw in the EPO data, if you're using a 2:1 ratio of ethanol to acetone, you use fast cooling or slow cooling, you always get Form B." (Trial Tr. 1596:19-22 (Myerson).)

Accordingly, as Dr. Myerson explained, even where a POSA was motivated to perform routine polymorph screens on the '052 Publication's Example 2 involving varying cooling rates

88

or varying mixtures of ethanol and acetone, the POSA "can't have a reasonable expectation of success of knowing—of making something"—here Form A—that "[they] don't know exists." (Trial Tr. 1609:7-8, 1608:23-1609:6 (Myerson) ("[E]xample 2 makes Form B. So Dr. Sacchetti's obviousness combination would not make Form A because his obvious combination is Example 2 from the '052 Publication and polymorph references. A POSA would have no reasonable expectation of success in making Form A based on the '052 Publication because polymorphism is very unpredictable and a POSA could have no reasonable expectation of making Form A because they don't know [it] exists nor what its properties are."); *see also* PTX-1114_260 ("Every compound is essentially a new situation, and the state of our knowledge and understanding of the phenomenon of polymorphism is still such that we cannot predict with any degree of confidence if a compound will be polymorphic, prescribe how to make possible (unknown) polymorphs, or predict what their properties might be.").)

Because a polymorph screen of Example 2 of the '052 Publication would have had no reasonable expectation of success in producing Form A, a then-unknown crystal, Zydus's obviousness arguments fail. *Bristol-Myers Co. v. U.S. Int'l Trade Comm'n*, No. 89-1530, 1989 WL 147230, at \*4 (Fed. Cir. Dec. 8, 1989) ("[A] new crystalline form of a compound would not have been obvious *absent evidence that the prior art suggests the particular structure or form of the compound or composition* as well as suitable methods of obtaining that structure or form." (emphasis added) (citation omitted)). "'[G]eneral motivation to discover an undefined solution that could take many possible forms' is insufficient to establish obviousness where the prior art does not suggest the unknown claimed form.'" *Kowa Co., Ltd. v. Amneal Pharms., LLC*, No. 14-7934, 2017 WL 10667089, at \*28 (S.D.N.Y. Sept. 19, 2017) (quoting *In re Armodafinil*, 939 F. Supp. 2d 456, 500 (D. Del. 2013)).

The Court's opinion in this regard is consistent with several district courts that have considered similar obviousness invalidity arguments involving polymorph screens. *See, e.g., In re Depomed Patent Litig.*, 2016 WL 7163647, at *53 (D.N.J. Sept. 30, 2016) ("[T]he determination of the structure and properties of the polymorph forms of tapentadol hydrochloride—would have been impossible to predict. . . . Defendants have failed to meet their burden of demonstrating that the specific polymorph Form A of tapentadol hydrochloride was obvious."); *Kowa Co., Ltd. v. Amneal Pharms., LLC*, No. 14-7934, 2017 WL 10667089, at *26 (S.D.N.Y. Sept. 19, 2017) ("The unpredictable possible results a POSA could obtain from performing a polymorph screen of pitavastatin calcium are a far cry from evidence of a 'finite number of identified, predictable solutions' that the Federal Circuit has declared 'might support an inference of obviousness.'" (quoting *Eisai Co. Ltd. v. Dr. Reddy's Labs., Ltd.*, 533 F.3d 1353, 1359 (Fed. Cir. 2008))); *In re Armodafinil*, 939 F. Supp. 2d at 498 ("[T]here was no way to reasonably predict the outcome of any vast number of possible conditions that could have been chosen, as the selection of certain sets of conditions, but not others, could have resulted exclusively in forms other than Form I or mixtures of forms."); *Merck & Cie v. Watson Labs., Inc.*, 125 F. Supp. 3d 503, 514 (D. Del. 2015) ("Both sides' experts agree that finding an unknown polymorph requires experimentation. While there may have been a motivation to discover new crystalline polymorphs of MTHF, doing so would have required a process of trial and error. There was therefore no reasonable expectation of success of finding Type I crystals."), *rev'd on other grounds*, 822 F.3d 1347 (Fed. Cir. 2016).

### 2.    Anticipation and the '283 Patent

Finally, the Court considers Zydus's invalidity challenge to the '283 Patent on anticipation grounds. "A prior art reference which expressly or inherently contains each and every limitation of the claimed subject matter anticipates and invalidates." *Schering Corp. v. Geneva Pharms.*, 339 F.3d 1373, 1379 (Fed. Cir. 2003). Although Zydus argues that Example 2 of the '052 Publication

Case 3:18-cv-11026-MAS-DEA    Document 510 *SEALED*    Filed 09/20/21    Page 91 of 91
PageID: 16986

inherently results in Form A of apremilast when fast cooling is employed, as Amgen notes, Zydus did not present any experimental evidence that Example 2 of the '052 Publication ever produces Form A. On the contrary, Dr. Myerson testified that in data from thirteen experiments submitted to the EPO reproducing the process outlined in Example 2, "if you're using a 2:1 ratio of ethanol to acetone, you use fast cooling or slow cooling, you always get Form B." (Trial Tr. 1596:19-22.) The Court, accordingly, finds that Zydus has failed to meet its burden of demonstrating that Example 2 of the '052 Publication anticipates claims 2 and 27 of the '283 Patent.

IV.    **CONCLUSION**

For the reasons set forth above, the Court will enter judgment in favor of Amgen in part and for Defendants in part.

s/ Michael A. Shipp
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

Appx136

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| AMGEN, INC.,<br><br>Plaintiff,<br><br>v.<br><br>SANDOZ INC., *et al.*,<br><br>Defendants. | Civil Action No. 18-11026 (MAS) (DEA)<br>(Consolidated)[1]<br><br>**ORDER** |

This matter arises from Hatch-Waxman Act patent infringement claims brought by Plaintiff Amgen, Inc. ("Amgen") against Defendants Dr. Reddy's Laboratories, Inc. and Dr. Reddy's Laboratories, Ltd. (together, "DRL"), Sandoz Inc., and Zydus Pharmaceuticals (USA) Inc. ("Zydus") (collectively, "Defendants"). The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338, as well as under 28 U.S.C. §§ 2201 and 2202. The Court conducted a nine-day bench trial in this matter from June 14, 2021, to June 25, 2021. (*See* ECF Nos. 479-87.) The parties submitted post-trial briefing, proposed findings of fact, and proposed conclusions of law on July 8, 2021. (ECF Nos. 467-71.) Closing arguments were heard on July 28, 2021. (ECF No. 492.) For the reasons set forth in the accompanying Opinion, and for other good cause shown,

---

[1] The Court consolidated docket numbers 18-11026, 18-11267, 18-11269, and 19-18806 for trial. (Stipulation & Order regarding Case Consolidation for Trial, ECF No. 424.) Docket number 18-11026 is the lead matter. (*Id.*)

**IT IS** on this 20th day of September 2021, **ORDERED** as follows:

1. Judgment of infringement is entered against Defendants in favor of Amgen on U.S. Patent No. 7,427,638 and U.S. Patent No. 8,455,536.

2. Judgment of non-infringement is entered in favor of Defendants on U.S. Patent No. 10,092,541.

3. Judgment of non-infringement is entered in favor of Zydus on U.S. Patent No. 7,893,101 (the "'101 Patent").

4. Judgment of infringement is entered against DRL and Sandoz in favor of Amgen on the '101 Patent.

5. Judgment of infringement is entered against Zydus in favor of Amgen on U.S. Patent No. 8,093,283.

6. The parties shall meet and confer and shall e-file a proposed form of judgment for each of the underlying cases by **September 27, 2021**.

7. The Clerk is directed to file the accompanying Opinion under temporary seal until further order of the Court.

8. To the extent that any party believes that portions of the Court's Opinion should be permanently sealed, that party shall file (or the parties may jointly file) a formal motion to seal. Any motion to seal shall be filed by **October 20, 2021**.

s/ Michael A. Shipp
**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**

2

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

**U.S. District Court**

**District of New Jersey [LIVE]**

**Notice of Electronic Filing**

The following transaction was entered on 9/23/2021 at 10:05 AM EDT and filed on 9/23/2021

| | |
|---|---|
| **Case Name:** | AMGEN INC v. SANDOZ INC. |
| **Case Number:** | 3:18-cv-11026-MAS-DEA |
| **Filer:** | |
| **Document Number:** | 513(No document attached) |

**Docket Text:**
**TEXT ORDER: The Court is in receipt of Defendants Dr. Reddy's Laboratories, Inc., and Dr. Reddy's Laboratories, Ltd.'s (collectively, "DRL") correspondence, filed on September 22, 2021. (ECF No. 512.) That correspondence reflected that DRL settled all claims with Plaintiff Amgen Inc. as reflected in the docket for Civil Action No. 18-11269. The Court, therefore, strikes all references to DRL, DRL's ANDA, and Civil Action No. 18-11269 from its September 20, 2021 Opinion and Order. (ECF Nos. 510, 511.) This Order applies to Civil Action Nos. 18-11026, 18-11267, and 19-18806. (FH)**

**3:18-cv-11026-MAS-DEA Notice has been electronically mailed to:**

CAROLYN A. BLESSING     cblessing@lockelord.com

CHARLES H. CHEVALIER     cchevalier@gibbonslaw.com, docketing@cov.com, ngiffo01@amgen.com

CHARLES MICHAEL LIZZA     clizza@saul.com

CHRISTINE A. GADDIS     cgaddis@gibbonslaw.com

DAVID B. ABRAMOWITZ     dabramowitz@lockelord.com

DAVID LEIGH MOSES     dmoses816@gmail.com, Celgene-Otezla@cov.com, justin-parady-7860@ecf.pacerpro.com, sarah.sullivan@saul.com

DEIRDRE M. WELLS     dwells@sternekessler.com

EMILY L. SAVAS     esavas@lockelord.com

ERIC I. ABRAHAM     eabraham@hillwallack.com, dcavanaugh@hillwallack.com, jwong@winston.com, nshah@hillwallack.com

Gaby L. Longsworth     glongs@sternekessler.com

HUA HOWARD WANG     hwang@budd-larner.com, hwang@windelsmarx.com

J. BRUGH LOWER     jlower@gibbonslaw.com

JAMES P. BARABAS     jbarabas@windelsmarx.com, jpbarabas@hotmail.com

JAY P. LESSLER     JLessler@BlankRome.com, fgrace@blankrome.com, JYeddo@BlankRome.com, slwilson@blankrome.com

JEFFREY A. COHEN     jeff.cohen@flastergreenberg.com, lisa.maroccia@flastergreenberg.com

JENNIFER CORONEL     jcoronel@lockelord.com

KENT M. WALKER     kwalker@brinksgilson.com

KEVIN M. CAPUZZI    kcapuzzi@beneschlaw.com, docket@beneschlaw.com, lmolinaro@beneschlaw.com, mmehta@beneschlaw.com, mweinstein@beneschlaw.com, zbaig@beneschlaw.com

LAURA LYDIGSEN    llydigsen@brinksgilson.com

LAUREN BROPHY COOPER    lcooper@ebglaw.com, nwiggins@ebglaw.com, nyma@ebglaw.com

LISA J. RODRIGUEZ    ljrodriguez@schnader.com, 7467326420@filings.docketbird.com

LOUIS HARRY WEINSTEIN    lweinstein@windelsmarx.com, barmstrong@windelsmarx.com, mthomas@windelsmarx.com

MICHAEL J. GAERTNER    MGAERTNER@LOCKELORD.COM

NAKUL Y. SHAH    nshah@hillwallack.com

NOELLE TORRICE    ntorrice@beneschlaw.com, docket@beneschlaw.com, lmolinaro@beneschlaw.com

PAUL BRIAN SUDENTAS    psudentas@lockelord.com, Autodocket@lockelord.com, elsa.vargas@lockelord.com, esavas@lockelord.com, ewilson@lockelord.com, Jennifer.Coronel@lockelord.com, kholtz@lockelord.com, MKlimasara@lockelord.com, mohara@lockelord.com

PHILIP SCOTT MAY    pmay@cov.com

RACHEL SPEARS JOHNSTON    rjohnston@gibbonslaw.com

REBEKAH R. CONROY    rconroy@stoneconroy.com, brodriguez@stoneconroy.com

ROBERT LUFRANO    rlufrano@ebglaw.com, ediliberto@ebglaw.com, HStrakele@ebglaw.com, nwiggins@ebglaw.com

SARAH A GEERS    sgeers@jonesday.com

SARAH ANN SULLIVAN    sarah.sullivan@saul.com, alexander.callo@saul.com, gpappas@cov.com

Samuel J. Ruggio    sruggio@beneschlaw.com

THEODORA T. MCCORMICK    tmccormick@ebglaw.com, Nwiggins@ebglaw.com, nyma@ebglaw.com

WILLIAM C. BATON    wbaton@saul.com, alexander.callo@saul.com

**3:18-cv-11026-MAS-DEA Notice has been sent by regular U.S. Mail:**

ANNORA PHARMA PRIVATE LIMITED


AUROBINDO PHARMA LIMITED


AUROBINDO PHARMA U.S.A., INC.


EMCURE PHARMACEUTICALS LTD.


HETERO USA INC.


MACLEODS PHARMACEUTICALS LTD.


C. NICHOLE GIFFORD



THE UNITED STATES OF AMERICA

TO ALL TO WHOM THESE PRESENTS; SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

July 09, 2018

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM
THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: *7,427,638*
ISSUE DATE: *September 23, 2008*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

P. SWAIN
Certifying Officer

JOINT
EXHIBIT

CASE
NO. 18-cv-11026 (Consol.)

EXHIBIT
NO. **JTX-3**

CEL-OTZ-00672246



US007427638B2

(12) **United States Patent**
Muller et al.

(10) Patent No.: **US 7,427,638 B2**
(45) Date of Patent: **Sep. 23, 2008**

(54) **(+)-2-[1-(3-ETHOXY-4-METHOXYPHENYL)-2-METHYLSULFONYLETHYL]-4-ACETYL-AMINOISOINDOLINE-1,3-DIONE:, AND METHODS OF SYNTHESIS AND COMPOSITIONS THEREOF**

(75) Inventors: **George W. Muller**, Bridgewater, NJ (US); **Peter H. Schafer**, Somerset, NJ (US); **Hon-Wah Man**, Princeton, NJ (US); **Chuansheng Ge**, Belle Mead, NJ (US)

(73) Assignee: **Celgene Corporation**, Summit, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 446 days.

(21) Appl. No.: **11/106,142**

(22) Filed: **Apr. 13, 2005**

(65) **Prior Publication Data**

US 2005/0192336 A1    Sep. 1, 2005

**Related U.S. Application Data**

(62) Division of application No. 10/392,195, filed on Mar. 19, 2003, now Pat. No. 6,962,940.

(60) Provisional application No. 60/438,450, filed on Jan. 7, 2003, provisional application No. 60/366,515, filed on Mar. 20, 2002.

(51) **Int. Cl.**
*A61K 31/40* (2006.01)

(52) **U.S. Cl.** ...................... 514/411; 514/416; 514/417; 548/451; 548/472; 564/80

(58) **Field of Classification Search** ................ 514/411, 514/416, 417; 548/451, 472; 564/80
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,031,450 A | 4/1962 | Fischer et al. |
| 3,322,755 A | 5/1967 | Roch et al. |
| 3,920,636 A | 11/1975 | Takahashi et al. |
| 4,001,237 A | 1/1977 | Partyka et al. |
| 4,001,238 A | 1/1977 | Partyka et al. |
| 4,047,404 A | 9/1977 | Hayashi |
| 4,060,615 A | 11/1977 | Matier et al. |
| 4,101,548 A | 7/1978 | Crenshaw et al. |
| 4,162,316 A | 7/1979 | Nishimura et al. |
| 4,209,623 A | 6/1980 | Juby |
| 4,880,810 A | 11/1989 | Lowe, III |
| 4,885,301 A | 12/1989 | Coates |
| 5,147,875 A | 9/1992 | Coates et al. |
| 5,354,571 A | 10/1994 | Morikawa et al. |
| 5,401,774 A | 3/1995 | Pamukcu et al. |
| 5,439,895 A | 8/1995 | Lee et al. |
| 5,488,055 A | 1/1996 | Kumar et al. |
| 5,608,914 A | 3/1997 | Keesler |
| 5,614,530 A | 3/1997 | Kumar et al. |
| 5,614,627 A | 3/1997 | Takase et al. |
| 5,658,940 A | 8/1997 | Muller et al. |

| | | | |
|---|---|---|---|
| 5,698,579 A | 12/1997 | Muller |
| 5,703,098 A | 12/1997 | Muller et al. |
| 5,710,170 A | 1/1998 | Guay et al. |
| 5,728,844 A | 3/1998 | Muller et al. |
| 5,728,845 A | 3/1998 | Muller et al. |
| 5,736,570 A | 4/1998 | Muller et al. |
| 5,798,373 A | 8/1998 | Warrellow |
| 5,801,195 A | 9/1998 | Muller et al. |
| 5,849,770 A | 12/1998 | Head et al. |
| 5,877,200 A | 3/1999 | Muller |
| 5,891,896 A | 4/1999 | Warrellow et al. |
| 6,011,050 A | 1/2000 | Muller et al. |
| 6,020,339 A | 2/2000 | Perrier et al. |
| 6,020,358 A | 2/2000 | Muller et al. |
| 6,034,089 A | 3/2000 | Han et al. |
| 6,046,221 A | 4/2000 | Muller et al. |
| 6,069,156 A | 5/2000 | Oku et al. |
| 6,162,830 A | 12/2000 | Connor et al. |
| 6,166,041 A | 12/2000 | Cavalla et al. |
| 6,177,471 B1 | 1/2001 | Menander et al. |
| 6,204,275 B1 | 3/2001 | Friesen et al. |
| 6,218,400 B1 | 4/2001 | Daugan et al. |
| 6,300,335 B1 | 10/2001 | Campbell et al. |
| 6,316,472 B1 | 11/2001 | Frenette et al. |
| 6,333,354 B1 | 12/2001 | Schudt |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 347 146 | 6/1989 |
| EP | 0 349 239 A2 | 6/1989 |

(Continued)

OTHER PUBLICATIONS

Craven et al., 1969, CAS: 71:117431.*
Berge et al., Journal of Pharmaceutical Science, 1977, vol. 66, pp. 1-19.*
Bundgaard et al. publication, 1985, Design of prodrug, pp. 1-4.*
FDA's guidance for industry, 2000, pp. 1-20.*
Dredge et al., 2003, "Angiogenesis inhibitors in cancer therapy," Curr. Opin. Investig. Drugs 4(6):667-674.
Dredge et al., 2002, "Immunological effects of thalidomide and its chemical and functional analogs," *Crit. Rev. Immunol.* 22(5-6):425-437.
Dredge et al., 2002, "Recent developments in antiangiogenic therapy," *Expert Opin. Biol. Ther.* 2(8):953-966.
Gee et al., 2003, "Selective cytokine inhibitory drugs with enhanced antiangiogenic activity control tumor growth through vascular inhibition," *Cancer Res.* 63(23):8073-8078.

(Continued)

*Primary Examiner*—Rei-Tsang Shiao
(74) *Attorney, Agent, or Firm*—Jones Day

(57) **ABSTRACT**

Stereomerically pure (+)-2-[1-(3-Ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione, substantially free of its (−) isomer, and prodrugs, metabolites, polymorphs, salts, solvates, hydrates, and clathrates thereof are discussed. Also discussed are methods of using and pharmaceutical compositions comprising the (+) enantiomer of 2-[1-(3-Ethoxy-4-methoxyphenyl)-2-methyl-sulfonylethyl]-4-acetylaminoisoindoline-1,3-dione are disclosed. The methods include methods of treating and/or preventing disorders ameliorated by the reduction of levels of TNF-α or the inhibition of PDE4.

**13 Claims, 2 Drawing Sheets**

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

US 7,427,638 B2

Page 2

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 351 058 | 6/1989 |
| EP | 0 352 960 A2 | 7/1989 |
| EP | 0 395 328 | 4/1990 |
| EP | 0 428 268 A2 | 10/1990 |
| EP | 0 463 756 A1 | 6/1991 |
| EP | 0 526 004 A1 | 7/1992 |
| EP | 0 607 439 A1 | 9/1992 |
| EP | 0 722 937 A1 | 1/1996 |
| EP | 0 722 943 A1 | 1/1996 |
| EP | 0 722 944 A1 | 1/1996 |
| GB | 2 063 249 A | 9/1980 |
| WO | WO 93/07149 | 4/1993 |
| WO | WO 93/12095 | 6/1993 |
| WO | WO 94/01728 | 1/1994 |
| WO | WO 94/05661 | 3/1994 |
| WO | WO 94/29277 | 12/1994 |
| WO | WO 95/19978 | 7/1995 |
| WO | WO 96/32379 | 10/1996 |
| WO | WO 97/03070 | 1/1997 |
| WO | WO 97/03675 | 2/1997 |
| WO | WO 97/03985 | 2/1997 |
| WO | WO 97/24334 | 7/1997 |
| WO | WO 98/06722 | 2/1998 |
| WO | WO 98/08848 | 3/1998 |
| WO | WO 98/14448 | 4/1998 |
| WO | WO 98/16521 | 4/1998 |
| WO | WO 98/17668 | 4/1998 |
| WO | WO 98/23597 | 6/1998 |
| WO | WO 98/38168 | 9/1998 |
| WO | WO 99/06041 | 2/1999 |

### OTHER PUBLICATIONS

Marriott et al., 2001, "Immunotherapeutic and antitumour potential of thalidomide analogues," *Expert Opin. Biol. Ther.* 1(4):1-8.
Marriott et al., 2002, "Thalidomide and its analogues have distinct and opposing effects on TNF-alpha and TNFR2 during co-stimulation of both CD4(+) and CD8(+) T cells," *Clin. Exp. Immunol.* 130(1):75-84.
Molostvov et al., 2004, "The effects of selective cytokine inhibitory drugs (CC-10004 and CC-1088) on VEGF and IL-6 expression and apoptosis in myeloma and endothelial cell co-cultures," *Br. J. Haematol.* 124(3):366-375.
U.S. Appl. No. 60/454,155, filed Mar. 12, 2003, Muller, G. et al.
U.S. Appl. No. 60/454,149, filed Mar. 12, 2003, Muller, G. et al.
U.S. Appl. No. 60/438,448, filed Jan. 7, 2003, Muller, G. et al.
U.S. Appl. No. 60/436,975, filed Dec. 30, 2002, Muller, G. et al.
U.S. Appl. No. 60/366,515, filed Mar. 20, 2002, Muller, G. et al.
Akazome, M. et al., 1997, "Asymmetric recognition of 1-arylethylamines by (R)-phenylglycyl-(R)-phenylglycine and its

mechanism," Tetrahedron: Asymmetry, Elsevier Scince Publishers, Amsterdam, NL, 8(14):2331-2336.
Au et al., 1998, *Brit. J. Pharm.* 123:1260-1266.
Baehr et al., 1979, *J. Biol. Chem.* 254:11669.
Baughman et al., 1990, *J. Lab. Clin. Med.* 115:36-42.
Beavo and Reifsnyder, *Trends in Pharm.*, 11, 150-55, 1990.
Bissonnette et al., 1989, *Inflammation* 13:329-339.
Bloom and Beavo 1996, *Proc. Natl. Acad. Sci. USA* 93:14188-14192.
Brackeen, M.F. et al., 1995, "Design and synthesis of conformationally constrained analogues of 4-(3-butoxy-4-methoxybenzyl) imidazolidin-2-one (Ro 20-1724) as potent inhibitors of cAMP-specific phosphodiesterase", *J. Med. Chem.* 38:4848-54.
Carstensen, Jens T., 1995, *Drug Stability: Principles & Practice*, 2nd ed., Marcel Dekker, New York, NY pp. 379-380.
Casini et al., 1964, Farmaco Ed. Sci. 19:563.
Clouse et al., 1989, *J. Immunol.* 142:431-438.
Derian et al., 1995, J. Immunol. 154:308-317.
Duh et al., 1989, Proc. Nat. Acad. Sci. 86:5974-5978.
Featherstone, R.L., et al., 2000, "Comparison of phosphodiesterase inhibitors of differing isoenzyme selectivity added to St. Thomas' hospital cardioplegic solution used for hypothermic preservation of rat lungs", Am. J. Respir. Crit. Care Med. 162:850-6.
Gillespie et al., 1989, *Mol. Pharm.* 36:773.
Hidaka and Asano 1976, *Biochem. Biophys. Acta* 429:485.
Hinshaw et al. 1990. *Circ. Shock* 30:2797-292.
Holler et al., 1990, *Blood* 75:1011-1016.
Johnson et al., 1989, *Endocrinology* 124:1424-1427.
List et al., 1990, *J. Clin. Oncol.* 8:1424.MDS.
Luke, G.P. et al., 1999, "Synthesis of (S)-5-(1-aminoethyl)-2-(cyclohexylmethoxy) benzamide," Tetrahedron: Asymmetry, Elsevier Science Publishers, Amsterdam, NL, 10(22):4393-4403.
Merck Manual (1999) 17th ed., 953.
Monté et al., 1990, *Blood* 79:2670.
Muller, George, et al., 1999, *Bioorganic & Medicinal Chemistry Letters* 9; pp. 1625-1630.
Muller et al., 1998, *Bioorg. & Med Chem Lett.* 8:2669-2674.
Muller, et al., 1996, *J. Med. Chem.* 39:3238.
Nicholson et al., 1991, *Trends Pharmaco. Sci.* 12:19.
Shealy et al., 1965, "D- and L-thalidomide." *Chem. Indus.* 12;24:1030-1.
Tigrney, et al., et al., 1998, Current Medical Diagnosis & Treatment, 37th ed., Appleton & Lange, pp. 499.
Verghese, et al., *Journal of Pharmacology and Experimental Therapeutics*, 272(3), 1313-1320, 1995.
Van Dullemen et al., 1995, *Gastroenterology*, 109:129-135.
Wilen, S.H., et al., 1977, *Tetrahedron* 33:2725.
Wilen, S.H., 1972, *Tables of Resolving Agents and Optical Resolutions* (E.L. Eliel, Ed., Univ. of Notre Dame Press, Notre Dame, IN) p. 268.
Wolff, Manfred E., ed., *Burger's Medicinal Chemistry and Drug Discovery*, 5th ED. 1995 172-178, 949-982.

* cited by examiner

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672248
**JTX-3_3**

**FIG. 1**

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

Appx10507

**FIG 2.**



CEL-OTZ-00672250
**JTX-3_5**

Appx10508

US 7,427,638 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

**(+)-2-[1-(3-ETHOXY-4-METHOXYPHENYL)-2-METHYLSULFONYLETHYL]-4-ACETYL-AMINOISOINDOLINE-1,3-DIONE:, AND METHODS OF SYNTHESIS AND COMPOSITIONS THEREOF**

CROSS-REFERENCE TO RELATED APPLICATION

This application is a divisional application of U.S. patent application Ser. No. 10/392,195, filed Mar. 19, 2003 now U.S. Pat. No. 6,962,940, which claims the benefit of U.S. Provisional Application No. 60/366,515 filed Mar. 20, 2002 and U.S. Provisional Application No. 60/438,450 filed Jan. 7, 2003, all of which are incorporated herein by reference in their entireties.

1. FIELD OF INVENTION

The invention relates to methods of using and compositions comprising the (+) enantiomer of 2-[1-(3-Ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione.

2. BACKGROUND OF THE INVENTION

Tumor necrosis factor alpha, (TNF-α) is a cytokine that is released primarily by mononuclear phagocytes in response to immunostimulators. TNF-α is capable of enhancing most cellular processes, such as differentiation, recruitment, proliferation, and proteolytic degradation. At low levels, TNF-α confers protection against infective agents, tumors, and tissue damage. But TNF-α also has a role in many diseases. When administered to mammals or humans, TNF-α causes or aggravates inflammation, fever, cardiovascular effects, hemorrhage, coagulation, and acute phase responses similar to those seen during acute infections and shock states. Enhanced or unregulated TNF-α production has been implicated in a number of diseases and medical conditions, for example, cancers, such as solid tumors and blood-born tumors; heart disease, such as congestive heart failure; and viral, genetic, inflammatory, allergic, and autoimmune diseases.

Adenosine 3',5'-cyclic monophosphate (cAMP) also plays a role in many diseases and conditions, such as but not limited to asthma and inflammation, and other conditions (Lowe and Cheng, *Drugs of the Future*, 17(9), 799-807, 1992). It has been shown that the elevation of cAMP in inflammatory leukocytes inhibits their activation and the subsequent release of inflammatory mediators, including TNF-α and NF-κB. Increased levels of cAMP also leads to the relaxation of airway smooth muscle.

It is believed that the primary cellular mechanism for the inactivation of cAMP is the breakdown of cAMP by a family of isoenzymes referred to as cyclic nucleotide phosphodiesterases (PDE) (Beavo and Reitsnyder, *Trends in Pharm.*, 11, 150-155, 1990). There are eleven known PDE families. It is recognized, for example, that the inhibition of PDE type IV is particularly effective in both the inhibition of inflammatory mediator release and the relaxation of airway smooth muscle (Verghese, et al., *Journal of Pharmacology and Experimental Therapeutics*, 272(3), 1313-1320, 1995). Thus, compounds that inhibit PDE4 (PDE IV) specifically, may inhibit inflammation and aid the relaxation of airway smooth muscle with a minimum of unwanted side effects, such as cardiovascular or anti-platelet effects. Currently used PDE4 inhibitors lack the selective action at acceptable therapeutic doses.

Cancer is a particularly devastating disease, and increases in blood TNF-α levels are implicated in the risk of and the spreading of cancer. Normally, in healthy subjects, cancer cells fail to survive in the circulatory system, one of the reasons being that the lining of blood vessels acts as a barrier to tumor-cell extravasation. But increased levels of cytokines have been shown to substantially increase the adhesion of cancer cells to endothelium in vitro. One explanation is that cytokines, such as TNF-α, stimulate the biosynthesis and expression of a cell surface receptors called ELAM-1 (endothelial leukocyte adhesion molecule). ELAM-1 is a member of a family of calcium-dependent cell adhesion receptors, known as LEC-CAMs, which includes LECAM-1 and GMP-140. During an inflammatory response, ELAM-1 on endothelial cells functions as a "homing receptor" for leukocytes. Recently, ELAM-1 on endothelial cells was shown to mediate the increased adhesion of colon cancer cells to endothelium treated With cytokines (Rice et al., 1989, *Science* 246:1303-1306).

Inflammatory diseases such as arthritis, related arthritic conditions. (e.g., osteoarthritis and rheumatoid arthritis), inflammatory bowel disease (e.g., Crohn's disease and ulcerative colitis), sepsis, psoriasis, atopic dermatitis, contact dermatitis, and chronic obstructive pulmonary disease, chronic inflammatory pulmonary diseases are also prevalent and problematic ailments. TNF-α plays a central role in the inflammatory response and the administration of their antagonists block chronic and acute responses in animal models of inflammatory disease.

Enhanced or unregulated TNF-α production has been implicated in viral, genetic, inflammatory, allergic, and autoimmune diseases. Examples of such diseases include but are not limited to: HIV; hepatitis; adult respiratory distress syndrome; bone-resorption diseases; chronic obstructive pulmonary diseases; chronic pulmonary inflammatory diseases; asthma, dermatitis; cystic fibrosis; septic shock; sepsis; endotoxic shock; hemodynamic shock; sepsis syndrome; post ischemic reperfusion injury; meningitis; psoriasis; fibrotic disease; cachexia; graft rejection; auto-immune disease; rheumatoid spondylitis; arthritic conditions, such as rheumatoid arthritis and osteoarthritis; osteoporosis; Crohn's disease; ulcerative colitis; inflammatory-bowel disease; multiple sclerosis; systemic lupus erythematosus; ENL in leprosy; radiation damage; asthma; and hyperoxic alveolar injury. Tracey et al., 1987, *Nature* 330:662-664 and Hinshaw et al., 1990, *Circ. Shock* 30:279-292 (endotoxic shock); Dezube et al., 1990, *Lancet*, 335:662 (cachexia); Millar et al., 1989, *Lancet* 2:712-714 and Ferrai-Baliviera et al., 1989, *Arch. Surg.* 124:1400-1405 (adult respiratory distress syndrome); Bertolini et al., 1986, *Nature* 319:516-518, Johnson et al., 1989, *Endocrinology* 124:1424-1427, Holler et al., 1990, *Blood* 75:1011-1016, and Grau et al., 1989, *N. Engl. J. Med.* 320:1586-1591 (bone resorption diseases); Pignet et al., 1990, *Nature*, 344:245-247, Bissonnette et al., 1989, *Inflammation* 13:329-339 and Baughman et al., 1990, *J. Lab. Clin. Med.* 115:36-42 (chronic pulmonary inflammatory diseases); Elliot et al., 1995, *Int. J. Pharmac.* 17:141-145 (rheumatoid arthritis); von Dullemen et al., 1995, *Gastroenterology*, 109:129-135 (Crohn's disease); Duh et al., 1989, *Proc. Nat. Acad. Sci.* 86:5974-5978, Poll et al., 1990, *Proc. Nat. Acad. Sci.* 87:782-785, Monto et al., 1990, *Blood* 79:2670, Clouse et al., 1989, *J. Immunol.* 142, 431-438, Poll et al., 1992, *AIDS Res. Hum. Retrovirus*, 191-197, Poli et al. 1990, *Proc. Nat. Acad. Sci.* 87:782-784, Folks et al., 1989, PNAS 86:2365-2368 (HIV and opportunistic infections resulting from HIV).

Pharmaceutical compounds that can block the activity or inhibit the production of certain cytokines, including TNF-α,

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

Appx10509

US 7,427,638 B2

3

may be beneficial therapeutics. Many small-molecule inhibitors have demonstrated an ability to treat or prevent inflammatory diseases implicated by TNF-α (for a review, see Lowe, 1998 *Exp. Opin. Ther. Patents* 8:1309-1332). One such class of molecules are the substituted phenethylsulfones described in U.S. Pat. No. 6,020,358.

## 3. SUMMARY OF THE INVENTION

This invention relates to methods of treating diseases and disorders utilizing an enantiomer of a substituted phenethylsulfone compound and pharmaceutically acceptable salts, hydrates, solvates, clathrates, prodrugs and polymorphs thereof and methods for reducing the level of cytokines and their precursors in mammals. The invention also relates to pharmaceutical compositions comprising an enantiomer of 2-[1-(3-Ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione and a pharmaceutically acceptable carrier. The invention further relates to an enantiomer of 2-[1-(3-Ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione substantially free of its other enantiomer.

This invention particularly relates to the (+) enantiomer of 2-[1-(3-Ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione. This compound is believed to have increased potency and other benefits as compared to its racemate—2-[1-(3-Ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione.

The invention encompasses the use of the (+) enantiomer of 2-[1-(3-Ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione for treating or preventing diseases or disorders ameliorated by the inhibition of TNF-α production in mammals. In certain embodiments, this treatment includes the reduction or avoidance of adverse effects. Such disorders include, but are not limited to, cancers, including, but not limited to cancer of the head, thyroid, neck, eye, skin, mouth, throat, esophagus, chest, bone, blood, bone marrow, lung, colon, sigmoid, rectum, stomach, prostate, breast, ovaries, kidney, liver, pancreas, brain, intestine, heart, adrenal, subcutaneous tissue, lymph nodes, heart, and combinations thereof. Specific cancers that can be treated by this method are multiple myeloma, malignant melanoma, malignant glioma, leukemia and solid tumors.

The invention also encompasses the use of the (+) enantiomer of 2-[1-(3-Ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione in the treatment or prevention of heart disease, including, but not limited to congestive heart failure, cardiomyopathy, pulmonary edema, endotoxin-mediated septic shock, acute viral myocarditis, cardiac allograft rejection, and myocardial infarction.

The invention also encompasses the use of the (+) enantiomer of 2-[1-(3-Ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione to treat diseases or disorders ameliorated by the inhibition of PDE4. For example, the compounds and compositions of the invention may be useful to treat or prevent viral, genetic, inflammatory, allergic, and autoimmune diseases. Examples of such diseases include, but are not limited to: HIV; hepatitis; adult respiratory distress syndrome; bone-resorption diseases; chronic obstructive pulmonary diseases; chronic pulmonary inflammatory diseases; dermatitis; inflammatory skin disease, atopic dermatitis, cystic fibrosis; septic shock; sepsis; endotoxic shock; hemodynamic shock; sepsis syndrome; post ischemic reperfusion injury; meningitis; psoriasis; fibrotic disease; cachexia; graft rejection including graft ver-

4

sus host disease; auto-immune disease; rheumatoid spondylitis; arthritic conditions, such as rheumatoid arthritis and osteoarthritis; osteoporosis; Crohn's disease; ulcerative colitis; inflammatory-bowel disease; multiple sclerosis; systemic lupus erythematosus; erythema nodosum leprosum (ENL) in leprosy; radiation damage; asthma; and hyperoxic alveolar injury.

In yet another embodiment, the stereomerically pure (+) enantiomer of 2-[1-(3-Ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione is also useful in the treatment or prevention of microbial infections or the symptoms of microbial infections including, but not limited to, bacterial infections, fungal infections, malaria, mycobacterial infection, and opportunistic infections resulting from HIV.

The invention further encompasses pharmaceutical compositions and single unit dosage forms comprising an enantiomer of 2-[1-(3-Ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione and pharmaceutically acceptable polymorphs, prodrugs, salts, hydrates, clathrates, and solvates thereof.

In a separate embodiment, the invention encompasses the (+) enantiomer of 2-[1-(3-Ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione.

In a further embodiment, the invention encompasses a method of producing a stereomerically pure enantiomer of 2-[1-(3-Ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione which comprises contacting 1-(3-Ethoxy-4-methoxy-phenyl)-2-methanesulfonylethylamine with a chiral amino acid and contacting the product of the first step with N-(1,3-Dioxo-1,3-dihydro-isobenzofuran-4-yl)-acetamide. In a related embodiment the invention encompasses a chiral salt of 1-(3-Ethoxy-4-methoxy-phenyl)-2-methanesulfonyl-ethylamine.

## 3.1. BRIEF DESCRIPTION OF THE FIGURES

FIG. 1 illustrates the preparation of the (+) enantiomer of 2-[1-(3-Ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione.

FIG. 2 illustrates the effect of the enantiomer of the invention on LPS-induced neutrophilia in the lungs of conscious ferrets.

## 3.2. DEFINITIONS

As used herein, term "Compound A" refers to an enantiomerically pure form of 2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione which comes off of an HPLC column at about 25.4 minutes when that column is a 150 mm×4.6 mm Ultron Chiral ES-OVS chiral HPLC column (Agilent Technology), the eluent is 15:85 ethanol: 20 mM $KH_2PO_4$ at pH 3.5, and the observation wavelength is 240 nm. The $^1H$ NMR spectrum of compound A is substantially as follows: δ(CDCl$_3$): 1.47 (t, 3H), 2.26 (s, 3H), 2.87 (s, 3H), 3.68-3.75 (dd, 1H), 3.85 (s, 3H), 4.07-4.15 (q, 2H), 4.51-4.61 (dd, 1H), 5.84-5.90 (dd, 1H), 6.82-8.77 (m, 6H), 9.46 (s, 1H). The $^{13}C$ NMR spectrum of Compound A is substantially as follows δ(DMSO-d$_6$): 14.66, 24.92, 41.61, 48.53, 54.46, 55.91, 64.51, 111.44, 112.40, 115.10, 118.20, 120.28, 124.94, 129.22, 131.02, 136.09, 137.60, 148.62, 149.74, 167.46, 169.14, 169.48. Compound A dissolved in methanol also rotates plane polarized light in the (+) direction.

Without being limited by theory, Compound A is believed to be S-{2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfo

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672252
JTX-3_7

US 7,427,638 B2

| 5 | 6 |

nylethyl]-4-acetylaminoisoindoline-1,3-dione}, which has the following structure:



As used herein, the term "patient" refers to a mammal, particularly a human.

As used herein, the term "pharmaceutically acceptable salts" refer to salts prepared from pharmaceutically acceptable non-toxic acids or bases including inorganic acids and bases and organic acids and bases. Suitable pharmaceutically acceptable base addition salts for the compound of the present invention include metallic salts made from aluminum, calcium, lithium, magnesium, potassium, sodium and zinc or organic salts made from lysine, N,N'-dibenzylethylenediamine, chloroprocaine, choline, diethanolamine, ethylenediamine, meglumine (N-methylglucamine) and procaine. Suitable non-toxic acids include, but are not limited to, inorganic and organic acids such as acetic, alginic, anthranilic, benzenesulfonic, benzoic, camphorsulfonic citric, ethenesulfonic, formic, fumaric, furoic, galacturonic, gluconic, glucuronic, glutamic, glycolic, hydrobromic, hydrochloric, isethionic, lactic, maleic, malic, mandelic, methanesulfonic, mucic, nitric, pamoic, pantothenic, phenylacetic, phosphoric, propionic, salicylic, stearic, succinic, sulfanilic, sulfric, tartaric acid, and p-toluenesulfonic acid. Specific non-toxic acids include hydrochloric, hydrobromic, phosphoric, sulfuric, and methanesulfonic acids. Examples of specific salts thus include hydrochloride and mesylate salts.

As used herein and unless otherwise indicated, the term "prodrug" means a derivative of a compound that can hydrolyze, oxidize, or otherwise react under biological conditions (in vitro or in vivo) to provide the compound. Examples of prodrugs include, but are not limited to, derivatives and metabolites of Compound A that include biohydrolyzable moieties such as biohydrolyzable amides, biohydrolyzable esters, biohydrolyzable carbamates, biohydrolyzable carbonates, biohydrolyzable ureides, and biohydrolyzable phosphate analogues. Prodrugs can typically be prepared using well-known methods, such as those described by 1 *Burger's Medicinal Chemistry and Drug Discovery*, 172-178, 949-982 (Manfred E. Wolff ed., 5th ed. 1995).

As used herein and unless otherwise indicated, the terms "biohydrolyzable amide," "biohydrolyzable ester," "biohydrolyzable carbamate," "biohydrolyzable carbonate," "biohydrolyzable ureide," "biohydrolyzable phosphate" mean an amide, ester, carbamate, carbonate, ureide, or phosphate, respectively, of a compound that either: 1) does not interfere with the biological activity of the compound but can confer upon that compound advantageous properties in vivo, such as uptake, duration of action, or onset of action; or 2) is biologically inactive but is converted in vivo to the biologically active compound. Examples of biohydrolyzable esters include, but are not limited to, lower alkyl esters, alkoxyacyloxy esters, alkyl acylamino alkyl esters, and choline esters. Examples of biohydrolyzable amides include, but are not limited to, lower alkyl amides, α-amino acid amides, alkoxyacyl amides, and alkylaminoalkylcarbonyl amides. Examples of biohydrolyzable carbamates include, but are not limited to, lower alkylamines, substituted ethylenediamines, aminoacids, hydroxyalkylamines, heterocyclic and heteroaromatic amines, and polyether amines.

As used herein and unless otherwise indicated, the term "stereomerically pure" means a composition that comprises one stereoisomer of a compound and is substantially free of other stereoisomers of that compound. For example, a stereomerically pure composition of a compound having one chiral center will be substantially free of the opposite enantiomer of the compound. A stereomerically pure composition of a compound having two chiral centers will be substantially free of other diastereomers of the compound. A typical stereomerically pure compound comprises greater than about 80% by weight of one stereoisomer of the compound and less than about 20% by weight of other stereoisomers of the compound, more preferably greater than about 90% by weight of one stereoisomer of the compound and less than about 10% by weight of the other stereoisomers of the compound, even more preferably greater than about 95% by weight of one stereoisomer of the compound and less than about 5% by weight of the other stereoisomers of the compound, and most preferably greater than about 97% by weight of one stereoisomer of the compound and less than about 3% by weight of the other stereoisomers of the compound.

As used herein and unless otherwise indicated, the term "enantiomerically pure" means a stereomerically pure composition of a compound having one chiral center.

As used herein, term "adverse effects" includes, but is not limited to gastrointestinal, renal and hepatic toxicities, leukopenia, increases in bleeding times due to, e.g., thrombocytopenia, and prolongation of gestation, nausea, vomiting, somnolence, asthenia, dizziness, teratogenicity, extra-pyramidal symptoms, akathisia, cardiotoxicity including cardiovascular disturbances, inflammation, male sexual dysfunction, and elevated serum liver enzyme levels. The term "gastrointestinal toxicities" includes but is not limited to gastric and intestinal ulcerations and erosions. The term "renal toxicities" includes but is not limited to such conditions as papillary necrosis and chronic interstitial nephritis.

As used herein and unless otherwise indicated, the phrases "reduce or avoid adverse effects" and "reducing or avoiding adverse effects" mean the reduction of the severity of one or more adverse effects as defined herein.

It should be noted that if there is a discrepancy between a depicted structure and a name given that structure, the depicted structure is to be accorded more weight. In addition, if the stereochemistry of a structure or a portion of a structure is not indicated with, for example, bold or dashed lines, the structure or portion of the structure is to be interpreted as encompassing all stereoisomers of it.

## 4. DETAILED DESCRIPTION OF THE INVENTION

This invention relates to stereomerically pure Compound A, which is an enantiomer of 2-[1-(3-Ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione, substantially free of its other enantiomer, as well as novel methods using, and compositions comprising stereo-

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672253
**JTX-3_8**

US 7,427,638 B2

7

merically pure Compound A. For example, the present invention encompasses the in vitro and in vivo use of Compound A, and the incorporation of Compound A into pharmaceutical compositions and single unit dosage forms useful in the treatment and prevention of a variety of diseases and disorders. Diseases and disorders which are ameliorated by the reduction of levels of TNF-α or inhibition of PDE4 are well known in the art and are described herein. Specific methods of the invention reduce or avoid the adverse effects associated with compounds used as TNF-α inhibitor. Other specific methods of the invention reduce or avoid the adverse effects associated with use of racemic 2-[1-(3-Ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione.

Specific methods of the invention include methods of treating or preventing diseases and disorders including, but not limited to, solid tumor cancers, blood-born cancers and inflammatory diseases.

Pharmaceutical and dosage forms of the invention, which comprise Compound A or a pharmaceutically acceptable polymorph, prodrug, salt, clathrate, solvate or hydrate thereof, can be used in the methods of the invention.

Without being limited by theory, it is believed that Compound A can inhibit TNF-α production. Consequently, a first embodiment of the invention relates to a method of inhibiting TNF-α production which comprises contacting a cell exhibiting abnormal TNF-α production with an effective amount of stereomerically pure Compound A, or a pharmaceutically acceptable prodrug, metabolite, polymorph, salt, solvate, hydrate, or clathrate thereof. In a particular embodiment, the invention relates to a method of inhibiting TNF-α production which comprises contacting a mammalian cell exhibiting abnormal TNF-α production with an effective amount of stereomerically pure Compound A, or a pharmaceutically acceptable prodrug, metabolite, polymorph, salt, solvate, hydrate, or clathrate thereof.

The invention also relates to a method of treating or preventing disorders ameliorated by the reduction of levels of TNF-α in a patient which comprises administering to a patient in need of such treatment or prevention a therapeutically or prophylactically effective amount of stereomerically pure compound A, or a pharmaceutically acceptable prodrug, metabolite, polymorph, salt, solvate, hydrate, or clathrate thereof.

A further embodiment of the invention relates to a method of treating or preventing cancer, including but not limited to, solid tumor, blood-born tumor, leukemias, and in particular, multiple myeloma in a patient which comprises administering to a patient in need of such treatment or prevention a therapeutically effective amount of stereomerically pure compound A, or a pharmaceutically acceptable prodrug, metabolite, polymorph, salt, solvate, hydrate, or clathrate thereof; in particular wherein the patient is a mammal.

In another embodiment, the invention relates to a method of inhibiting PDE4 which comprises contacting PDE4 with an effective amount of stereomerically pure Compound A, or a pharmaceutically acceptable prodrug, metabolite, polymorph, salt, solvate, hydrate, or clathrate thereof.

In another embodiment, the invention relates to a method of controlling cAMP levels in a cell which comprises contacting a cell with an effective amount of stereomerically pure Compound A, or a pharmaceutically acceptable prodrug, metabolite, polymorph, salt, solvate, hydrate, or clathrate thereof. As used herein the term "controlling cAMP levels" includes preventing or reducing the rate of the breakdown of Adenosine 3',5'-cyclic monophosphate (cAMP) in a cell or increasing the amount of Adenosine 3',5'-cyclic monophosphate present in a cell, preferably a mammalian cell, more

8

preferably a human cell. In a particular method, the rate of cAMP breakdown is reduced by about 10, 25, 50, 100, 200, or 500 percent as compared to the rate in comparable cells which have not been contacted with a compound of the invention.

A further embodiment of the invention relates to a method of treating or preventing diseases or disorders ameliorated by the inhibition of PDE4 in a patient which comprises administering to a patient in need of such treatment or prevention a therapeutically or prophylactically effective amount of stereomerically pure Compound A, or a pharmaceutically acceptable prodrug, metabolite, polymorph, salt, solvate, hydrate, or clathrate thereof. Disorders ameliorated by the inhibition of PDE4 include, but are not limited to, asthma, inflammation (e.g., inflammation due to reperfusion), chronic or acute obstructive pulmonary diseases, chronic or acute pulmonary inflammatory diseases, inflammatory bowel disease, Crohn's Disease, Bechet's Disease, or colitis.

A further embodiment of the invention relates to a method of treating or preventing depression, asthma, inflammation (e.g., contact dermatitis, atopic dermatitis, psoriais, rheumatoid arthritis, osteoarthritis, inflammatory skin disease, inflammation due to reperfusion), chronic or acute obstructive pulmonary diseases, chronic or pulmonary inflammatory diseases, inflammatory bowel disease, Crohn's Disease, Bechet's Disease or colitis in a patient which comprises administering to a patient in need of such treatment or prevention a therapeutically or prophylactically effective amount of stereomerically pure Compound A, or a pharmaceutically acceptable prodrug, metabolite, polymorph, salt, solvate, hydrate, or clathrate thereof; in particular wherein the patient is a mammal.

A separate embodiment of the invention encompasses methods of treating or preventing Myelodysplastic syndrome (MDS) which comprises administering to a patient in need of such treatment or prevention a therapeutically or prophylactically effective amount of stereomerically pure Compound A, or a pharmaceutically acceptable salt, solvate, hydrate, stereoisomer, clathrate, or prodrug thereof. MDS refers to a diverse group of hematopoietic stem cell disorders. MDS is characterized by a cellular marrow with impaired morphology and maturation (dysmyelopoiesis), peripheral blood cytopenias, and a variable risk of progression to acute leukemia, resulting from ineffective blood cell production. See The Merck Manual 953 (17th ed. 1999) and List et al., 1990, J. Clin. Oncol. 8:1424.MDS

A separate embodiment of the invention encompasses methods of treating or preventing Myeloproliferative disease (MPD) which comprises administering to a patient in need of such treatment or prevention a therapeutically or prophylactically effective amount of stereomerically pure Compound A, or a pharmaceutically acceptable salt, solvate, hydrate, stereoisomer, clathrate, or prodrug thereof. Myeloproliferative disease (MPD) refers to a group of disorders characterized by clonal abnormalities of the hematopoietic stem cell. See e.g., Current Medical Diagnosis & Treatment, pp. 499 (37th ed., Tierney et al. ed, Appleton & Lange, 1998).

The invention also encompasses a method of treating, preventing or managing complex regional pain syndrome, which comprises administering to a patient in need of such treatment, prevention or management a therapeutically or prophylactically effective amount of stereomerically pure Compound A, or a pharmaceutically acceptable salt, solvate, hydrate, stereoisomer, clathrate, or prodrug thereof. In a specific embodiment, the administration is before, during or after surgery or physical therapy directed at reducing or avoiding a symptom of complex regional pain syndrome in the patient.

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672254
JTX-3_9

Appx10512

US 7,427,638 B2

9                                      10

In particular methods of the invention, stereomerically pure Compound A, or a pharmaceutically acceptable polymorph, prodrug, salt, solvate, hydrate, or clathrate thereof, is adjunctively administered with at least one additional therapeutic agent. Examples of additional therapeutic agents include, but are not limited to, anti-cancer drugs, anti-inflammatory, antihistamines and decongestants.

4.1. Synthesis and Preparation

Racemic 2-[1-(3-Ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione is readily prepared using the methods in U.S. Pat. No. 6,020,358, which is incorporated herein by reference.

Compound A can be isolated from the racemic compound by techniques known in the art. Examples include, but are not limited to, the formation of chiral salts and the use of chiral or high performance liquid chromatography "HPLC" and the formation and crystallization of chiral salts. See, e.g., Jacques, J., et al., *Enantiomers, Racemates and Resolutions* (Wiley-Interscience, New York, 1981); Wilen, S. H., et al., *Tetrahedron* 33:2725 (1977); Eliel, E. L., *Stereochemistry of Carbon Compounds* (McGraw-Hill, NY, 1962); and Wilen, S. H., *Tables of Resolving Agents and Optical Resolutions* p. 268 (E. L. Eliel, Ed., Univ. of Notre Dame Press, Notre Dame, Ind., 1972).

In a specific method, Compound A is synthesized from 3-acetamidophthalic anhydride and a chiral amino acid salt of (S)-2-(3-ethoxy-4-methoxyphenyl)-1-(methylsulphonyl)-eth-2-ylamine. Chiral amino acid salts of (S)-2-(3-ethoxy-4-methoxyphenyl)-1-(methylsulphonyl)-eth-2-ylamine include, but are not limited to salts formed with the L isomers of alanine, arginine, asparagine, aspartic acid, cysteine, glutamine, glutamic acid, glycine, histidine, isoleucine, leucine, lysine, methionine, phenylalanine, proline, serine, threonine, tryptophan, tyrosine, valine, ornithine, 4-aminobutyric acid, 2 amino isobutyric acid, 3 amino propionic acid, ornithine, norleucine, norvaline, hydroxyproline, sarcosine, citrulline, cysteic acid, t-butylglycine, t-butylalanine, phenylglycine, cyclohexylalanine, and N-acetyl-leucine. A specific chiral amino acid salt is (S)-2-(3-ethoxy-4-methoxyphenyl)-1-(methylsulphonyl)-eth-2-ylamine    N-acetyl-L-leucine salt, which is resolved from 2-(3-ethoxy-4-methoxyphenyl)-1-(methylsulphonyl)-eth-2-ylamine and N-acetyl-L-leucine in methanol.

4.2. Methods of Treatment

The invention encompasses methods of treating and preventing diseases or disorders ameliorated by the reduction of levels of TNF-α in a patient which comprise administering to a patient in need of such treatment or prevention a therapeutically effective amount of stereomerically pure Compound A, or a pharmaceutically acceptable prodrug, metabolite, polymorph, salt, solvate, hydrate, or clathrate thereof.

Disorders ameliorated by the inhibition of TNF-α but are not limited to: heart disease, such as congestive heart failure, cardiomyopathy, pulmonary edema, endotoxin-mediated septic shock, acute viral myocarditis, cardiac allograft rejection, and myocardial infarction; solid tumors, including but not limited to, sarcoma, carcinomas, fibrosarcoma, myxosarcoma, liposarcoma, chondrosarcoma, osteogenic sarcoma, chordoma, angiosarcoma, endotheliosarcoma, lymphangiosarcoma, lymphangioendotheliosarcoma, synovioma, mesothelioma, Ewing's tumor, leiomyosarcoma, rhabdomyosarcoma, colon carcinoma, pancreatic cancer, breast cancer, ovarian cancer, prostate cancer, squamous cell carcinoma, basal cell carcinoma, adenocarcinoma, sweat gland carcinoma, sebaceous gland carcinoma, papillary carcinoma, papillary adenocarcinomas, cystadenocarcinoma, medullary carcinoma, bronchogenic carcinoma, renal cell carcinoma, hepatoma, bile duct carcinoma, choriocarcinoma, seminoma, embryonal carcinoma, Wilms' tumor, cervical cancer, testicular tumor, lung carcinoma, small cell lung carcinoma, bladder carcinoma, epithelial carcinoma, glioma, astrocytoma, medulloblastoma, craniopharyngioma, ependymoma, Kaposi's sarcoma, pinealoma, hemangioblastoma, acoustic neuroma, oligodendroglioma, menangioma, melanoma, neuroblastoma, and retinoblastoma; and blood-born tumors including but not limited to, acute lymphoblastic leukemia "ALL", acute lymphoblastic B-cell leukemia, acute lymphoblastic T-cell leukemia, acute myeloblastic leukemia "AML", acute promyelocytic leukemia "APL", acute monoblastic leukemia, acute erythroleukemic leukemia, acute megakaryoblastic leukemia, acute myelomonocytic leukemia, acute nonlymphocytic leukemia, acute undifferentiated leukemia, chronic myelocytic leukemia "CML", chronic lymphocytic leukemia "CLL", hairy cell leukemia, multiple myeloma and acute and chronic leukemias, for example, lymphoblastic, myelogenous, lymphocytic, and myelocytic leukemias.

Specific methods of the invention further comprise the administration of an additional therapeutic agent (i.e., a therapeutic agent other than Compound A). Examples of additional therapeutic agents include, but are not limited to, anticancer drugs such as, but are not limited to: alkylating agents, nitrogen mustards, ethylenimines, methylmelamines, alkyl sulfonates, nitrosoureas, triazenes, folic acid analofs, pyrimidine analogs, purine analogs, vinca alkaloids, epipodophyllotoxins, antibiotics, topoisomerase inhibitors and anti-cancer vaccines.

Specific additional therapeutic agents include, but are not limited to: acivicin; aclarubicin; acodazole hydrochloride; acronine; adozelesin; aldesleukin; altretamine; ambomycin; ametantrone acetate; aminoglutethimide; amsacrine; anastrozole; anthramycin; asparaginase; asperlin; azacitidine; azetepa; azotomycin; batimnastat; benzodepa; bicalutamide; bisantrene hydrochloride; bisnafide dimesylate; bizelesin; bleomycin sulfate; brequinar sodium; bropirimine; busulfan; cactinomycin; calusterone; caracemide; carbetimer; carboplatin; carmustine; carubicin hydrochloride; carzelesin; cedefingol; chlorambucil; cirolemycin; cisplatin; cladribine; crisnatol    mesylate;    cyclophosphamide;    cytarabine; dacarbazine; dactinomycin; daunorubicin hydrochloride; decitabine; dexormaplatin; dezaguanine; dezaguanine mesylate; diaziquone; docetaxel; doxorubicin; doxorubicin hydrochloride; droloxifene; droloxifene citrate; dromostanolone propionate; duazomycin; edatrexate; eflornithine hydrcchloride; elsamitrucin; enloplatin; enpromate; epipropidine; epirubicin hydrochloride; erbulozole; esorubicin hydrochloride; estramustine; estramustine phosphate sodium; etanidazole; etoposide; etoposide phosphate; etoprine; fadrozole hydrochloride; fazarabine; fenretinide; floxuridine; fludarabine phosphate; fluorouracil; flurocitabine; fosquidone; fostriecin sodium; gemcitabine; gemcitabine hydrochloride; hydroxyurea; idarubicin hydrochloride; ifosfamide; ilmofosine; interleukin II (including recombinant interleukin II, or rlL2), interferon alfa-2a; interferon alfa-2b; interferon alfa-n1; interferon alfa-n3; interferon beta-I a; interferon gamma-I b; iproplatin; irinotecan hydrochloride; lanreotide acetate; letrozole; leuprolide acetate; liarozole hydrochloride; lometrexol sodium; lomustine; losoxantrone hydrochloride; masoprocol; maytansine; mechlorethamine hydrochloride; megestrol acetate; melengestrol acetate; melphalan; menogaril; mercaptopurine; methotrexate; methotrexate sodium; metoprine; meturedepa; mitindomide; mitocarcin; mitocromin; mitogillin; mitomalcin; mitomycin; mitosper; mitotane;

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672255

JTX-3_10

Appx10513

US 7,427,638 B2

| 11 | 12 |

mitoxantrone hydrochloride; mycophenolic acid; nocodazole; nogalamycin; ormaplatin; oxisuran; paclitaxel; pegaspargase; peliomycin; pentamustine; peplomycin sulfate; perfosfamide; pipobroman; piposulfan; piroxantrone hydrochloride; plicamycin; plomestane; porfimer sodium; porfiromycin; prednimustine; procarbazine hydrochloride; puromycin; puromycin hydrochloride; pyrazofurin; riboprine; rogletimide; safingol; safingol hydrochloride; semustine; simtrazene; sparfosate sodium; sparsomycin; spirogermanium hydrochloride; spiromustine; spiroplatin; streptonigrin; streptozocin; sulofenur; talisomycin; tecogalan sodium; tegafur; teloxantrone hydrochloride; temoporfin; teniposide; teroxirone; testolactone; thiamiprine; thioguanine; thiotepa; tiazofurin; tirapazamine; toremifene citrate; trestolone acetate; triciribine phosphate; trimetrexate; trimetrexate glucuronate; triptorelin; tubulozole hydrochloride; uracil mustard; uredepa; vapreotide; verteporfin; vinblastine sulfate; vincristine sulfate; vindesine; vindesine sulfate; vinepidine sulfate; vinglycinate sulfate; vinleurosine sulfate; vinorelbine tartrate; vinrosidine sulfate; vinzolidine sulfate; vorozole; zeniplatin; zinostatin; zorubicin hydrochloride. Other anti-cancer drugs include, but are not limited to: 20-epi-1,25 dihydroxyvitamin D3; 5-ethynyluracil; abiraterone; aclarubicin; acylfulvene; adecypenol; adozelesin; aldesleukin; ALL-TK antagonists; altretamine; ambamustine; amidox; amifostine; aminolevulinic acid; amrubicin; amsacrine; anagrelide; anastrozole; andrographolide; angiogenesis inhibitors; antagonist D; antagonist G; antarelix; antidorsalizing morphogenetic protein-1; antiandrogen, prostatic carcinoma; antiestrogen; antineoplaston; antisense oligonucleotides; aphidicolin glycinate; apoptosis gene modulators; apoptosis regulators; apurinic acid; ara-CDP-DL-PTBA; arginine deaminase; asulacrine; atamestane; atrimustine; axinastatin 1; axinastatin 2; axinastatin 3; azasetron; azatoxin; azatyrosine; baccatin III derivatives; balanol; batimastat; BCR/ABL antagonists; benzochlorins; benzoylstaurosporine; beta lactam derivatives; beta-alethine; betaclamycin B; betulinic acid; bFGF inhibitor; bicalutamide; bisantrene; bisaziridinylspermine; bisnafide; bistratene A; bizelesin; breflate; bropirimine; budotitane; buthionine sulfoximine; calcipotriol; calphostin C; camptothecin derivatives; canarypox IL-2; capecitabine; carboxamide-aminotriazole; carboxyamidotriazole; CaRest M3; CARN 700; cartilage derived inhibitor; carzelesin; casein kinase inhibitors (ICOS); castanospermine; cecropin B; cetrorelix; chlorlns; chloroquinoxaline sulfonamide; cicaprost; cis-porphyrin; cladribine; clomifene analogues; clotrimazole; collismycin A; collismycin B; combretastatin A4; combretastatin analogue; conagenin; crambescidin 816; crisnatol; cryptophycin 8; cryptophycin A derivatives; curacin A; cyclopentanthraquinones; cycloplatam; cypemycin; cytarabine ocfosfate; cytolytic factor; cytostatin; dacliximab; decitabine; dehydrodidemnin B; deslorelin; dexamethasone; dexifosfamide; dexrazoxane; dexverapamil; diaziquone; didemnin B; didox; diethylnorspermine; dihydro-5-azacytidine; dihydrotaxol, 9-; dioxamycin; diphenyl spiromustine; docetaxel; docosanol; dolasetron; doxifluridine; droloxifene; dronabinol; duocarmycin SA; ebselen; ecomustine; edelfosine; edrecolomab; eflornithine; elemene; emitefur; epirubicin; epristeride; estramustine analogue; estrogen agonists; estrogen antagonists; etanidazole; etoposide phosphate; exemestane; fadrozole; fazarabine; fenretinide; filgrastim; finasteride; flavopiridol; flezelastine; fluasterone; fludarabine; fluorodaunorunicin hydrochloride; forfenimex; formestane; fostriecin; fotemustine; gadolinium texaphyrin; gallium nitrate; galocitabine; ganirelix; gelatinase inhibitors; gemcitabine; glutathione inhibitors; hepsulfam; heregulin; hexamethylene bisacetamide; hypericin; ibandronic acid; idarubicin; idoxifene; idramantone; ilmofosine; ilomastat; imidazoacridones; imiquimod; immunostimulant peptides; insulin-like growth factor-1 receptor inhibitor; interferon agonists; interferons; interleukins; iobenguane; iododoxorubicin; ipomeanol, 4-; iroplact; irsogladine; isobengazole; isohomohalicondrin B; itasetron; jasplakinolide; kahalalide F; lamellarin-N triacetate; lanreotide; leinamycin; lenograstim; lentinan sulfate; leptolstatin; letrozole; leukemia inhibiting factor; leukocyte alpha interferon; leuprolide+estrogen+progesterone; leuprorelin; levamisole; liarozole; linear polyamine analogue; lipophilic disaccharide peptide; lipophilic platinum compounds; lissoclinamide 7; lobaplatin; lombricine; lometrexol; lonidamine; losoxantrone; lovastatin; loxoribine; lurtotecan; lutetium texaphyrin; lysofylline; lytic peptides; maitansine; mannostatin A; marimastat; masoprocol; maspin; matrilysin inhibitors; matrix metalloproteinase inhibitors; menogaril; merbarone; meterelin; methioninase; metoclopramide; MIF inhibitor; mifepristone; miltefosine; mirimostim; mismatched double stranded RNA; mitoguazone; mitolactol; mitomycin analogues; mitonafide; mitotoxin fibroblast growth factor-saporin; mitoxantrone; mofarotene; molgramostim; monoclonal antibody, human chorionic gonadotrophin; monophosphoryl lipid A+myobacterium cell wall sk; mopidamol; multiple drug resistance gene inhibitor; multiple tumor suppressor 1-based therapy; mustard anticancer agent; mycaperoxide B; mycobacterial cell wall extract; myriaporone; N-acetyldinaline; N-substituted benzamides; nafarelin; nagrestip; naloxone+pentazocine; napavin; naphterpin; nartograstim; nedaplatin; nemorubicin; neridronic acid; neutral endopeptidase; nilutamide; nisamycin; nitric oxide modulators; nitroxide antioxidant; nitrullyn; O6-benzylguanine; octreotide; okicenone; oligonucleotides; onapristone; ondansetron; ondansetron; oracin; oral cytokine inducer; ormaplatin; osaterone; oxaliplatin; oxaunomycin; paclitaxel; paclitaxel analogues; paclitaxel derivatives; palauamine; palmitoylrhizoxin; pamidronic acid; panaxytriol; panomifene; parabactin; pazelliptine; pegaspargase; peldesine; pentosan polysulfate sodium; pentostatin; pentrozole; perflubron; perfosfamide; perillyl alcohol; phenazinomycin; phenylacetate; phosphatase inhibitors; picibanil; pilocarpine hydrochloride; pirarubicin; piritrexim; placetin A; placetin B; plasminogen activator inhibitor; platinum complex; platinum compounds; platinum-triamine complex; porfimer sodium; porfiromycin; prednisone; propyl bis-acridone; prostaglandin J2; proteasome inhibitors; protein A-based immune modulator; protein kinase C inhibitor; protein kinase C inhibitors, microalgal; protein tyrosine phosphatase inhibitors; purine nucleoside phosphorylase inhibitors; purpurins; pyrazoloacridine; pyridoxylated hemoglobin polyoxyethylene conjugate; raf antagonists; raltitrexed; ramosetron; ras farnesyl protein transferase inhibitors; ras inhibitors; ras-GAP inhibitor; retelliptine demethylated; rhenium Re 186 etidronate; rhizoxin; ribozymes; RII retinamide; rogletimide; rohitukine; romurtide; roquinimex; rubiginone B1; ruboxyl; safingol; saintopin; SarCNU; sarcophytol A; sargramostim; Sdi 1 mimetics; semustine; senescence derived inhibitor 1; sense oligonucleotides; signal transduction inhibitors; signal transduction modulators; single chain antigen binding protein; sizofiran; sobuzoxane; sodium borocaptate; sodium phenylacetate; solverol; somatomedin binding protein; sonermin; sparfosic acid; spicamycin D; spiromustine; splenopentin; spongistatin 1; squalamine; stem cell inhibitor; stem-cell division inhibitors; stipiamide; stromelysin inhibitors; sulfinosine; superactive vasoactive intestinal peptide antagonist; suradista; suramin; swainsonine; synthetic glycosaminoglycans; tallimustine;

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672256

JTX-3_11

Appx10514

US 7,427,638 B2

13

tamoxifen methiodide; tauromustine; tazarotene; tecogalan sodium; tegafur; tellurapyrylium; telomerase inhibitors; temoporfin; temozolomide; teniposide; tetrachlorodecaoxide; tetrazomine; thaliblastine; thiocoraline; thrombopoietin; thrombopoietin mimetic; thymalfasin; thymopoietin receptor agonist; thymotrinan; thyroid stimulating hormone; tin ethyl etiopurpurin; tirapazamine; titanocene bichloride; topsentin; toremifene; totipotent stem cell factor; translation inhibitors; tretinoin; triacetyluridine; tricribine; trimetrexate; triptorelin; tropisetron; turosteride; tyrosine kinase inhibitors; tyrphostins; UBC inhibitors; ubenimex; urogenital sinus-derived growth inhibitory factor; urokinase receptor antagonists; vapreotide; variolin B; vector system, erythrocyte gene therapy; velaresol; veramine; verdins; verteporfin; vinorelbine; vinxaltine; vitaxin; vorozole; zanoterone; zeniplatin; zilascorb; and zinostatin stimalaamer.

The invention further encompasses a method of treating or preventing diseases or disorders ameliorated by the inhibition of PDE4 in a patient which comprise administering to a patient in need of such treatment or prevention a therapeutically effective amount of stereomerically pure Compound A, or a pharmaceutically acceptable prodrug, metabolite, polymorph, salt, solvate, hydrate, or clathrate thereof. Disorders ameliorated by the inhibition of PDE4 include, but are not limited to, asthma, inflammation, chronic or acute obstructive pulmonary disease, chronic or acute pulmonary inflammatory disease, inflammatory bowel disease, Crohn's Disease, Bechet's Disease, colitis, ulcerative colitis and arthritis or inflammation due to reperfusion. In a preferred embodiment, the disease or disorder to be treated or prevented is chronic obstructive pulmonary disease.

Specific methods of the invention can comprise the administration of an additional therapeutic agent such as, but not limited to, anti-inflammatory drugs, antihistamines and decongestants. Examples of such additional therapeutic agents include, but are not limited to: antihistamines including, but not limited to, ethanolamines, ethylenediamines, piperazines, and phenothiazines; antiinflammatory drugs; NSAIDS, including, but not limited to, aspirin, salicylates, acetominophen, indomethacin, sulindac, etodolac, fenamates, tolmetin, ketorolac, diclofenac, ibuprofen, naproxen, fenoprofen, ketoprofen, flurbiprofen, oxaprozin, piroxicam, meloxicamn, pyrazolon derivatives; and steriods including, but not limited to, cortical steroids and adrenocortical steroids.

Specific methods of the invention avoid or reduce drug-drug interactions and other adverse effects associated with agents used in the treatment of such disorders, including racemic substituted phenylethylsulfones. Without being limited by any theory, stereomerically pure Compound A may further provide an overall improved therapeutic effectiveness, or therapeutic index, over racemic 2-[1-(3-Ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione. For example, a smaller amount of the drug may in some circumstances be administered to attain the same level of effectiveness.

As stated above, the active compound of the invention (i.e., Compound A) may be used in the treatment or prevention of a wide range of diseases and conditions. The magnitude of a prophylactic or therapeutic dose of a particular active ingredient of the invention in the acute or chronic management of a disease or condition will vary, however, with the nature and severity of the disease or condition, and the route by which the active ingredient is administered. The dose, and perhaps the dose frequency, will also vary according to the age, body weight, and response of the individual patient. Suitable dosing regimens can be readily selected by those skilled in the art

14

with due consideration of such factors. In general, the recommended daily dose range for the conditions described herein lie within the range of from about 1 mg to about 1000 mg per day, given as a single once-a-day dose preferably as divided doses throughout a day. More specifically, the daily dose is administered twice daily in equally divided doses. Specifically, a daily dose range should be from about 5 mg to about 500 mg per day, more specifically, between about 10 mg and about 200 mg per day. Specifically, the daily dose may be administered in 5 mg, 10 mg, 15 mg, 20 mg, 25 mg, 50 mg, or 100 mg dosage forms. In managing the patient, the therapy should be initiated at a lower dose, perhaps about 1 mg to about 25 mg, and increased if necessary up to about 200 mg to about 1000 mg per day as either a single dose or divided doses, depending on the patient's global response. Alternatively, the daily dose is from 0.01 mg/kg to 100 mg/kg.

It may be necessary to use dosages of the active ingredient outside the ranges disclosed herein in some cases, as will be apparent to those of ordinary skill in the art. Furthermore, it is noted that the clinician or treating physician will know how and when to interrupt, adjust, or terminate therapy in conjunction with individual patient response.

The phrases "therapeutically effective amount", "prophylactically effective amount" and "therapeutically or prophylactically effective amount," as used herein encompasses the above described dosage amounts and dose frequency schedules. Different therapeutically effective amounts may be applicable for different diseases and conditions, as will be readily known by those of ordinary skill in the art. Similarly, amounts sufficient to treat or prevent such disorders, but insufficient to cause, or sufficient to reduce, adverse effects associated with racemic 2-[1-(3-Ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione are also encompassed by the above described dosage amounts and dose frequency schedules.

4.3. Pharmaceutical Compositions

Pharmaceutical compositions and single unit dosage forms comprising Compound A, or a pharmaceutically acceptable polymorph, prodrug, salt, solvate, hydrate, or clathrate thereof, are encompassed by the invention. Individual dosage forms of the invention may be suitable for oral, mucosal (including rectal, nasal, or vaginal), parenteral (including subcutaneous, intramuscular, bolus injection, intraarterial, or intravenous), sublingual, transdermal, buccal, or topical administration.

Pharmaceutical compositions and dosage forms of the invention comprise stereomerically pure Compound A, or a pharmaceutically acceptable prodrug, metabolite, polymorph, salt, solvate, hydrate, or clathrate thereof. Pharmaceutical compositions and dosage forms of the invention typically also comprise one or more pharmaceutically acceptable excipients.

A particular pharmaceutical composition encompassed by this embodiment comprises stereomerically pure Compound A, or a pharmaceutically acceptable polymorph, prodrug, salt, solvate, hydrate, or clathrate thereof, and at least one additional therapeutic agent. Examples of additional therapeutic agents include, but are not limited to: anti-cancer drugs and anti-inflammation therapies including, but not limited to, those listed above in section 4.2.

Single unit dosage forms of the invention are suitable for oral, mucosal (e.g., nasal, sublingual, vaginal, buccal, or rectal), parenteral (e.g., subcutaneous, intravenous, bolus injection, intramuscular, or intraarterial), or transdermal administration to a patient. Examples of dosage forms include, but are not limited to: tablets; caplets; capsules, such as soft elastic gelatin capsules; cachets; troches; lozenges; dispersions; sup-

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672257
JTX-3_12

US 7,427,638 B2

15

positories; ointments; cataplasms (poultices); pastes; powders; dressings; creams; plasters; solutions; patches; aerosols (e.g., nasal sprays or inhalers); gels; liquid dosage forms suitable for oral or mucosal administration to a patient, including suspensions (e.g. aqueous or non-aqueous liquid suspensions, oil-in-water emulsions, or a water-in-oil liquid emulsions), solutions, and elixirs; liquid dosage forms suitable for parenteral administration to a patient; and sterile solids (e.g., crystalline or amorphous solids) that can be reconstituted to provide liquid dosage forms suitable for parenteral administration to a patient.

The composition, shape, and type of dosage forms of the invention will typically vary depending on their use. For example, a dosage form used in the acute treatment of inflammation or a related disorder may contain larger amounts of one or more of the active ingredients it comprises than a dosage form used in the chronic treatment of the same disease. Similarly, a parenteral dosage form may contain smaller amounts of one or more of the active ingredients it comprises than an oral dosage form used to treat the same disease or disorder. These and other ways in which specific dosage forms encompassed by this invention will vary from one another will be readily apparent to those skilled in the art. See, e.g., *Remington's Pharmaceutical Sciences*, 18th ed., Mack Publishing, Easton Pa. (1990).

Typical pharmaceutical compositions and dosage forms comprise one or more excipients. Suitable excipients are well known to those skilled in the art of pharmacy, and non-limiting examples of suitable excipients are provided herein. Whether a particular excipient is suitable for incorporation into a pharmaceutical composition or dosage form depends on a variety of factors well known in the art including, but not limited to, the way in which the dosage form will be administered to a patient. For example, oral dosage forms such as tablets may contain excipients not suited for use in parenteral dosage forms. The suitability of a particular excipient may also depend on the specific active ingredients in the dosage form.

Lactose-free compositions of the invention can comprise excipients that are well known in the art and are listed, for example, in the U.S. Pharmocopia (USP) SP (XXI)/NF (XVI). In general, lactose-free compositions comprise an active ingredient, a binder/filler, and a lubricant in pharmaceutically compatible and pharmaceutically acceptable amounts. Preferred lactose-free dosage forms comprise an active ingredient, microcrystalline cellulose, pre-gelatinized starch, and magnesium stearate.

This invention further encompasses anhydrous pharmaceutical compositions and dosage forms comprising active ingredients, since water can facilitate the degradation of some compounds. For example, the addition of water (e.g., 5%) is widely accepted in the pharmaceutical arts as a means of simulating long-term storage in order to determine characteristics such as shelf-life or the stability of formulations over time. See, e.g., Jens T. Carstensen, *Drug Stability: Principles & Practice*, 2d. Ed., Marcel Dekker, NY, N.Y., 1995, pp. 379-80. In effect, water and heat accelerate the decomposition of some compounds. Thus, the effect of water on a formulation can be of great significance since moisture and/or humidity are commonly encountered during manufacture, handling, packaging, storage, shipment, and use of formulations.

Anhydrous pharmaceutical compositions and dosage forms of the invention can be prepared using anhydrous or low moisture containing ingredients and low moisture or low humidity conditions. Pharmaceutical compositions and dosage forms that comprise lactose and at least one active ingre-

16

dient that comprises a primary or secondary amine are preferably anhydrous if substantial contact with moisture and/or humidity during manufacturing, packaging, and/or storage is expected.

An anhydrous pharmaceutical composition should be prepared and stored such that its anhydrous nature is maintained. Accordingly, anhydrous compositions are preferably packaged using materials known to prevent exposure to water such that they can be included in suitable formulary kits. Examples of suitable packaging include, but are not limited to, hermetically sealed foils, plastics, unit dose containers (e.g., vials), blister packs, and strip packs.

The invention further encompasses pharmaceutical compositions and dosage forms that comprise one or more compounds that reduce the rate by which an active ingredient will decompose. Such compounds, which are referred to herein as "stabilizers," include, but are not limited to, antioxidants such as ascorbic acid, pH buffers, or salt buffers.

Like the amounts and types of excipients, the amounts and specific types of active ingredients in a dosage form may differ depending on factors such as, but not limited to, the route by which it is to be administered to patients. However, typical dosage forms of the invention comprise compound A, or a pharmaceutically acceptable salt, solvate, clathrate, hydrate, polymorph or prodrug thereof lie within the range of from about 1 mg to about 1000 mg per day, given as a single once-a-day dose in the morning but preferably as divided doses throughout the day taken with food. More specifically, the daily dose is administered twice daily in equally divided doses. Specifically, a daily dose range should be from about 5 mg to about 500 mg per day, more specifically, between about 10 mg and about 200 mg per day. In managing the patient, the therapy should be initiated at a lower dose, perhaps about 1 mg to about 25 mg, and increased if necessary up to about 200 mg to about 1000 mg per day as either a single dose or divided doses, depending on the patient's global response.

4.3.1. Oral Dosage Forms

Pharmaceutical compositions of the invention that are suitable for oral administration can be presented as discrete dosage forms, such as, but are not limited to, tablets (e.g., chewable tablets), caplets, capsules, and liquids (e.g., flavored syrups). Such dosage forms contain predetermined amounts of active ingredients, and may be prepared by methods of pharmacy well known to those skilled in the art. See generally, *Remington's Pharmaceutical Sciences*, 18th ed., Mack Publishing, Easton Pa. (1990).

Typical oral dosage forms of the invention are prepared by combining the active ingredient(s) in an intimate admixture with at least one excipient according to conventional pharmaceutical compounding techniques. Excipients can take a wide variety of forms depending on the form of preparation desired for administration. For example, excipients suitable for use in oral liquid or aerosol dosage forms include, but are not limited to, water, glycols, oils, alcohols, flavoring agents, preservatives and coloring agents. Examples of excipients suitable for use in solid oral dosage forms (e.g., powders, tablets, capsules, and caplets) include, but are not limited to, starches, sugars, micro-crystalline cellulose, diluents, granulating agents, lubricants, binders, and disintegrating agents.

Because of their ease of administration, tablets and capsules represent the most advantageous oral dosage unit forms, in which case solid excipients are employed. If desired, tablets can be coated by standard aqueous or nonaqueous techniques. Such dosage forms can be prepared by any of the methods of pharmacy. In general, pharmaceutical compositions and dosage forms are prepared by uniformly and intimately admixing the active ingredients with liquid carriers,

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

US 7,427,638 B2

17

18

finely divided solid carriers, or both, and then shaping the product into the desired presentation if necessary.

For example, a tablet can be prepared by compression or molding. Compressed tablets can be prepared by compressing in a suitable machine the active ingredients in a free-flowing form such as powder or granules, optionally mixed with an excipient. Molded tablets can be made by molding in a suitable machine a mixture of the powdered compound moistened with an inert liquid diluent.

Examples of excipients that can be used in oral dosage forms of the invention include, but are not limited to, binders, fillers, disintegrants, and lubricants. Binders suitable for use in pharmaceutical compositions and dosage forms include, but are not limited to, corn starch, potato starch, or other starches, gelatin, natural and synthetic gums such as acacia, sodium alginate, alginic acid, other alginates, powdered tragacanth, guar gum, cellulose and its derivatives (e.g., ethyl cellulose, cellulose acetate, carboxymethyl cellulose calcium, sodium carboxymethyl cellulose), polyvinyl pyrrolidone, methyl cellulose, pre-gelatinized starch, hydroxypropyl methyl cellulose, (e.g., Nos. 2208, 2906, 2910), microcrystalline cellulose, and mixtures thereof.

Examples of fillers suitable for use in the pharmaceutical compositions and dosage forms disclosed herein include, but are not limited to, talc, calcium carbonate (e.g., granules or powder), microcrystalline cellulose, powdered cellulose, dextrates, kaolin, mannitol, silicic acid, sorbitol, starch, pre-gelatinized starch, and mixtures thereof. The binder or filler in pharmaceutical compositions of the invention is typically present in from about 50 to about 99 weight percent of the pharmaceutical composition or dosage form.

Suitable forms of microcrystalline cellulose include, but are not limited to, the materials sold as AVICEL-PH-101, AVICEL-PH-103 AVICEL RC-581, AVICEL-PH-105 (available from FMC Corporation, American Viscose Division, Avicel Sales, Marcus Hook, Pa.), and mixtures thereof. An specific binder is a mixture of microcrystalline cellulose and sodium carboxymethyl cellulose sold as AVICEL RC-581. Suitable anhydrous or low moisture excipients or additives include AVICEL-PH-103™ and Starch 1500 LM.

Disintegrants are used in the compositions of the invention to provide tablets that disintegrate when exposed to an aqueous environment. Tablets that contain too much disintegrant may disintegrate in storage, while those that contain too little may not disintegrate at a desired rate or under the desired conditions. Thus, a sufficient amount of disintegrant that is neither too much nor too little to detrimentally alter the release of the active ingredients should be used to form solid oral dosage forms of the invention. The amount of disintegrant used varies based upon the type of formulation, and is readily discernible to those of ordinary skill in the art. Typical pharmaceutical compositions comprise from about 0.5 to about 15 weight percent of disintegrant, specifically from about 1 to about 5 weight percent of disintegrant.

Disintegrants that can be used in pharmaceutical compositions and dosage forms of the invention include, but are not limited to, agar-agar, alginic acid, calcium carbonate, microcrystalline cellulose, croscarmellose sodium, crospovidone, polacrilin potassium, sodium starch glycolate, potato or tapioca starch, pre-gelatinized starch, other starches, clays, other algins, other celluloses, gums, and mixtures thereof.

Lubricants that can be used in pharmaceutical compositions and dosage forms of the invention include, but are not limited to, calcium stearate, magnesium stearate, mineral oil, light mineral oil, glycerin, sorbitol, mannitol, polyethylene glycol, other glycols, stearic acid, sodium lauryl sulfate, talc, hydrogenated vegetable oil (e.g. peanut oil, cottonseed oil,

sunflower oil, sesame oil, olive oil, corn oil, and soybean oil), zinc stearate, ethyl oleate, ethyl laureate, agar, and mixtures thereof. Additional lubricants include, for example, a syloid silica gel (AEROSIL 200, manufactured by W.R. Grace Co. of Baltimore, Md.), a coagulated aerosol of synthetic silica (marketed by Degussa Co. of Plano, Tex.), CAB-O-SIL (a pyrogenic silicon dioxide product sold by Cabot Co. of Boston, Mass.), and mixtures thereof. If used at all, lubricants are typically used in an amount of less than about 1 weight percent of the pharmaceutical compositions or dosage forms into which they are incorporated.

4.3.2. Delayed Release Dosage Forms

Active ingredients of the invention can be administered by controlled release means or by delivery devices that are well known to those of ordinary skill in the art. Examples include, but are not limited to, those described in U.S. Pat. Nos.: 3,845,770; 3,916,899; 3,536,809; 3,598,123; and 4,008,719, 5,674,533, 5,059,595, 5,591,767, 5,120,548, 5,073,543, 5,639,476, 5,354,556, and 5,733,566, each of which is incorporated herein by reference. Such dosage forms can be used to provide slow or controlled-release of one or more active ingredients using, for example, hydroxypropylmethyl cellulose, other polymer matrices, gels, permeable membranes, osmotic systems, multilayer coatings, microparticles, liposomes, microspheres, or a combination thereof to provide the desired release profile in varying proportions. Suitable controlled-release formulations known to those of ordinary skill in the art, including those described herein, can be readily selected for use with the active ingredients of the invention. The invention thus encompasses single unit dosage forms suitable for oral administration such as, but not limited to, tablets, caps-ules, gelcaps, and caplets that are adapted for controlled-release.

All controlled-release pharmaceutical products have a common goal of improving drug therapy over that achieved by their non-controlled counterparts. Ideally, the use of an optimally designed controlled-release preparation in medical treatment is characterized by a minimum of drug substance being employed to cure or control the condition in a minimum amount of time. Advantages of controlled-release formulations include extended activity of the drug, reduced dosage frequency, and increased patient compliance. In addition, controlled-release formulations can be used to affect the time of onset of action or other characteristics, such as blood levels of the drug, and can thus affect the occurrence of side (e.g., adverse) effects.

Most controlled-release formulations are designed to initially release an amount of drug (active ingredient) that promptly produces the desired therapeutic effect, and gradually and continually release of other amounts of drug to maintain this level of therapeutic or prophylactic effect over an extended period of time. In order to maintain this constant level of drug in the body, the drug must be released from the dosage form at a rate that will replace the amount of drug being metabolized and excreted from the body. Controlled-release of an active ingredient can be stimulated by various conditions including, but not limited to, pH, temperature, enzymes, water, or other physiological conditions or compounds.

4.3.3. Parenteral Dosage Forms

Parenteral dosage forms can be administered to patients by various routes including, but not limited to, subcutaneous, intravenous (including bolus injection), intramuscular, and intraarterial. Because their administration typically bypasses patients' natural defenses against contaminants, parenteral dosage forms are preferably sterile or capable of being sterilized prior to administration to a patient. Examples of

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672259

JTX-3_14

Appx10517

US 7,427,638 B2

19

parenteral dosage forms include, but are not limited to, solutions ready for injection, dry products ready to be dissolved or suspended in a pharmaceutically acceptable vehicle for injection, suspensions ready for injection, and emulsions.

Suitable vehicles that can be used to provide parenteral dosage forms of the invention are well known to those skilled in the art. Examples include, but are not limited to: Water for Injection USP; aqueous vehicles such as, but not limited to, Sodium Chloride Injection, Ringer's Injection, Dextrose Injection, Dextrose and Sodium Chloride Injection, and Lactated Ringer's Injection; water-miscible vehicles such as, but not limited to, ethyl alcohol, polyethylene glycol, and polypropylene glycol; and non-aqueous vehicles such as, but not limited to, corn oil, cottonseed oil, peanut oil, sesame oil, ethyl oleate, isopropyl myristate, and benzyl benzoate.

Compounds that increase the solubility of one or more of the active ingredients disclosed herein can also be incorporated into the parenteral dosage forms of the invention.

4.3.4. Transdermal, Topical, and Mucosal Dosage Forms

Transdermal, topical, and mucosal dosage forms of the invention include, but are not limited to, ophthalmic solutions, sprays, aerosols, creams, lotions, ointments, gels, solutions, emulsions, suspensions, or other forms known to one of skill in the art. See, e.g., *Remington's Pharmaceutical Sciences*, 16th and 18th eds., Mack Publishing, Easton Pa. (1980 & 1990); and *Introduction to Pharmaceutical Dosage Forms*, 4th ed., Lea & Febiger, Philadelphia (1985). Dosage forms suitable for treating mucosal tissues within the oral cavity can be formulated as mouthwashes or as oral gels. Further, transdermal dosage forms include "reservoir type" or "matrix type" patches, which can be applied to the skin and worn for a specific period of time to permit the penetration of a desired amount of active ingredients.

Suitable excipients (e.g., carriers and diluents) and other materials that can be used to provide transdermal, topical, and mucosal dosage forms encompassed by this invention are well known to those skilled in the pharmaceutical arts, and depend on the particular tissue to which a given pharmaceutical composition or dosage form will be applied. With that fact in mind, typical excipients include, but are not limited to, water, acetone, ethanol, ethylene glycol, propylene glycol, butane-1,3-diol, isopropyl myristate, isopropyl palmitate, mineral oil, and mixtures thereof to form lotions, tinctures, creams, emulsions, gels or ointments, which are non-toxic and pharmaceutically acceptable. Moisturizers or humectants can also be added to pharmaceutical compositions and dosage forms if desired. Examples of such additional ingredients are well known in the art. See, e.g., *Remington's Pharmaceutical Sciences*, 16th and 18th eds., Mack Publishing, Easton Pa. (1980 & 1990).

Depending on the specific tissue to be treated, additional components may be used prior to, in conjunction with, or subsequent to treatment with active ingredients of the invention. For example, penetration enhancers can be used to assist in delivering the active ingredients to the tissue. Suitable penetration enhancers include, but are not limited to: acetone; various alcohols such as ethanol, oleyl, and tetrahydrofuryl; alkyl sulfoxides such as dimethyl sulfoxide; dimethyl acetamide; dimethyl formamide; polyethylene glycol; pyrrolidones such as polyvinylpyrrolidone; Kollidon grades (Povidone, Polyvidone); urea; and various water-soluble or insoluble sugar esters such as Tween 80 (polysorbate 80) and Span 60 (sorbitan monostearate).

The pH of a pharmaceutical composition or dosage form, or of the tissue to which the pharmaceutical composition or dosage form is applied, may also be adjusted to improve delivery of one or more active ingredients. Similarly, the

20

polarity of a solvent carrier, its ionic strength, or tonicity can be adjusted to improve delivery. Compounds such as stearates can also be added to pharmaceutical compositions or dosage forms to advantageously alter the hydrophilicity or lipophilicity of one or more active ingredients so as to improve delivery. In this regard, stearates can serve as a lipid vehicle for the formulation, as an emulsifying agent or surfactant, and as a delivery-enhancing or penetration-enhancing agent. Different salts, hydrates or solvates of the active ingredients can be used to further adjust the properties of the resulting composition.

4.3.5. Kits

Typically, active ingredients of the invention are preferably not administered to a patient at the same time or by the same route of administration. This invention therefore encompasses kits which, when used by the medical practitioner, can simplify the administration of appropriate amounts of active ingredients to a patient.

A typical kit of the invention comprises a unit dosage form of compound A, or a pharmaceutically acceptable salt, solvate, hydrate, clathrate, polymorph or prodrug thereof, and a unit dosage form of a second active ingredient. Examples of second active ingredients include, but are not limited to, those listed in section 4.2 above.

Kits of the invention can further comprise devices that are used to administer the active ingredient(s). Examples of such devices include, but are not limited to, syringes, drip bags, patches, and inhalers.

Kits of the invention can further comprise pharmaceutically acceptable vehicles that can be used to administer one or more active ingredients. For example, if an active ingredient is provided in a solid form that must be reconstituted for parenteral administration, the kit can comprise a sealed container of a suitable vehicle in which the active ingredient can be dissolved to form a particulate-free sterile solution that is suitable for parenteral administration. Examples of pharmaceutically acceptable vehicles include, but are not limited to: Water for Injection USP; aqueous vehicles such as, but not limited to, Sodium Chloride Injection, Ringer's Injection, Dextrose Injection, Dextrose and Sodium Chloride Injection, and Lactated Ringer's Injection; water-miscible vehicles such as, but not limited to, ethyl alcohol, polyethylene glycol, and polypropylene glycol; and non-aqueous vehicles such as, but not limited to, corn oil, cottonseed oil, peanut oil, sesame oil, ethyl oleate, isopropyl myristate, and benzyl benzoate.

5. EXAMPLES

5.1. Example 1

Synthesis of 2-[1-(3-Ethoxy4-Methoxyphenyl)-2-Methylsulfonylethyl]-4-Acetylaminoisoindoline-1,3-Dione

A stirred solution of 1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethylamine (1.0 g, 3.7 mmol) and 3-acetamidophthalic anhydride (751 mg, 3.66 mmol) in acetic acid (20 mL) was heated at reflux for 15 h. The solvent was removed in vacuo to yield an oil. Chromatography of the resulting oil yielded the product as a yellow solid (1.0 g, 59% yield): mp, 144° C.; $^{1}$H NMR (CDCl$_3$) δ1.47 (t, J=7.0 Hz, 3H, CH$_3$), 2.26 (s, 3H, CH$_3$), 2.88 (s,3H, CH$_3$), 3.75 (dd, J=4.4, 14.3 Hz, 1H, CHH), 3.85 (s, 3H, CH3), 4.11 (q, J=7 Hz, 2H, CH2), 5.87 (dd, J=4.3, 10.5 Hz, 1H, NCH), 6.82-6.86 (m, 1H, Ar), 7.09-7.11 (m, 2H, Ar), 7.47 (d, J=7 Hz, 1H., Ar), 7.64 (t, J=8 Hz, 1H, Ar), 8.74 (d, J=8 Hz, 1H, Ar), 9.49 (br s, 1H, NH); $^{13}$C NMR (CDCl$_3$) δ14.61, 24.85, 41.54, 48.44, 54.34, 55.85,

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672260
**JTX-3_15**

Appx10518

US 7,427,638 B2

21

64.43, 111.37, 112.34, 115.04, 118.11, 120.21, 124.85, 129.17, 130.96, 136.01, 137.52, 148.54, 149.65, 167.38, 169.09, 169.40; Anal Calc'd. for $C_{23}H_{24}N_{2}O_{7}S$: C, 57.38; H, 5.25; N, 6.08. Found: C, 57.31; H, 5.34; N, 5.83.

## 5.2. Example 2

### Synthesis of (+)-2-[1-(3-Ethoxy-4-Methoxyphenyl)-2-Methylsulfonylethyl]-4-Acetylaminoisoindoline-1, 3-Dione

Preparation of 3-aminophthalic acid

10% Pd/C (2.5 g), 3-nitrophthalic acid (75.0 g, 355 mmol) and ethanol (1.5 L) were charged to a 2.5 L Parr hydrogenator, under a nitrogen atmosphere. Hydrogen was charged to the reaction vessel for up to 55 psi. The mixture was shaken for 13 hours, maintaining hydrogen pressure between 50 and 55 psi. Hydrogen was released and the mixture was purged with nitrogen 3 times. The suspension was filtered through a celite bed and rinsed with methanol. The filtrate was concentrated in vacuo. The resulting solid was reslurried in ether and isolated by vacuum filtration. The solid was dried in vacuo to a constant weight, affording 54 g (84% yield) of 3-aminophthalic acid as a yellow product. [1]H-NMR (DMSO-d6) δ: 3.17 (s, 2H), 6.67 (d, 1H), 6.82 (d, 1H), 7.17 (t, 1H), 8-10 (brs, 2H). [13]C-NMR DMSO-d6)δ: 112.00, 115.32, 118.20, 131.28, 135.86, 148.82, 169.15, 170.09.

Preparation of 3-acetamidophthalic anhydride

A 1 L 3-necked round bottom flask was equipped with a mechanical stirrer, thermometer, and condenser and charged with 3-aminophthalic acid (108 g, 596 mmol) and acetic anhydride (550 mL). The reaction mixture was heated to reflux for 3 hours and cooled to ambient temperature and further to 0-5° C. for another 1 hour. The crystalline solid was collected by vacuum filtration and washed with ether. The solid product was dried in vacuo at ambient temperature to a constant weight, giving 75 g (61% yield) of 3-acetamidopthalic anhydride as a white product. [1]H-NMR (CDCl₃) δ: 2.21 (s, 3H), 7.76 (d, 1H), 7.94 (t, 1H), 8.42 (d, 1H), 9.84 (s, 1H).

Resolution of 2-(3-ethoxy-4-methoxyphenyl)-1-(methylsulphonyl)-eth-2-ylamine

A 3 L 3-necked round bottom flask was equipped with a mechanical stirrer, thermometer, and condenser and charged with 2-(3-ethoxy-4-methoxyphenyl)-1-(methylsulphonyl)-eth-2-ylamine (137.0 g, 500 mmol), N-acetyl-L-leucine (52 g, 300 mmol), and methanol (1.0 L). The stirred slurry was heated to reflux for 1 hour. The stirred mixture was allowed to cool to ambient temperature and stirring was continued for another 3 hours at ambient temperature. The slurry was filtered and washed with methanol (250 mL). The solid was air-dried and then dried in vacuo at ambient temperature to a constant weight, giving 109.5 g (98% yield) of the crude product (58.8% ee). The crude solid (55.0 g) and methanol (440 mL) were brought to reflux for 1 hour, cooled to room temperature and stirred for an additional 3 hours at ambient temperature. The slurry was filtered and the filter cake was washed with methanol (200 mL). The solid was air-dried and then dried in vacuo at 30° C. to a constant weight, yielding 49.6 g (90% recovery) of this 2-(3-ethoxy-4-methoxyphenyl)-1-(methylsulphonyl)-eth-2-ylamine-N-acetyl-L-leucine salt (98.4% ee.) Chiral HPLC (1/99 EtOH/20 mM KH₂PO₄ @pH 7.0, Ultron Chiral ES-OVS from Agilent Technologies, 150 mm×4.6 mm, 0.5 mL/min., @240 nm): 18.4 min (S-isomer, 99.2%), 25.5 min (R-isomer, 0.8%).

22

Preparation of Compound A

A 500 mL 3-necked round bottom flask was equipped with a mechanical stirrer, thermometer, and condenser. The reaction vessel was charged with (S)-2-(3-ethoxy-4-methoxyphenyl)-1-(methylsulphonyl)-eth-2-yl amine N-acetyl-L-leucine salt (25 g, 56 mmol, 98% ee), 3-acetamidophthalic anhydride (12.1 g 58.8 mmol), and glacial acetic acid (250 mL). The mixture was refluxed over night and then cooled to <50° C. The solvent was removed in vacuo, and the residue was dissolved in ethyl acetate. The resulting solution was washed with water (250 mL×2), saturated aqeous NaHCO₃ (250 mL×2), brine (250 mL×2), and dried over sodium sulphate. The solvent was evaporated in vacuo, and the residue recrystallized from a binary solvent containing ethanol (150 mL) and acetone (75 mL). The solid was isolated by vacuum filtration and washed with ethanol (100 mL×2). The product was dried in vacuo at 60° C. to a constant weight, affording 19.4 g (75% yield) of S-{2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-aminoisoindoline-1,3-dione with 98% ee. Chiral HPLC (15/85 EtOH/20 mM KH₂PO₄ @pH 3.5, Ultron Chiral ES-OVS from Agilent Technology, 150 mm×4.6 mm, 0.4 mL/min., @240 nm): 25.4 min (S-isomer, 98.7%), 29.5 min (R-isomer, 1.2%). [1]H-NMR (CDCl₃) δ:1.47 (t, 3H), 2.26 (s, 3H), 2.87 (s, 3H), 3.68-3.75 (dd, 1H), 3.85 (s, 3H), 4.07-4.15 (q, 2H), 4.51-4.61 (dd, 1H), 5.84-5.90 (dd, 1H), 6.82-8.77 (m, 6H), 9.46 (s, 1H). [13]C-NMR (DMSO-d6) δ: 14.66, 24.92, 41.61, 48.53, 54.46, 55.91, 64.51, 111.44, 112.40, 115.10, 118.20, 120.28, 124.94, 129.22, 131.02, 136.09, 137.60, 148.62, 149.74, 167.46, 169.14, 169.48.

## 5.3. Example 3

### TNF-α Inhibition

Human Whole Blood LPS-induced TNF-α assay

The ability of compounds to inhibit LPS-induced TNF-α production by human whole blood was measured essentially as described below for the LPS-induced TNF-α assay in human PBMC, except that freshly drawn whole blood was used instead of PBMC. (George Muller, et al. 1999, *Bioorganic & Medicinal Chemistry Letters* 9; 1625-1630.) Human whole blood LPS-induced TNF-α IC₅₀-294 nM

Mouse LPS-induced serum TNF-α inhibition

Compounds were tested in this animal model according to previously described methods (Corral et al. 1996, *Mol. Med* 2:506-515). Mouse LPS-induced serum TNF-α inhibition (ED₅₀, mg/kg, p.o.)=0.05.

LPS-induced TNF-α production

Lipopolysaccharide (LPS) is an endotoxin produced by gram-negative bacteria such as *E. coli* which induces production of many pro-inflammatory cytokines, including TNF-α. In peripheral blood mononuclear cells (PBMC), the TNF-α produced in response to LPS is derived from monocytes, which comprise approximately 5-20% of the total PBMC. Compounds were tested for the ability to inhibit LPS-induced TNF-α production from human PBMC as previously described (Muller et al. 1996, *J. Med Chem.* 39:3238). PBMC from normal donors were obtained by Ficoll Hypaque (Pharmacia, Piscataway, N.J., USA) density centrifugation. Cells were cultured in RPMI (Life Technologies, Grand Island, N.Y., USA) supplemented with 10% AB±human serum (Gemini Bio-products, Woodland, Calif., USA), 2 mM L-glutamine, 100 U/ml penicillin, and 100 µg/ml streptomycin (Life Technologies).

PBMC (2×10⁵ cells) were plated in 96-well flat-bottom Costar tissue culture plates (Corning, N.Y., USA) in triplicate. Cells were stimulated with LPS (Sigma, St. Louis, Mo.,

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672261
JTX-3_16

Appx10519

US 7,427,638 B2

23

USA) at 100 ng/ml in the absence or presence of compounds. Compounds (Celgene Corp., Warren, N.J., USA) were dissolved in DMSO (Sigma) and further dilutions were done in culture medium immediately before use. The final DMSO concentration in all samples was 0.25%. Compounds were added to cells 1 hour before LPS stimulation. Cells were incubated for 18-20 hours at 37° C. in 5% CO₂, and supernatants were then collected, diluted with culture medium and assayed for TNF-α levels by ELISA (Endogen, Boston, Mass., USA). LPS-induced TNF-α IC₅₀=77 nM.

IL-1β-induced TNF-α production

During the course of inflammatory diseases, TNF-α production is often stimulated by the cytokine 1L-1β, rather than by bacterially derived LPS. Compounds were tested for the ability to inhibit IL-1β-induced TNFα production from human PBMC as described above for LPS-induced TNFα production, except that the PBMC were isolated from source leukocyte units (Sera-Tec Biologicals, North Brunswick, N.J., USA) by centrifugation on Ficoll-Paque Plus (Amersham Pharmacia, Piscataway, N.J., USA), plated in 96-well tissue culture plates at 3×10⁵ cells/well in RPMI-1640 medium (BioWhittaker, Walkersville, Md., USA) containing 10% heat-inactivated fetal bovine serum (Hyclone), 2 mM L-glutamine, 100 U/ml penicillin, and 100 mg/ml streptomycin (complete medium), pretreated with compounds at 10, 2, 0.4, 0.08, 0.016, 0.0032, 0.00064, and 0 μM in duplicate at a final DMSO concentration of 0.1% at 37° C. in a humidified incubator at 5% CO₂ for 1 hour, then stimulated with 50 ng/ml recombinant human IL-1β (Endogen) for 18 hours. IL-β-induced TNF-α IC₅₀=83 nM.

5.4. Example 4

PDE Selectivity

PDE1, 2, 3, 5, and 6 enzyme assays

The specificity of compounds for PDE4 was assessed by testing at a single concentration (10 μM) against bovine PDE1, human PDE2, PDE3, and PDE5 from human platelets (Hidaka and Asano 1976, *Biochem. Biophys. Acta* 429:485, and Nicholsen et al. 1991, *Trends Pharmaco. Sci.* 12:19), and PDE6 from bovine retinal rod outer segments (Baehr et al. 1979, *J. Biol. Chem.* 254:11669, and Gillespie et al. 1989, *Mol. Pharm.* 36:773). Results are listed in Table 1.

PDE7 enzyme assay

PDE7 is a cAMP-selective PDE expressed mainly in T cells and in skeletal muscle. T cell-derived cytokines such as IL-2 and IFN-γ are potentially regulatable via PDE7 inhibition. PDE7 was purified from Hut78 human T cells by anion exchange chromatography as previously described (Bloom and Beavo 1996, *Proc. Natl. Acad. Sci. USA* 93:14188-14192). Compounds were tested against the PDE7 preparation in the presence of 10 nM cAMP as described for PDE4 in Table 1 below.

TABLE 1

| | Racemic Compound | Compound A | Compound B* |
|---|---|---|---|
| PDE Inhibition | | | |
| PDE4 IC₅₀ (from U937 cells) (nM) | 81.8 | 73.5 | 611 |
| PDE1 (% inhib at 10 μM) | 9% | 23% | 27% |
| PDE2 (% inhib at 10 μM) | 19% | 6% | 10% |
| PDE3 (% inhib at 10 μM) | 21% | 20% | 31% |
| PDE5 (% inhib at 10 μM) | 3% | 3% | −9% |

24

TABLE 1-continued

| | Racemic Compound | Compound A | Compound B* |
|---|---|---|---|
| PDE6 (% inhib at 10 μM) | ND | −6% | 10% |
| PDE7 IC₅₀ (nM) | 22110 | 20500 | ND |
| PDE Specificity Ratios from above data (*fold) | | | |
| PDE4/PDE1 | >2700 | >500 | >50 |
| PDE4/PDE2 | >800 | >10000 | >260 |
| PDE4/PDE3 | >670 | >1200 | >45 |
| PDE4/PDE5 | >12000 | >30000 | >39000 |
| PDE4/PDE6 | ND | >40000 | >250 |
| PDE7 IC₅₀/PDE4 IC₅₀ | 270 | 279 | ND |

*Compound B is the opposite enantiomer of Compound A.

5.5. Example 5

PDE4 Inhibition

PDE4 (U937 cell-derived) enzyme assay

PDE4 enzyme was purified from U937 human monocytic cells by gel filtration chromatography as previously described (Muller et al. 1998, *Bioorg. & Med Chem Lett* 8:2669-2674). Phosphodiesterase reactions were carried out on 50 mM Tris HCl pH 7.5, 5 mM MgCl₂, 1 μM cAMP, 10 nM [³H]-cAMP for 30 min at 30° C., terminated by boiling, treated with 1 mg/ml snake venom, and separated using AG-1XS ion exchange resin (BioRad) as described (Muller et al. 1998, *Bioorg. & Med Chem Lett* 8:2669-2674). Reactions consumed less than 15% of available substrate. Results are listed in Table 1.

5.6. Example 6

Human T Cell Assays

SEB -induced IL-2 and IFN-γ production

Staphylococcal Enterotoxin B (SEB) is a superantigen derived from gram-positive bacteria *Staphylococcus aureus*. SEB provides a convenient physiological stimulus specific for T cells expressing particular T cell receptor Vβ chains. Human PBMC (consisting of approximately 50% T cells) were isolated from source leukocyte units as described above and plated in 96-well tissue culture plates at 3×10⁵ cells/well in complete medium, pretreated with compounds at 10, 2, 0.4, 0.08, 0.016, 0.0032, 0.00064, and 0 μM in duplicate at a final DMSO concentration of 0.1% at 37° C. in a humidified incubator at 5% CO₂ for 1 hour, then stimulated with 100 ng/ml SEB (Sigma Chemical Co., St. Louis, Mo., USA) for 18 hours. IL-2 and IFN-γ levels were measured by ELISA (R&D Systems, Minneapolis, Minn., USA). IL-2 IC₅₀=291 nM. IFN-γ IC₅₀=46 nM.

5.7. Example 6

cAMP Elevation Assays

PGE₂-induced cAMP elevation

Prostaglandin E₂ (PGE₂) binds to prostanoid receptors on monocytes, T cells and other leukocytes and consequently elevates intracellular cAMP levels, resulting in inhibition of cellular responses. The combination of PGE₂ and a PDE4 inhibitor synergistically elevates cAMP levels in these cell types, and the elevation of cAMP in PBMC caused by PDE4 inhibitors in the presence of PGE₂ is proportional to the

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

US 7,427,638 B2

25

inhibitory activity of that PDE4 inhibitor. Intracellular cAMP was measured in human PBMC as follows. PBMC were isolated as described above and plated in 96-well plates at $1 \times 10^6$ cells per well in RPMI-1640. The cells were pre-treated with compounds at 100, 10, 1, 0.1, 0.01, and 0 μM in a final concentration of 2% DMSO in duplicate at 37° C. in a humidified incubator at 5% CO$_2$ for one hour. The cells were then stimulated with PGE$_2$ (10 μM) (Sigma) for 1 h. The cells were lysed with HCl, 0.1N final concentration to inhibit phosphodiesterase activity and the plates were frozen at −20° C. The cAMP produced was measured using cAMP (low pH) Immunoassay kit (R&D Systems). PBMC cAMP EC$_{50}$ for racemate is 3.09 μM. PBMC cAMP EC$_{50}$ for Compound A is 1.58 μM.

Elevation of cAMP in human neutrophils was measured as follows. PBMC were removed from source leukocytes (Sera-Tec Biologicals) by centrifugation on Ficoll—Paque Plus (Amersham Pharmacia). The resulting erythrocyte/polymorphonuclear cell (PMN) pellet was resuspended in Hank's Balanced Salt Solution (BioWhittaker) and mixed with an equal volume of 3% Dextran T-500 (Amersham Pharmacia) in 0.9% saline. Erythrocytes were allowed to sediment for 20 minutes, and the PMN were removed and centrifuged at 120 rpm for 8 minutes at 4° C. The remaining erythrocytes were lysed in cold 0.2% saline for 30 seconds, and the cells restored to isotonicity by the addition of an equal volume of 1.6% saline. The PMN were centrifuged at 1200 rpm for 8 minutes at 4° C., then resuspended in RPMI-1640 and assayed for cAMP elevation as described for PBMC above. PMN were found to be approximately 74% CD18/CD11b⁺, 71% CD16⁺⁺ CD9⁻ neutrophils by flow cytometry on a FACSCalibur (Becton Dickinson, San Jose, Calif., USA). Results are shown in Table 2.

fMLF-induced LTB4 production

N-formyl-methionine-leucine-phenylalanine (fMLF) is a bacterially derived peptide that activates neutrophils to rapidly degranulate, migrate, adhere to endothelial cells, and release leukotriene LTB4, a product of arachidonic acid metabolism and itself a neutrophil chemoattractant. Compounds were tested for the ability to block fMLF-induced neutrophil LTB4 production as previously described (Hatzelmann and Schudt 2001, J. Pharm. Exp. Ther. 297:267-279), with the following modifications. Neutrophils were isolated as described above and resuspended in phosphate-buffered saline without calcium or magnesium (BioWhittaker) containing 10 mM HEPES pH7.2 and plated in 96-well tissue culture plates at a concentration of $1.7 \times 10^6$ cells/well. Cells were treated with 50 μM thimerosal (Sigma)/1 mM CaCl$_2$/1 MM MgCl$_2$ for 15 minutes at 37° C. 5% CO$_2$, then treated with compounds at 1000, 200, 40, 8, 1.6, 0.32, 0.064, and 0 nM in a final DMSO concentration of 0.01% in duplicate for 10 minutes. Neutrophils were stimulated with 1 μM fMLF for 30 minutes, then lysed by the addition of methanol (20% final concentration) and frozen in a dry ice/isopropanol bath for 10 minutes. Lysates were stored at −70° C. until the LTB4 content was measured by competitive LTB4 ELISA (R&D Systems). Results are shown in Table 2.

Zymosan-induced IL-8 production

Zymosan A, or the heat-killed yeast Saccharomyces cerevisiae, binds to the adhesion molecule Mac-1 on the neutrophil surface and triggers phagocytosis, cell activation and IL-8 production. Zymosan-induced IL-8 production was measured as previously described (Au et al. 1998, Brit. J. Pharm. 123:1260-1266) with the following modifications. Human neutrophils were purified as described above, plated in 96-well tissue culture plates at $3 \times 10^5$ cells/well in complete medium, treated with compounds at 10, 2, 0.4, 0.08, 0.016,

26

0.0032, 0.00064, and 0 μM in duplicate in a final DMSO concentration of 0.1% for 1 hour at 37° C. 5%CO$_2$. Neutrophils were then stimulated with unopsonized, boiled Zymosan A (Sigma) at $2.5 \times 10^5$ particles/well for 18 hours. Supernatants were harvested and tested for IL-8 by ELISA (R&D Systems). Results are shown in Table 2.

fMLF-induced CD18/CD11b expression

CD18/CD 11b (Mac-1) expression on neutrophils was measured as previously described (Derian et al. 1995, J. Immunol.: 154:308-317) with the following modifications. Neutrophils were isolated as described above, then resuspended in complete medium at $1 \times 10^6$ cells/ml, pretreated with compounds at 10, 1, 0.1, 0.01, and 0 μM in duplicate at a final DMSO concentration of 0.1% for 10 minutes at 37° C. 5%CO$_2$. Cells were then stimulated with 30 nM fMLF for 30 minutes and then chilled to 4° C. Cells were treated with rabbit IgG (Jackson ImmunoResearch Labs, West Grove, Pa., USA) (10 μg/$1 \times 10^6$ cells) to block Fc receptors, stained with CD18-FITC and CD11b-PE (Becton Dickinson), and analyzed by flow cytometry on a FACSCalibur. CD18/CD11b expression (mean fluorescence) in the absence of stimulation was subtracted from all samples to obtain inhibition curves and calculate IC$_{50}$s. Results are shown in Table 2.

fMLF-induced adhesion to HUVEC

Human umbilical vein endothelial cells (HUVEC) were used as a substrate for neutrophil adhesion as previously described (Derian et al. 1995, J. Immunol.: 154:308-317) with the following modifications. HUVEC cells were obtained from Anthrogenesis (Cedar Knolls, N.J., USA), and neutrophils were not treated with cytochalasin B. Cells were treated with compounds at 10, 1, 0.1, 0.01, 0.001, and 0 μM in a final DMSO concentration of 0.1% in duplicate for 10 minutes, stimulated with 500 nM fMLF for 30 minutes, and washed twice with PBS before measuring fluorescence on an FLX800 plate reader (Bio-Tek Instruments, Winooski, Vt., USA). Results are shown in Table 2.

TABLE 2

| Human Neutrophil Assays (all values in nM) | Racemic Compound | Compound A |
| --- | --- | --- |
| PGE$_2$-induced cAMP EC$_{50}$ | 12589 | 4570 |
| fMLF-induced LTB4 IC$_{50}$ | 20.1 | 2.48 |
| Zymosan-induced IL-8 IC$_{50}$ | ND | 94 |
| fMLF-induced CD18 expression IC$_{50}$ | ND | 390 |
| fMLF-induced CD11b expression IC$_{50}$ | ND | 74 |
| fMLF-induced adhesion to HUVEC IC$_{50}$ | ND | 150 |

5.8. Example 8

Aqueous Solubility

Equilibrium solubilities were measured in pH 7.4 aqueous buffer. The pH 7.4 buffer was prepared by adjusting the pH of a 0.07 M NaH$_2$PO$_4$ solution to 7.4 with 10 N NaOH. The ionic strength of the solution was 0.15. At least 1 mg of powder was combined with 1 ml of buffer to make >1 mg/ml mixture. These samples were shaken for >2 hours and left to stand overnight at room temperature. The samples were then filtered through a 0.45-μm Nylon syringe filter that was first saturated with the sample. The filtrate was sampled twice, consecutively. The filtrate was assayed by HPLC against standards prepared in 50% methanol. Compound A has 3.5-fold greater aqueous solubility than the racemic mixture. Measured solubility Compound A=0.012 mg/ML; racemic mixture=0.0034 mg/mL.

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

US 7,427,638 B2

| 27 | 28 |

5.9. Example 8

LPS-Induced Lung

Neutrophilia Ferret Model

The conscious ferret model has been used to investigate anti-inflammatory, emetic and behavioral effects of PDE4 inhibitors when administered by the oral (p.o.) route. From these experiments, a therapeutic index (TI) for each PDE4 inhibitor may be determined. The TI has been calculated by dividing the threshold dose for causing emetic episodes and behavioral changes by the anti-inflammatory dose (dose that causes 50% inhibition of the LPS-induced neutrophilia).

Animal husbandry

Male ferrets (Mustela Pulorius Euro, weighing 1-2 kg). Ferrets were supplied either by Bury Green Farm or Misay Consultancy. Following transport, the animals were allowed to acclimatize in the holding rooms for a period of not less than 7 days. The Diet comprised SDS diet C pelleted food given ad lib with Whiskers cat food given 3 times per week. Water was pasteurized animal grade drinking water and was changed daily.

Dosing with PDE4 inhibitor

PDE4 inhibitors were administered orally (p.o.), at doses initially of 1-10 mg/kg, but subsequently up to 30 mg/kg in order to establish whether the TI was 10 or higher, and/or at lower doses to establish the minimum dose to cause 50% inhibition of neutrophilia. Ferrets were fasted overnight but allowed free access to water. The animals were orally dosed with vehicle or PDE4 inhibitor using a 15 cm dosing needle that was passed down the back of the throat into the oesophagus. After dosing, the animals were returned to holding cages fitted with Perspex doors to allow observation, and given free access to water. After dosing, the animals were constantly observed and any emesis or behavioural changes were recorded. The animals were allowed access to food 60-90 minutes after p.o. dosing

Exposure to LPS

Thirty minutes after p.o. dosing with compound or vehicle control, the ferrets were placed into sealed Perspex containers and exposed to an aerosol of LPS (100 µg/ml) for 10 minutes. Aerosols of LPS were generated by a nebulizer (DeVilbiss, USA) and this was directed into the Perspex exposure chamber. Following a 10 minute exposure period, the animals were returned to the holding cages and allowed free access to water, and at a later stage, food. Observation continued for a period of at least 2.5 hours post p.o. dosing and emetic episodes and behavioral changes were recorded.

Bronchoalveolar lavage

Six hours after LPS exposure the animals were killed by overdose of sodium pentobarbitone administered intraperitoneally. The trachea was then cannulated with polypropylene tubing and the lungs lavaged twice with 20 ml heparinized (10 units/ml) phosphate buffered saline (PBS).

Blood sampling/tissue removal

A terminal blood sample (10 ml) was removed by transthoracic cardiac puncture. The blood was spun at 2500 rpm for 15 minutes and the plasma removed and stored at −20° C. The brain also removed and frozen at −20° C. for analysis of compound content.

Cell counts

The bronchoalveolar lavage (BAL) samples were centrifuged at 1500 rpm for 5 minutes. The supernatant was removed and the resulting cell pellet re-suspended in 1 ml PBS. A cell smear of the re-suspended fluid was prepared and stained with Leishman's stain to allow differential cell counting. A total cell count was made using the remaining re-suspended sample. From this, the total number of neutrophils in the BAL-was determined.

Parameters measured:

1. % Inhibition of LPS-induced pulmonary neutrophilia.

2. Emetic episodes—the number of vomits and retches were counted.

3. Behavioral changes—the following behavioral effects were noted: salivation, panting, mouth clawing, flattened posture, ataxia, arched back and backward walking. Any behavioral changes were semi-quantified by applying a severity rating (mild, moderate or severe).

4. The TI was calculated as the highest dose found to not cause emetic episodes divided by the lowest dose found to inhibit pulmonary neutrophilia by 50% or more.

The effect of Compound A on LPS-induced neutrophilia in the lungs of conscious ferrets is demonstrated in FIG. 1.

Emesis and behavioral changes

Following p.o. dosing of the PDE4, the ferrets were observed for at least 2 hours and emetic episodes (vomits and retches) and behavioral changes were recorded.

No emetic episodes (retching or vomiting) were observed in the ferrets pre-treated p.o. with the relevant vehicle (acetone/cremophor/distilled water). In a small proportion of the control-treated animals (7/22), mild behavioral changes (lip licking and backward walking) were seen.

Compound A (0.1-3 mg/kg, p.o.), caused no emetic episodes (retching and vomiting). Some behavioral changes (flattened posture, lip licking and backward walking) were observed and classified as mild. At 10 mg/kg in 2/6 ferrets, some retching but no frank emesis was observed along with salivation and behavioral changes (scored as mild or moderate). At the highest dose tested (30 mg/kg) moderate to marked emesis was observed in ¾ animals along with pronounced behavioral changes. These data are summarized in Table III.

TABLE III

| Conscious ferret: Emetic episodes and behavioural changes following oral administration of Compound A. | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Treatment/dose (mg/kg) | Vomits | Retches | Salivation | Panting | Mouth clawing | Flattened posture | Ataxia | Lip licking | Backward walking |
| Vehicle (acetone/cremophor/diet.H2O) | None | None | None | None | None | None | None | Mild (6/22) | Mild (7/22) |
| Compound A (0.1 mg/kg) | None | None | None | None | None | Mild (2/5) | None | Mild (4/5) | Mild (3/5) |
| Compound A (0.3 mg/kg) | None | None | None | None | None | Mild (2/6) | None | Mild (3/6) | Mild (4/6) |

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672264

**JTX-3_19**

Appx10522

US 7,427,638 B2

29                                                    30

TABLE III-continued

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Conscious ferret: Emetic episodes and behavioural changes following oral administration of Compound A. | | | | | | | | | |
| Treatment/dose (mg/kg) | Vomits | Retches | Salivation | Panting | Mouth clawing | Flattened posture | Ataxia | Lip licking | Backward walking |
| Compound A (1.0 mg/kg) | None | None | None | None | None | Mild (2/6) | None | Mild (6/6) | Mild (4/6) |
| Compound A (3.0 mg/kg) | None | None | None | None | Mild (1/8) | Marked (7/8) | None | Mild (2/8) | Moderate (5/8) |
| Compound A (10 mg/kg) | None | Mild (2/6) | Mild (1/6) | None | Mild (1/6) | Marked (6/6) | None | Moderate (5/6) | Marked (6/6) |
| Compound A (30 mg/kg) | Moderate (3/4) | Marked (3/4) | Moderate (3/4) | Mild (1/4) | Marked (4/4) | Marked (4/4) | Mild (3/4) | Moderate (4/4) | Mild (2/4) |

Animals were observed for up to 3 hours following dosing. Numbers in parentheses refer to the number of animals that responded The numbers of animals in each group range from 4–22.

Therapeutic Index Calculation

From these experiments, a therapeutic index (TI) was determined for each compound by dividing the threshold dose for inducing emetic episodes by the ED$_{50}$ value for inhibiting the pulmonary neutrophilia. The TI calculation is summarized in Table IV. Compound A had a TI of 12, causing no emetic episodes at an anti-inflammatory dose of 1 mg/kg.

TABLE IV

| | | | |
|---|---|---|---|
| Summary of the effective doses (ED$_{50}$) for inhibition of LPS-induced pulmonary neutrophilia and induction of emesis and the therapeutic index derived from those values. | | | |
| Compound | Inhibition of LPS-induced neutrophilia (ED$_{50}$ mg/kg) | Threshold emetic dose (mg/kg) | Therapeutic index |
| Compound A | 0.8 | 10 | 12 |

5.10. Example 9

200MG Dosage Capsule

Table V illustrates a batch formulation and single dosage formulation for a 200 mg Compound A single dose unit, i.e., about 40 percent by weight, in a size #0 capsule.

TABLE V

| | | | |
|---|---|---|---|
| Formulation for 200 mg capsule | | | |
| Material | Percent By Weight | Quantity (mg/tablet) | Quantity (kg/batch) |
| Compound A | 40.0% | 200 mg | 16.80 kg |
| Pregelatinized Corn Starch, NF5 | 9.5% | 297.5 mg | 24.99 kg |
| Magnesium Stearate | 0.5% | 2.5 mg | 0.21 kg |
| Total | 100.0% | 500 mg | 42.00 kg |

The pregelatinized corn starch (SPRESS B-820) and Compound A components are passed through a 710 μm screen and then are loaded into a Diffusion Mixer with a baffle insert and blended for 15 minutes. The magnesium stearate is passed through a 210 μm screen and is added to the Diffusion Mixer.

The blend is then encapsulated in a size #0 capsule, 500 mg per capsule (8400 capsule batch size) using a Dosator type capsule filling machine.

5.11. Example 10

100 MG Oral Dosage Form

Table VI illustrates a batch formulation and a single dose unit formulation containing 100 mg of Compound A.

TABLE VI

| | | | |
|---|---|---|---|
| Formulation for 100 mg tablet | | | |
| Material | Percent by Weight | Quantity (mg/tablet) | Quantity (kg/batch) |
| Compound A | 40% | 100.00 | 20.00 |
| Microcrystalline Cellulose, NF | 53.5% | 133.75 | 26.75 |
| Pluronic F-68 Surfactant | 4.0% | 10.00 | 2.00 |
| Croscarmellose Sodium Type A, NF | 2.0% | 5.00 | 1.00 |
| Magnesium Stearate, NF | 0.5% | 1.25 | 0.25 |
| Total | 100.0% | 250.00 mg | 50.00 kg |

The microcrystalline cellulose, croscarmellose sodium, and Compound A components are passed through a #30 mesh screen (about 430μ to about 655μ). The Pluronic F-68® (manufactured by JRH Biosciences, Inc. of Lenexa, Kans.) surfactant is passed through a #20 mesh screen (about 457μ to about 1041μ). The Pluronic F-68® surfactant and 0.5 kgs of croscarmellose sodium are loaded in a 16 qt. twin shell tumble blender and are mixed for about 5 minutes. The mix is then transferred to a 3 cubic foot twin shell tumble blender where the microcrystalline cellulose is added and blended for about 5 minutes. The thalidomide is added and blended for an additional 25 minutes. This pre-blend is passed through a roller compactor with a hammer mill attached at the discharge of the roller compactor and moved back to the tumble blender. The remaining croscarmellose sodium and magnesium stearate is added to the tumble blender and blended for about 3 minutes. The final mixture is compressed on a rotary tablet press with 250 mg per tablet (200,000 tablet batch size).

5.12. Example 11

Aerosol Dosage Form

A concentrate is prepared by combining Compound A, and a 12.6 kg portion of the trichloromonofluoromethane in a

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672265

JTX-3_20

Appx10523

US 7,427,638 B2

31

sealed stainless steel vessel equipped with a high shear mixer. Mixing is carried out for about 20 minutes. The bulk suspension is then prepared in the sealed vessel by combining the concentrate with the balance of the propellants in a bulk product tank that is temperature controlled to 21° to 27° C. and pressure controlled to 2.8 to 4.0 BAR. 17 ml aerosol containers which have a metered valve which is designed to provide 100 inhalations of the composition of the invention. Each container is provided with the following:

| | |
|---|---|
| Compound A | 0.0120 g |
| trichloromonofluoromethane | 1.6939 g |
| dichlorodifluoromethane | 3.7175 g |
| dichlorotetrafluoroethane | 1.5766 g |
| total | 7.0000 g |

While the invention has been described with respect to the particular embodiments, it will be apparent to those skilled in the art that various changes and modifications may be made without departing from the spirit and scope of the invention as defined in the claims. Such modifications are also intended to fall within the scope of the appended claims.

What is claimed is:

1. A pharmaceutical composition comprising stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione, or a pharmaceutically acceptable salt, solvate or hydrate, thereof; and a pharmaceutically acceptable carrier, excipient or diluent.

2. The pharmaceutical composition of claim 1 wherein said pharmaceutical composition is suitable for parenteral, transdermal, mucosal, nasal, buccal, sublingual, or oral administration to a patient.

3. The pharmaceutical composition of claim 2 wherein said pharmaceutical composition is suitable for oral administration to a patient.

32

4. The pharmaceutical composition of claim 2 wherein the amount of stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonyl-ethyl]-4-acetylaminoisoindoline-1,3-dione is from 1 mg to 1000 mg.

5. The pharmaceutical composition of claim 4 wherein the amount of stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonyl-ethyl]-4-acetylaminoisoindoline-1,3-dione is from 5 mg to 500 mg.

6. The pharmaceutical composition of claim 5 wherein the amount of stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonyl-ethyl]-4-acetylaminoisoindoline-1 ,3-dione is from 10 mg to 200 mg.

7. A single unit dosage form which comprises about 1 mg to about 1000 mg of a stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylamino-isoindoline-1,3-dione or a pharmaceutically acceptable salt, solvate or hydrate, thereof; and a pharmaceutically acceptable carrier, excipient or diluent.

8. The dosage form of claim 7 wherein said dosage form is suitable for parenteral, transdermal, mucosal, nasal, buccal, sublingual, or oral administration to a patient.

9. The dosage form of claim 8 wherein said dosage form is a capsule or a tablet.

10. The dosage form of claim 9 wherein said dosage form is an aerosol.

11. The dosage form of claim 7 wherein the amount of stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione is from about 5 mg to about 500 mg.

12. The dosage form of claim 11 wherein the amount of stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione is from about 10 mg to about 200 mg.

13. Stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfo-    nylethyl]-4-acetylaminoisoindoline-1,3-dione, substantially free of its (−) isomer, or a pharmaceutically acceptable metabolite, salt, solvate or hydrate, thereof.

\* \* \* \* \*

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672266

JTX-3_21

Appx10524

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.        : 7,427,638 B2                                   Page 1 of 1
APPLICATION NO. : 11/106142
DATED             : September 23, 2008
INVENTOR(S)      : Muller et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Title Pg, Item (54)
**In the title**, replace "(+)-2-[1-(3-ETHOXY-4-METHOXYPHENYL)-2-METHYLSULFONYLETHYL]-4-ACETYLAMINOISOINDOLINE-1,3-DIONE:, AND METHODS OF SYNTHESIS AND COMPOSITIONS THEREOF"

with -- (+)-2-[1-(3-ETHOXY-4-METHOXYPHENYL)-2-METHYLSULFONYLETHYL]-4-ACETYLAMINOISOINDOLINE-1,3-DIONE: METHODS OF USING AND COMPOSITIONS THEREOF --

**In claim 4**, at column 32, line 3, "methylsulfonyl-ethyl" should be -- methylsulfonylethyl --

**In claim 5**, at column 32, line 7, "methylsulfonyl-ethyl" should be -- methylsulfonylethyl --

**In claim 6**, at column 32, line 11, "methylsulfonyl-ethyl" should be -- methylsulfonylethyl --

**In claim 13**, at column 32, line 35, "methylsulfo- nylethyl" should be -- methylsulfonylethyl --

Signed and Sealed this

Twentieth Day of January, 2009

JON W. DUDAS
*Director of the United States Patent and Trademark Office*

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672267
**JTX-3_22**

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.        : 7,427,638 B2                                    Page 1 of 1
APPLICATION NO. : 11/106142
DATED              : September 23, 2008
INVENTOR(S)     : Muller et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

Title Pg, Item (54) and Column 1, lines 1-5
**In the title,** replace "(+)-2-[1-(3-ETHOXY-4-METHOXYPHENYL)-2-
METHYLSULFONYLETHYL]-4-ACETYLAMINOISOINDOLINE-1,3-DIONE:,
AND METHODS OF SYNTHESIS AND COMPOSITIONS THEREOF"

with -- (+)-2-[1-(3-ETHOXY-4-METHOXYPHENYL)-2-
METHYLSULFONYLETHYL]-4-ACETYLAMINOISOINDOLINE-1,3-DIONE:
METHODS OF USING AND COMPOSITIONS THEREOF --

**In claim 4,** at column 32, line 3, "methylsulfonyl-ethyl" should be
-- methylsulfonylethyl --

**In claim 5,** at column 32, line 7, "methylsulfonyl-ethyl" should be
-- methylsulfonylethyl --

**In claim 6,** at column 32, line 11, "methylsulfonyl-ethyl" should be
-- methylsulfonylethyl --

**In claim 13,** at column 32, line 35, "methylsulfo- nylethyl" should be
-- methylsulfonylethyl --

This certificate supersedes the Certificate of Correction issued January 20, 2009.

Signed and Sealed this

Seventeenth Day of February, 2009

*John Doll*

JOHN DOLL
*Acting Director of the United States Patent and Trademark Office*

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672268
**JTX-3_23**

Appx10526

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO.         : 7,427,638 B2                                    Page 1 of 1
APPLICATION NO.    : 11/106142
DATED              : September 23, 2008
INVENTOR(S)        : Muller et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title Page:

The first or sole Notice should read --

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b)
by 609 days.

Signed and Sealed this
Twenty-sixth Day of July, 2011

David J. Kappos
Director of the United States Patent and Trademark Office

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

UNITED STATES PATENT AND TRADEMARK OFFICE

(12)          CERTIFICATE EXTENDING PATENT TERM
                      UNDER 35 U.S.C. § 156

| | | | |
|---|---|---|---|
| (68) | PATENT NO. | : | 7,427,638 |
| (45) | ISSUED | : | September 23, 2008 |
| (75) | INVENTOR | : | George W. Mueller et al. |
| (73) | PATENT OWNER | : | Celgene Corporation |
| (95) | PRODUCT | : | OTEZLA® (apremilast) |

This is to certify that an application under 35 U.S.C. § 156 has been filed in the United States Patent and Trademark Office, requesting extension of the term of U.S. Patent No. 7,427,638 based upon the regulatory review of the product OTEZLA® (apremilast) by the Food and Drug Administration. According to United States Patent and Trademark Office records, the original expiration date of the patent as of the date of issuance of this certificate is November 17, 2024. Because it appears that the requirements of the law have been met, this certificate extends the term of the patent for the period of

(94)                          1,186 days

subject to the payment of maintenance fees as provided by law, with all rights pertaining thereto as provided by 35 U.S.C. § 156.



I have caused the seal of the United States Patent and Trademark Office to be affixed this 15th day of March 2018.

*Andrei Iancu*

Andrei Iancu
Under Secretary of Commerce for Intellectual Property and
    Director of the United States Patent and Trademark Office

Copy provided by USPTO from the PIRS Image Database on 07-06-2018



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

July 09, 2018

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM
THE RECORDS OF THIS OFFICE OF:

U.S. PATENT:  *7,893,101*
ISSUE DATE:  *February 22, 2011*

By Authority of the

**Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office**

P.  SWAIN
Certifying Officer

JOINT
EXHIBIT
CASE
NO. 18-cv-11026 (Consol.)
EXHIBIT
NO. **JTX-5**

CEL-OTZ-00672179



US007893101B2

(12) **United States Patent**
Muller et al.

(10) Patent No.: **US 7,893,101 B2**
(45) Date of Patent: **Feb. 22, 2011**

(54) **SOLID FORMS COMPRISING (+)-2-[1-(3-ETHOXY-4-METHOXYPHENYL)-2-METHYLSULFONYLETHYL]-4-ACETYLAMINOISOINDOLINE-1,3-DIONE, COMPOSITIONS THEREOF, AND USES THEREOF**

(75) Inventors: **George W. Muller**, Bridgewater, NJ (US); **Peter H. Schafer**, Somerset, NJ (US); **Hon-Wah Man**, Princeton, NJ (US); **Chuansheng Ge**, Belle Mead, NJ (US); **Jean Xu**, Warren, NJ (US)

(73) Assignee: **Celgene Corporation**, Summit, NJ (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 265 days.

(21) Appl. No.: 12/079,615

(22) Filed: **Mar. 27, 2008**

(65) **Prior Publication Data**

US 2008/0234359 A1 Sep. 25, 2008

**Related U.S. Application Data**

(60) Continuation-in-part of application No. 11/106,142, filed on Apr. 13, 2005, now Pat. No. 7,427,638, which is a division of application No. 10/392,195, filed on Mar. 19, 2003, now Pat. No. 6,962,940.

(60) Provisional application No. 60/366,515, filed on Mar. 20, 2002, provisional application No. 60/438,450, filed on Jan. 7, 2003.

(51) Int. Cl.
*A61K 31/40* (2006.01)
*C07D 209/56* (2006.01)

(52) U.S. Cl. ..................................... **514/411**; 548/451

(58) Field of Classification Search ................. 514/411; 548/451

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,031,450 A | 4/1962 | Fischer et al. | |
| 3,322,755 A | 5/1967 | Roch et al. | |
| 3,920,636 A | 11/1975 | Takabashi et al. | |
| 4,001,237 A | 1/1977 | Partyka et al. | |
| 4,001,238 A | 1/1977 | Partyka et al. | |
| 4,047,404 A | 9/1977 | Hayashi | |
| 4,060,615 A | 11/1977 | Matier et al. | |
| 4,101,548 A | 7/1978 | Crenshaw et al. | |
| 4,162,316 A | 7/1979 | Nishimura et al. | |
| 4,209,623 A | 6/1980 | Juby | |
| 4,880,810 A | 11/1989 | Lowe, III | |
| 4,885,301 A | 12/1989 | Coates | |
| 5,147,875 A | 9/1992 | Coates et al. | |
| 5,354,571 A | 10/1994 | Morikawa et al. | |
| 5,401,774 A | 3/1995 | Pamukcu et al. | |
| 5,439,895 A | 8/1995 | Lee et al. | |
| 5,488,055 A | 1/1996 | Kumar et al. | |
| 5,608,914 A | 3/1997 | Keesler | |

| | | | |
|---|---|---|---|
| 5,614,530 A | 3/1997 | Kumar et al. | |
| 5,614,627 A | 3/1997 | Takase et al. | |
| 5,658,940 A | 8/1997 | Muller et al. | |
| 5,698,579 A | 12/1997 | Muller | |
| 5,703,098 A | 12/1997 | Muller et al. | |
| 5,710,170 A | 1/1998 | Guay et al. | |
| 5,728,844 A | 3/1998 | Muller et al. | |
| 5,728,845 A | 3/1998 | Muller et al. | |
| 5,736,570 A | 4/1998 | Muller et al. | |
| 5,798,373 A | 8/1998 | Warrellow | |
| 5,801,195 A | 9/1998 | Muller et al. | |
| 5,849,770 A | 12/1998 | Head et al. | |
| 5,877,200 A | 3/1999 | Muller | |
| 5,891,896 A | 4/1999 | Warrellow et al. | |
| 6,011,050 A | 1/2000 | Muller et al. | |
| 6,020,339 A | 2/2000 | Perrier et al. | |
| 6,020,358 A * | 2/2000 | Muller et al. ............... 514/411 |
| 6,034,089 A | 3/2000 | Han et al. | |
| 6,046,221 A | 4/2000 | Muller et al. | |
| 6,069,156 A | 5/2000 | Oku et al. | |
| 6,162,830 A | 12/2000 | Connor et al. | |
| 6,166,041 A | 12/2000 | Cavalla et al. | |
| 6,177,471 B1 | 1/2001 | Menander et al. | |
| 6,204,275 B1 | 3/2001 | Friesen et al. | |
| 6,218,400 B1 | 4/2001 | Daugan et al. | |
| 6,300,335 B1 | 10/2001 | Campbell et al. | |
| 6,316,472 B1 | 11/2001 | Frenette et al. | |
| 6,333,354 B1 | 12/2001 | Schudt | |

(Continued)

FOREIGN PATENT DOCUMENTS

EP 0 347 146 6/1989

(Continued)

OTHER PUBLICATIONS

Brittain's, polymorphism in Pharmaceutical Solids, Drugs and the Pharmaceutical Science; 1999, V. 95, pp. 348-361.*

(Continued)

*Primary Examiner*—Rei-tsang Shiao
(74) *Attorney, Agent, or Firm*—Jones Day

(57) **ABSTRACT**

Solid forms comprising (+)-2-[1-(3-Ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione, compositions comprising the solid forms, methods of making the solid forms and methods of their use are disclosed. The methods include methods of treating and/or preventing disorders ameliorated by the reduction of levels of TNF-α or the inhibition of PDE4.

**15 Claims, 33 Drawing Sheets**

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672180
**JTX-5_2**

Appx10530

US 7,893,101 B2

Page 2

### U.S. PATENT DOCUMENTS

| 7,427,638 B2 * | 9/2008 | Muller et al. | ............... 514/411 |
| 2008/0027123 A1 | 1/2008 | Muller et al. | |

### FOREIGN PATENT DOCUMENTS

| EP | 0 349 239 A2 | 6/1989 |
| EP | 0 351 058 | 6/1989 |
| EP | 0 352 960 A2 | 7/1989 |
| EP | 0 395 328 | 4/1990 |
| EP | 0 428 268 A2 | 10/1990 |
| EP | 0 463 756 A1 | 6/1991 |
| EP | 0 526 004 A1 | 7/1992 |
| EP | 0 607 439 A1 | 9/1992 |
| EP | 0 722 937 A1 | 1/1996 |
| EP | 0 722 943 A1 | 1/1996 |
| EP | 0 722 944 A1 | 1/1996 |
| GB | 2 063 249 A | 9/1980 |
| WO | WO 93/07149 | 4/1993 |
| WO | WO 93/12095 | 6/1993 |
| WO | WO 94/01728 | 1/1994 |
| WO | WO 94/05661 | 3/1994 |
| WO | WO 94/29277 | 12/1994 |
| WO | WO 95/19978 | 7/1995 |
| WO | WO 96/32379 | 10/1996 |
| WO | WO 97/03070 | 1/1997 |
| WO | WO 97/03075 | 2/1997 |
| WO | WO 97/03985 | 2/1997 |
| WO | WO 97/24334 | 7/1997 |
| WO | WO 98/06722 | 2/1998 |
| WO | WO 98/08848 | 3/1998 |
| WO | WO 98/14448 | 4/1998 |
| WO | WO 98/16521 | 4/1998 |
| WO | WO 98/17668 | 4/1998 |
| WO | WO 98/23597 | 6/1998 |
| WO | WO 98/38168 | 9/1998 |
| WO | WO 99/06041 | 2/1999 |
| WO | WO 03/080049 | 10/2003 |

### OTHER PUBLICATIONS

Grant, D. J. W., "Theory and Origin of Polymorphism," Polymorphism in Pharmaceutical Solids, Chap. 1999:1-10.
International Search Report in corresponding application No. PCT/US2008/004021 dated Jan. 14, 2009.
U.S. Appl. No. 60/454,155, filed Mar. 12, 2003, Muller, G. et al.
U.S. Appl. No. 60/454,149, filed Mar. 12, 2003, Muller, G. et al.
U.S. Appl. No. 60/438,448, filed Jan. 7, 2003, Muller, G. et al.
U.S. Appl. No. 60/363,756, filed Mar. 30, 2002, Muller, G. et al.
U.S. Appl. No. 60/366,515, filed Mar. 20, 2002, Muller, G. et al.
Akazome, M. et al., 1997, "Asymmetric recognition of 1-arylethylamines by (R)-phenylglycyl-(R)-phenylglycine and its mechanism," Tetrahedron: Asymmetry, Elsevier Scince Publishers, Amsterdam, NL, 8(14):2531-2336.
Au et al., 1998, Brit. J. Pharm. 123:1260-1266.
Baehr et al., 1979, J. Biol. Chem. 254:11669.
Baughman et al., 1990, J. Lab. Clin. Med. 115:36-42.
Beavo and Reifsnyder, Trends in Pharm., 11, 150-55, 1990.
Bissonnette et al., 1989, Inflammation 13:329-339.
Bloom and Beavo 1996, Proc. Natl. Acad. Sci. USA 93:14188-14192.
Brackeen, M.F. et al., 1995, "Design and synthesis of conformationally constrained analogues of 4-(3-butoxy-4-methoxybenzyl) imidazolidin-2-one (Ro 20/1724) as potent inhibitors of cAMP-specific phosphodiesterase", J. Med. Chem. 38:4848-54.
Carstensen, Jens T., 1995, Drug Stability: Principles & Practice, 2nd ed., Marcel Dekker, New York, NY pp. 379-380.
Casini et al., 1964, Farmaco Ed. Sci. 19:563.
Clouse et al, 1989, J. Immunol. 142:431-438.
Derian et al., 1995, J. Immunol. 154:308-317.
Duh et al., 1989, Proc. Nat. Acad. Sci. 86:5974-5978.
Featherstone, R.L., et al., 2000, "Comparison of phosphodiesterase inhibitors of differing isoenzyme selectivity added to St. Thomas'
hospital cardioplegic solution used for hypothermic preservation of rat lungs", Am. J. Respir. Crit. Care Med. 162:850-6.
Gillespie et al., 1989, Mol. Pharm. 36:773.
Hidaka and Asano 1976, Biochem. Biophys. Acta 429:485.
Hinshaw et al. 1990, Circ. Shock 30:797-292.
Holler et al., 1990, Blood 75:1011-1016.
Johnson et al., 1989, Endocrinology 124:1424-1427.
List et al., 1990, J. Clin. Oncol. 8:1424.MDS.
Luke, G.P. et al., 1999, "Synthesis of (S)-5-(1-aminoethyl)-2-(cyclohexylmethoxy) benzamide," Tetrahedron: Asymmetry, Elsevier Science Publishers, Amsterdam, NL, 10(22):4393-4403.
Merck Manual (1999) 17th ed., 953.
Monté et al., 1990, Blood 79:2670.
Muller, George, et al., 1999, Bioorganic & Medicinal Chemistry Letters 9; pp. 1625-1630.
Muller et al., 1998, Bioorg. & Med Chem Lett. 8:2669-2674.
Muller, et al., 1996, J. Med. Chem. 39:3238.
Nicholson et al., 1991, Trends Pharmaco. Sci. 12:19.
Shealy et al., 1965, "D- and L-thalidomide." Chem. Indus. 12;24:1030-1.
Tierney, et al., ed., 1998, Current Medical Diagnosis & Treatment, 37th ed., Appleton & Lange, pp. 499.
Verghese, et al., Journal of Pharmacology and Experimental Therapeutics, 272(3), 1313-1320, 1995.
Van Dullemen et al., 1995, Gastroenterology, 109:129-135.
Wilen, S.H., et al., 1977, Tetrahedron 33:2725.
Wilen, S.H., 1972, Tables of Resolving Agents and Optical Resolutions (E.L. Eliel, Ed., Univ. of Notre Dame Press, Notre Dame, IN) p. 268.
Wolff, Manfred E., ed., Burger's Medicinal Chemistry and Drug Discovery, 5th ed. 1995 172-178, 949-982.
Dredge et al., 2003, "Angiogenesis inhibitors in cancer therapy," Curr. Opin. Investig. Drugs 4(6):667-674.
Dredge et al., 2002, "Recent developments in antiangiogenic therapy," Expert Opin. Biol. Ther. 2(8):953-966.
Gee et al., 2003, "Selective cytokine inhibitory drugs with enhanced antiangiogenic activity control tumor growth through vascular inhibition," Cancer Res. 63(23):8073-8078.
Marriott et al., 2001, "Immunotherapeutic and antitumour potential of thalidomide analogues," Expert Opin. Biol. Ther. 1(4):1-8.
Marriott et al., 2002, "Thalidomide and its analogues have distinct and opposing effects on TNF-alpha and TNFR2 during co-stimulation of both CD4(+) and CD8(+) T cells," Clin. Exp. Immunol. 130(1):75-84.
Molostvov et al., 2004, "The effects of selective cytokine inhibitory drugs (CC-10004 and CC-1088) on VEGF and IL-6 expression and apoptosis in myeloma and endothelial cell co-cultures," Br. J. Haematol.124(3):366-375.
Notice of References Cited from Office Action dated Dec. 3, 2007 in U.S. Appl. No. 11/106,142.
Craven, B.M. et al., 1969, "Crystal structures of two polymorphs of 5-ethyl-5-isoamylbarbituric acid (amobarbital)," Acta Crystallographica, Section B: Structural Crystal Chemistry, B25 (Pt. 10).
Berge et al., 1977, "Pharmaceutical Salts," Journal of Pharmaceutical Sciences, 66(1):1-19.
Bundgaard, Hans, 1985, "Design of prodrugs: Bioreversible derivatives for various functional groups and chemical entities," Design of Prodrugs, Chapter 1:1-4.
U.S. Department of Health and Human Services, Food and Drug Administration, 2000, "Guidance for Industry—Impurities: Residual Solvents in New Veterinary Medicinal Products, Active Substances and Excipients," pp. 1-20.
Craven et al., 1969, CAS: 71:117431.
Berge et al., Journal of pharmaceutical Science, 1977, vol. 66, pp. 1-19.
Bundgaard et al. publication, 1985, Design of prodrug, pp. 1-4.
FDA's guidance for industry, 2000, pp. 1-20.
Jones et al., "Pharmaceutical Cocrystals: An Emerging Approach to Physical Property Enhancement," Mater. Res. Bull., 31:875-79 (2006).

Copy provided by USPTO from the PIRS Image Databsc on 07-06-2018

CEL-OTZ-00672181

JTX-5_3

# US 7,893,101 B2
Page 3

Andrew D. Bond & William Jones, Controlling Crystal Architecture in Molecular Solids: The Supramolecular Approach, in Supramolecular Organization and Materials Design, 391, 436 (W. Jones & C. N. R. Rao, eds., 2001).

Trask et al., "Selective polymorph transformation via solvent-drop grinding," *Chem. Commun.*, 880-882 (2005).

* cited by examiner

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672182

**JTX-5_4**

Appx10532



FIG. 1

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672183
**JTX-5_5**



FIG.2

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

Appx10534



FIG.3

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

Appx10535

Appx10536

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

JTX-5_8
CEL-OTZ-00672186



FIG.4

**DVS ISOTHERM PLOT**

CHANGE IN MASS (%) – DRY

TARGET RH (%)

CYCLE 1 SORP
CYCLE 1 DESORP



FIG.5

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672187
JTX-5_9

Appx10537



**FIG.6**

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672188

JTX-5_10



FIG.7

Copy provided by USPTO from the PIRS Image Database on 07-06-2018



FIG.8

Copy provided by USPTO from the PIRS Image Database on 07-06-2018



FIG. 9

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672191
JTX-5_13

Appx10541



FIG. 10

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672192
**JTX-5_14**

Appx10542



**FIG.11**

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672193

**JTX-5_15**

Appx10543



FIG.12

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672194
JTX-5_16

Appx10544



FIG. 13

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672195
**JTX-5_17**

Appx10545

Case: 22-1147    Document: 27    Page: 243    Filed: 01/31/2022



**FIG. 14**

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672196

**JTX-5_18**

Appx10546



FIG.15

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672197
**JTX-5_19**

Appx10547



Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672198
JTX-5_20

Appx10548



FIG.17

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672199

**JTX-5_21**

Appx10549

FIG.18

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

Appx10550



FIG. 19

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672201
JTX-5_23

Appx10551

FIG.20

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672202

JTX-5_24

Appx10552



FIG. 21

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672203

JTX-5_25

Appx10553

FIG.22

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672204
JTX-5_26

Appx10554

FIG.23

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

Appx10555

FIG.24

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

Appx10556



FIG.25

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672207
JTX-5_29

Appx10557

FIG.26

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672208

JTX-5_30

Appx10558

FIG.27

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672209
JTX-5_31

Appx10559

FIG.28

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672210
JTX-5_32

Appx10560

FIG.29

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672211
JTX-5_33

Appx10561

Case: 22-1147    Document: 27    Page: 259    Filed: 01/31/2022



FIG.30

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672212
JTX-5_34



# FIG.31

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672213
**JTX-5_35**

Appx10563



FIG.32

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672214
JTX-5_36

Appx10564



# FIG.33

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672215
**JTX-5_37**

US 7,893,101 B2

1

## SOLID FORMS COMPRISING (+)-2-[1-(3-ETHOXY-4-METHOXYPHENYL)-2-METHYLSULFONYLETHYL]-4-ACETYLAMINOISOINDOLINE-1,3-DIONE, COMPOSITIONS THEREOF, AND USES THEREOF

This application is a continuation-in-part of U.S. patent application Ser. No. 11/106,142, filed Apr. 13, 2005 now U.S. Pat. No. 7,427,638, which is a divisional of U.S. patent application Ser. No. 10/392,195, filed on Mar. 19, 2003, issued as U.S. Pat. No. 6,962,940, which claims the benefit of U.S. Provisional Patent Application No. 60/366,515, filed on Mar. 20, 2002, and U.S. Provisional Patent Application No. 60/438,450, filed on Jan. 7, 2003, the entireties of which are incorporated herein by reference.

### 1. FIELD OF INVENTION

Provided herein are solid forms comprising (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione, compositions comprising the solid forms, methods of making the solid forms and methods of their use for the treatment of various diseases and/or disorders.

### 2. BACKGROUND OF THE INVENTION

Tumor necrosis factor alpha (TNF-$\alpha$) is a cytokine that is released primarily by mononuclear phagocytes in response to immunostimulators. TNF-$\alpha$ is capable of enhancing most cellular processes, such as differentiation, recruitment, proliferation, and proteolytic degradation. At low levels, TNF-$\alpha$ confers protection against infective agents, tumors, and tissue damage. However, TNF-$\alpha$ also has a role in many diseases. When administered to a patient, TNF-$\alpha$ causes or aggravates inflammation, fever, cardiovascular effects, hemorrhage, coagulation, and acute phase responses similar to those seen during acute infections and shock states. Enhanced or unregulated TNF-$\alpha$ production has been implicated in a number of diseases and medical conditions, for example, cancers, such as solid tumors and blood-borne tumors; heart disease, such as congestive heart failure; and viral, genetic, inflammatory, allergic, and autoimmune diseases.

Adenosine 3',5'-cyclic monophosphate (cAMP) also plays a role in many diseases and conditions, such as, but not limited to, asthma and inflammation, and other conditions (Lowe and Cheng, *Drugs of the Future,* 17(9), 799-807, 1992). It has been shown that the elevation of cAMP in inflammatory leukocytes inhibits their activation and the subsequent release of inflammatory mediators, including TNF-$\alpha$ and NF-$\kappa$B. Increased levels of cAMP also leads to the relaxation of airway smooth muscle.

It is believed that the primary cellular mechanism for the inactivation of cAMP is the breakdown of cAMP by a family of isoenzymes referred to as cyclic nucleotide phosphodiesterases (PDE) (Beavo and Reitsnyder, *Trends in Pharm.,* 11, 150-155, 1990). There are eleven known PDE families. It is recognized, for example, that the inhibition of PDE type IV is particularly effective in both the inhibition of inflammatory mediator release and the relaxation of airway smooth muscle (Verghese, et al., *J. Pharm. Exper. Therapeut.,* 272(3), 1313-1320, 1995). Thus, compounds that inhibit PDE4 (PDE IV) specifically, may inhibit inflammation and aid the relaxation of airway smooth muscle with a minimum of unwanted side effects, such as cardiovascular or anti-platelet effects. Currently used PDE4 inhibitors lack the selective action at acceptable therapeutic doses.

2

Cancer is a particularly devastating disease, and increases in blood TNF-$\alpha$ levels are implicated in the risk of and the spreading of cancer. Normally, in healthy subjects, cancer cells fail to survive in the circulatory system, one of the reasons being that the lining of blood vessels acts as a barrier to tumor-cell extravasation. However, increased levels of cytokines have been shown to substantially increase the adhesion of cancer cells to endothelium in vitro. One explanation is that cytokines, such as TNF-$\alpha$, stimulate the biosynthesis and expression of a cell surface receptors called ELAM-1 (endothelial leukocyte adhesion molecule). ELAM-1 is a member of a family of calcium-dependent cell adhesion receptors, known as LEC-CAMs, which includes LECAM-1 and GMP-140. During an inflammatory response, ELAM-1 on endothelial cells functions as a "homing receptor" for leukocytes. Recently, ELAM-1 on endothelial cells was shown to mediate the increased adhesion of colon cancer cells to endothelium treated with cytokines (Rice et al., 1989, *Science* 246:1303-1306).

Inflammatory diseases such as arthritis, related arthritic conditions (e.g., osteoarthritis and rheumatoid arthritis), inflammatory bowel disease (e.g., Crohn's disease and ulcerative colitis), sepsis, psoriasis, atopic dermatitis, contact dermatitis, chronic obstructive pulmonary disease, and chronic inflammatory pulmonary diseases are also prevalent and problematic ailments. TNF-$\alpha$ plays a central role in the inflammatory response and the administration of their antagonists block chronic and acute responses in animal models of inflammatory disease.

Enhanced or unregulated TNF-$\alpha$ production has been implicated in viral, genetic, inflammatory, allergic, and autoimmune diseases. Examples of such diseases include but are not limited to: HIV; hepatitis; adult respiratory distress syndrome; bone-resorption diseases; chronic obstructive pulmonary diseases; chronic pulmonary inflammatory diseases; asthma; dermatitis; cystic fibrosis; septic shock; sepsis; endotoxic shock; hemodynamic shock; sepsis syndrome; post ischemic reperfusion injury; meningitis; psoriasis; fibrotic disease; cachexia; graft rejection; auto-immune disease; rheumatoid spondylitis; arthritic conditions, such as rheumatoid arthritis and osteoarthritis; osteoporosis; Crohn's disease; ulcerative colitis; inflammatory-bowel disease; multiple sclerosis; systemic lupus erythematosus; ENL in leprosy; radiation damage; asthma; and hyperoxic alveolar injury. Tracey et al., 1987, *Nature* 330:662-664 and Hinshaw et al., 1990, *Circ. Shock* 30:279-292 (endotoxic shock); Dezube et al., 1990, *Lancet,* 335:662 (cachexia); Millar et al., 1989, *Lancet* 2:712-714 and Ferrai-Baliviera et al., 1989, *Arch. Surg.* 124:1400-1405 (adult respiratory distress syndrome); Bertolini et al., 1986, *Nature* 319:516-518, Johnson et al., 1989, *Endocrinology* 124:1424-1427, Holler et al., 1990, *Blood* 75:1011-1016, and Grau et al., 1989, *N. Engl. J. Med.* 320:1586-1591 (bone-resorption diseases); Pignet et al., 1990, *Nature,* 344:245-247, Bissonnette et al., 1989, *Inflammation* 13:329-339 and Baughman et al., 1990, *J. Lab. Clin. Med.* 115:36-42 (chronic pulmonary inflammatory diseases); Elliot et al., 1995, *Int. J. Pharmac.* 17:141-145 (rheumatoid arthritis); von Dullemen et al., 1995, *Gastroenterology,* 109: 129-135 (Crohn's disease); Duh et al., 1989, *Proc. Nat. Acad. Sci.* 87:782-785, Monto et al., 1990, *Blood* 79:2670, Clouse et al., 1989, *J. Immunol.* 142, 431-438, Poll et al., 1992, *AIDS Res. Hum. Retrovirus,* 191-197, Poli et al. 1990, *Proc. Nat. Acad. Sci.* 87:782-784, Folks et al., 1989, PNAS 86:2365-2368 (HIV and opportunistic infections resulting from HIV).

Pharmaceutical compounds that can block the activity or inhibit the production of certain cytokines, including TNF-$\alpha$,

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672216

JTX-5_38

Appx10566

US 7,893,101 B2

3

may be beneficial therapeutics. Many small-molecule inhibitors have demonstrated an ability to treat or prevent inflammatory diseases implicated by TNF-α (for a review, see Lowe, 1998 *Exp. Opin. Ther. Patents* 8:1309-1332). One such class of molecules are the substituted phenethylsulfones described in U.S. Pat. No. 6,020,358.

The preparation and selection of a solid form of a pharmaceutical compound is complex, given that a change in solid form may affect a variety of physical and chemical properties, which may provide benefits or drawbacks in processing, formulation, stability and bioavailability, among other important pharmaceutical characteristics. Potential pharmaceutical solids include crystalline solids and amorphous solids. Amorphous solids are characterized by a lack of long-range structural order, whereas crystalline solids are characterized by structural periodicity. The desired class of pharmaceutical solid depends upon the specific application; amorphous solids are sometimes selected on the basis of, e.g., an enhanced dissolution profile, while crystalline solids may be desirable for properties such as, e.g., physical or chemical stability (see, e.g., S. R. Vippagunta et al., *Adv. Drug. Deliv. Rev.*, (2001) 48:3-26; L. Yu, *Adv. Drug. Deliv. Rev.*, (2001) 48:27-42).

Whether crystalline or amorphous, potential solid forms of a pharmaceutical compound include single-component and multiple-component solids. Single-component solids consist essentially of the pharmaceutical compound in the absence of other compounds. Variety among single-component crystalline materials may potentially arise, e.g., from the phenomenon of polymorphism, wherein multiple three-dimensional arrangements exist for a particular pharmaceutical compound (see, e.g., S. R. Byrn et al., *Solid State Chemistry of Drugs*, (1999) SSCI, West Lafayette). The importance of studying polymorphs was underscored by the case of Ritonavir, an HIV protease inhibitor that was formulated as soft gelatin capsules. About two years after the product was launched, the unanticipated precipitation of a new, less soluble polymorph in the formulation necessitated the withdrawal of the product from the market until a more consistent formulation could be developed (see S. R. Chemburkar et al., *Org. Process Res. Dev.*, (2000) 4:413-417).

Additional diversity among the potential solid forms of a pharmaceutical compound may arise, e.g., from the possibility of multiple-component solids. Crystalline solids comprising two or more ionic species may be termed salts (see, e.g., *Handbook of Pharmaceutical Salts Properties, Selection and Use*, P. H. Stahl and C. G. Wermuth, Eds., (2002), Wiley, Weinheim). Additional types of multiple-component solids that may potentially offer other property improvements for a pharmaceutical compound or salt thereof include, e.g., hydrates, solvates, co-crystals and clathrates, among others (see, e.g., S. R. Byrn et al., *Solid State Chemistry of Drugs*, (1999) SSCI, West Lafayette). Moreover, multiple-component crystal forms may potentially be susceptible to polymorphism, wherein a given multiple-component composition may exist in more than one three-dimensional crystalline arrangement. The preparation of solid forms is of great importance in the development of a safe, effective, stable and marketable pharmaceutical compound.

Provided herein are embodiments addressing a need for solid forms of the compound chemically named (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione ("Compound A"), which was disclosed in U.S. application Ser. No. 10/392,195, filed Mar. 19, 2003 (issued as U.S. Pat. No. 6,962,940), as well as U.S.

4

Provisional Application Ser. Nos. 60/366,515, filed Mar. 20, 2002 and 60/438,450, filed Jan. 7, 2003.

3. SUMMARY OF THE INVENTION

This invention relates to methods of treating diseases and disorders utilizing an enantiomer of a substituted phenethylsulfone compound and pharmaceutically acceptable solvates, hydrates, co-crystals, clathrates, prodrugs and polymorphs thereof and methods for reducing the level of cytokines and their precursors in mammals. The invention also relates to pharmaceutical compositions comprising the (+) enantiomer of 2-[1-(3-Ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione and a pharmaceutically acceptable carrier. The invention further relates to the (+) enantiomer of 2-[1-(3-Ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione substantially free of its (−) enantiomer.

This invention particularly relates to the (+) enantiomer of 2-[1-(3-Ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione. This compound is believed to have increased potency and other benefits as compared to its racemate, 2-[1-(3-Ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione.

The invention encompasses the use of the (+) enantiomer of 2-[1-(3-Ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione for treating or preventing diseases or disorders ameliorated by the inhibition of TNF-α production in mammals. In certain embodiments, this treatment includes the reduction or avoidance of adverse effects. Such disorders include, but are not limited to, cancers, including, but not limited to cancer of the head, thyroid, neck, eye, skin, mouth, throat, esophagus, chest, bone, blood, bone marrow, lung, colon, sigmoid, rectum, stomach, prostate, breast, ovaries, kidney, liver, pancreas, brain, intestine, heart, adrenal, subcutaneous tissue, lymph nodes, heart, and combinations thereof. Specific cancers that can be treated by this method are multiple myeloma, malignant melanoma, malignant glioma, leukemia and solid tumors.

The invention also encompasses the use of the (+) enantiomer of 2-[1-(3-Ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione in the treatment or prevention of heart disease, including, but not limited to congestive heart failure, cardiomyopathy, pulmonary edema, endotoxin-mediated septic shock, acute viral myocarditis, cardiac allograft rejection, and myocardial infarction.

The invention also encompasses the use of the (+) enantiomer of 2-[1-(3-Ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione to treat diseases or disorders ameliorated by the inhibition of PDE4. For example, the compounds and compositions of the invention may be useful to treat or prevent viral, genetic, inflammatory, allergic, and autoimmune diseases. Examples of such diseases include, but are not limited to: HIV; hepatitis; adult respiratory distress syndrome; bone-resorption diseases; chronic obstructive pulmonary diseases; chronic pulmonary inflammatory diseases; dermatitis; inflammatory skin disease, atopic dermatitis, cystic fibrosis; septic shock; sepsis; endotoxic shock; hemodynamic shock; sepsis syndrome; post ischemic reperfusion injury; meningitis; psoriasis; fibrotic disease; cachexia; graft rejection including graft versus host disease; auto-immune disease; rheumatoid spondylitis; arthritic conditions, such as rheumatoid arthritis and osteoarthritis; osteoporosis; Crohn's disease; ulcerative colitis; inflammatory-bowel disease; multiple sclerosis; systemic

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

Appx10567

US 7,893,101 B2

<table>
<tr><td>5</td><td>6</td></tr>
</table>

lupus erythematosus; erythema nodosum leprosum (ENL) in leprosy; radiation damage; asthma; and hyperoxic alveolar injury.

In yet another embodiment, the stereomerically pure (+) enantiomer of 2-[1-(3-Ethoxy-4-methoxyphenyl)-2-methyl-sulfonylethyl]-4-acetylaminoisoindoline-1,3-dione is also useful in the treatment or prevention of microbial infections or the symptoms of microbial infections including, but not limited to, bacterial infections, fungal infections, malaria, mycobacterial infection, and opportunistic infections resulting from HIV.

The invention further encompasses pharmaceutical compositions and single unit dosage forms comprising the (+) enantiomer of 2-[1-(3-Ethoxy-4-methoxyphenyl)-2-methyl-sulfonylethyl]-4-acetylaminoisoindoline-1,3-dione and pharmaceutically acceptable polymorphs, prodrugs, hydrates, clathrates, and solvates thereof.

In a separate embodiment, the invention encompasses the (+) enantiomer of 2-[1-(3-Ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione.

In a further embodiment, the invention encompasses a method of producing the stereomerically pure (+) enantiomer of 2-[1-(3-Ethoxy-4-methoxyphenyl)-2-methylsulfonyl-ethyl]-4-acetylaminoisoindoline-1,3-dione which comprises contacting 1-(3-Ethoxy-4-methoxyphenyl)-2-methane-sulfonyl-ethylamine with a chiral amino acid and contacting the product of the first step with N-(1,3-Dioxo-1,3-dihydro-isobenzofuran-4-yl)-acetamide. In a related embodiment the invention encompasses a chiral salt of 1-(3-Ethoxy-4-meth-oxy-phenyl)-2-methanesulfonyl-ethylamine.

Embodiments herein provide solid forms comprising the compound chemically named (+)-2-[1-(3-ethoxy-4-methox-yphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione ("Compound A"). Compound A can be synthesized or obtained according to any method apparent to those of skill in the art based upon the teachings herein, including the methods described in the Examples below. Compound A can also be prepared according to the methods described in U.S. Pat. No. 6,962,940, issued Nov. 8, 2005, the entirety of which is incorporated by reference herein.

In certain embodiments, the solid forms are single-component crystal forms of Compound A. In certain embodiments, the solid forms are multiple-component crystal forms, including, but not limited to, co-crystals and/or solvates (including hydrates) comprising Compound A. In other embodiments, the solid forms are single-component amorphous forms of Compound A. In other embodiments, the solid forms are multiple-component amorphous forms. Without intending to be limited by any particular theory, certain novel solid forms provided herein have particular advantageous physical and/or chemical properties making them useful, e.g., for manufacturing, processing, formulation and/or storage, while also possessing particularly advantageous biological properties, such as, e.g., bioavailability and/or biological activity.

In particular embodiments, solid forms provided herein include solid forms comprising Compound A, including, but not limited to, single-component and multiple-component solid forms comprising Compound A. In certain embodiments, solid forms provided herein include polymorphs, solvates (including hydrates) and co-crystals comprising Compound A. Certain embodiments herein provide methods of making, isolating and/or characterizing the solid forms provided herein.

The solid forms provided herein are useful as active pharmaceutical ingredients for the preparation of formulations for use in patients. Thus, embodiments herein encompass the use of these solid forms as a final drug product. Certain embodiments provide solid forms useful in making final dosage forms with improved properties, e.g., powder flow properties, compaction properties, tableting properties, stability properties, and excipient compatibility properties, among others, that are needed for manufacturing, processing, formulation and/or storage of final drug products. Certain embodiments herein provide pharmaceutical compositions comprising a single-component crystal form, a multiple-component crystal form, a single-component amorphous form and/or a multiple-component amorphous form comprising Compound A and a pharmaceutically acceptable diluent, excipient or carrier. The solid forms and the final drug products provided herein are useful, for example, for the treatment, prevention or management of diseases and disorders provided herein.

Certain embodiments herein provide methods using the solid forms provided herein for treating, preventing or managing diseases or disorders ameliorated by the inhibition of TNF-α production in mammals, such as HIV; hepatitis; adult respiratory distress syndrome; bone resorption diseases; chronic obstructive pulmonary diseases; chronic pulmonary inflammatory diseases; asthma; dermatitis; cystic fibrosis; septic shock; sepsis; endotoxic shock; hemodynamic shock; sepsis syndrome; post ischemic reperfusion injury; meningitis; psoriasis; fibrotic disease; cachexia; graft rejection; auto immune disease; rheumatoid spondylitis; arthritic conditions, such as psoriatic arthritis, rheumatoid arthritis and osteoarthritis; osteoporosis; Crohn's disease; ulcerative colitis; inflammatory bowel disease; multiple sclerosis; systemic lupus erythematosus; cutaneous lupus erythematosus; pulmonary sarcoidosis; ENL in leprosy; radiation damage; asthma; and hyperoxic alveolar injury. Such disorders further include, but are not limited to, cancers, including, but not limited to cancer of the head, thyroid, neck, eye, skin, mouth, throat, esophagus, chest, bone, blood, bone marrow, lung, colon, sigmoid, rectum, stomach, prostate, breast, ovaries, kidney, liver, pancreas, brain, intestine, heart, adrenal, subcutaneous tissue, lymph nodes, heart, and combinations thereof. Specific cancers that can be treated by this method are multiple myeloma, malignant melanoma, malignant glioma, leukemia and solid tumors. In certain embodiments, methods using the solid forms provided herein include the reduction or avoidance of certain adverse effects.

Certain embodiments herein provide methods of using the solid forms provided herein in the treatment or prevention of heart disease, including, but not limited to congestive heart failure, cardiomyopathy, pulmonary edema, endotoxin-mediated septic shock, acute viral myocarditis, cardiac allograft rejection, and myocardial infarction.

Certain embodiments herein provide methods of using the solid forms provided herein to treat diseases or disorders ameliorated by the inhibition of PDE4. For example, the solid forms provided herein may be useful to treat or prevent viral, genetic, inflammatory, allergic, and autoimmune diseases. Examples of such diseases include, but are not limited to: HIV; hepatitis; adult respiratory distress syndrome; bone-resorption diseases; chronic obstructive pulmonary diseases; chronic pulmonary inflammatory diseases; dermatitis; inflammatory skin disease; atopic dermatitis; cystic fibrosis; septic shock; sepsis; endotoxic shock; hemodynamic shock; sepsis syndrome; post ischemic reperfusion injury; meningitis; psoriasis; fibrotic disease; cachexia; graft rejection including graft versus host disease; auto-immune disease; rheumatoid spondylitis; arthritic conditions, such as rheumatoid arthritis and osteoarthritis; osteoporosis; Crohn's disease; ulcerative colitis; inflammatory-bowel disease; multiple sclerosis; systemic lupus erythematosus; erythema

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672218
**JTX-5_40**

Appx10568

US 7,893,101 B2

7

nodosum leprosum (ENL) in leprosy; radiation damage; asthma; and hyperoxic alveolar injury.

Certain embodiments herein provide methods of using the solid forms provided herein in the treatment or prevention of microbial infections or the symptoms of microbial infections including, but not limited to, bacterial infections, fungal infections, malaria, mycobacterial infection, and opportunistic infections resulting from HIV.

Particular embodiments herein provide methods of using the solid forms provided herein in the treatment or prevention of diseases including: psoriasis; psoriatic arthritis; rheumatoid arthritis; chronic cutaneous sarcoid; giant cell arteritis; Parkinson's; prurigo nodularis; lichen planus; complex apthosis; Behcet's disease; lupus; hepatitis; uveitis; Sjogren's disease; depression (including major depression); interstitial cystitis; vulvodynia; prostatitis; osteoarthritis; diffuse large B cell lymphoma; polymyositis; dermatomyositis; inclusion body myositis; erosive osteoarthritis; interstitial cystitis; hepatitis; endometriosis; radiculopathy; and pyoderma gangrenosum.

Certain embodiments herein provide pharmaceutical compositions and single unit dosage forms comprising one or more solid forms provided herein.

### 3.1. BRIEF DESCRIPTION OF THE FIGURES

FIG. 1 provides a representative X-ray Powder Diffraction ("XRPD") pattern of Form A of Compound A.

FIG. 2 provides a representative Differential Scanning Calorimetry ("DSC") plot of Form A of Compound A.

FIG. 3 provides a representative Thermal Gravimetric Analysis ("TGA") plot of Form A of Compound A.

FIG. 4 provides a representative Dynamic Vapor Sorption ("DVS") plot of Form A of Compound A.

FIG. 5 provides a representative XRPD pattern of Form B of Compound A.

FIG. 6 provides a representative DSC plot of Form B of Compound A.

FIG. 7 provides a representative TGA plot of Form B of Compound A.

FIG. 8 provides a representative DVS plot of Form B of Compound A.

FIG. 9 provides a representative XRPD pattern of Form C of Compound A.

FIG. 10 provides a representative DSC plot of Form C of Compound A.

FIG. 11 provides a representative TGA plot of Form C of Compound A.

FIG. 12 provides a representative DVS plot of Form C of Compound A.

FIG. 13 provides a representative XRPD pattern of Form D of Compound A.

FIG. 14 provides a representative DSC plot of Form D of Compound A.

FIG. 15 provides a representative TGA plot of Form D of Compound A.

FIG. 16 provides a representative DVS plot of Form D of Compound A.

FIG. 17 provides a representative XRPD pattern of Form E of Compound A.

FIG. 18 provides a representative DSC plot of Form E of Compound A.

FIG. 19 provides a representative TGA plot of Form E of Compound A.

FIG. 20 provides a representative DVS plot of Form E of Compound A.

8

FIG. 21 provides a representative XRPD pattern of Form F of Compound A.

FIG. 22 provides a representative DSC plot of Form F of Compound A.

FIG. 23 provides a representative TGA plot of Form F of Compound A.

FIG. 24 provides a representative DVS plot of Form F of Compound A.

FIG. 25 provides a representative XRPD of Form G of Compound A.

FIG. 26 provides a representative DSC plot of Form G of Compound A.

FIG. 27 provides a representative TGA plot of Form G of Compound A.

FIG. 28 provides a representative DVS plot of Form G of Compound A.

FIG. 29 illustrates a preparation of the (+) enantiomer of 2-[1-(3-Ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione.

FIG. 30 illustrates the effect of Compound A on LPS-induced neutrophilia in the lungs of conscious ferrets.

FIG. 31 illustrates the percent change in epidermal thickness among all 15 subjects at Day 29 in a clinical study evaluating Compound A in patients with severe plaque-type psoriasis.

FIG. 32 illustrates the change in mean iNOS (normalized to hARP) in biopsy specimens of lesional skin at Day 29 in a clinical study evaluating Compound A in patients with severe plaque-type psoriasis.

FIG. 33 illustrates the percentage change in total Psoriasis Area and Severity Index (PASI) score among evaluable patients from baseline at Day 29 in a clinical study evaluating Compound A in patients with severe plaque-type psoriasis.

### 3.2. DEFINITIONS

As used herein, term "Compound A" refers to enantiomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione which comes off of an HPLC column at about 25.4 minutes when that column is a 150 mm×4.6 mm Ultron Chiral ES-OVS chiral HPLC column (Agilent Technology), the eluent is 15:85 ethanol: 20 mM $KH_2PO_4$ at pH 3.5, and the observation wavelength is 240 nm. The $^1H$ NMR spectrum of Compound A is substantially as follows: $\delta(CDCl_3)$: 1.47 (t, 3H); 2.26 (s, 3H); 2.87 (s, 3H); 3.68-3.75 (dd, 1H); 3.85 (s, 3H); 4.07-4.15 (q, 2H); 4.51-4.61 (dd, 1H); 5.84-5.90 (dd, 1H); 6.82-8.77 (m, 6H); 9.46 (s, 1H). The $^{13}C$ NMR spectrum of Compound A is substantially as follows: $\delta(DMSO-d_6)$; 14.66; 24.92; 41.61; 48.53; 54.46; 55.91; 64.51; 111.44; 112.40; 115.10; 118.20; 120.28; 124.94; 129.22; 131.02; 136.09; 137.60; 148.62; 149.74; 167.46; 169.14; 169.48. Compound A dissolved in methanol rotates plane polarized light in the (+) direction.

Without being limited by theory, Compound A is believed to be S-{2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione}, which has the following structure:

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

US 7,893,101 B2

9



As used herein, the term "patient" refers to a mammal, particularly a human.

As used herein, the term "pharmaceutically acceptable salts" refer to salts prepared from pharmaceutically acceptable non-toxic acids or bases including inorganic acids and bases and organic acids and bases.

As used herein and unless otherwise indicated, the term "prodrug" means a derivative of a compound that can hydrolyze, oxidize, or otherwise react under biological conditions (in vitro or in vivo) to provide the compound. Examples of prodrugs include, but are not limited to, derivatives and metabolites of Compound A that include biohydrolyzable moieties such as biohydrolyzable amides, biohydrolyzable esters, biohydrolyzable carbamates, biohydrolyzable carbonates, biohydrolyzable ureides, and biohydrolyzable phosphate analogues. Prodrugs can typically be prepared using well-known methods, such as those described by 1 Burger's Medicinal Chemistry and Drug Discovery, 172-178, 949-982 (Manfred E. Wolff ed., 5th ed. 1995).

As used herein and unless otherwise indicated, the terms "biohydrolyzable amide," "biohydrolyzable ester," "biohydrolyzable carbamate," "biohydrolyzable carbonate," "biohydrolyzable ureide," "biohydrolyzable phosphate" mean an amide, ester, carbamate, carbonate, ureide, or phosphate, respectively, of a compound that either: 1) does not interfere with the biological activity of the compound but can confer upon that compound advantageous properties in vivo, such as uptake, duration of action, or onset of action; or 2) is biologically inactive but is converted in vivo to the biologically active compound. Examples of biohydrolyzable esters include, but are not limited to, lower alkyl esters, alkoxyacyloxy esters, alkyl acylamino alkyl esters, and choline esters. Examples of biohydrolyzable amides include, but are not limited to, lower alkyl amides, α-amino acid amides, alkoxyacyl amides, and alkylaminoalkylcarbonyl amides. Examples of biohydrolyzable carbamates include, but are not limited to, lower alkylamines, substituted ethylenediamines, aminoacids, hydroxyalkylamines, heterocyclic and heteroaromatic amines, and polyether amines.

As used herein and unless otherwise indicated, the term "stereomerically pure" means a composition that comprises one stereoisomer of a compound and is substantially free of other stereoisomers of that compound. For example, a stereomerically pure composition of a compound having one chiral center will be substantially free of the opposite enantiomer of the compound. A stereomerically pure composition of a compound having two chiral centers will be substantially free of other diastereomers of the compound. A typical stereomeri-

10

cally pure compound comprises greater than about 80% by weight of one stereoisomer of the compound and less than about 20% by weight of other stereoisomers of the compound, more preferably greater than about 90% by weight of one stereoisomer of the compound and less than about 10% by weight of the other stereoisomers of the compound, even more preferably greater than about 95% by weight of one stereoisomer of the compound and less than about 5% by weight of the other stereoisomers of the compound, and most preferably greater than about 97% by weight of one stereoisomer of the compound and less than about 3% by weight of the other stereoisomers of the compound.

As used herein and unless otherwise indicated, the term "enantiomerically pure" means a stereomerically pure composition of a compound having one chiral center.

As used herein, term "adverse effects" includes, but is not limited to gastrointestinal, renal and hepatic toxicities, leukopenia, increases in bleeding times due to, e.g., thrombocytopenia, and prolongation of gestation, nausea, vomiting, somnolence, asthenia, dizziness, teratogenicity, extra-pyramidal symptoms, akathisia, cardiotoxicity including cardiovascular disturbances, inflammation, male sexual dysfunction, and elevated serum liver enzyme levels. The term "gastrointestinal toxicities" includes but is not limited to gastric and intestinal ulcerations and erosions. The term "renal toxicities" includes but is not limited to such conditions as papillary necrosis and chronic interstitial nephritis.

As used herein and unless otherwise indicated, the phrases "reduce or avoid adverse effects" and "reducing or avoiding adverse effects" mean the reduction of the severity of one or more adverse effects as defined herein.

It should be noted that if there is a discrepancy between a depicted structure and a name given that structure, the depicted structure is to be accorded more weight. In addition, if the stereochemistry of a structure or a portion of a structure is not indicated with, for example, bold or dashed lines, the structure or portion of the structure is to be interpreted as encompassing all stereoisomers of it.

As used herein and unless otherwise specified, the terms "solid form" and related terms refer to a physical form which is not predominantly in a liquid or a gaseous state. As used herein and unless otherwise specified, the term "solid form" and related terms, when used herein to refer to Compound A, refer to a physical form comprising Compound A which is not predominantly in a liquid or a gaseous state. Solid forms may be crystalline, amorphous or mixtures thereof. In particular embodiments, solid forms may be liquid crystals. A "single-component" solid form comprising Compound A consists essentially of Compound A. A "multiple-component" solid form comprising Compound A comprises a significant quantity of one or more additional species, such as ions and/or molecules, within the solid form. For example, in particular embodiments, a crystalline multiple-component solid form comprising Compound A further comprises one or more species non-covalently bonded at regular positions in the crystal lattice. Multiple-component solid forms comprising Compound A include co-crystals, solvates (e.g., hydrates), and clathrates of Compound A. In particular embodiments, the term "solid form comprising Compound A" and related terms include single-component and multiple-component solid forms comprising Compound A. In particular embodiments, "solid forms comprising Compound A" and related terms include crystal forms comprising Compound A, amorphous forms comprising Compound A, and mixtures thereof.

As used herein and unless otherwise specified, the term "crystalline" and related terms used herein, when used to describe a compound, substance, modification, material,

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

Appx10570

US 7,893,101 B2

11

component or product, unless otherwise specified, mean that the compound, substance, modification, material, component or product is substantially crystalline as determined by X-ray diffraction. See, e.g., *Remington: The Science and Practice of Pharmacy,* 21st edition, Lippincott, Williams and Wilkins, Baltimore, Md. (2005); *The United States Pharmacopeia,* 23rd ed., 1843-1844 (1995).

As used herein and unless otherwise specified, the term "crystal forms," "crystalline forms" and related terms herein refer to solid forms that are crystalline. Crystal forms include single-component crystal forms and multiple-component crystal forms, and include, but are not limited to, polymorphs, solvates, hydrates, and/or other molecular complexes. In certain embodiments, a crystal form of a substance may be substantially free of amorphous forms and/or other crystal forms. In certain embodiments, a crystal form of a substance may contain less than about 1%, 2%, 3%, 4%, 5%, 6%, 7%, 8%, 9%, 10%, 15%, 20%, 25%, 30%, 35%, 40%, 45% or 50% of one or more amorphous forms and/or other crystal forms on a weight basis. In certain embodiments, a crystal form of a substance may be physically and/or chemically pure. In certain embodiments, a crystal form of a substance may be about 99%, 98%, 97%, 96%, 95%, 94%, 93%, 92%, 91% or 90% physically and/or chemically pure.

As used herein and unless otherwise specified, the terms "polymorphs," "polymorphic forms" and related terms herein, refer to two or more crystal forms that consist essentially of the same molecule, molecules, and/or ions. Like different crystal forms, different polymorphs may have different physical properties such as, e.g., melting temperature, heat of fusion, solubility, dissolution properties and/or vibrational spectra, as a result of the arrangement or conformation of the molecules and/or ions in the crystal lattice. The differences in physical properties may affect pharmaceutical parameters such as storage stability, compressibility and density (important in formulation and product manufacturing), and dissolution rate (an important factor in bioavailability). Differences in stability can result from changes in chemical reactivity (e.g., differential oxidation, such that a dosage form discolors more rapidly when comprised of one polymorph than when comprised of another polymorph) or mechanical changes (e.g., tablets crumble on storage as a kinetically favored polymorph converts to thermodynamically more stable polymorph) or both (e.g., tablets of one polymorph are more susceptible to breakdown at high humidity). As a result of solubility/dissolution differences, in the extreme case, some solid-state transitions may result in lack of potency or, at the other extreme, toxicity. In addition, the physical properties may be important in processing (e.g., one polymorph might be more likely to form solvates or might be difficult to filter and wash free of impurities, and particle shape and size distribution might be different between polymorphs).

As used herein and unless otherwise specified, the terms "solvate" and "solvated," refer to a crystal form of a substance which contains solvent. The terms "hydrate" and "hydrated" refer to a solvate wherein the solvent comprises water. "Polymorphs of solvates" refers to the existence of more than one crystal form for a particular solvate composition. Similarly, "polymorphs of hydrates" refers to the existence of more than one crystal form for a particular hydrate composition. The term "desolvated solvate," as used herein, refers to a crystal form of a substance which may be prepared by removing the solvent from a solvate.

As used herein and unless otherwise specified, the term "amorphous," "amorphous form," and related terms used herein, mean that the substance, component or product in question is not substantially crystalline as determined by

12

X-ray diffraction. In particular, the term "amorphous form" describes a disordered solid form, i.e., a solid form lacking long range crystalline order. In certain embodiments, an amorphous form of a substance may be substantially free of other amorphous forms and/or crystal forms. In other embodiments, an amorphous form of a substance may contain less than about 1%, 2%, 3%, 4%, 5%, 10%, 15%, 20%, 25%, 30%, 35%, 40%, 45% or 50% of one or more other amorphous forms and/or crystal forms on a weight basis. In certain embodiments, an amorphous form of a substance may be physically and/or chemically pure. In certain embodiments, an amorphous form of a substance may be about 99%, 98%, 97%, 96%, 95%, 94%, 93%, 92%, 91% or 90% physically and/or chemically pure.

Techniques for characterizing crystal forms and amorphous forms include, but are not limited to, thermal gravimetric analysis (TGA), differential scanning calorimetry (DSC), X-ray powder diffractometry (XRPD), single-crystal X-ray diffractometry, vibrational spectroscopy, e.g., infrared (IR) and Raman spectroscopy, solid-state and solution nuclear magnetic resonance (NMR) spectroscopy, optical microscopy, hot stage optical microscopy, scanning electron microscopy (SEM), electron crystallography and quantitative analysis, particle size analysis (PSA), surface area analysis, solubility measurements, dissolution measurements, elemental analysis and Karl Fischer analysis. Characteristic unit cell parameters may be determined using one or more techniques such as, but not limited to, X-ray diffraction and neutron diffraction, including single-crystal diffraction and powder diffraction. Techniques useful for analyzing powder diffraction data include profile refinement, such as Rietveld refinement, which may be used, e.g., to analyze diffraction peaks associated with a single phase in a sample comprising more than one solid phase. Other methods useful for analyzing powder diffraction data include unit cell indexing, which allows one of skill in the art to determine unit cell parameters from a sample comprising crystalline powder.

As used herein and unless otherwise specified, the terms "about" and "approximately," when used in connection with a numeric value or a range of values which is provided to characterize a particular solid form, e.g., a specific temperature or temperature range, such as, e.g., that describing a DSC or TGA thermal event, including, e.g., melting, dehydration, desolvation or glass transition events; a mass change, such as, e.g., a mass change as a function of temperature or humidity; a solvent or water content, in terms of, e.g., mass or a percentage; or a peak position, such as, e.g., in analysis by IR or Raman spectroscopy or XRPD; indicate that the value or range of values may deviate to an extent deemed reasonable to one of ordinary skill in the art while still describing the particular solid form. For example, in particular embodiments, the terms "about" and "approximately," when used in this context and unless otherwise specified, indicate that the numeric value or range of values may vary within 25%, 20%, 15%, 10%, 9%, 8%, 7%, 6%, 5%, 4%, 3%, 2%, 1.5%, 1%, 0.5%, or 0.25% of the recited value or range of values.

As used herein and unless otherwise specified, a sample comprising a particular crystal form or amorphous form that is "substantially pure," e.g., substantially free of other solid forms and/or other chemical compounds, contains, in particular embodiments, less than about 25%, 20%, 15%, 10%, 9%, 8%, 7%, 6%, 5%, 4%, 3%, 2%, 1%, 0.75%, 0.5%, 0.25% or 0.1% percent by weight of one or more other solid forms and/or or other chemical compounds.

As used herein and unless otherwise specified, a sample or composition that is "substantially free" of one or more other solid forms and/or other chemical compounds means that the

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

US 7,893,101 B2

13

composition contains, in particular embodiments, less than about 25%, 20%, 15%, 10%, 9%, 8%, 7%, 6%, 5%, 4%, 3%, 2%, 1%, 0.75%, 0.5%, 0.25% or 0.1% percent by weight of one or more other solid forms and/or other chemical compounds.

As used herein, and unless otherwise specified, the terms "treat," "treating" and "treatment" refer to the eradication or amelioration of a disease or disorder, or of one or more symptoms associated with the disease or disorder. In certain embodiments, the terms refer to minimizing the spread or worsening of the disease or disorder resulting from the administration of one or more prophylactic or therapeutic agents to a patient with such a disease or disorder. In some embodiments, the terms refer to the administration of a compound provided herein, with or without other additional active agent, after the onset of symptoms of the particular disease.

As used herein, and unless otherwise specified, the terms "prevent," "preventing" and "prevention" refer to the prevention of the onset, recurrence or spread of a disease or disorder, or of one or more symptoms thereof. In certain embodiments, the terms refer to the treatment with or administration of a compound provided herein, with or without other additional active compound, prior to the onset of symptoms, particularly to patients at risk of diseases or disorders provided herein. The terms encompass the inhibition or reduction of a symptom of the particular disease. Patients with familial history of a disease in particular are candidates for preventive regimens in certain embodiments. In addition, patients who have a history of recurring symptoms are also potential candidates for the prevention. In this regard, the term "prevention" may be interchangeably used with the term "prophylactic treatment."

As used herein, and unless otherwise specified, the terms "manage," "managing" and "management" refer to preventing or slowing the progression, spread or worsening of a disease or disorder, or of one or more symptoms thereof. Often, the beneficial effects that a patient derives from a prophylactic and/or therapeutic agent do not result in a cure of the disease or disorder. In this regard, the term "managing" encompasses treating a patient who had suffered from the particular disease in an attempt to prevent or minimize the recurrence of the disease.

As used herein, and unless otherwise specified, a "therapeutically effective amount" of a compound is an amount sufficient to provide a therapeutic benefit in the treatment or management of a disease or disorder, or to delay or minimize one or more symptoms associated with the disease or disorder. A therapeutically effective amount of a compound means an amount of therapeutic agent, alone or in combination with other therapies, which provides a therapeutic benefit in the treatment or management of the disease or disorder. The term "therapeutically effective amount" can encompass an amount that improves overall therapy, reduces or avoids symptoms or causes of disease or disorder, or enhances the therapeutic efficacy of another therapeutic agent.

As used herein, and unless otherwise specified, a "prophylactically effective amount" of a compound is an amount sufficient to prevent a disease or disorder, or prevent its recurrence. A prophylactically effective amount of a compound means an amount of therapeutic agent, alone or in combination with other agents, which provides a prophylactic benefit in the prevention of the disease. The term "prophylactically effective amount" can encompass an amount that improves overall prophylaxis or enhances the prophylactic efficacy of another prophylactic agent.

14

The term "composition" as used herein is intended to encompass a product comprising the specified ingredients (and in the specified amounts, if indicated), as well as any product which results, directly or indirectly, from combination of the specified ingredients in the specified amounts. By "pharmaceutically acceptable" it is meant that the diluent, excipient or carrier must be compatible with the other ingredients of the formulation and not deleterious to the recipient thereof.

## 4. DETAILED DESCRIPTION OF THE INVENTION

This invention relates to stereomerically pure Compound A, which is the (+) enantiomer of 2-[1-(3-Ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione, substantially free of its (–) enantiomer, as well as novel methods of using, and compositions comprising, stereomerically pure Compound A and/or solid forms comprising Compound A. For example, the present invention encompasses the in vitro and in vivo use of Compound A, and the incorporation of Compound A into pharmaceutical compositions and single unit dosage forms useful in the treatment and prevention of a variety of diseases and disorders. Diseases and disorders which are ameliorated by the reduction of levels of TNF-α or inhibition of PDE4 are well known in the art and are described herein. Specific methods of the invention reduce or avoid the adverse effects associated with compounds used as TNF-α inhibitor. Other specific methods of the invention reduce or avoid the adverse effects associated with use of racemic 2-[1-(3-Ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione.

Specific methods of the invention include methods of treating or preventing diseases and disorders including, but not limited to, solid tumors, blood-borne tumors and inflammatory diseases.

Pharmaceutical and dosage forms of the invention, which comprise Compound A or a pharmaceutically acceptable polymorph, prodrug, clathrate, solvate or hydrate thereof (wherein particular embodiments encompass solid forms comprising Compound A as described herein) can be used in the methods of the invention.

Without being limited by theory, it is believed that Compound A, including solid forms comprising Compound A, can inhibit TNF-α production. Consequently, a first embodiment of the invention relates to a method of inhibiting TNF-α production which comprises contacting a cell exhibiting abnormal TNF-α production with an effective amount of stereomerically pure Compound A or a pharmaceutically acceptable prodrug, metabolite, polymorph, solvate, hydrate, or clathrate thereof (wherein particular embodiments encompass solid forms comprising Compound A as described herein). In a particular embodiment, the invention relates to a method of inhibiting TNF-α production which comprises contacting a mammalian cell exhibiting abnormal TNF-α production with an effective amount of stereomerically pure Compound A or a pharmaceutically acceptable prodrug, metabolite, polymorph, solvate, hydrate, or clathrate thereof (wherein particular embodiments encompass solid forms comprising Compound A as described herein).

The invention also relates to a method of treating, preventing or managing disorders ameliorated by the reduction of levels of TNF-α in a patient which comprises administering to a patient in need of such treatment or prevention a therapeutically or prophylactically effective amount of stereomerically pure Compound A or a pharmaceutically acceptable prodrug, metabolite, polymorph, solvate, hydrate, or clathrate

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

US 7,893,101 B2

15

thereof (wherein particular embodiments encompass solid forms comprising Compound A as described herein). In particular embodiments, diseases or disorders ameliorated by the inhibition of TNF-α production in mammals include, but are not limited to: HIV; hepatitis; adult respiratory distress syndrome; bone resorption diseases; chronic obstructive pulmonary diseases; chronic pulmonary inflammatory diseases; asthma; dermatitis; cystic fibrosis; septic shock; sepsis; endotoxic shock; hemodynamic shock; sepsis syndrome; post ischemic reperfusion injury; meningitis; psoriasis; fibrotic disease; cachexia; graft rejection; auto immune disease; rheumatoid spondylitis; arthritic conditions, such as psoriatic arthritis, rheumatoid arthritis and osteoarthritis; osteoporosis; Crohn's disease; ulcerative colitis; inflammatory bowel disease; multiple sclerosis; systemic lupus erythematosus; cutaneous lupus erythematosus; pulmonary sarcoidosis; erythema nodosum leprosum (ENL) in leprosy; radiation damage; asthma; and hyperoxic alveolar injury. Such disorders further include, but are not limited to, cancers, including, but not limited to cancer of the head, thyroid, neck, eye, skin, mouth, throat, esophagus, chest, bone, blood, bone marrow, lung, colon, sigmoid, rectum, stomach, prostate, breast, ovaries, kidney, liver, pancreas, brain, intestine, heart, adrenal, subcutaneous tissue, lymph nodes, heart, and combinations thereof. Specific cancers that can be treated by this method are multiple myeloma, malignant melanoma, malignant glioma, leukemia and solid tumors.

A further embodiment of the invention relates to a method of treating or preventing cancer, including but not limited to, solid tumor, blood-borne tumor, leukemias, and in particular, multiple myeloma in a patient which comprises administering to a patient in need of such treatment or prevention a therapeutically effective amount of stereomerically pure Compound A or a pharmaceutically acceptable prodrug, metabolite, polymorph, solvate, hydrate, or clathrate thereof (wherein particular embodiments encompass solid forms comprising Compound A as described herein); in particular wherein the patient is a mammal.

In another embodiment, the invention relates to a method of inhibiting PDE4 which comprises contacting PDE4 in a cell (e.g. a mammalian cell) with an effective amount of stereomerically pure Compound A or a pharmaceutically acceptable prodrug, metabolite, polymorph, solvate, hydrate, or clathrate thereof (wherein particular embodiments encompass solid forms comprising Compound A as described herein).

A further embodiment of the invention relates to a method of treating or preventing diseases or disorders ameliorated by the inhibition of PDE4 in a patient which comprises administering to a patient in need of such treatment or prevention a therapeutically or prophylactically effective amount of stereomerically pure Compound A or a pharmaceutically acceptable prodrug, metabolite, polymorph, solvate, hydrate, or clathrate thereof (wherein particular embodiments encompass solid forms comprising Compound A as described herein). Disorders ameliorated by the inhibition of PDE4 include, but are not limited to, asthma, inflammation (e.g., inflammation due to reperfusion), chronic or acute obstructive pulmonary diseases, chronic or acute pulmonary inflammatory diseases, inflammatory bowel disease, Crohn's Disease, Behcet's Disease, or colitis.

In another embodiment, the invention relates to a method of controlling cAMP levels in a cell which comprises contacting a cell with an effective amount of stereomerically pure Compound A or a pharmaceutically acceptable prodrug, metabolite, polymorph, solvate, hydrate, or clathrate thereof (wherein particular embodiments encompass solid forms

16

comprising Compound A as described herein). As used herein the term "controlling cAMP levels" includes preventing or reducing the rate of the breakdown of Adenosine 3′,5′-cyclic monophosphate (cAMP) in a cell or increasing the amount of Adenosine 3′,5′-cyclic monophosphate present in a cell, preferably a mammalian cell, more preferably a human cell. In a particular method, the rate of cAMP breakdown is reduced by about 10, 25, 50, 100, 200, or 500 percent as compared to the rate in comparable cells which have not been contacted with a compound of the invention.

A further embodiment of the invention relates to a method of treating or preventing depression, asthma, inflammation (e.g., contact dermatitis, atopic dermatitis, psoriasis, rheumatoid arthritis, osteoarthritis, inflammatory skin disease, inflammation due to reperfusion), chronic or acute obstructive pulmonary diseases, chronic or pulmonary inflammatory diseases, inflammatory bowel disease, Crohn's Disease, Behcet's Disease or colitis in a patient which comprises administering to a patient in need of such treatment or prevention a therapeutically or prophylactically effective amount of stereomerically pure Compound A or a pharmaceutically acceptable prodrug, metabolite, polymorph, solvate, hydrate, or clathrate thereof (wherein particular embodiments encompass solid forms comprising Compound A as described herein); in particular wherein the patient is a mammal.

A separate embodiment of the invention encompasses methods of treating or preventing myelodysplastic syndrome (MDS) which comprises administering to a patient in need of such treatment or prevention a therapeutically or prophylactically effective amount of stereomerically pure Compound A or a pharmaceutically acceptable solvate, hydrate, stereoisomer, clathrate, or prodrug thereof (wherein particular embodiments encompass solid forms comprising Compound A as described herein). MDS refers to a diverse group of hematopoietic stem cell disorders. MDS is characterized by a cellular marrow with impaired morphology and maturation (dysmyelopoiesis), peripheral blood cytopenias, and a variable risk of progression to acute leukemia, resulting from ineffective blood cell production. See The Merck Manual 953 (17th ed. 1999) and List et al., 1990, J. Clin. Oncol. 8:1424.

A separate embodiment of the invention encompasses methods of treating or preventing myeloproliferative disease (MPD) which comprises administering to a patient in need of such treatment or prevention a therapeutically or prophylactically effective amount of stereomerically pure Compound A or a pharmaceutically acceptable solvate, hydrate, stereoisomer, clathrate, or prodrug thereof (wherein particular embodiments encompass solid forms comprising Compound A as described herein). Myeloproliferative disease (MPD) refers to a group of disorders characterized by clonal abnormalities of the hematopoietic stem cell. See e.g., Current Medical Diagnosis & Treatment, pp. 499 (37th ed., Tierney et al., ed., Appleton & Lange, 1998).

The invention also encompasses a method of treating, preventing or managing pain, including, but not limited to, complex regional pain syndrome, which comprises administering to a patient in need of such treatment, prevention or management a therapeutically or prophylactically effective amount of a stereomerically pure Compound A or a pharmaceutically acceptable solvate, hydrate, stereoisomer, clathrate, or prodrug thereof (wherein particular embodiments encompass solid forms comprising Compound A as described herein). In a specific embodiment, the administration is before, during or after surgery or physical therapy directed at reducing or avoiding a symptom of complex regional pain syndrome in the patient.

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

Appx10573

US 7,893,101 B2

<table>
<tr><td>17</td><td>18</td></tr>
</table>

In particular methods of the invention, stereomerically pure Compound A or a pharmaceutically acceptable polymorph, prodrug, solvate, hydrate, or clathrate thereof (wherein particular embodiments encompass solid forms comprising Compound A as described herein), is adjunctively administered with at least one additional therapeutic agent. Examples of additional therapeutic agents include, but are not limited to, anti-cancer drugs, anti-inflammatories, antihistamines and decongestants.

### 4.1. SOLID FORMS COMPRISING COMPOUND A

Certain embodiments herein provide solid forms comprising Compound A, which has the chemical structure shown above. Racemic 2-[1-(3-Ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione is readily prepared using the methods in U.S. Pat. No. 6,020, 358, which is incorporated herein by reference. Compound A, which is the (+) enantiomer of 2-[1-(3-Ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione, can be prepared according to any method apparent to those of skill in the art, including the methods described in U.S. Pat. No. 6,962,940, which is incorporated herein by reference.

Solid forms comprising Compound A include single-component and multiple-component forms, including crystal forms and amorphous forms, and including, but not limited to, polymorphs, solvates, hydrates, co-crystals and clathrates. Particular embodiments herein provide single-component amorphous solid forms of Compound A. Particular embodiments herein provide single-component crystalline solid forms of Compound A. Particular embodiments herein provide multiple-component amorphous forms comprising Compound A. Particular embodiments herein provide multiple-component crystalline solid forms comprising Compound A. Multiple-component solid forms provided herein include solid forms which may be described by the terms salt, co-crystal, hydrate, solvate, clathrate and/or polymorph, and include solid forms which may be described by one or more of these terms.

Solid forms comprising Compound A can be prepared by the methods described herein, including the methods described in the Examples below, or by techniques known in the art, including heating, cooling, freeze drying, lyophilization, quench cooling the melt, rapid solvent evaporation, slow solvent evaporation, solvent recrystallization, antisolvent addition, slurry recrystallization, crystallization from the melt, desolvation, recrystallization in confined spaces such as, e.g., in nanopores or capillaries, recrystallization on surfaces or templates such as, e.g., on polymers, recrystallization in the presence of additives, such as, e.g., co-crystal countermolecules, desolvation, dehydration, rapid cooling, slow cooling, exposure to solvent and/or water, drying, including, e.g., vacuum drying, vapor diffusion, sublimation, grinding (including, e.g., cryo-grinding, solvent-drop grinding or liquid assisted grinding), microwave-induced precipitation, sonication-induced precipitation, laser-induced precipitation and precipitation from a supercritical fluid. The particle size of the resulting solid forms, which can vary, (e.g., from nanometer dimensions to millimeter dimensions), can be controlled, e.g., by varying crystallization conditions, such as, e.g., the rate of crystallization and/or the crystallization solvent system, or by particle-size reduction techniques, e.g., grinding, milling, micronizing or sonication.

While not intending to be bound by any particular theory, certain solid forms are characterized by physical properties, e.g., stability, solubility and dissolution rate, appropriate for pharmaceutical and therapeutic dosage forms. Moreover, while not wishing to be bound by any particular theory, certain solid forms are characterized by physical properties (e.g., density, compressibility, hardness, morphology, cleavage, stickiness, solubility, water uptake, electrical properties, thermal behavior, solid-state reactivity, physical stability, and chemical stability) affecting particular processes (e.g., yield, filtration, washing, drying, milling, mixing, tableting, flowability, dissolution, formulation, and lyophilization) which make certain solid forms suitable for the manufacture of a solid dosage form. Such properties can be determined using particular analytical chemical techniques, including solid-state analytical techniques (e.g., X-ray diffraction, microscopy, spectroscopy and thermal analysis), as described herein and known in the art.

Certain embodiments herein provide compositions comprising one or more of the solid forms. Certain embodiments provide compositions of one or more solid forms in combination with other active ingredients. Certain embodiments provide methods of using these compositions in the treatment, prevention or management of diseases and disorders including, but not limited to, the diseases and disorders provided herein.

In addition to solid forms comprising Compound A, provided herein are solid forms comprising prodrugs of Compound A.

Solid forms provided herein may also comprise unnatural proportions of atomic isotopes at one or more of the atoms in Compound A. For example, the compound may be radiolabeled with radioactive isotopes, such as for example tritium ($^3$H), iodine-125 ($^{125}$I) sulfur-35 ($^{35}$S), or carbon-14 ($^{14}$C). Radiolabeled compounds are useful as therapeutic agents, e.g., cancer therapeutic agents, research reagents, e.g., binding assay reagents, and diagnostic agents, e.g., in vivo imaging agents. All isotopic variations of Compound A, whether radioactive or not, are intended to be encompassed within the scope of the embodiments provided herein.

4.1.1. Form A of Compound A

Certain embodiments herein provide the Form A crystal form of Compound A. In certain embodiments, Form A of Compound A can be obtained from various solvents, including, but not limited to, solvent systems comprising acetone, ethanol, and mixtures thereof. In certain embodiments, Form A can be obtained using a fast cooling crystallization process.

In certain embodiments, Form A of Compound A may be characterized by X-ray powder diffraction analysis. A representative XRPD pattern of Form A of Compound A is provided in FIG. 1. In certain embodiments, Form A of Compound A is characterized by XRPD peaks located at one, two, three, four, five, six, seven, eight, nine, ten, eleven or twelve of the following approximate positions: 8.1, 14.4, 15.2, 17.4, 18.4, 19.2, 20.5, 22.8, 23.2 23.6, 24.5, 25.1 degrees 2θ. In certain embodiments, Form A of Compound A is characterized by an XRPD pattern which matches the pattern exhibited in FIG. 1. In certain embodiments, Form A of Compound A is characterized by an XRPD pattern having 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24 or 25 peaks matching peaks in the representative Form A pattern provided herein.

In certain embodiments, Form A of Compound A may be characterized by thermal analysis. A representative DSC plot for Form A of Compound A is shown in FIG. 2. In certain embodiments, Form A is characterized by a DSC plot comprising an endothermic event with an onset temperature of about 145° C. In certain embodiments, Form A is characterized by a DSC plot further comprising an endothermic event

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672224

**JTX-5_46**

US 7,893,101 B2

19 20

with an onset temperature of about 155° C. A representative TGA plot for Form A of Compound A is shown in FIG. 3. In certain embodiments, Form A is characterized by a TGA plot comprising a mass loss of less than about 1%, e.g., about 0.05%, of the total mass of the sample upon heating from about 25° C. to about 140° C. In certain embodiments, Form A of Compound A does not contain substantial amounts of either water or other solvent in the crystal lattice. In certain embodiments, Form A is unsolvated. In certain embodiments, Form A is anhydrous.

In certain embodiments, Form A of Compound A may be characterized by moisture sorption analysis. A representative moisture sorption isotherm plot is shown in FIG. 4. In certain embodiments, when the relative humidity ("RH") is increased from about 0% to about 95% RH, Form A exhibits a mass change of less than about 1%, e.g., about 0.4%, of the starting mass of the sample. In certain embodiments, mass gained upon adsorption is lost when the RH is decreased back to about 0% RH. Accordingly, in certain embodiments, Form A is substantially nonhygroscopic. In certain embodiments, the XRPD pattern of the Form A material is substantially unchanged following the adsorption/desorption analysis. In certain embodiments, Form A is stable with respect to humidity.

In certain embodiments, Form A of Compound A may be characterized by its stability profile. In certain embodiments, Form A material is stable, e.g., its XRPD pattern remains substantially unchanged, upon exposure to elevated temperature, upon exposure to elevated humidity, upon exposure to one or more solvents, and/or upon compression. In certain embodiments, for example, Form A is stable following exposure to an environment of about 40° C. and about 75% RH environment for about four weeks. In certain embodiments, Form A is stable following exposure to one or more solvent systems comprising, e.g., ethanol, water and/or heptane, at about 40° C. for at least about four weeks. In certain embodiments, Form A converts to Form C of Compound A upon exposure to a solvent including, but not limited to, toluene for four weeks. In certain embodiments, Form A is stable upon compression at about 2000 psi pressure for about one minute.

In certain embodiments, Form A of Compound A may be characterized by particle analysis. In certain embodiments, Form A is characterized as a white powder. In certain embodiments, a sample of Form A comprises particles having a plate-like morphology. In certain embodiments, a sample of Form A comprises particles with a $D_{90}$ of less than about 18 μm. (As used herein, the $D_{90}$ value represents the 90th percentile of the particle size distribution as measured by length; i.e., 90% of the particles have a length of this value or less.)

Certain embodiments herein provide Form A of Compound A which is substantially pure. Certain embodiments herein provide Form A of Compound A which is substantially free of other solid forms comprising Compound A including, e.g., Forms B, C, D, E, F, G and/or an amorphous solid form comprising Compound A as provided herein. Certain embodiments herein provide Form A as a mixture of solid forms comprising Compound A, including, e.g., a mixture comprising one or more of the following: Forms B, C, D, E, F, G and an amorphous solid form comprising Compound A as provided herein.

4.1.2. Form B of Compound A

Certain embodiments herein provide the Form B crystal form of Compound A. In certain embodiments, Form B of Compound A can be obtained from various solvents, including, but not limited to, solvent systems comprising 2-propanol, acetone, acetonitrile, ethanol, ethyl acetate, heptane, methanol, methyl ethyl ketone, methyl t-butyl ether, methyl-

ene chloride, n-butanol, n-butyl acetate, tetrahydrofuran, toluene, water and mixtures comprising two or more thereof. For example, in certain embodiments, Form B can be obtained by crystallization from a solvent system comprising 1:1 ethanol:water, e.g., by a process comprising evaporation of the 1:1 ethanol:water solvent system at about 25° C., followed by isolation of Form B. For example, in certain embodiments, Form B can be obtained by crystallization from a solvent system comprising 1:1 acetone:ethanol, e.g., by a process comprising slurrying a solid form comprising Compound A in 1:1 acetone:ethanol at about 25° C. for about 2 days, followed by isolation of Form B.

In certain embodiments, Form B of Compound A may be characterized by X-ray powder diffraction analysis. A representative XRPD pattern of Form B of Compound A is provided in FIG. 5. In certain embodiments, Form B of Compound A is characterized by XRPD peaks located at one, two, three, four, five, six, seven, eight, nine, ten, eleven or twelve of the following approximate positions: 10.1, 12.4, 13.5, 15.7, 16.3, 18.1, 20.7, 22.5, 24.7, 26.2, 26.9, 29.1 degrees 2θ. In certain embodiments, Form B of Compound A is characterized by an XRPD pattern which matches the pattern exhibited in FIG. 5. In certain embodiments, Form B of Compound A is characterized by an XRPD pattern having 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24 or 25 peaks matching peaks in the representative Form B pattern provided herein.

In certain embodiments, Form B of Compound A may be characterized by thermal analysis. A representative DSC plot for Form B of Compound A is shown in FIG. 6. In certain embodiments, Form B is characterized by a DSC plot comprising an endothermic event with an onset temperature of about 154° C. A representative TGA plot for Form B of Compound A is shown in FIG. 7. In certain embodiments, Form B is characterized by a TGA plot comprising a mass loss of less than about 1%, e.g., about 0.25%, of the total mass of the sample upon heating from about 25° C. to about 140° C. In certain embodiments, Form B of Compound A does not contain substantial amounts of either water or other solvent in the crystal lattice. In certain embodiments, Form B is anhydrous. In certain embodiments, Form B is unsolvated.

In certain embodiments, Form B of Compound A may be characterized by moisture sorption analysis. A representative moisture sorption isotherm plot is shown in FIG. 8. In certain embodiments, when the RH is increased from about 0% to about 95% RH, Form B exhibits a mass change of less than about 1%, e.g., about 0.6%, of the starting mass of the sample. In certain embodiments, mass gained upon adsorption is lost when the RH is decreased back to about 0% RH. In certain embodiments, Form B is substantially nonhygroscopic. In certain embodiments, the XRPD pattern of Form B material is substantially unchanged following the adsorption/desorption analysis. In certain embodiments, Form B is stable with respect to humidity.

In certain embodiments, Form B of Compound A may be characterized by its stability profile. In certain embodiments, Form B material is stable, e.g., its XRPD pattern remains substantially unchanged, upon exposure to elevated temperature, upon exposure to elevated humidity, upon exposure to one or more solvents, and/or upon compression. In certain embodiments, for example, Form B is stable following exposure to an environment of about 40° C. and about 75% RH environment for about four weeks. In certain embodiments, Form B is stable following exposure to a solvent system comprising, e.g., ethanol, water or heptane, at about 40° C. for at least about four weeks. In certain embodiments, Form B converts to Form C of Compound A upon exposure to a

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672225

JTX-5_47

US 7,893,101 B2

21

solvent system comprising, e.g., toluene for about four weeks. In certain embodiments, Form B is stable following compression at about 2000 psi pressure for about one minute.

In certain embodiments, Form B of Compound A may be characterized by particle analysis. In certain embodiments, Form B is characterized as a white powder. In certain embodiments, a sample of Form B comprises particles having a flake-like morphology. In certain embodiments, a sample of Form B comprises particles with a $D_{90}$ of less than about 12 μm.

Certain embodiments herein provide Form B of Compound A which is substantially pure. Certain embodiments herein provide Form B of Compound A which is substantially free of other solid forms comprising Compound A including, e.g., Forms A, C, D, E, F, G and/or an amorphous solid form comprising Compound A as provided herein. Certain embodiments herein provide Form B as a mixture of solid forms comprising Compound A, including, e.g., a mixture comprising one or more of the following: Forms A, C, D, E, F, G and an amorphous solid form comprising Compound A as provided herein.

4.1.3. Form C of Compound A

Certain embodiments herein provide the Form C crystal form of Compound A. In certain embodiments, Form C of Compound A can be obtained from various solvent systems, including, but not limited to, solvent systems comprising acetone, acetonitrile, ethanol, heptane, methanol, methyl ethyl ketone, tetrahydrofuran, toluene, water, and mixtures comprising two or more thereof. For example, in certain embodiments, Form C can be obtained by crystallization from a solvent system comprising toluene, e.g., by a process comprising the use of toluene as an anti-solvent, followed by isolation of Form C.

In certain embodiments, Form C of Compound A may be characterized by X-ray powder diffraction analysis. A representative XRPD pattern of Form C of Compound A is provided in FIG. 9. In certain embodiments, Form C of Compound A is characterized by XRPD peaks located at one, two, three, four, five, six, seven, eight, nine, ten, eleven or twelve of the following approximate positions: 7.5, 11.3, 15.3, 16.4, 17.8, 21.4, 22.6, 23.5, 24.8, 25.5, 26.4, 27.6 degrees 2θ. In certain embodiments, Form C of Compound A is characterized by an XRPD pattern which matches the pattern exhibited in FIG. 9. In certain embodiments, Form C of Compound A is characterized by an XRPD pattern having 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24 or 25 peaks matching peaks in the representative Form C pattern provided herein.

In certain embodiments, Form C of Compound A may be characterized by thermal analysis. A representative DSC plot for Form C of Compound A is shown in FIG. 10. In certain embodiments, Form C is characterized by a DSC plot comprising an endothermic event with an onset temperature of about 138° C. In certain embodiments, a characteristic Form C DSC plot further comprises one or more additional events, such as, e.g., an endothermic event with an onset temperature of about 166° C. A representative TGA plot for Form C of Compound A is shown in FIG. 11. In certain embodiments, Form C is characterized by a TGA plot comprising a mass loss of less than about 10%, e.g., about 5.9%, of the total mass of the sample upon heating from about 25° C. to about 140° C. In certain embodiments, the TGA mass loss event comprises the loss of the solvent toluene, as indicated, e.g., by TG-IR analysis. In certain embodiments, Form C of Compound A is solvated. In certain embodiments, Form C is a toluene sol-

22

vate. In certain embodiments, the crystal lattice of Form C comprises about three molar equivalents of toluene per mole of Compound A.

In certain embodiments, Form C of Compound A may be characterized by moisture sorption analysis. A representative moisture sorption isotherm plot is shown in FIG. 12. In certain embodiments, when the RH is increased from about 0% to about 95% RH, Form C exhibits a mass change of less than about 1%, e.g., about 0.5%, of the starting mass of the sample. In certain embodiments, mass gained upon adsorption is lost when the RH is decreased back to about 0% RH. In certain embodiments, Form C is substantially nonhygroscopic. In certain embodiments, the XRPD pattern of Form C material is substantially unchanged following the adsorption/desorption analysis. In certain embodiments, Form C is stable with respect to humidity.

In certain embodiments, Form C of Compound A may be characterized by its stability profile. In certain embodiments, Form C material is stable, e.g., its XRPD pattern remains substantially unchanged, upon exposure to elevated temperature, upon exposure to elevated humidity, upon exposure to one or more solvents, and/or upon compression. In certain embodiments, for example, Form C is stable following exposure to an environment of about 40° C. and about 75% RH environment for about four weeks. In certain embodiments, Form C is stable following exposure to a solvent system comprising, e.g., ethanol, water, heptane or toluene, at about 40° C. for at least about four weeks. In certain embodiments, Form C is stable following compression at about 2000 psi pressure for about one minute.

In certain embodiments, Form C of Compound A may be characterized by particle analysis. In certain embodiments, Form C is characterized as a white powder. In certain embodiments, a sample of Form C comprises particles having a plate-like morphology. In certain embodiments, a sample of Form C comprises particles with a $D_{90}$ of less than about 12 μm.

Certain embodiments herein provide Form C of Compound A which is substantially pure. Certain embodiments herein provide Form C of Compound A which is substantially free of other solid forms comprising Compound A including, e.g., Forms A, B, D, E, F, G and/or an amorphous solid form comprising Compound A as provided herein. Certain embodiments herein provide Form C as a mixture of solid forms comprising Compound A, including, e.g., a mixture comprising one or more of the following: Forms A, B, D, E, F, G and an amorphous solid form comprising Compound A as provided herein.

4.1.4. Form D of Compound A

Certain embodiments herein provide the Form D crystal form of Compound A. In certain embodiments, Form D of Compound A can be obtained from various solvents, including, but not limited to, solvent systems comprising methylene chloride. For example, in certain embodiments, Form D can be obtained by crystallization from a solvent system comprising methylene chloride, e.g., by a process comprising the evaporation of methylene chloride, followed by isolation of Form D.

In certain embodiments, Form D of Compound A may be characterized by X-ray powder diffraction analysis. A representative XRPD pattern of Form D of Compound A is provided in FIG. 13. In certain embodiments, Form D of Compound A is characterized by XRPD peaks located at one, two, three, four, five, six, seven, eight, nine, ten, eleven or twelve of the following approximate positions: 7.5, 9.6, 11.3, 13.9, 16.3, 17.7, 20.5, 23.2, 24.6, 25.2, 26.0, 28.8 degrees 2θ. In certain embodiments, Form D of Compound A is character-

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672226

JTX-5_48

US 7,893,101 B2

23

ized by an XRPD pattern which matches the pattern exhibited in FIG. 13. In certain embodiments, Form D of Compound A is characterized by an XRPD pattern having 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24 or 25 peaks matching peaks in the representative Form D pattern provided herein.

In certain embodiments, Form D of Compound A may be characterized by thermal analysis. A representative DSC plot for Form D of Compound A is shown in FIG. 14. In certain embodiments, Form D is characterized by a DSC plot comprising an endothermic event with an onset temperature of about 100° C. A representative TGA plot for Form D of Compound A is shown in FIG. 15. In certain embodiments, Form D is characterized by a TGA plot comprising a mass loss of less than about 10%, e.g., about 6.5%, of the total mass of the sample upon heating from about 25° C. to about 110° C. In certain embodiments, the TGA mass loss event comprises the loss of the solvent methylene chloride (i.e. dichloromethane), as indicated, e.g., by TG-IR analysis. In certain embodiments, Form D of Compound A is solvated. In certain embodiments, Form D is a methylene chloride solvate. In certain embodiments, the crystal lattice of Form D comprises about 2.5 molar equivalents of methylene chloride per mole of Compound A.

In certain embodiments, Form D of Compound A may be characterized by moisture sorption analysis. A representative moisture sorption isotherm plot is shown in FIG. 16. In certain embodiments, when the RH is increased from about 0% to about 95% RH, Form D exhibits a mass change of less than about 3%, e.g., about 1.5%, of the starting mass of the sample. In certain embodiments, mass gained upon adsorption is lost when the RH is decreased back to about 0% RH. Accordingly, in certain embodiments, Form D is slightly hygroscopic. In certain embodiments, the XRPD pattern of Form D material is substantially unchanged following the adsorption/desorption analysis. In certain embodiments, Form D is stable with respect to humidity.

In certain embodiments, Form D of Compound A may be characterized by its stability profile. In certain embodiments, Form D material is stable, e.g., its XRPD pattern remains substantially unchanged, upon compression. For example, in certain embodiments, Form D is stable following compression at about 2000 psi pressure for about one minute. In certain embodiments, Form D is stable following exposure to an environment of about 40° C. and about 75% RH environment for about four weeks, although, in certain embodiments, the resulting peak intensity of the Form D XRPD pattern is reduced. In certain embodiments, this reduction in XRPD peak intensity results from the formation of amorphous material comprising Compound A. In certain embodiments, Form D converts to Form B of Compound A upon exposure to a solvent system comprising, e.g., heptane, ethanol and/or water at about 40° C. for about four weeks. In certain embodiments, Form D converts to Form C of Compound A upon exposure to a solvent system comprising toluene at about 40° C. for about four weeks.

In certain embodiments, Form D of Compound A may be characterized by particle analysis. In certain embodiments, Form D is characterized as a white powder. In certain embodiments, a sample of Form D comprises particles having a flake-like morphology. In certain embodiments, a sample of Form D comprises particles with a $D_{90}$ of less than about 18 μm.

Certain embodiments herein provide Form D of Compound A which is substantially pure. Certain embodiments herein provide Form D of Compound A which is substantially free of other solid forms comprising Compound A including,

24

e.g., Forms A, B, C, E, F, G and/or an amorphous solid form comprising Compound A as provided herein. Certain embodiments herein provide Form D as a mixture of solid forms comprising Compound A, including, e.g., a mixture comprising one or more of the following: Forms A, B, C, E, F, G and an amorphous solid form comprising Compound A as provided herein.

4.1.5. Form E of Compound A

Certain embodiments herein provide the Form E crystal form of Compound A. In certain embodiments, Form E of Compound A can be obtained from various solvents, including, but not limited to, solvent systems comprising acetone, acetonitrile, heptane, methylene chloride, and mixtures comprising two or more thereof. For example, in certain embodiments, Form E can be obtained by crystallization from a solvent system comprising acetonitrile, e.g., by a process comprising the evaporation of acetonitrile, followed by isolation of Form E.

In certain embodiments, Form E of Compound A may be characterized by X-ray powder diffraction analysis. A representative XRPD pattern of Form E of Compound A is provided in FIG. 17. In certain embodiments, Form E of Compound A is characterized by XRPD peaks located at one, two, three, four, five, six, seven, eight, nine, ten, eleven or twelve of the following approximate positions: 7.6, 9.2, 11.4, 15.5, 16.5, 17.9, 19.6, 20.5, 21.6, 22.8, 23.8, 26.6 degrees 2θ. In certain embodiments, Form E of Compound A is characterized by an XRPD pattern which matches the pattern exhibited in FIG. 17. In certain embodiments, Form E of Compound A is characterized by an XRPD pattern having 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24 or 25 peaks matching peaks in the representative Form E pattern provided herein.

In certain embodiments, Form E of Compound A may be characterized by thermal analysis. A representative DSC plot for Form E of Compound A is shown in FIG. 18. In certain embodiments, Form E is characterized by a DSC plot comprising an endothermic event with an onset temperature of about 95° C. A representative TGA plot for Form E of Compound A is shown in FIG. 19. In certain embodiments, Form E is characterized by a TGA plot comprising a mass loss of less than about 8%, e.g., about 4.0%, of the total mass of the sample upon heating from about 25° C. to about 110° C. In certain embodiments, the TGA mass loss event comprises the loss of the solvent acetonitrile, as indicated, e.g., by TG-IR analysis. In certain embodiments, Form E of Compound A is solvated. In certain embodiments, Form E is an acetonitrile solvate. In certain embodiments, the crystal lattice of Form E comprises about 2.5 molar equivalents of acetonitrile per mole of Compound A.

In certain embodiments, Form E of Compound A may be characterized by moisture sorption analysis. A representative moisture sorption isotherm plot is shown in FIG. 20. In certain embodiments, when the RH is increased from about 0% to about 95% RH, Form E exhibits a mass change of less than about 10%, e.g., about 5.1%, of the starting mass of the sample. In certain embodiments, mass gained upon adsorption is lost when the RH is decreased back to about 0% RH. In certain embodiments, Form E is hygroscopic. In certain embodiments, the XRPD pattern of Form E material is substantially unchanged following the adsorption/desorption analysis. In certain embodiments, Form E is stable with respect to humidity.

In certain embodiments, Form E of Compound A may be characterized by its stability profile. In certain embodiments, Form E material is stable, e.g., its XRPD pattern remains substantially unchanged, upon compression. For example, in

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672227
JTX-5_49

Appx10577

US 7,893,101 B2

25

certain embodiments, Form E is stable following compression at about 2000 psi pressure for about one minute.

In certain embodiments, Form E of Compound A may be characterized by particle analysis. In certain embodiments, Form E is characterized as a white powder. In certain embodiments, a sample of Form E comprises particles having a flake-like morphology. In certain embodiments, a sample of Form E comprises particles with a $D_{90}$ of less than about 18 μm.

Certain embodiments herein provide Form E of Compound A which is substantially pure. Certain embodiments herein provide Form E of Compound A which is substantially free of other solid forms comprising Compound A including, e.g., Forms A, B, C, D, F, G and/or an amorphous solid form comprising Compound A as provided herein. Certain embodiments herein provide Form E as a mixture of solid forms comprising Compound A, including, e.g., a mixture comprising one or more of the following: Forms A, B, C, D, F, G and an amorphous solid form comprising Compound A as provided herein.

4.1.6. Form F of Compound A

Certain embodiments herein provide the Form F crystal form of Compound A. In certain embodiments, Form F of Compound A can be obtained from various solvents, including, but not limited to, solvent systems comprising acetone, ethanol, water, and mixtures comprising two or more thereof. For example, in certain embodiments, Form F can be obtained by crystallization from a solvent system comprising ethanol and/or water, e.g., by a process comprising contacting a solid form comprising Compound A with a solvent system comprising ethanol and/or water, followed by isolation of Form F.

In certain embodiments, Form F of Compound A may be characterized by X-ray powder diffraction analysis. A representative XRPD pattern of Form F of Compound A is provided in FIG. 21. In certain embodiments, Form F of Compound A is characterized by XRPD peaks located at one, two, three, four, five, six, seven, eight, nine, ten, eleven or twelve of the following approximate positions: 8.1, 8.6, 15.6, 17.3, 19.3, 21.4, 22.8, 24.6, 25.4, 25.9, 26.6, 27.7 degrees 2θ. In certain embodiments, Form F of Compound A is characterized by an XRPD pattern which matches the pattern exhibited in FIG. 21. In certain embodiments, Form F of Compound A is characterized by an XRPD pattern having 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24 or 25 peaks matching peaks in the representative Form F pattern provided herein.

In certain embodiments, Form F of Compound A may be characterized by thermal analysis. A representative DSC plot for Form F of Compound A is shown in FIG. 22. In certain embodiments, Form F is characterized by a DSC plot comprising an endothermic event with an onset temperature of about 145° C. A representative TGA plot for Form F of Compound A is shown in FIG. 23. In certain embodiments, Form F is characterized by a TGA plot comprising a mass loss of less than about 1%, e.g., about 0.1%, of the total mass of the sample upon heating from about 25° C. to about 180° C. In certain embodiments, Form F of Compound A does not contain substantial amounts of either water or other solvent in the crystal lattice. In certain embodiments, Form F is unsolvated. In certain embodiments, Form F is anhydrous.

In certain embodiments, Form F of Compound A may be characterized by moisture sorption analysis. A representative moisture sorption isotherm plot is shown in FIG. 24. In certain embodiments, when the RH is increased from about 0% to about 95% RH, Form F exhibits a mass change of less than about 1%, e.g., about 0.2%, of the starting mass of the sample. In certain embodiments, mass gained upon adsorption is lost

26

when the RH is decreased back to about 0% RH. In certain embodiments, Form F is substantially nonhygroscopic. In certain embodiments, the XRPD pattern of Form F material is substantially unchanged following the adsorption/desorption analysis. In certain embodiments, Form F is stable with respect to humidity.

In certain embodiments, Form F of Compound A may be characterized by its stability profile. In certain embodiments, Form F material is stable, e.g., its XRPD pattern remains substantially unchanged, upon compression. For example, in certain embodiments, Form F is stable following compression at about 2000 psi pressure for about one minute. In certain embodiments, Form F is stable following exposure to a solvent system comprising, e.g., ethanol, acetone or mixtures thereof, for about two days at about 25° C.

In certain embodiments, Form F of Compound A may be characterized by particle analysis. In certain embodiments, Form F is characterized as a white powder. In certain embodiments, a sample of Form F comprises particles having a flake-like morphology. In certain embodiments, a sample of Form F comprises particles with a $D_{90}$ of less than about 18 μm.

Certain embodiments herein provide Form F of Compound A which is substantially pure. Certain embodiments herein provide Form F of Compound A which is substantially free of other solid forms comprising Compound A including, e.g., Forms A, B, C, D, E, G and/or an amorphous solid form comprising Compound A as provided herein. Certain embodiments herein provide Form F as a mixture of solid forms comprising Compound A, including, e.g., a mixture comprising one or more of the following: Forms A, B, C, D, E, G and an amorphous solid form comprising Compound A as provided herein.

4.1.7. Form G of Compound A

Certain embodiments herein provide the Form G crystal form of Compound A. In certain embodiments, Form G of Compound A can be obtained from various solvents, including, but not limited to, solvent systems comprising ethyl acetate. For example, in certain embodiments, Form G can be obtained by crystallization from a solvent system comprising ethyl acetate, e.g., by a process comprising contacting a solid form comprising Compound A with a solvent system comprising ethyl acetate, followed by isolation of Form G.

In certain embodiments, Form G of Compound A may be characterized by X-ray powder diffraction analysis. A representative XRPD pattern of Form G of Compound A is provided in FIG. 25. In certain embodiments, Form G of Compound A is characterized by XRPD peaks located at one, two, three, four, five, six, seven, eight, nine, ten, eleven or twelve of the following approximate positions: 7.9, 9.5, 11.7, 15.7, 16.8, 18.1, 19.7, 21.8, 22.8, 25.1, 25.8, 26.7 degrees 2θ. In certain embodiments, Form G of Compound A is characterized by an XRPD pattern which matches the pattern exhibited in FIG. 25. In certain embodiments, Form G of Compound A is characterized by an XRPD pattern having 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24 or 25 peaks matching peaks in the representative Form G pattern provided herein.

In certain embodiments, Form G of Compound A may be characterized by thermal analysis. A representative DSC plot for Form G of Compound A is shown in FIG. 26. In certain embodiments, Form G is characterized by a DSC plot comprising an endothermic event with an onset temperature of about 109° C. A representative TGA plot for Form G of Compound A is shown in FIG. 27. In certain embodiments, Form G is characterized by a TGA plot comprising a mass loss of less than about 8%, e.g., about 3.8%, of the total mass

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

Appx10578

US 7,893,101 B2

27 28

of the sample upon heating from about 25° C. to about 110° C. In certain embodiments, the TGA mass loss event comprises the loss of the solvent ethyl acetate, as indicated, e.g., by TG-IR analysis. In certain embodiments, Form G of Compound A is solvated. In certain embodiments, Form G is an ethyl acetate solvate. In certain embodiments, the crystal lattice of Form G comprises about three molar equivalents of ethyl acetate per mole of Compound A.

In certain embodiments, Form G of Compound A may be characterized by moisture sorption analysis. A representative moisture sorption isotherm plot is shown in FIG. 28. In certain embodiments, when the RH is increased from about 0% to about 95% RH, Form G exhibits a mass change of less than about 1%, e.g., about 0.4%, of the starting mass of the sample. In certain embodiments, mass gained upon adsorption is lost when the RH is decreased back to about 0% RH. In certain embodiments, Form G is substantially nonhygroscopic. In certain embodiments, the XRPD pattern of Form G material is substantially unchanged following the adsorption/desorption analysis. In certain embodiments, Form G is stable with respect to humidity.

In certain embodiments, Form G of Compound A may be characterized by its stability profile. In certain embodiments, Form G material is stable, e.g., its XRPD pattern remains substantially unchanged upon compression. For example, in certain embodiments, Form F is stable following compression at about 2000 psi pressure for about one minute. In certain embodiments, Form G converts to Form B upon exposure to a solvent system comprising, e.g., ethanol, acetone or mixtures thereof, for about two days at about 25° C.

In certain embodiments, Form G of Compound A may be characterized by particle analysis. In certain embodiments, Form G is characterized as a white powder. In certain embodiments, a sample of Form G comprises particles having a flake-like morphology. In certain embodiments, a sample of Form G comprises particles with a $D_{90}$ of less than about 18 μm.

Certain embodiments herein provide Form G of Compound A which is substantially pure. Certain embodiments herein provide Form G of Compound A which is substantially free of other solid forms comprising Compound A including, e.g., Forms A, B, C, D, E, F and/or an amorphous solid form comprising Compound A as provided herein. Certain embodiments herein provide Form G as a mixture of solid forms comprising Compound A, including, e.g., a mixture comprising one or more of the following: Forms A, B, C, D, E, F and an amorphous solid form comprising Compound A as provided herein.

### 4.2. METHODS OF TREATMENT

The invention encompasses methods of treating, preventing and managing diseases or disorders ameliorated by the reduction of levels of TNF-α in a patient which comprise administering to a patient in need of such treatment, prevention or management a therapeutically or prophylactically effective amount of one or more solid forms comprising Compound A, such as, e.g., Form A of Compound A, Form B of Compound A, Form C of Compound A, Form D of Compound A, Form E of Compound A, Form F of Compound A, Form G of Compound A, or an amorphous solid form of Compound A, as provided herein.

Disorders ameliorated by the inhibition of TNF-α include, but are not limited to: heart disease, such as congestive heart failure, cardiomyopathy, pulmonary edema, endotoxin-mediated septic shock, acute viral myocarditis, cardiac allograft rejection, and myocardial infarction; solid tumors, including

but not limited to, sarcoma, carcinomas, fibrosarcoma, myxosarcoma, liposarcoma, chondrosarcoma, osteogenic sarcoma, chordoma, angiosarcoma, endotheliosarcoma, lymphangiosarcoma, lymphangioendotheliosarcoma, synovioma, mesothelioma, Ewing's tumor, leiomyosarcoma, rhabdomyosarcoma, colon carcinoma, pancreatic cancer, breast cancer, ovarian cancer, prostate cancer, squamous cell carcinoma, basal cell carcinoma, adenocarcinoma, sweat gland carcinoma, sebaceous gland carcinoma, papillary carcinoma, papillary adenocarcinomas, cystadenocarcinoma, medullary carcinoma, bronchogenic carcinoma, renal cell carcinoma, hepatoma, bile duct carcinoma, choriocarcinoma, seminoma, embryonal carcinoma, Wilms' tumor, cervical cancer, testicular tumor, lung carcinoma, small cell lung carcinoma, bladder carcinoma, epithelial carcinoma, glioma, astrocytoma, medulloblastoma, craniopharyngioma, ependymoma, Kaposi's sarcoma, pinealoma, hemangioblastoma, acoustic neuroma, oligodendroglioma, meningioma, melanoma, neuroblastoma, and retinoblastoma; and blood-borne tumors including but not limited to, acute lymphoblastic leukemia "ALL", acute lymphoblastic B-cell leukemia, acute lymphoblastic T-cell leukemia, acute myeloblastic leukemia "AML", acute promyelocytic leukemia "APL", acute monoblastic leukemia, acute erythroleukemic leukemia, acute megakaryoblastic leukemia, acute myelomonocytic leukemia, acute nonlymphocytic leukemia, acute undifferentiated leukemia, chronic myelocytic leukemia "CML", chronic lymphocytic leukemia "CLL", hairy cell leukemia, multiple myeloma and acute and chronic leukemias, for example, lymphoblastic, myelogenous, lymphocytic, and myelocytic leukemias.

Specific methods of the invention further comprise the administration of an additional therapeutic agent (i.e., a therapeutic agent other than Compound A). Examples of additional therapeutic agents include, but are not limited to, anticancer drugs such as, but are not limited to: alkylating agents, nitrogen mustards, ethylenimines, methylmelamines, alkyl sulfonates, nitrosoureas, triazenes, folic acid analogs, pyrimidine analogs, purine analogs, vinca alkaloids, epipodophyllotoxins, antibiotics, topoisomerase inhibitors and anticancer vaccines.

Specific additional therapeutic agents include, but are not limited to: acivicin; aclarubicin; acodazole hydrochloride; acronine; adozelesin; aldesleukin; altretamine; ambomycin; ametantrone acetate; aminoglutethimide; amsacrine; anastrozole; anthramycin; asparaginase; asperlin; azacitidine; azetepa; azotomycin; batimastat; benzodepa; bicalutamide; bisantrene hydrochloride; bisnafide dimesylate; bizelesin; bleomycin sulfate; brequinar sodium; bropirimine; busulfan; cactinomycin; calusterone; caracemide; carbetimer; carboplatin; carmustine; carubicin hydrochloride; carzelesin; cedefingol; chlorambucil; cirolemycin; cisplatin; cladribine; crisnatol mesylate; cyclophosphamide; cytarabine; dacarbazine; dactinomycin; daunorubicin hydrochloride; decitabine; dexormaplatin; dezaguanine; dezaguanine mesylate; diaziquone; docetaxel; doxorubicin; doxorubicin hydrochloride; droloxifene; droloxifene citrate; dromostanolone propionate; duazomycin; edatrexate; eflornithine hydrochloride; elsamitrucin; enloplatin; enpromate; epipropidine; epirubicin hydrochloride; erbulozole; esorubicin hydrochloride; estramustine; estramustine phosphate sodium; etanidazole; etoposide; etoposide phosphate; etoprine; fadrozole hydrochloride; fazarabine; fenretinide; floxuridine; fludarabine phosphate; fluorouracil; fluorocitabine; fosquidone; fostriecin sodium; gemcitabine; gemcitabine hydrochloride; hydroxyurea; idarubicin hydrochloride; ifosfamide; ilmofosine; interleukin II (including recombinant interleukin II, or

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672229
JTX-5_51

US 7,893,101 B2

29

rIL2); interferon alfa-2a; interferon alfa-2b; interferon alfa-n1; interferon alfa-n3; interferon beta-I a; interferon gamma-I b; iproplatin; irinotecan hydrochloride; lanreotide acetate; letrozole; leuprolide acetate; liarozole hydrochloride; lometrexol sodium; lomustine; losoxantrone hydrochloride; masoprocol; maytansine; mechlorethamine hydrochloride; megestrol acetate; melengestrol acetate; melphalan; menogaril; mercaptopurine; methotrexate; methotrexate sodium; metoprinc; meturedepa; mitindomide; mitocarcin; mitocromin; mitogillin; mitomalcin; mitomycin; mitosper; mitotane; mitoxantrone hydrochloride; mycophenolic acid; nocodazole; nogalamycin; ormaplatin; oxisuran; paclitaxel; pegaspargase; peliomycin; pentamustine; peplomycin sulfate; perfosfamide; pipobroman; piposulfan; piroxantrone hydrochloride; plicamycin; plomestane; porfimer sodium; porfiromycin; prednimustine; procarbazine hydrochloride; puromycin; puromycin hydrochloride; pyrazofurin; riboprine; rogletimide; safingol; safingol hydrochloride; semustine; simtrazene; sparfosate sodium; sparsomycin; spirogermanium hydrochloride; spiromustine; spiroplatin; streptonigrin; streptozocin; sulofenur; talisomycin; tecogalan sodium; tegafur; teloxantrone hydrochloride; temoporfin; teniposide; teroxirone; testolactone; thiamiprine; thioguanine; thiotepa; tiazofurin; tirapazamine; toremifene citrate; trestolone acetate; triciribine phosphate; trimetrexate; trimetrexate glucuronate; triptorelin; tubulozole hydrochloride; uracil mustard; uredepa; vapreotide; verteporfin; vinblastine sulfate; vincristine sulfate; vindesine; vindesine sulfate; vinepidine sulfate; vinglycinate sulfate; vinleurosine sulfate; vinorelbine tartrate; vinrosidine sulfate; vinzolidine sulfate; vorozole; zeniplatin; zinostatin; zorubicin hydrochloride. Other anti-cancer drugs include, but are not limited to: 20-epi-1,25 dihydroxyvitamin D3; 5-ethynyluracil; abiraterone; aclarubicin; acylfulvene; adecypenol; adozelesin; aldesleukin; ALL-TK antagonists; altretamine; ambamustine; amidox; amifostine; aminolevulinic acid; amrubicin; amsacrine; anagrelide; anastrozole; andrographolide; angiogenesis inhibitors; antagonist D; antagonist G; antarelix; antidorsalizing morphogenetic protein-1; antiandrogen, prostatic carcinoma; antiestrogen; antineoplaston; antisense oligonucleotides; aphidicolin glycinate; apoptosis gene modulators; apoptosis regulators; apurinic acid; ara-CDP-DL-PTBA; arginine deaminase; asulacrine; atamestane; atrimustine; axinastatin 1; axinastatin 2; axinastatin 3; azasetron; azatoxin; azatyrosine; baccatin III derivatives; balanol; batimastat; BCR/ABL antagonists; benzochlorins; benzoylstaurosporine; beta lactam derivatives; beta-alethine; betaclamycin B; betulinic acid; bFGF inhibitor; bicalutamide; bisantrene; bisaziridinylspermine; bisnafide; bistratene A; bizelesin; breflate; bropirimine; budotitane; buthionine sulfoximine; calcipotriol; calphostin C; camptothecin derivatives; canarypox IL-2; capecitabine; carboxamide-aminotriazole; carboxyamidotriazole; CaRest M3; CARN 700; cartilage derived inhibitor; carzelesin; casein kinase inhibitors (ICOS); castanospermine; cecropin B; cetrorelix; chlorins; chloroquinoxaline sulfonamide; cicaprost; cis-porphyrin; cladribine; clomifene analogues; clotrimazole; collismycin A; collismycin B; combretastatin A4; combretastatin analogue; conagenin; crambescidin 816; crisnatol; cryptophycin 8; cryptophycin A derivatives; curacin A; cyclopentanthraquinones; cycloplatam; cypemycin; cytarabine ocfosfate; cytolytic factor; cytostatin; dacliximab; decitabine; dehydrodidemin B; deslorelin; dexamethasone; dexifosfamide; dexrazoxane; dexverapamil; diaziquone; didemnin B; didox; diethylnorspermine; dihydro-5-azacytidine; dihydrotaxol, 9-; dioxamycin; diphenyl spiromustine; docetaxel; docosanol; dolasetron; doxifluridine; droloxifene; dronab-

30

inol; duocarmycin SA; ebselen; ecomustine; edelfosine; edrecolomab; eflornithine; elemene; emitefur; epirubicin; epristeride; estramustine analogue; estrogen agonists; estrogen antagonists; etanidazole; etoposide phosphate; exemestane; fadrozole; fazarabine; fenretinide; filgrastim; finasteride; flavopiridol; flezelastine; fluasterone; fludarabine; fluorodaunorunicin hydrochloride; forfenimex; formestane; fostriecin; fotemustine; gadolinium texaphyrin; gallium nitrate; galocitabine; ganirelix; gelatinase inhibitors; gemcitabine; glutathione inhibitors; hepsulfam; heregulin; hexamethylene bisacetamide; hypericin; ibandronic acid; idarubicin; idoxifene; idramantone; ilmofosine; ilomastat; imidazoacridones; imiquimod; immunostimulant peptides; insulin-like growth factor-I receptor inhibitor; interferon agonists; interferons; interleukins; iobenguane; iododoxorubicin; ipomeanol, 4-; iroplact; irsogladine; isobengazole; isohomohalicondrin B; itasetron; jasplakinolide; kahalalide F; lamellarin-N triacetate; lanreotide; leinamycin; lenograstim; lentinan sulfate; leptolstatin; letrozole; leukemia inhibiting factor; leukocyte alpha interferon; leuprolide+estrogen+progesterone; leuprorelin; levamisole; liarozole; linear polyamine analogue; lipophilic disaccharide peptide; lipophilic platinum compounds; lissoclinamide 7; lobaplatin; lombricine; lometrexol; lonidamine; losoxantrone; lovastatin; loxoribine; lurtotecan; lutetium texaphyrin; lysofylline; lytic peptides; maitansine; mannostatin A; marimastat; masoprocol; maspin; matrilysin inhibitors; matrix metalloproteinase inhibitors; menogaril; merbarone; meterelin; methioninase; metoclopramide; MIF inhibitor; mifepristone; miltefosine; mirimostim; mismatched double stranded RNA; mitoguazone; mitolactol; mitomycin analogues; mitonafide; mitotoxin fibroblast growth factor-saporin; mitoxantrone; mofarotene; molgramostim; monoclonal antibody, human chorionic gonadotrophin; monophosphoryl lipid A+myobacterium cell wall sk; mopidamol; multiple drug resistance gene inhibitor; multiple tumor suppressor 1-based therapy; mustard anticancer agent; mycaperoxide B; mycobacterial cell wall extract; myriaporone; N-acetyldinaline; N-substituted benzamides; nafarelin; nagrestip; naloxone+pentazocine; napavin; naphterpin; nartograstim; nedaplatin; nemorubicin; neridronic acid; neutral endopeptidase; nilutamide; nisamycin; nitric oxide modulators; nitroxide antioxidant; nitrullyn; O6-benzylguanine; octreotide; okicenone; oligonucleotides; onapristone; ondansetron; ondansetron; oracin; oral cytokine inducer; ormaplatin; osaterone; oxaliplatin; oxaunomycin; paclitaxel; paclitaxel analogues; paclitaxel derivatives; palauamine; palmitoylrhizoxin; pamidronic acid; panaxytriol; panomifene; parabactin; pazelliptine; pegaspargase; peldesine; pentosan polysulfate sodium; pentostatin; pentrozole; perflubron; perfosfamide; perillyl alcohol; phenazinomycin; phenylacetate; phosphatase inhibitors; picibanil; pilocarpine hydrochloride; pirarubicin; piritrexim; placetin A; placetin B; plasminogen activator inhibitor; platinum complex; platinum compounds; platinum-triamine complex; porfimer sodium; porfiromycin; prednisone; propyl bis-acridone; prostaglandin J2; proteasome inhibitors; protein A-based immune modulator; protein kinase C inhibitor; protein kinase C inhibitors, microalgal; protein tyrosine phosphatase inhibitors; purine nucleoside phosphorylase inhibitors; purpurins; pyrazoloacridine; pyridoxylated hemoglobin polyoxyethylene conjugate; raf antagonists; raltitrexed; ramosetron; ras farnesyl protein transferase inhibitors; ras inhibitors; ras-GAP inhibitor; retelliptine demethylated; rhenium Re 186 etidronate; rhizoxin; ribozymes; RII retinamide; rogletimide; rohitukine; romurtide; roquinimex; rubiginone B1; ruboxyl; safingol; saintopin; SarCNU; sarcophytol A; sargramostim; Sdi 1 mimetics; semustine; senescence

CEL-OTZ-00672230

JTX-5_52

Appx10580

US 7,893,101 B2

31

derived inhibitor 1; sense oligonucleotides; signal transduction inhibitors; signal transduction modulators; single chain antigen binding protein; sizofiran; sobuzoxane; sodium borocaptate; sodium phenylacetate; solverol; somatomedin binding protein; sonermin; sparfosic acid; spicamycin D; spiromustine; splenopentin; spongistatin 1; squalamine; stem cell inhibitor; stem-cell division inhibitors; stipiamide; stromelysin inhibitors; sulfinosine; superactive vasoactive intestinal peptide antagonist; suradista; suramin; swainsonine; synthetic glycosaminoglycans; tallimustine; tamoxifen methiodide; tauromustine; tazarotene; tecogalan sodium; tegafur; tellurapyrylium; telomerase inhibitors; temoporfin; temozolomide; teniposide; tetrachlorodecaoxide; tetrazomine; thaliblastine; thiocoraline; thrombopoietin; thrombopoietin mimetic; thymalfasin; thymopoietin receptor agonist; thymotrinan; thyroid stimulating hormone; tin ethyl etiopurpurin; tirapazamine; titanocene bichloride; topsentin; toremifene; totipotent stem cell factor; translation inhibitors; tretinoin; triacetyluridine; triciribine; trimetrexate; triptorelin; tropisetron; turosteride; tyrosine kinase inhibitors; tyrphostins; UBC inhibitors; ubenimex; urogenital sinus-derived growth inhibitory factor; urokinase receptor antagonists; vapreotide; variolin B; vector system; erythrocyte gene therapy; velaresol; veramine; verdins; verteporfin; vinorelbine; vinxaltine; vitaxin; vorozole; zanoterone; zeniplatin; zilascorb; and zinostatin stimalamer.

Embodiments herein further encompass a method of treating or preventing diseases or disorders ameliorated by the inhibition of PDE4 in a patient which comprise administering to a patient in need of such treatment or prevention one or more solid forms comprising Compound A. Disorders ameliorated by the inhibition of PDE4 include, but are not limited to, asthma, inflammation, chronic or acute obstructive pulmonary disease, chronic or acute pulmonary inflammatory disease, inflammatory bowel disease, Crohn's Disease, Behcet's Disease, colitis, ulcerative colitis and arthritis or inflammation due to reperfusion. In a preferred embodiment, the disease or disorder to be treated or prevented is chronic obstructive pulmonary disease.

Specific methods of the invention can comprise the administration of an additional therapeutic agent such as, but not limited to, anti-inflammatory drugs, antihistamines and decongestants. Examples of such additional therapeutic agents include, but are not limited to: antihistamines including, but not limited to, ethanolamines, ethylenediamines, piperazines, and phenothiazines; antiinflammatory drugs; NSAIDS, including, but not limited to, aspirin, salicylates, acetominophen, indomethacin, sulindac, etodolac, fenamates, tolmetin, ketorolac, diclofenac, ibuprofen, naproxen, fenoprofen, ketoprofen, flurbiprofen, oxaprozin, piroxicam, meloxicam, pyrazolon derivatives; and steroids including, but not limited to, cortical steroids and adrenocortical steroids.

Specific methods of the invention avoid or reduce drug-drug interactions and other adverse effects associated with agents used in the treatment of such disorders, including racemic substituted phenylethylsulfones. Without being limited by any theory, certain solid forms comprising Compound A may further provide an overall improved therapeutic effectiveness, or therapeutic index, over racemic 2-[1-(3-Ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione, including solid forms thereof.

As stated above, certain solid forms comprising Compound A may be used in the treatment or prevention of a wide range of diseases and conditions. The magnitude of a prophylactic or therapeutic dose of a particular active ingredient of the invention in the acute or chronic management of a disease or condition may vary with the nature and severity of the

32

disease or condition and the route by which the active ingredient is administered. The dose, and perhaps the dose frequency, will also vary according to the age, body weight, and response of the individual patient. Suitable dosing regimens can be readily selected by those skilled in the art with due consideration of such factors. In general, the recommended daily dose range for the conditions described herein lie within the range of from about 1 mg to about 1,000 mg per day, given as a single once-a-day dose preferably as divided doses throughout a day. More specifically, the daily dose is administered twice daily in equally divided doses. Specifically, a daily dose range may be from about 5 mg to about 500 mg per day, more specifically, between about 10 mg and about 200 mg per day. Specifically, the daily dose may be administered in 5 mg, 10 mg, 15 mg, 20 mg, 25 mg, 50 mg, or 100 mg dosage forms. In managing the patient, the therapy should be initiated at a lower dose, perhaps about 1 mg to about 25 mg, and increased if necessary up to about 200 mg to about 1,000 mg per day as either a single dose or divided doses, depending on the patient's global response. Alternatively, the daily dose is from 0.01 mg/kg to 100 mg/kg.

It may be necessary to use dosages of the active ingredient outside the ranges disclosed herein in some cases, as will be apparent to those of ordinary skill in the art. Furthermore, it is noted that the clinician or treating physician will know how and when to interrupt, adjust, or terminate therapy in conjunction with individual patient response.

The phrases "therapeutically effective amount", "prophylactically effective amount" and "therapeutically or prophylactically effective amount," as used herein encompass the above described dosage amounts and dose frequency schedules. Different therapeutically effective amounts may be applicable for different diseases and conditions, as will be readily known by those of ordinary skill in the art. Similarly, amounts sufficient to treat or prevent such disorders, but insufficient to cause, or significant to reduce, adverse effects associated with racemic 2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione are also encompassed by the above described dosage amounts and dose frequency schedules.

### 4.3. PHARMACEUTICAL COMPOSITIONS

Pharmaceutical compositions and single unit dosage forms comprising one or more solid forms comprising Compound A are provided herein. Also provided herein are methods for preparing pharmaceutical compositions and single unit dosage forms comprising one or more solid forms comprising Compound A. For example, in certain embodiments, individual dosage forms comprising a solid form provided herein or prepared using solid form provided herein may be suitable for oral, mucosal (including rectal, nasal, or vaginal), parenteral (including subcutaneous, intramuscular, bolus injection, intraarterial, or intravenous), sublingual, transdermal, buccal, or topical administration.

In certain embodiments, pharmaceutical compositions and dosage forms provided herein comprise one or more solid forms comprising Compound A. Certain embodiments herein provide pharmaceutical compositions and dosage forms comprising a solid form comprising Compound A, such as, e.g., Forms A, B, C, D, E, F, G or an amorphous solid form comprising Compound A as provided herein, wherein the solid form comprising Compound A substantially pure. Certain embodiments herein provide pharmaceutical compositions and dosage forms comprising a solid form comprising Compound A, such as, e.g., Forms A, B, C, D, E, F, G or an amorphous solid form comprising Compound A as provided

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

Appx10581

US 7,893,101 B2

33

herein, which is substantially free of other solid forms comprising Compound A including, e.g., Forms A, B, C, D, E, F, G and/or an amorphous solid form comprising Compound A as provided herein. Certain embodiments herein provide pharmaceutical compositions and dosage forms comprising a mixture of solid forms comprising Compound A, including, e.g., a mixture comprising one or more of the following: Forms A, B, C, D, E, F and an amorphous solid form comprising Compound A as provided herein. Pharmaceutical compositions and dosage forms provided herein typically also comprise one or more pharmaceutically acceptable excipient, diluent or carrier.

A particular pharmaceutical composition encompassed by this embodiment comprises one or more solid forms comprising Compound A and at least one additional therapeutic agent. Examples of additional therapeutic agents include, but are not limited to: anti-cancer drugs and anti-inflammation therapies including, but not limited to, those provided herein.

Single unit dosage forms of the invention are suitable for oral, mucosal (e.g., nasal, sublingual, vaginal, buccal, or rectal), parenteral (e.g., subcutaneous, intravenous, bolus injection, intramuscular, or intraarterial), or transdermal administration to a patient. Examples of dosage forms include, but are not limited to: tablets; caplets; capsules, such as soft elastic gelatin capsules; cachets; troches; lozenges; dispersions; suppositories; ointments; cataplasms (poultices); pastes; powders; dressings; creams; plasters; solutions; patches; aerosols (e.g., nasal sprays or inhalers); gels; liquid dosage forms suitable for oral or mucosal administration to a patient, including suspensions (e.g., aqueous or non-aqueous liquid suspensions, oil-in-water emulsions, or a water-in-oil liquid emulsions), solutions, and elixirs; liquid dosage forms suitable for parenteral administration to a patient; and sterile solids (e.g., crystalline or amorphous solids) that can be reconstituted to provide liquid dosage forms suitable for parenteral administration to a patient.

The composition, shape, and type of dosage forms of the invention will typically vary depending on their use. For example, a dosage form used in the acute treatment of inflammation or a related disorder may contain larger amounts of one or more of the active ingredients it comprises than a dosage form used in the chronic treatment of the same disease. Similarly, a parenteral dosage form may contain smaller amounts of one or more of the active ingredients it comprises than an oral dosage form used to treat the same disease or disorder. These and other ways in which specific dosage forms encompassed by this invention will vary from one another will be readily apparent to those skilled in the art. See, e.g., *Remington's Pharmaceutical Sciences*, 18th ed., Mack Publishing, Easton Pa. (1990).

Typical pharmaceutical compositions and dosage forms comprise one or more excipients. Suitable excipients are well known to those skilled in the art of pharmacy, and non-limiting examples of suitable excipients are provided herein. Whether a particular excipient is suitable for incorporation into a pharmaceutical composition or dosage form depends on a variety of factors well known in the art including, but not limited to, the way in which the dosage form will be administered to a patient. For example, oral dosage forms such as tablets may contain excipients not suited for use in parenteral dosage forms. The suitability of a particular excipient may also depend on the specific active ingredients in the dosage form.

Lactose-free compositions of the invention can comprise excipients that are well known in the art and are listed, for example, in the U.S. Pharmocopia (USP) SP (XXI)/NF (XVI). In general, lactose-free compositions comprise an

34

active ingredient, a binder/filler, and a lubricant in pharmaceutically compatible and pharmaceutically acceptable amounts. Preferred lactose-free dosage forms comprise an active ingredient, microcrystalline cellulose, pre-gelatinized starch, and magnesium stearate.

This invention further encompasses anhydrous pharmaceutical compositions and dosage forms comprising active ingredients, since water can facilitate the degradation of some compounds. For example, the addition of water (e.g., 5%) is widely accepted in the pharmaceutical arts as a means of simulating long-term storage in order to determine characteristics such as shelf-life or the stability of formulations over time. See, e.g., Jens T. Carstensen, *Drug Stability: Principles & Practice*, 2d. Ed., Marcel Dekker, NY, N.Y., 1995, pp. 379-80. In effect, water and heat accelerate the decomposition of some compounds. Thus, the effect of water on a formulation can be of great significance since moisture and/or humidity are commonly encountered during manufacture, handling, packaging, storage, shipment, and use of formulations.

Anhydrous pharmaceutical compositions and dosage forms of the invention can be prepared using anhydrous or low moisture containing ingredients and low moisture or low humidity conditions. Pharmaceutical compositions and dosage forms that comprise lactose and at least one active ingredient that comprises a primary or secondary amine are preferably anhydrous if substantial contact with moisture and/or humidity during manufacturing, packaging, and/or storage is expected.

An anhydrous pharmaceutical composition should be prepared and stored such that its anhydrous nature is maintained. Accordingly, anhydrous compositions are preferably packaged using materials known to prevent exposure to water such that they can be included in suitable formulary kits. Examples of suitable packaging include, but are not limited to, hermetically sealed foils, plastics, unit dose containers (e.g., vials), blister packs, and strip packs.

The invention further encompasses pharmaceutical compositions and dosage forms that comprise one or more compounds that reduce the rate by which an active ingredient will decompose. Such compounds, which are referred to herein as "stabilizers," include, but are not limited to, antioxidants such as ascorbic acid, pH buffers, or salt buffers.

Like the amounts and types of excipients, the amounts and specific types of active ingredients in a dosage form may differ depending on factors such as, but not limited to, the route by which it is to be administered to patients. However, typical dosage forms provided herein lie within the range of from about 1 mg to about 1,000 mg per day, given as a single once-a-day dose in the morning but preferably as divided doses throughout the day. More specifically, the daily dose is administered twice daily in equally divided doses. Specifically, a daily dose range may be from about 5 mg to about 500 mg per day, more specifically, between about 10 mg and about 200 mg per day. In managing the patient, the therapy may be initiated at a lower dose, perhaps about 1 mg to about 25 mg, and increased if necessary up to about 200 mg to about 1,000 mg per day as either a single dose or divided doses, depending on the patient's global response.

4.3.1. Oral Dosage Forms

Pharmaceutical compositions of the invention that are suitable for oral administration can be presented as discrete dosage forms, such as, but are not limited to, tablets (e.g., chewable tablets), caplets, capsules, and liquids (e.g., flavored syrups). Such dosage forms contain predetermined amounts of active ingredients, and may be prepared by methods of

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

US 7,893,101 B2

35

pharmacy well known to those skilled in the art. See generally *Remington's Pharmaceutical Sciences*, 18th ed., Mack Publishing, Easton Pa. (1990).

Typical oral dosage forms of the invention are prepared by combining the active ingredient(s) in an intimate admixture with at least one excipient according to conventional pharmaceutical compounding techniques. Excipients can take a wide variety of forms depending on the form of preparation desired for administration. For example, excipients suitable for use in oral liquid or aerosol dosage forms include, but are not limited to, water, glycols, oils, alcohols, flavoring agents, preservatives, and coloring agents. Examples of excipients suitable for use in solid oral dosage forms (e.g., powders, tablets, capsules, and caplets) include, but are not limited to, starches, sugars, micro-crystalline cellulose, diluents, granulating agents, lubricants, binders, and disintegrating agents.

Because of their ease of administration, tablets and capsules represent the most advantageous oral dosage unit forms, in which case solid excipients are employed. If desired, tablets can be coated by standard aqueous or nonaqueous techniques. Such dosage forms can be prepared by any of the methods of pharmacy. In general, pharmaceutical compositions and dosage forms are prepared by uniformly and intimately admixing the active ingredients with liquid carriers, finely divided solid carriers, or both, and then shaping the product into the desired presentation if necessary.

For example, a tablet can be prepared by compression or molding. Compressed tablets can be prepared by compressing in a suitable machine the active ingredients in a free-flowing form such as powder or granules, optionally mixed with an excipient. Molded tablets can be made by molding in a suitable machine a mixture of the powdered compound moistened with an inert liquid diluent.

Examples of excipients that can be used in oral dosage forms of the invention include, but are not limited to, binders, fillers, disintegrants, and lubricants. Binders suitable for use in pharmaceutical compositions and dosage forms include, but are not limited to, corn starch, potato starch, or other starches, gelatin, natural and synthetic gums such as acacia, sodium alginate, alginic acid, other alginates, powdered tragacanth, guar gum, cellulose and its derivatives (e.g., ethyl cellulose, cellulose acetate, carboxymethyl cellulose calcium, sodium carboxymethyl cellulose), polyvinyl pyrrolidone, methyl cellulose, pre-gelatinized starch, hydroxypropyl methyl cellulose, (e.g., Nos. 2208, 2906, 2910), microcrystalline cellulose, and mixtures thereof.

Examples of fillers suitable for use in the pharmaceutical compositions and dosage forms disclosed herein include, but are not limited to, talc, calcium carbonate (e.g., granules or powder), microcrystalline cellulose, powdered cellulose, dextrates, kaolin, mannitol, silicic acid, sorbitol, starch, pregelatinized starch, and mixtures thereof. The binder or filler in pharmaceutical compositions of the invention is typically present in from about 50 to about 99 weight percent of the pharmaceutical composition or dosage form.

Suitable forms of microcrystalline cellulose include, but are not limited to, the materials sold as AVICEL-PH-101™, AVICEL-PH-103™, AVICEL RC-581™, AVICEL-PH-105™ (available from FMC Corporation, American Viscose Division, Avicel Sales, Marcus Hook, Pa.), and mixtures thereof. A specific binder is a mixture of microcrystalline cellulose and sodium carboxymethyl cellulose sold as AVICEL RC-581 ™. Suitable anhydrous or low moisture excipients or additives include AVICEL-PH-103™ and Starch 1500 LM™.

Disintegrants are used in the compositions of the invention to provide tablets that disintegrate when exposed to an aqueous environment. Tablets that contain too much disintegrant may disintegrate in storage, while those that contain too little may not disintegrate at a desired rate or under the desired conditions. Thus, a sufficient amount of disintegrant that is neither too much nor too little to detrimentally alter the release of the active ingredients should be used to form solid oral dosage forms of the invention. The amount of disintegrant used varies based upon the type of formulation, and is readily discernible to those of ordinary skill in the art. Typical pharmaceutical compositions comprise from about 0.5 to about 15 weight percent of disintegrant, specifically from about 1 to about 5 weight percent of disintegrant.

Disintegrants that can be used in pharmaceutical compositions and dosage forms of the invention include, but are not limited to, agar-agar, alginic acid, calcium carbonate, microcrystalline cellulose, croscarmellose sodium, crospovidone, polacrilin potassium, sodium starch glycolate, potato or tapioca starch, pre-gelatinized starch, other starches, clays, other algins, other celluloses, gums, and mixtures thereof.

Lubricants that can be used in pharmaceutical compositions and dosage forms of the invention include, but are not limited to, calcium stearate, magnesium stearate, mineral oil, light mineral oil, glycerin, sorbitol, mannitol, polyethylene glycol, other glycols, stearic acid, sodium lauryl sulfate, talc, hydrogenated vegetable oil (e.g., peanut oil, cottonseed oil, sunflower oil, sesame oil, olive oil, corn oil, and soybean oil), zinc stearate, ethyl oleate, ethyl laureate, agar, and mixtures thereof. Additional lubricants include, for example, a syloid silica gel (AEROSIL 200™, manufactured by W.R. Grace Co. of Baltimore, Md.), a coagulated aerosol of synthetic silica (marketed by Degussa Co. of Plano, Tex.), CAB-O-SIL™ (a pyrogenic silicon dioxide product sold by Cabot Co. of Boston, Mass.), and mixtures thereof. If used at all, lubricants are typically used in an amount of less than about one weight percent of the pharmaceutical compositions or dosage forms into which they are incorporated.

4.3.2. Delayed Release Dosage Forms

Solid forms comprising Compound A as provided herein can be administered by controlled release means or by delivery devices that are well known to those of ordinary skill in the art. Examples include, but are not limited to, those described in U.S. Pat. Nos. 3,845,770; 3,916,899; 3,536,809; 3,598,123; and 4,008,719, 5,674,533, 5,059,595, 5,591,767, 5,120,548, 5,073,543, 5,639,476, 5,354,556, and 5,733,566, each of which is incorporated herein by reference. Such dosage forms can be used to provide slow or controlled-release of one or more active ingredients using, for example, hydroxypropylmethyl cellulose, other polymer matrices, gels, permeable membranes, osmotic systems, multilayer coatings, microparticles, liposomes, microspheres, or a combination thereof to provide the desired release profile in varying proportions. Suitable controlled-release formulations known to those of ordinary skill in the art, including those described herein, can be readily selected for use with the active ingredients of the invention. The invention thus encompasses single unit dosage forms suitable for oral administration such as, but not limited to, tablets, capsules, gelcaps, and caplets that are adapted for controlled-release.

All controlled-release pharmaceutical products have a common goal of improving drug therapy over that achieved by their non-controlled counterparts. Ideally, the use of an optimally designed controlled-release preparation in medical treatment is characterized by a minimum of drug substance being employed to cure or control the condition in a minimum amount of time. Advantages of controlled-release formulations include extended activity of the drug, reduced dosage frequency, and increased patient compliance. In addition,

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

US 7,893,101 B2

37

controlled-release formulations can be used to affect the time of onset of action or other characteristics, such as blood levels of the drug, and can thus affect the occurrence of side (e.g., adverse) effects.

Most controlled-release formulations are designed to initially release an amount of drug (active ingredient) that promptly produces the desired therapeutic effect, and gradually and continually release of other amounts of drug to maintain this level of therapeutic or prophylactic effect over an extended period of time. In order to maintain this constant level of drug in the body, the drug must be released from the dosage form at a rate that will replace the amount of drug being metabolized and excreted from the body. Controlled-release of an active ingredient can be stimulated by various conditions including, but not limited to, pH, temperature, enzymes, water, or other physiological conditions or compounds.

4.3.3. Parenteral Dosage Forms

Parenteral dosage forms can be administered to patients by various routes including, but not limited to, subcutaneous, intravenous (including bolus injection), intramuscular, and intraarterial. Because their administration typically bypasses patients' natural defenses against contaminants, parenteral dosage forms are preferably sterile or capable of being sterilized prior to administration to a patient. Examples of parenteral dosage forms include, but are not limited to, solutions ready for injection, dry products ready to be dissolved or suspended in a pharmaceutically acceptable vehicle for injection, suspensions ready for injection, and emulsions.

Suitable vehicles that can be used to provide parenteral dosage forms of the invention are well known to those skilled in the art. Examples include, but are not limited to: Water for Injection USP; aqueous vehicles such as, but not limited to, Sodium Chloride Injection, Ringer's Injection, Dextrose Injection, Dextrose and Sodium Chloride Injection, and Lactated Ringer's Injection; water-miscible vehicles such as, but not limited to, ethyl alcohol, polyethylene glycol, and polypropylene glycol; and non-aqueous vehicles such as, but not limited to, corn oil, cottonseed oil, peanut oil, sesame oil, ethyl oleate, isopropyl myristate, and benzyl benzoate.

Compounds that increase the solubility of one or more of the active ingredients disclosed herein can also be incorporated into the parenteral dosage forms of the invention.

4.3.4. Transdermal, Topical, and Mucosal Dosage Forms

Transdermal, topical, and mucosal dosage forms of the invention include, but are not limited to, ophthalmic solutions, sprays, aerosols, creams, lotions, ointments, gels, solutions, emulsions, suspensions, or other forms known to one of skill in the art. See, e.g., *Remington's Pharmaceutical Sciences*, 16th and 18th eds., Mack Publishing, Easton Pa. (1980 & 1990); and *Introduction to Pharmaceutical Dosage Forms*, 4th ed., Lea & Febiger, Philadelphia (1985). Dosage forms suitable for treating mucosal tissues within the oral cavity can be formulated as mouthwashes or as oral gels. Further, transdermal dosage forms include "reservoir type" or "matrix type" patches, which can be applied to the skin and worn for a specific period of time to permit the penetration of a desired amount of active ingredients.

Suitable excipients (e.g., carriers and diluents) and other materials that can be used to provide transdermal, topical, and mucosal dosage forms encompassed by this invention are well known to those skilled in the pharmaceutical arts, and depend on the particular tissue to which a given pharmaceutical composition or dosage form will be applied. With that fact in mind, typical excipients include, but are not limited to, water, acetone, ethanol, ethylene glycol, propylene glycol, butane-1,3-diol, isopropyl myristate, isopropyl palmitate,

38

mineral oil, and mixtures thereof to form lotions, tinctures, creams, emulsions, gels or ointments, which are non-toxic and pharmaceutically acceptable. Moisturizers or humectants can also be added to pharmaceutical compositions and dosage forms if desired. Examples of such additional ingredients are well known in the art. See, e.g., *Remington's Pharmaceutical Sciences*, 16th and 18th eds., Mack Publishing, Easton Pa. (1980 & 1990).

Depending on the specific tissue to be treated, additional components may be used prior to, in conjunction with, or subsequent to treatment with active ingredients of the invention. For example, penetration enhancers can be used to assist in delivering the active ingredients to the tissue. Suitable penetration enhancers include, but are not limited to: acetone; various alcohols such as ethanol, oleyl, and tetrahydrofuryl; alkyl sulfoxides such as dimethyl sulfoxide; dimethyl acetamide; dimethyl formamide; polyethylene glycol; pyrrolidones such as polyvinylpyrrolidone; Kollidon grades (Povidone, Polyvidone); urea; and various water-soluble or insoluble sugar esters such as Tween 80™ (polysorbate 80) and Span 60™ (sorbitan monostearate).

The pH of a pharmaceutical composition or dosage form, or of the tissue to which the pharmaceutical composition or dosage form is applied, may also be adjusted to improve delivery of one or more active ingredients. Similarly, the polarity of a solvent carrier, its ionic strength, or tonicity can be adjusted to improve delivery. Compounds such as stearates can also be added to pharmaceutical compositions or dosage forms to advantageously alter the hydrophilicity or lipophilicity of one or more active ingredients so as to improve delivery. In this regard, stearates can serve as a lipid vehicle for the formulation, as an emulsifying agent or surfactant, and as a delivery-enhancing or penetration-enhancing agent. Different solid forms comprising the active ingredients can be used to further adjust the properties of the resulting composition.

4.3.5. Kits

This invention encompasses kits which, when used by the medical practitioner, can simplify the administration of appropriate amounts of active ingredients to a patient.

A typical kit of the invention comprises a unit dosage form of compound A, or a pharmaceutically acceptable solid form or prodrug thereof, and a unit dosage form of a second active ingredient. Examples of second active ingredients include, but are not limited to, those listed herein.

Kits of the invention can further comprise devices that are used to administer the active ingredient(s). Examples of such devices include, but are not limited to, syringes, drip bags, patches, and inhalers.

Kits of the invention can further comprise pharmaceutically acceptable vehicles that can be used to administer one or more active ingredients. For example, if an active ingredient is provided in a solid form that must be reconstituted for parenteral administration, the kit can comprise a sealed container of a suitable vehicle in which the active ingredient can be dissolved to form a particulate-free sterile solution that is suitable for parenteral administration. Examples of pharmaceutically acceptable vehicles include, but are not limited to: Water for Injection USP; aqueous vehicles such as, but not limited to, Sodium Chloride Injection, Ringer's Injection, Dextrose Injection, Dextrose and Sodium Chloride Injection, and Lactated Ringer's Injection; water-miscible vehicles such as, but not limited to, ethyl alcohol, polyethylene glycol, and polypropylene glycol; and non-aqueous vehicles such as, but not limited to, corn oil, cottonseed oil, peanut oil, sesame oil, ethyl oleate, isopropyl myristate, and benzyl benzoate.

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672234

JTX-5_56

US 7,893,101 B2

**39**

## 5. EXAMPLES

The present application incorporates by reference the entirety of U.S. Pat. No. 6,962,940 (issued Nov. 8, 2005), including the Examples provided therein.

### 5.1. Example 1

#### Synthesis of 2-[1-(3-Ethoxy-4-Methoxyphenyl)-2-Methylsulfonylethyl]-4-Acetylaminoisoindoline-1,3-Dione

A stirred solution of 1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethylamine (1.0 g, 3.7 mmol) and 3-acetamidophthalic anhydride (751 mg, 3.66 mmol) in acetic acid (20 mL) was heated at reflux for 15 h. The solvent was removed in vacuo to yield an oil. Chromatography of the resulting oil yielded the product as a yellow solid (1.0 g, 59% yield); mp, 144° C.; $^1$H NMR (CDCl$_3$) δ: 1.47 (t, J=7.0 Hz, 3H, CH$_3$), 2.26 (s, 3H, CH$_3$), 2.88 (s, 3H, CH$_3$), 3.75 (dd, J=4.4, 14.3 Hz, 1H, CH), 3.85 (s, 3H, CH3), 4.11 (q, J=7 Hz, 2H, CH$_2$), 5.87 (dd, J=4.3, 10.5 Hz, 1H, NCH), 6.82-6.86 (m, 1H, Ar), 7.09-7.11 (m, 2H, Ar), 7.47 (d, J=7 Hz, 1H, Ar), 7.64 (t, J=8 Hz, 1H, Ar), 8.74 (d, J=8 Hz, 1H, Ar), 9.49 (br s, 1H, NH); $^{13}$C NMR (CDCl$_3$) δ: 14.61, 24.85, 41.54, 48.44, 54.34, 55.85, 64.43, 111.37, 112.34, 115.04, 118.11, 120.21, 124.85, 129.17, 130.96, 136.01, 137.52, 148.54, 149.65, 167.38, 169.09, 169.40; Anal Calc'd. for C$_{22}$H$_{24}$N$_2$O$_7$S: C, 57.38; H, 5.25; N, 6.08. Found: C, 57.31; H, 5.34; N, 5.83.

### 5.2. Example 2

#### Synthesis of (+)-[1-(3-Ethoxy-4-Methoxyphenyl)-2-Methylsulfonylethyl]-4-Acetylaminoisoindoline-1,3-Dione

##### Preparation of 3-aminophthalic acid

10% Pd/C (2.5 g), 3-nitrophthalic acid (75.0 g, 355 mmol) and ethanol (1.5 L) were charged to a 2.5 L Parr hydrogenator under a nitrogen atmosphere. Hydrogen was charged to the reaction vessel for up to 55 psi. The mixture was shaken for 13 hours, maintaining hydrogen pressure between 50 and 55 psi. Hydrogen was released and the mixture was purged with nitrogen 3 times. The suspension was filtered through a celite bed and rinsed with methanol. The filtrate was concentrated in vacuo. The resulting solid was reslurried in ether and isolated by vacuum filtration. The solid was dried in vacuo to a constant weight, affording 54 g (84% yield) of 3-aminophthalic acid as a yellow product. $^1$H-NMR (DMSO-d6) δ: 3.17 (s, 2H), 6.67 (d, 1H), 6.82 (d, 1H), 7.17 (t, 1H), 8-10 (br, s, 2H); $^{13}$C-NMR (DMSO-d6) δ: 112.00, 115.32, 118.20, 131.28, 135.86, 148.82, 169.15, 170.09.

##### Preparation of 3-acetamidophthalic anhydride

A 1 L 3-necked round bottom flask was equipped with a mechanical stirrer, thermometer, and condenser and charged with 3-aminophthalic acid (108 g, 596 mmol) and acetic anhydride (550 mL). The reaction mixture was heated to reflux for 3 hours and cooled to about 25° C. and further to 0-5° C. for another 1 hour. The crystalline solid was collected by vacuum filtration and washed with ether. The solid product was dried in vacuo at ambient temperature to a constant weight, giving 75 g (61% yield) of 3-acetamidophthalic anhydride as a white product. $^1$H-NMR (CDCl$_3$) δ: 2.21 (s, 3H), 7.76 (d, 1H), 7.94 (t, 1H), 8.42 (d, 1H), 9.84 (s, 1H).

**40**

#### Resolution of 2-(3-ethoxy-4-methoxyphenyl)-1-(methylsulfonyl)-eth-2-ylamine

A 3 L 3-necked round bottom flask was equipped with a mechanical stirrer, thermometer, and condenser and charged with 2-(3-ethoxy-4-methoxyphenyl)-1-(methylsulphonyl)-eth-2-ylamine (137.0 g, 500 mmol), N-acetyl-L-leucine (52 g, 300 mmol), and methanol (1.0 L). The stirred slurry was heated to reflux for 1 hour. The stirred mixture was allowed to cool to ambient temperature and stirring was continued for another 3 hours at ambient temperature. The slurry was filtered and washed with methanol (250 L). The solid was air-dried and then dried in vacuo at ambient temperature to a constant weight, giving 109.5 g (98% yield) of the crude product (85.8% ee). The crude solid (55.0 g) and methanol (440 mL) were brought to reflux for 1 hour, cooled to room temperature and stirred for an additional 3 hours at ambient temperature. The slurry was filtered and the filter cake was washed with methanol (200 mL). The solid was air-dried and then dried in vacuo at 30° C. to a constant weight, yielding 49.6 g (90% recovery) of (S)-2-(3-ethoxy-4-methoxyphenyl)-1-(methylsulphonyl)-eth-2-ylamine N-acetyl-L-leucine salt (98.4% ee). Chiral HPLC (1/99 EtOH/20 mM KH$_2$PO$_4$ @ pH 7.0, Ultron Chiral ES-OVS from Agilent Technologies, 150 mm×4.6 mm, 0.5 mL/min., @ 240 nm): 18.4 min (S-isomer, 99.2%), 25.5 min (R-isomer, 0.8%).

##### Preparation of Compound A

A 500 mL 3-necked round bottom flask was equipped with a mechanical stirrer, thermometer, and condenser. The reaction vessel was charged with (S)-2-(3-ethoxy-4-methoxyphenyl)-1-(methylsulphonyl)-eth-2-ylamine N-acetyl-L-leucine salt (25 g, 56 mmol, 98% ee), 3-acetamidophthalic anhydride (12.1 g, 58.8 mmol), and glacial acetic acid (250 mL). The mixture was refluxed over night and then cooled to <50° C. The solvent was removed in vacuo, and the residue was dissolved in ethyl acetate. The resulting solution was washed with water (250 mL×2), saturated aqueous NaHCO$_3$ (250 mL×2), brine (250 mL×2), and dried over sodium sulphate. The solvent was evaporated in vacuo, and the residue recrystallized from a binary solvent containing ethanol (150 mL) and acetone (75 mL). The solid was isolated by vacuum filtration and washed with ethanol (100 mL×2). The product was dried in vacuo at 60° C. to a constant weight, affording 19.4 g (75% yield) of S-{2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulphonylethyl]-4-acetamidoisoindoline-1,3-dione} with 98% ee. Chiral HPLC (15/85 EtOH/20 mM KH$_2$PO$_4$ @ pH 5, Ultron Chiral ES-OVS from Agilent Technology, 150 mm×4.6 mm, 0.4 mL/min, @ 240 nm): 25.4 min (S-isomer, 98.7%), 29.5 min (R-isomer, 1.2%). $^1$H-NMR (CDCl$_3$) δ: 1.47 (t, 3H), 2.26 (s, 3H), 2.87 (s, 3H), 3.68-3.75 (dd, 1H), 3.85 (s, 3H), 4.07-4.15 (q, 2H), 4.51-4.61 (dd, 1H), 5.84-5.90 (dd, 1H), 6.82-8.77 (m, 6H), 9.46 (s, 1H); $^{13}$C-NMR (DMSO-d6) δ: 14.66, 24.92, 41.61, 48.53, 54.46, 55.91, 64.51, 111.44, 112.40, 115.10, 118.20, 120.28, 124.94, 129.22, 131.02, 136.09, 137.60, 148.62, 149.74, 167.46, 169.14, 169.48.

A reaction scheme illustrating a preparation of the (+) enantiomer of Compound A is provided as FIG. 29.

### 5.3. Example 3

#### TNF-α Inhibition

##### Human Whole Blood LPS-induced TNF-α Assay

The ability of compounds to inhibit LPS-induced TNF-α production by human whole blood was measured essentially as described below for the LPS-induced TNF-α assay in human PBMC, except that freshly drawn whole blood was

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

US 7,893,101 B2

41

used instead of PBMC. (Muller et al., 1999, *Bioorg. & Med. Chem. Lett.*, 9:1625-1630.) Human whole blood LPS-induced TNF-$\alpha$ IC$_{50}$=294 nM for Compound A.

Mouse LPS-induced Serum TNF-$\alpha$ Inhibition

Compounds were tested in this animal model according to previously described methods (Corral et al., 1996, *Mol. Med.*, 2:506-515). Mouse LPS-induced serum TNF-$\alpha$ inhibition (ED$_{50}$, mg/kg, p.o.)=0.05 for Compound A.

LPS-induced TNF-$\alpha$ Production

Lipopolysaccharide (LPS) is an endotoxin produced by gram-negative bacteria such as *E. coli* which induces production of many pro-inflammatory cytokines, including TNF-$\alpha$. In peripheral blood mononuclear cells (PBMC), the TNF-$\alpha$ produced in response to LPS is derived from monocytes, which comprise approximately 5-20% of the total PBMC. Compounds were tested for the ability to inhibit LPS-induced TNF-$\alpha$ production from human PBMC as previously described (Muller et al., 1996, *J. Med. Chem.*, 39:3238). PBMC from normal donors were obtained by Ficoll Hypaque (Pharmacia, Piscataway, N.J., USA) density centrifugation. Cells were cultured in RPMI (Life Technologies, Grand Island, N.Y., USA) supplemented with 10% AB±human serum (Gemini Bio-products, Woodland, Calif., USA), 2 mM L-glutamine, 100 U/ml penicillin, and 100 µg/ml streptomycin (Life Technologies).

PBMC (2×10$^5$ cells) were plated in 96-well flat-bottom Costar tissue culture plates (Corning, N.Y., USA) in triplicate. Cells were stimulated with LPS (Sigma, St. Louis, Mo., USA) at 100 ng/ml in the absence or presence of compounds. Compounds (Celgene Corp., Warren, N.J., USA) were dissolved in DMSO (Sigma) and further dilutions were done in culture medium immediately before use. The final DMSO concentration in all samples was 0.25%. Compounds were added to cells one hour before LPS stimulation. Cells were incubated for 18-20 hours at 37° C. in 5% CO$_2$ and supernatants were then collected, diluted with culture medium and assayed for TNF-$\alpha$ levels by ELISA (Endogen, Boston, Mass., USA). LPS-induced TNF-$\alpha$ IC$_{50}$=77 nM for Compound A.

IL-1$\beta$-induced TNF-$\alpha$ Production

During the course of inflammatory diseases, TNF-$\alpha$ production is often stimulated by the cytokine IL-1$\beta$, rather than by bacterially derived LPS. Compounds were tested for the ability to inhibit IL-1$\beta$-induced TNF-$\alpha$ production from human PBMC as described above for LPS-induced TNF-$\alpha$ production, except that the PBMC were isolated from source leukocyte units (Sera-Tec Biologicals, North Brunswick, N.J., USA) by centrifugation on Ficoll-Paque Plus (Amersham Pharmacia, Piscataway, N.J., USA), plated in 96-well tissue culture plates at 3x10$^5$ cells/well in RPMI-1640 medium (BioWhittaker, Walkersville, Md., USA) containing 10% heat-inactivated fetal bovine serum (Hyclone), 2 mM L-glutamine, 100 U/ml penicillin, and 100 mg/ml streptomycin (complete medium), pretreated with compounds at 10, 2, 0.4, 0.08, 0.016, 0.0032, 0.00064, and 0 µM in duplicate at a final DMSO concentration of 0.1% at 37° C. in a humidified incubator at 5% CO$_2$ for one hour, then stimulated with 50 ng/ml recombinant human IL-1$\beta$ (Endogen) for 18 hours. IL-$\beta$-induced TNF-$\alpha$ IC$_{50}$=83 nM for Compound A.

5.4. Example 4

PDE Selectivity

PDE1, 2, 3, 5, and 6 Enzyme Assays

The specificity of compounds for PDE4 was assessed by testing at a single concentration (10 µM) against bovine

42

PDE1, human PDE2, PDE3, and PDE5 from human platelets (Hidaka and Asano, 1976, *Biochem. Biophys. Acta*, 429:485, and Nicholsen et al., 1991, *Trends Pharmaco. Sci.*, 12:19); and PDE6 from bovine retinal rod outer segments (Baehr et al., 1979, *J. Biol. Chem.*, 254:11669, and Gillespie et al. 1989, *Mol. Pharm.*, 36:773). Results are listed in Table 1.

PDE7 Enzyme Assay

PDE7 is a cAMP-selective PDE expressed mainly in T cells and in skeletal muscle. T cell-derived cytokines such as IL-2 and IFN-$\gamma$ are potentially regulatable via PDE7 inhibition. PDE7 was purified from Hut78 human T cells by anion exchange chromatography as previously described (Bloom and Beavo, 1996, *Proc. Natl. Acad. Sci. USA*, 93:14188-14192). Compounds were tested against the PDE7 preparation in the presence of 10 nM cAMP as described for PDE4 in Table 1.

5.5. Example 5

PDE4 Inhibition

PDE4 (U937 Cell-derived) Enzyme Assay

PDE4 enzyme was purified from U937 human monocytic cells by gel filtration chromatography as previously described (Muller et al., 1998, *Bioorg. & Med. Chem. Lett.* 8:2669-2674). Phosphodiesterase reactions were carried out in 50 mM Tris HCl pH 7.5, 5 mM MgCl$_2$, 1 µM cAMP, 10 nM [$^3$H]-cAMP for 30 min at 30° C., terminated by boiling, treated with 1 mg/ml snake venom, and separated using AG-1XS ion exchange resin (BioRad) as described (Muller et al., 1998, *Bioorg & Med. Chem. Lett.* 8:2669-2674). Reactions consumed less than 15% of available substrate. Results are listed in Table 1.

TABLE 1

| | PDE Specificity | | |
|---|---|---|---|
| | Racemic Compound | Compound A | Compound B* |
| | PDE Inhibition | | |
| PDE4 IC$_{50}$ (from U937 cells) (nM) | 81.8 | 73.5 | 611 |
| PDE1 (% inhib at 10 µM) | 9% | 23% | 27% |
| PDE2 (% inhib at 10 µM) | 19% | 6% | 10% |
| PDE3 (% inhib at 10 µM) | 21% | 20% | 31% |
| PDE5 (% inhib at 10 µM) | 3% | 3% | −9% |
| PDE6 (% inhib at 10 µM) | ND | −6% | 10% |
| PDE7 IC$_{50}$ (nM) | 22110 | 20500 | ND |
| | PDE Specificity Ratios from above data (*fold) | | |
| PDE4/PDE1 | >2700 | >500 | >50 |
| PDE4/PDE2 | >800 | >10000 | >260 |
| PDE4/PDE3 | >670 | >1200 | >45 |
| PDE4/PDE5 | >12000 | >30000 | >39000 |
| PDE4/PDE6 | ND | >40000 | >250 |
| PDE7 IC$_{50}$/PDE4 IC$_{50}$ | 270 | 279 | ND |

*Compound B is the (−) enantiomer of Compound A.

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672236

JTX-5_58

Appx10586

US 7,893,101 B2

43

### 5.6. Example 6

### Human T Cell Assays

SEB-induced IL-2 and IFN-γ Production

Staphylococcal Enterotoxin B (SEB) is a superantigen derived from gram-positive bacteria *Staphylococcus aureus*. SEB provides a convenient physiological stimulus specific for T cells expressing particular T cell receptor Vβ chains. Human PBMC (consisting of approximately 50% T cells) were isolated from source leukocyte units as described above and plated in 96-well tissue culture plates at $3\times10^5$ cells/well in complete medium, pretreated with compounds at 10, 2, 0.4, 0.08, 0.016, 0.0032, 0.00064, and 0 μM in duplicate at a final DMSO concentration of 0.1% at 37° C. in a humidified incubator at 5% $CO_2$ for 1 hour, then stimulated with 100 ng/ml SEB (Sigma Chemical Co., St. Louis, Mo., USA) for 18 hours. IL-2 and IFN-γ levels were measured by ELISA (R&D Systems, Minneapolis, Minn., USA). IL-2 $IC_{50}$=291 nM for Compound A. IFN-γ $IC_{50}$=46 nM for Compound A.

### 5.7. Example 7

### cAMP Elevation Assays

$PGE_2$-induced cAMP Elevation

Prostaglandin $E_2$ ($PGE_2$) binds to prostanoid receptors on monocytes, T cells and other leukocytes and consequently elevates intracellular cAMP levels, resulting in inhibition of cellular responses. The combination of $PGE_2$ and a PDE4 inhibitor synergistically elevates cAMP levels in these cell types, and the elevation of cAMP in PBMC caused by PDE4 inhibitors in the presence of $PGE_2$ is proportional to the inhibitory activity of that PDE4 inhibitor. Intracellular cAMP was measured in human PBMC as follows. PBMC were isolated as described above and plated in 96-well plates at $1\times10^6$ cells per well in RPMI-1640. The cells were pretreated with compounds at 100, 10, 1, 0.1, 0.01, and 0 μM in a final concentration of 2% DMSO in duplicate at 37° C. in a humidified incubator at 5% $CO_2$ for one hour. The cells were then stimulated with $PGE_2$ (10 μM) (Sigma) for 1 h. The cells were lysed with HCl, 0.1 N final concentration to inhibit phosphodiesterase activity and the plates were frozen at −20° C. The cAMP produced was measured using cAMP (low pH) Immunoassay kit (R&D Systems). PBMC cAMP $EC_{50}$ for racemate is 3.09 μM. PBMC cAMP $EC_{50}$ for Compound A is 1.58 μM.

Elevation of cAMP in human neutrophils was measured as follows. PBMC were removed from source leukocytes (Sera-Tec Biologicals) by centrifugation on Ficoll-Paque Plus (Amersham Pharmacia). The resulting erythrocyte/polymorphonuclear cell (PMN) pellet was resuspended in Hank's Balanced Salt Solution (BioWhittaker) and mixed with an equal volume of 3% Dextran T-500 (Amersham Pharmacia) in 0.9% saline. Erythrocytes were allowed to sediment for 20 minutes, and the PMN were removed and centrifuged at 120 rpm for 8 minutes at 4° C. The remaining erythrocytes were lysed in cold 0.2% saline for 30 seconds, and the cells restored to isotonicity by the addition of an equal volume of 1.6% saline. The PMN were centrifuged at 1200 rpm for 8 minutes at 4° C., then resuspended in RPMI-1640 and assayed for cAMP elevation as described for PBMC above. PMN were found to be approximately 74% CD18/CD11b+, 71% CD14-CD9+ neutrophils by flow cytometry on a FACSCalibur (Becton Dickinson, San Jose, Calif., USA). Results are shown in Table 2.

44

fMLF-induced LTB4 Production

N-formyl-methionine-leucine-phenylalanine (fMLF) is a bacterially derived peptide that activates neutrophils to rapidly degranulate, migrate, adhere to endothelial cells, and release leukotriene LTB4, a product of arachidonic acid metabolism and itself a neutrophil chemoattractant. Compounds were tested for the ability to block fMLF-induced neutrophil LTB4 production as previously described (Hatzelmann and Schudt, 2001, *J. Pharm. Exp. Ther.*, 297:267-279), with the following modifications. Neutrophils were isolated as described above and resuspended in phosphate-buffered saline without calcium or magnesium (BioWhittaker) containing 10 mM HEPES pH 7.2 and plated in 96-well tissue culture plates at a concentration of $1.7\times10^6$ cells/well. Cells were treated with 50 μM thimerosal (Sigma)/1 mM $CaCl_2$/1 mM $MgCl_2$ for 15 minutes at 37° C. 5% $CO_2$, then treated with compounds at 1000, 200, 40, 8, 1.6, 0.32, 0.064, and 0 nM in a final DMSO concentration of 0.01% in duplicate for 10 minutes. Neutrophils were stimulated with 1 μM fMLF for 30 minutes, then lysed by the addition of methanol (20% final concentration) and frozen in a dry ice/isopropanol bath for 10 minutes. Lysates were stored at −70° C. until the LTB4 content was measured by competitive LTB4 ELISA (R&D Systems). Results are shown in Table 2.

Zymosan-induced IL-8 Production

Zymosan A, or the heat-killed yeast *Saccharomyces cerevisiae*, binds to the adhesion molecule Mac-1 on the neutrophil surface and triggers phagocytosis, cell activation and IL-8 production. Zymosan-induced IL-8 production was measured as previously described (Au et al., 1998, *Brit. J. Pharm.*, 123:1260-1266) with the following modifications. Human neutrophils were purified as described above, plated in 96-well tissue culture plates at $3\times10^5$ cells/well in complete medium, treated with compounds at 10, 2, 0.4, 0.08, 0.016, 0.0032, 0.00064, and 0 μM in duplicate in a final DMSO concentration of 0.1% for 1 hour at 37° C. 5% $CO_2$. Neutrophils were then stimulated with unopsonized, boiled Zymosan A (Sigma) at $2.5\times10^6$ particles/well for 18 hours. Supernatants were harvested and tested for IL-8 by ELISA (R&D Systems). Results are shown in Table 2.

fMLF-induced CD18/CD11b Expression

CD18/CD11b (Mac-1) expression on neutrophils was measured as previously described (Derian et al., 1995, *J. Immunol.*, 154:308-3 17) with the following modifications. Neutrophils were isolated as described above, then resuspended in complete medium at $1\times10^6$ cells/ml, pretreated with compounds at 10, 1, 0.1, 0.01, and 0 μM in duplicate at a final DMSO concentration of 0.1% for 10 minutes at 37° C. 5% $CO_2$. Cells were then stimulated with 30 nM fMLF for 30 minutes and then chilled to 4° C. Cells were treated with rabbit IgG (Jackson ImmunoResearch Labs, West Grove, Pa., USA) (10 μg/$1\times10^6$ cells) to block Fc receptors, stained with CD18-FITC and CD11b-PE (Becton Dickinson), and analyzed by flow cytometry on a FACSCalibur. CD18/CD11b expression (mean fluorescence) in the absence of stimulation was subtracted from all samples to obtain inhibition curves and calculate $IC_{50}$ values. Results are shown in Table 2.

fMLF-induced Adhesion to HUVEC

Human umbilical vein endothelial cells (HUVEC) were used as a substrate for neutrophil adhesion as previously described (Derian et al., 1995, *J. Immunol.*, 154:308-317) with the following modifications. HUVEC cells were obtained from Anthrogenesis (Cedar Knolls, N.J., USA), and neutrophils were not treated with cytochalasin B. Cells were treated with compounds at 10, 1, 0.1, 0.01, 0.001, and 0 μM in a final DMSO concentration of 0.1% in duplicate for 10 minutes, stimulated with 500 nM fMLF for 30 minutes, and

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

Appx10587

US 7,893,101 B2

45

washed twice with PBS before measuring fluorescence on an FLX800 plate reader (Bio-Tek Instruments, Winooski, Vt., USA). Results are shown in Table 2.

TABLE 2

Assay results

| Human Neutrophil Assays (all values in nM) | Racemic Compound | Compound A |
|---|---|---|
| PGE$_2$-induced cAMP EC$_{50}$ | 12589 | 4570 |
| fMLF-induced LTB4 IC$_{50}$ | 20.1 | 2.48 |
| Zymosan-induced IL-8 IC$_{50}$ | ND | 94 |
| fMLF-induced CD18 expression IC$_{50}$ | ND | 390 |
| fMLF-induced CD11b expression IC$_{50}$ | ND | 74 |
| fMLF-induced adhesion to HUVEC IC$_{50}$ | ND | 150 |

5.8. Example 8

Aqueous Solubility

Equilibrium solubilities were measured in pH 7.4 aqueous buffer. The pH 7.4 buffer was prepared by adjusting the pH of a 0.07 M NaH$_2$PO$_4$ solution to 7.4 with 10 N NaOH. The ionic strength of the solution was 0.15. At least 1 mg of powder was combined with 1 ml of buffer to make >1 mg/ml mixture. These samples were shaken for >2 hours and left to stand overnight at room temperature. The samples were then filtered through a 0.45-μm Nylon syringe filter that was first saturated with the sample. The filtrate was sampled twice, consecutively. The filtrate was assayed by HPLC against standards prepared in 50% methanol. Compound A has 3.5-fold greater aqueous solubility than the racemic mixture. Measured solubility Compound A=0.012 mg/mL; racemic mixture=0.0034 mg/mL.

5.9. Example 9

LPS-Induced Lung Neutrophilia Ferret Model

The conscious ferret model has been used to investigate anti-inflammatory, emetic and behavioral effects of PDE4 inhibitors when administered by the oral (p.o.) route. From these experiments, a therapeutic index (TI) for each PDE4 inhibitor may be determined. The TI has been calculated by dividing the threshold dose for causing emetic episodes and behavioral changes by the anti-inflammatory dose (dose that causes 50% inhibition of the LPS-induced neutrophilia).

Animal Husbandry

Male ferrets (*Mustela Putorius* Euro, weighing 1-2 kg). Ferrets were supplied either by Bury Green Farm or Misay Consultancy. Following transport, the animals were allowed to acclimatize in the holding rooms for a period of not less than seven days. The diet comprised SDS diet C pelleted food given ad lib with Whiskers™ cat food given three times per week. Water was pasteurized animal grade drinking water and was changed daily.

Dosing with PDE4 Inhibitor

PDE4 inhibitors were administered orally (p.o.), at doses initially of 1-10 g/kg, but subsequently up to 30 mg/kg in order to establish whether the TI was 10 or higher, and/or at lower doses to establish the minimum dose to cause 50% inhibition of neutrophils. Ferrets were fasted overnight but allowed free access to water. The animals were orally dosed with vehicle or PDE4 inhibitor using a 15 cm dosing needle that was passed down the back of the throat into the oesophagus. After dosing, the animals were returned to holding cages

46

fitted with Perspex doors to allow observation, and given free access to water. After dosing, the animals were constantly observed and any emesis or behavioral changes were recorded. The animals were allowed access to food 60 to 90 minutes after p.o. dosing.

Exposure to LPS

Thirty minutes after p.o. dosing with compound or vehicle control, the ferrets were placed into sealed Perspex containers and exposed to an aerosol of LPS (100 μg/ml) for 10 minutes. Aerosols of LPS were generated by a nebulizer (DeVilbiss, USA) and this was directed into the Perspex exposure chamber. Following a 10 minute exposure period, the animals were returned to the holding cages and allowed free access to water, and at a later stage, food. Observation continued for a period of at least 2.5 hours post p.o. dosing and emetic episodes and behavioral changes were recorded.

Bronchoalveolar Lavage

Six hours after LPS exposure the animals were killed by overdose of sodium pentobarbitone administered intraperitoneally. The trachea was then cannulated with polypropylene tubing and the lungs lavaged twice with 20 ml heparinized (10 units/ml) phosphate buffered saline (PBS).

Blood Sampling/Tissue Removal

A terminal blood sample (10 ml) was removed by transthoracic cardiac puncture. The blood was spun at 2,500 rpm for 15 minutes and the plasma was removed and stored at −20° C. The brain also removed and frozen at −20° C. for analysis of compound content.

Cell Counts

The bronchoalveolar lavage (BAL) samples were centrifuged at 1,500 rpm for 5 minutes. The supernatant was removed and the resulting cell pellet re-suspended in 1 ml PBS. A cell smear of the re-suspended fluid was prepared and stained with Leishmans stain to allow differential cell counting. A total cell count was made using the remaining re-suspended sample. From this, the total number of neutrophils in the BAL was determined.

Parameters Measured

1. % Inhibition of LPS-induced pulmonary neutrophilia.

2. Emetic episodes—the number of vomits and retches were counted.

3. Behavioral changes—the following behavioral effects were noted: salivation, panting, mouth clawing, flattened posture, ataxia, arched back and backward walking. Any behavioral changes were semi-quantified by applying a severity rating (mild, moderate or severe).

4. The TI was calculated as the highest dose found to not cause emetic episodes divided by the lowest dose found to inhibit pulmonary neutrophilia by 50% or more.

The effect of Compound A on LPS-induced neutrophilia in the lungs of conscious ferrets is demonstrated in FIG. 30.

Emesis and Behavioral Changes

Following p.o. dosing of the PDE4, the ferrets were observed for at least two hours and emetic episodes (vomits and retches) and behavioral changes were recorded.

No emetic episodes (retching or vomiting) were observed in the ferrets pre-treated p.o. with the relevant vehicle (acetone/cremophor/distilled water). In a small proportion of the control-treated animals (7/22), mild behavioral changes (lip licking and backward walking) were seen.

Compound A (0.1-3 mg/kg, p.o.), caused no emetic episodes (retching and vomiting). Some behavioral changes (flattened posture, lip licking and backward walking) were observed and classified as mild. At 10 mg/kg in 2/6 ferrets, some retching but no frank emesis was observed along with salivation and behavioral changes (scored as mild or moderate). At the highest dose tested (30 mg/kg) moderate to

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672238

JTX-5_60

US 7,893,101 B2

| 47 | 48 |

marked emesis was observed in 3/4 animals along with pronounced behavioral changes. These data are summarized in Table 3.

Compound A was administered 20 mg orally daily for 29 days with an additional 28-day observational follow-up period for patient safety. Skin punch biopsy specimens (6

TABLE 3

| Conscious ferret: Emetic episodes and behavioral changes following oral administration of Compound A | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Treatment/dose (mg/kg) | Vomits | Retches | Salivation | Panting | Mouth clawing | Flattened posture | Ataxia | Lip licking | Backward walking |
| Vehicle (acetone/ cremophor/ dist. H₂O) | None | None | None | None | None | None | None | Mild (6/22) | Mild (7/22) |
| Compound A (0.1 mg/kg) | None | None | None | None | None | Mild (2/5) | None | Mild (4/5) | Mild (3/5) |
| Compound A (0.3 mg/kg) | None | None | None | None | None | Mild (2/6) | None | Mild (3/6) | Mild (4/6) |
| Compound A (1.0 mg/kg) | None | None | None | None | None | Mild (3/6) | None | Mild (6/6) | Mild (4/6) |
| Compound A (3.0 mg/kg) | None | None | None | None | Mild (1/8) | Marked (7/8) | None | Mild (2/8) | Moderate (5/8) |
| Compound A (10 mg/kg) | None | Mild (2/6) | Mild (1/6) | None | Mild (1/6) | Marked (6/6) | None | Moderate (5/6) | Marked (6/6) |
| Compound A (30 mg/kg) | Moderate (3/4) | Marked (4/4) | Moderate (3/4) | Mild (1/4) | Marked (4/4) | Marked (4/4) | Mild (3/4) | Moderate (4/4) | Mild (2/4) |

Animals were observed for up to three hours following dosing. Numbers in parentheses refer to the number of animals that responded. The numbers of animals in each group range from 4 to 22.

Therapeutic Index Calculation

From these experiments, a therapeutic index (TI) was determined for each compound by dividing the threshold dose for inducing emetic episodes by the $ED_{50}$ value for inhibiting the pulmonary neutrophilia. The TI calculation is summarized in Table 4. Compound A had a TI of 12, causing no emetic episodes at an anti-inflammatory dose of 1 mg/kg.

TABLE 4

| Summary of the effective doses (ED₅₀) for inhibition of LPS-induced pulmonary neutrophilia and induction of emesis and the therapeutic index derived from these values | | | |
|---|---|---|---|
| Compound | Inhibition of LPS-induced neutrophilia (ED₅₀ mg/kg) | Threshold emetic dose (mg/kg) | Therapeutic index |
| Compound A | 0.8 | 10 | 12 |

5.10. Example 10

Biological Activity of Compound A in Patients with Severe Plaque-Type Psoriasis

Compound A is a novel oral agent that downregulates pro-inflammatory cytokine production in human cellular models. Compound A has been shown to decrease TNF-α, IL-12 and IFN-γ production as well as elevate production of IL-10. Psoriasis is strongly associated with dysregulation of cytokines and chemokines allowing for potential therapies with immunomodulatory compounds. This Phase 2, open-label, single arm, pilot study was designed to assess the biological activity of Compound A in patients with severe plaque-type psoriasis. Additional assessments for clinical outcomes were performed to evaluate the potential efficacy of Compound A in treating severe plaque-type psoriasis.

mm) from target plaques were obtained at baseline, Day 15 and Day 29. A nonlesional skin biopsy was also taken at baseline. The primary pharmacodynamic endpoint was the percent change from baseline in epidermal thickness at Day 29. Epidermal skin thickness measurements and immunohistochemical analysis were carried out by a blinded reviewer to evaluate CD11c, CD83, K16, ICAM-1, HLA-DR, and fillagrin. Biopsy specimens were analyzed by RT-PCR for: TNF-α, p40-IL12/IL23, IL-10, IFN-γ, IP10, IL-2, IL-8, iNOS, p19-IL23, K16, CD 83, and hARP. PASI, PGA, and BSA measurements were performed to explore clinical efficacy during the 29-day treatment phase of the study. Adverse event reporting, clinical laboratory evaluations, physical examinations, ECG and vital sign measurements assessed safety. A total of 19 patients were enrolled: 15 patients had complete sets of evaluable biopsies and 17 patients had complete efficacy assessments.

Assessment of the change in epidermal thickness was the primary endpoint in this study. Nineteen patients were enrolled in the study, of which 15 had complete sets of evaluable biopsies at baseline and Day 29. Seventeen of the 19 subjects had clinical efficacy parameters measured at Baseline and Day 29. Eight (53.3%) of the patients with evaluable biopsies at baseline and Day 29 demonstrated a 20% reduction in epidermal skin thickness. The mean reduction of epidermal thickness among all 15 subjects with evaluable biopsies at baseline and Day 29 was 20.5% (p=0.015). FIG. 31 displays the change in epidermal thickness from baseline to Day 29 among subjects with evaluable biopsies.

Key inflammatory markers including epidermal and dermal T-cells, CD83+ and CD11c cells were evaluated in biopsy specimens. Results for 8 patients who responded showed a decrease of epidermal and dermal T-cells by 42.56% and 28.79% respectively in responders (≧20% epidermal thickness reduction). Mean reductions from baseline in epidermal and dermal CD83+ cells were 32.50% and 25.86% respectively in responders. CD11c cells were reduced by 40.16% in the epidermis and 18.50% in the dermis in responders. Table 5 lists reductions in key skin biopsy inflammatory markers in responders and nonresponders. In addition, one patient with

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

US 7,893,101 B2

**49**

abnormal K16 at baseline had normal K16 at Day 29. Three patients with abnormal ICAM-1 at baseline had normal ICAM-1 at Day 29. Two patients with abnormal HLA-DR had normal HLA-DR at Day 29 and three patients with abnormal fillagrin at baseline had normal fillagrin at Day 29.

TABLE 5

| Percentage Reduction of Key Inflammatory Markers at Day 29 | | | |
|---|---|---|---|
| Cell | | Epidermis | Dermis |
| T-cells | Responder | −42.56% | −28.79% |
| | Nonresponder | +8.76% | −17.34% |
| CD83+ | Responder | −32.50% | −25.86% |
| | Nonresponder | −16.31% | +0.46% |
| CD11c | Responder | −40.16% | −18.50% |
| | Nonresponder | −2.54% | −21.19% |

Biopsy specimens were evaluated for mRNA gene expression of key inflammatory markers by RT-PCR including: TNFα, p40-IL12/IL23, IL-10, IFNγ, IP10, IL-2, IL-8, iNOS, p19-IL23, K16 and CD83. The mRNA expression of iNOS was reduced 66.5% (p=0.025) in lesional skin after 29 days of treatment with Compound A. Reductions and increases in mRNA expression of other inflammatory markers showed overall trends of improvement. FIG. 32 graphically displays the change in iNOS expression during the study.

A total of 17 of the 19 subjects enrolled completed the 29-day treatment phase and had complete clinical efficacy assessments. Fourteen (73.7%) of the 19 subjects enrolled demonstrated improvement in their PASI with 3 (15.8%) of these patients showing a >50% reduction from baseline in their total Psoriasis Area and Severity Index (PASI) score at Day 29. FIG. 33 displays the percentage change in PASI scores among evaluable patients from baseline at Day 29. Additionally, 9 (52.9%) of the 17 evaluable patients demonstrated improvement in the static Physician's Global Assessment (sPGA) and 10 (58.8%) of the 17 evaluable patients showed a reduction from baseline in their psoriasis body surface area (BSA) after 29 days of treatment with Compound A. Safety was evaluated during treatment and follow-up phases through monitoring of adverse events, ECGs, laboratory tests, physical exams and vital signs. No deaths were reported nor did any patient prematurely discontinue due to an adverse event. Most common treatment-related adverse events included headache (26.3%), and nausea (15.8%).

In this clinical study, Compound A 20 mg p.o. QD for 29 days was safe in subjects with severe plaque type psoriasis. The primary endpoint was reached with 8 (53.3%) of 15 subjects achieving a 20% reduction in epidermal thickness at Day 29. Reductions of key inflammatory markers in skin biopsies were noted including dermal and epidermal T-cells, CD83+ and CD11c cells. RT-PCR analysis revealed a statistically significant reduction of 66.5% in iNOS mRNA in skin biopsies at Day 29. A positive clinical efficacy signal was noted after 29 days of treatment with Compound A. 73.7% of enrolled patients demonstrated improvement in their psoriasis symptoms with 15.8% of these patients showing >50% reduction from baseline in their PASI score at Day 29. 47.4% of enrolled patients showed an improvement in their sPGA

**50**

and 52.6% of enrolled patients showed a reduction from baseline in their psoriasis body surface area (BSA) at Day 29.

### 5.11. Example 11

A Phase 2 Study Demonstrating the Efficacy and Safety of Compound A in Subjects with Moderate-to-Severe Psoriasis

This phase 2, multicenter, randomized, double-blind, placebo-controlled, parallel-group, dose-comparison study evaluated the efficacy and safety of Compound A in subjects with moderate to severe plaque-type psoriasis who were candidates for systemic therapy.

This study included a 12-week treatment phase followed by a 4-week observational follow-up phase. A total of 260 subjects were randomized to receive Compound A 20 mg BID, Compound A 20 mg QD, or placebo for 12 weeks. The primary endpoint for this study was the proportion of subjects treated with Compound A who achieved a 75% reduction in Psoriasis Area and Severity Index score ("PASI-75") at week 12/last treatment in reference to the baseline visit. Last treatment is defined as the last PASI assessment completed during the 12-week treatment phase.

At week 12/last treatment, a significantly higher proportion of subjects treated with 20 mg BID (24%) achieved a PASI-75 compared with the placebo group (10%; P=0.023). Of the subjects receiving 20 mg BID or placebo, 57% versus 23% achieved PASI-50 at week 12/last treatment, respectively; whereas 14% versus 6% achieved PASI-90, respectively. At week 12/last treatment, subjects achieved a mean decrease of 52% versus 17% in PASI from baseline in the 20 mg BID versus placebo groups, respectively. Subjects receiving Compound A continued to improve over time, showing the greatest mean percent reduction in PASI score at week 12. Overall, the adverse event profiles were similar across all three treatment groups. The majority of adverse events reported were mild. No study drug-related serious adverse events were reported in this study. No subjects in the 20 mg BID group experienced psoriasis flare during the observational follow-up period.

In this clinical study, Compound A was shown to be well tolerated and safe in subjects with moderate to severe plaque-type psoriasis. The proportions of subjects that achieved 50%, 75%, and 90% improvement in PASI demonstrate the clinical activity of Compound A after 12 weeks of treatment.

### 5.12. Example 12

Solid Form Screening Studies

#### 5.12.1. Experimental Methodology

Solubility Studies. A weighed sample of Compound A (about 100 mg) was treated with about 2 mL of the test solvent. The solvents used were either reagent or HPLC grade. The resulting mixture was agitated for at least 24 hours at about 25° C. When all of the solids were dissolved by visual inspection, the estimated solubilities were calculated. The solubilities were estimated from these experiments based on the total volume of solvent used to give a solution. The actual solubilities may be greater than those calculated due to the use of large amount of solvent or to a slow rate of dissolution. If dissolution did not occur during the experiment, the solubility was measured gravimetrically. A known volume of filtrate was evaporated to dryness and the weight of the residue was measured.

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672240

**JTX-5_62**

Appx10590

US 7,893,101 B2

51

Solution Evaporation Studies. Solution evaporation was performed for solvents in which the solubility of Compound A was more than about 50 mg/mL, such as acetone, acetonitrile, methylene chloride and tetrahydrofuran. Solid samples were obtained by slowly evaporating the solvents at about 25° C. or about 50° C. in an open vial under nitrogen.

Equilibration Studies. Equilibration experiments were carried out by adding an excess of Compound A to about 2 mL of a test solvent. The resulting mixture was agitated for at least 24 hours at about 25° C. or about 50° C. Upon reaching equilibrium, the saturated solution was removed and allowed to evaporate slowly in an open vial under nitrogen at about 25° C. or about 50° C., respectively. The slurry resulting from the equilibration was filtered and dried in the air.

Cooling Crystallization Studies. Cooling crystallization studies were performed. The solid was dissolved in a solvent at an elevated temperature, about 65° C., and allowed to cool to about 25° C. Samples that did not crystallize at about 25° C. were placed in a refrigerator (about 0-5° C.). Solids were isolated by decantation and allowed to dry in the air.

Solvent/Anti-Solvent Precipitation Studies. Precipitations were carried out by solvent/anti-solvent combinations. The solid was dissolved in a solvent in which Compound A had a relatively high solubility, and then a selected solvent in which Compound A had a relatively low solubility (i.e., an anti-solvent) was added to the solution. A precipitate formed immediately in some solvent/anti-solvent systems. If the precipitation did not occur immediately, the resulting mixture was allowed to cool in a refrigerator (about 0-5° C.) until a precipitate formed. The precipitate was then isolated by decantation and allowed to dry in the air.

Interconversion Studies. Interconversion experiments were performed by making slurries of a solid form in a saturated solvent. The slurries were agitated for at least 2 days at about 25° C. The saturated solution was removed by filtration and the solid was dried in the air.

Compression Studies. Compression tests were performed by pressing the sample under 2000 psi force for at least one minute with Carver Mini C presser. The sample was then analyzed by XRPD.

Hygroscopicity studies. The hygroscopicity of various solid forms was studied using a Surface Measurement Systems DVS instrument. Typically a sample size of between about 10-50 mg was loaded into the DVS instrument sample pan and the sample was analyzed on a DVS automated sorption analyzer at about 25° C. The relative humidity was increased in increments of about 10% from about 0% to about 95% RH. The relative humidity was then decreased in a similar manner to accomplish a full adsorption/desorption cycle. The mass was recorded at periodic intervals throughout the experiment.

5.12.2. Characterization Methodology

Samples generated as described in the solid form screen were typically analyzed by X-Ray Powder Diffraction (XRPD). XRPD was conducted on a Thermo ARL X'TRA™ X-ray powder diffractometer using Cu Kα radiation at 1.54 Å. The instrument was equipped with a fine focus X-ray tube. The voltage and amperage of X-ray generator were set at 45 kV and 40 mA, respectively. The divergence slices were set at 4 mm and 2 mm and the measuring slices were set at 0.5 mm and 0.2 mm. The diffracted radiation was detected by a peltier-cooled Si(Li) solid-state detector. Typically, a theta-two theta continuous scan at 2.40°/min (0.5 sec/0.02° step) from 1.5°2θ to 40° 2θ was used. A sintered alumina standard was used to check the peak position. In general, positions of XRPD peaks are expected to individually vary on a measurement-by-measurement basis by about ±0.2°2θ. In general, as

52

understood in the art, two XRPD patterns match one another if the characteristic peaks of the first pattern are located at approximately the same positions as the characteristic peaks of the second pattern. As understood in the art, determining whether two XRPD patterns match or whether individual peaks in two XRPD patterns match may require consideration of individual variables and parameters such as, but not limited to, preferred orientation, phase impurities, degree of crystallinity, particle size, variation in diffractometer instrument setup, variation in XRPD data collection parameters, and/or variation in XRPD data processing, among others. The determination of whether two patterns match may be performed by eye and/or by computer analysis. Examples of XRPD patterns collected and analyzed using these methods and parameters are provided herein, e.g., as FIG. 1, FIG. 5, FIG. 9, FIG. 13, FIG. 17, FIG. 21 and FIG. 25.

Differential Scanning Calorimetry (DSC) analyses were performed on a TA Instruments Q1000™. About 5 mg of sample was placed into a tared DSC pan and the weight of the sample was accurately recorded. Typically, the sample was heated under nitrogen at a rate of about 10° C./min from about 25° C. up to a final temperature of about 200° C. Typically, thermal events were reported as extrapolated onset temperatures. Examples of DSC thermograms collected and analyzed using these methods and parameters are provided herein, e.g., as FIG. 2, FIG. 6, FIG. 10, FIG. 14, FIG. 18, FIG. 22 and FIG. 26.

Thermal Gravimetric Analyses (TGA) were performed on a TA Instruments Q500™. Calcium oxalate was used for calibration. About 10 mg of sample was placed on a pan, accurately weighed and loaded into the TGA furnace. The sample was heated under nitrogen at a rate of about 10° C./min from about 25° C. up to a final temperature of about 200° C. Examples of TGA thermograms collected and analyzed using these methods and parameters are provided herein, e.g., as FIG. 3, FIG. 7, FIG. 11, FIG. 15, FIG. 19, FIG. 23 and FIG. 27.

Solvation solvents were identified and quantified by TG-IR experiments using a TA Instruments Q500™ TGA interfaced with a Thermo Nicolet AEM Fourier transform IR spectrophotometer. Typically a sample size of about 20-50 mg was weighed into an aluminum pan and heated to about 200° C. During the TGA run, the vapor was transferred to the cell through a heated transfer line. The temperature of both transfer line and the cell were set at about 225° C. IR spectra were collected every 10-second repeat time. Volatiles were identified from a search of the Aldrich vapor phase spectral library and the library match results are presented to show the identified vapor.

Morphology and particle size analysis of the samples were carried out using an Olympus microscope. The instrument was calibrated with USP standards. $D_{90}$ values were determined using the software Image Plus—Material Plus. The $D_{90}$ value represents the 90th percentile of the particle size distribution as measured by length; i.e., 90% of the particles have a length of this value or less.

5.12.3. Solid Form Screening Study Results

Solid forms comprising Compound A which were prepared during the solid form screening studies included Forms A, B, C, D, E, F, G and an amorphous form. Representative XRPD patterns, DSC plots, TGA plots and DVS plots for each of Forms A, B, C, D, E, F and G are provided herein as FIG. 1-FIG. 28.

Solubility Studies. The approximate solubility of Form B of Compound A in various solvents at about 25° C. was determined. Results are shown in Table 6. Form B was found to be most soluble in acetone, acetonitrile, methylene chlo-

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

US 7,893,101 B2

53

ride, methyl ethyl ketone and tetrahydrofuran (greater than about 50 mg/mL) followed by ethyl acetate (about 30.15 mg/mL). Form B was also found to have low solubility in several solvents including n-butanol, heptane, 2-propanol, toluene and water (less than about 1 mg/mL).

Solution Evaporation Studies. Results from solution evaporation studies performed at about 25° C. and about 50° C. are summarized in Table 7.

Equilibration Studies. Results from equilibration studies performed at about 25° C. and about 50° C. are summarized in Table 8.

Cooling Crystallization Studies. Results from cooling crystallization studies are summarized in Table 9. Cooling crystallization studies yielded crystalline material from numerous solvents, including acetone, acetonitrile, n-butyl acetate, ethyl acetate, methanol, methylene chloride, methyl ethyl ketone (MEK) and tetrahydrofuran (THF). The crystalline materials obtained were typically characterized by XRPD, DSC and TGA.

Solvent/Anti-Solvent Precipitation Studies. Results from solvent/anti-solvent precipitation studies are summarized in Table 10. When heptane, water and toluene were added to Form B in THF solution at about 40° C., precipitates formed immediately. When heptane, methyl t-butyl ether (MTBE), toluene and water were added to Form B in acetonitrile solution separately at about 25° C., either a clear solution or a mixture formed. Crystalline material from MTBE/acetonitrile, water/acetonitrile and toluene/acetonitrile was obtained after stirring overnight. However, no crystallization occurred for heptane/acetonitrile mixture. When water was added to Form B in methanol solution at about 50° C., precipitates formed immediately and when heptane and toluene were added to Form B in methanol solution separately at about 50° C., either a clear solution or a mixture formed. Crystalline material from toluene/methanol and heptane/methanol was obtained after stirring overnight. When toluene was added to Form B in methylene chloride solution at about 25° C., precipitates formed immediately and when MTBE was added to Form B in methylene chloride solution at about 25° C., a clear solution was obtained. Crystalline material from MTBE/methylene chloride was obtained after stirred overnight. However, no crystallization occurred when heptane was added to Form B in methylene chloride solution. When heptane was added to Form B in MEK solution at about 50° C., precipitates formed immediately and when MTBE and toluene were added to Form B in MEK solution separately at about 50° C., clear solutions were obtained. Crystalline material from MTBE/MEK and toluene/MEK was obtained after stirring overnight. When heptane was added to Form B in n-butyl acetate solution at about 50° C., precipitates formed immediately and when MTBE and toluene were added to Form B in MEK solution separately at about 50° C., clear solutions were obtained. Crystalline material from MTBE/n-butyl acetate and toluene/n-butyl acetate was obtained after stirring overnight. When water and toluene were added to Form B in acetone solution separately at about 40° C., precipitates formed immediately and when ethanol and 2-propanol were added to Form B in acetone solution separately at about 40° C., clear solutions were obtained. Crystalline material from ethanol/acetone and 2-propanol/acetone were obtained after stirring overnight. Crystalline materials obtained were identified by XRPD, DSC, TGA.

Stability Studies. Stability study results are summarized in Table 11. The stabilities of Forms A, B, C and D were studied by exposing the solid samples to the stress condition of 40° C./75% RH for four weeks. Moreover, the stabilities of Forms A, B, C and D in different solvents were studied by equili-

54

bration in different solvents at 40° C. for four weeks. The slurries then were filtered and dried in the air. Solid samples obtained from the stability experiments were analyzed by XRPD and DSC.

Interconversion Studies. Results from interconversion studies are summarized in Table 12.

Compression Studies. Compression tests were performed on Forms A, B, C, D, E, F and G of Compound A. Each form studied was found to be substantially physically stable as observed by XRPD analysis.

Hygroscopicity Studies. Hygroscopicity (moisture sorption/desorption) studies were performed on Forms A, B, C, D, E, F and G. Each of the solid samples were analyzed by XRPD after undergoing a full adsorption/desorption cycle in the DVS system. XRPD results indicated that none of the forms analyzed underwent substantial solid-state transformation as a result of DVS analysis.

TABLE 6

| Solubility Study on Form B | |
| --- | --- |
| Solvent System | Approximate Solubility (mg/ml) |
| Acetone | >50 |
| Acetonitrile | >50 |
| n-Butanol | >0.72 |
| n-Butyl acetate | 9.75 |
| Absolute ethanol | 1.38 |
| Ethyl acetate | 30.15 |
| Heptane | 0.41 |
| Methylene chloride | >50 |
| Methyl ethyl ketone | >50 |
| Methanol | 4.05 |
| Methyl t-butyl ether | 1.17 |
| 2-Propanol | 0.81 |
| Tetrahydrofuran | >50 |
| Toluene | 0.90 |
| Water | 0.69 |
| Ethanol:Water (1:1) | 2.86 |

TABLE 7

| Solution Evaporation Studies | | | | |
| --- | --- | --- | --- | --- |
| Starting Form | Solvent System | Evaporation Temp. (° C.) | XRPD Analysis | DSC thermal events |
| B | Acetone | 25 | Form B | |
| B | Acetonitrile | 25 | Form B+ | 77.28° C.; |
| | | | Form E | 151.84° C. |
| B | n-Butyl acetate | 25 | Form B | |
| B | Ethyl acetate | 25 | Form B | |
| B | Methylene chloride | 25 | Form D | 93.11° C. |
| B | Methyl ethyl ketone | 25 | Form B | |
| B | Tetrahydrofuran | 25 | Form B | |
| B | Ethanol:Water (1:1) | 25 | Form B | |
| A | Acetonitrile | 25 | Form B | 95.42° C. (TGA wt. loss = 3.56%) |
| A | Methylene chloride | 25 | Form D | 97.23° C. |
| A | Acetone | 50 | Form B | |
| A | Acetonitrile | 50 | Form B | |
| A | n-Butyl acetate | 50 | Form B | |
| A | Ethyl acetate | 50 | Form B | |
| A | Methyl ethyl ketone | 50 | Form B | |
| A | Tetrahydrofuran | 50 | Form B | |
| A | Ethanol:Water (1:1) | 50 | Form B | |

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672242

JTX-5_64

Appx10592

US 7,893,101 B2

55

## TABLE 8

### Equilibration Studies

| Starting Form | Solvent System | Equilib. Temp. °C. | XRPD Analysis | DSC Thermal Events |
|---|---|---|---|---|
| B | n-Butanol | 25 | Form B | |
| B | n-Butyl acetate | 25 | Form B | |
| B | Ethanol | 25 | Form B | |
| B | Ethyl acetate | 25 | Form B | |
| B | Heptane | 25 | Form B | |
| B | Methanol | 25 | Form B | |
| B | Methyl t-butyl ether | 25 | Form B | |
| B | 2-Propanol | 25 | Form B | |
| B | Toluene (evap. at 60° C.) | 25 | Form C | 159.31° C. |
| B | Toluene (evap. at 60° C.) | 25 | Form C | Broad multiplet |
| B | Toluene:Acetone (9:1) (evap. at 100° C.) | 25 | Form C | Broad multiplet (TGA wt. loss = 5.90%) |
| B | Water | 25 | Form B | |
| B | Water (50 days) | 25 | Form B | |
| A | Ethanol | 25 | Form F | 145.06° C. (multiplet) |
| A | Heptane | 25 | Form A | |
| A | Ethyl acetate | 25 | Form G | 108.95° C. |
| A | Water | 25 | Form A | |
| A | Toluene | 25 | Form C | 170.18° C. (TGA wt. loss = 5.86%) |
| A | Toluene (evap. at 60° C.) | 25 | Form C | 167.84° C. |
| A | Toluene:Acetone (9:1) (evap. at 100° C.) | 25 | Form C | Broad multiplet |
| A | Acetone:Ethanol (1:1) | 25 | Form B | 154.00° C. (main) |

56

## TABLE 8-continued

### Equilibration Studies

| Starting Form | Solvent System | Equilib. Temp. °C. | XRPD Analysis | DSC Thermal Events |
|---|---|---|---|---|
| A | Ethanol:Water (1:1) | 25 | Form F | 145.22° C. |
| A | n-Butanol | 50 | Form B | |
| A | n-Butyl acetate | 50 | Form B | |
| A | Ethanol | 50 | Form B | |
| A | Heptane | 50 | Form B | |
| A | Methanol | 50 | Form B | |
| A | Methyl t-butyl ether | 50 | Form B | |
| A | 2-Propanol | 50 | Form B | |
| A | Toluene | 50 | Form C | 165.30° C. (multiplet) |
| A | Water | 50 | Form B | |
| A | Ethanol:Water (1:1) | 50 | Form B | |

## TABLE 9

### Cooling Crystallization Studies

| Starting Form | Solvent System | Analysis by XRPD | DSC Thermal Events |
|---|---|---|---|
| B | Acetone | Form E | |
| B | Acetonitrile | Form E | 95.42° C. |
| B | n-Butyl acetate | Form B | |
| B | Ethyl acetate | Form B | |
| B | Methylene Chloride | Form D | 100.90° C. |
| B | Methanol | Form B | |
| B | Methyl ethyl ketone | Form B | |
| B | THF | Form H | |

## TABLE 10

### Solvent/Anti-Solvent Precipitation Studies

| Starting Form | Solvent* | Anti-Solvent* | Ratio (Solvent:Antisolvent) & Temp. | Analysis by XRPD | DSC Thermal Events |
|---|---|---|---|---|---|
| B | Acetone | Ethanol | 1:8 at 40° C. | Form B | |
| B | Acetone | 2-Propanol | 1:10 at 40° C. | Form B | |
| B | Acetone | Water | 1:4 at 40° C. | Form B | |
| B | Acetone | Toluene | 1:10 at 40° C. | Form C | 167.57° C. (broad) |
| B | Acetonitrile | Heptane | 1:8 at 25° C. | Form B | |
| B | Acetonitrile | MtBE | 1:8 at 25° C. | Form B | |
| B | Acetonitrile | Water | 1:6 at 25° C. | Form B | |
| B | Acetonitrile | Toluene | 1:8 at 50° C. | Form C | 167.97° C. |
| B | Methyl ethyl ketone | Heptane | 1:3 at 50° C. | Form B | |
| B | MEK | MtBE | 1:4 at 50° C. | Form B | |
| B | MEK | Toluene | 1:3 at 50° C. | Form C | 168.22° C. |
| B | n-Butyl acetate | Heptane | 1:4 at 50° C. | Form B | |
| B | n-Butyl acetate | MtBE | 1:4 at 50° C. | Form B | |
| B | n-Butyl acetate | Toluene | 1:4 at 50° C. | Form B | |
| B | DCM | Heptane | 1:8 at 25° C. | Form E + B | 89.65° C.; 149.81° C. |
| B | DCM | MtBE | 1:15 at 25° C. | Form B | |
| B | DCM | Toluene | 1:15 at 25° C. | Form B | 167.99° C. (multiplet) |
| B | Methanol | Heptane | 1:3 at 50° C. | Form B | |
| B | Methanol | Water | 1:3 at 50° C. | Form B | |
| B | Methanol | Toluene | 1:3 at 50° C. | Form C | 168.37° C. (multiplet) |
| B | Tetrahydrofuran | Heptane | 1:6 at 40° C. | Form B | |
| B | Tetrahydrofuran | Water | 1:6 at 40° C. | Form B | |
| B | Tetrahydrofuran | Toluene | 1:6 at 40° C. | Form C | 168.64° C. (multiplet) |

*Abbreviations:
MEK = methyl ethyl ketone;
DCM = dichloromethane (i.e., methylene chloride);
MtBE = methyl t-butyl ether

CEL-OTZ-00672243
JTX-5_65

Appx10593

US 7,893,101 B2

<table>
<tr><td>57</td><td>58</td></tr>
</table>

**57**

### TABLE 11

| | Stability Studies | | |
|---|---|---|---|
| Starting Form | Test Conditions ("EQ" = equilibrate; "RH" = relative humidity) | Appearance | Analysis by XRPD |
| Form A | 40° C./75% RH; 4 weeks | White solid | Form A |
| Form B | 40° C./75% RH; 4 weeks | White solid | Form B |
| Form C | 40° C./75% RH; 4 weeks | Yellow solid | Form C |
| Form D | 40° C./75% RH; 4 weeks | White solid | Form D |
| Form A | EQ in ethanol at 40° C. for 4 weeks | | Form F |
| Form A | EQ in heptane at 40° C. for 4 weeks | | Form A |
| Form A | EQ in water at 40° C. for 4 weeks | | Form A |
| Form A | EQ in toluene at 40° C. for 4 weeks | | Form C |
| Form B | EQ in ethanol at 40° C. for 4 weeks | | Form B |
| Form B | EQ in heptane at 40° C. for 4 weeks | | Form B |
| Form B | EQ in water at 40° C. for 4 weeks | | Form B |
| Form B | EQ in toluene at 40° C. for 4 weeks | | Form B |
| Form C | EQ in ethanol at 40° C. for 4 weeks | | Form B |
| Form C | EQ in heptane at 40° C. for 4 weeks | | Form C |
| Form C | EQ in water at 40° C. for 4 weeks | | Form C |
| Form C | EQ in toluene at 40° C. for 4 weeks | | Form C |
| Form D | EQ in ethanol at 40° C. for 4 weeks | | Form B |
| Form D | EQ in heptane at 40° C. for 4 weeks | | Form B |
| Form D | EQ in water at 40° C. for 4 weeks | | Form B |
| Form D | EQ in toluene at 40° C. for 4 weeks | | Form C |

### TABLE 12

| | Interconversion Studies | |
|---|---|---|
| Starting Form | Test Conditions ("EQ" = equilibrate) | Analysis by XRPD |
| Mixture of Forms A, B, C, D, E, F and G | EQ in acetone:ethanol (1:1) at 25° C. | Form B + C + F |
| Form A | EQ in acetone:ethanol (1:1) at 25° C. | Form B |
| Form C | EQ in acetone:ethanol (1:1) at 25° C. | Form C |
| Form D | EQ in acetone:ethanol (1:1) at 25° C. | Form B |
| Form E | EQ in acetone:ethanol (1:1) at 25° C. | Form B |
| Form F | EQ in acetone:ethanol (1:1) at 25° C. | Form F |
| Form G | EQ in acetone:ethanol (1:1) at 25° C. | Form C |

#### 5.13. Example 13

#### 200 Mg Dosage Capsule

Table 13 illustrates a batch formulation and single dosage formulation for a single dose unit containing 200 mg of a solid form comprising Compound A, i.e., about 40 percent by weight, in a size #0 capsule.

### TABLE 13

| | Formulation for 200 mg capsule | | |
|---|---|---|---|
| Material | Percent By Weight | Quantity (mg/tablet) | Quantity (kg/batch) |
| Compound A | 40.0% | 200 mg | 16.80 kg |
| Pregelatinized Corn Starch, NF5 | 9.5% | 297.5 mg | 24.99 kg |
| Magnesium Stearate | 0.5% | 2.5 mg | 0.21 kg |
| Total | 100.0% | 500 mg | 42.00 kg |

The pregelatinized corn starch (SPRESS™ B-820) and Compound A components are passed through a 710 μm screen and then are loaded into a Diffusion Mixer with a baffle insert and blended for 15 minutes. The magnesium stearate is passed through a 210 μm screen and is added to the Diffusion Mixer. The blend is then encapsulated in a size #0 capsule, 500 mg per capsule (8400 capsule batch size) using a Dosator type capsule filling machine.

#### 5.14. Example 14

#### 100 Mg Oral Dosage Form

Table 14 illustrates a batch formulation and a single dose unit formulation containing 100 mg of a solid form comprising Compound A.

### TABLE 14

| | Formulation for 100 mg tablet | | |
|---|---|---|---|
| Material | Percent by Weight | Quantity (mg/tablet) | Quantity (kg/batch) |
| Compound A | 40% | 100.00 | 20.00 |
| Microcrystalline Cellulose, NF | 53.5% | 133.75 | 26.75 |
| Pluronic F-68 Surfactant | 4.0% | 10.00 | 2.00 |
| Croscarmellose Sodium Type A, NF | 2.0% | 5.00 | 1.00 |
| Magnesium Stearate, NF | 0.5% | 1.25 | 0.25 |
| Total | 100.0% | 250.00 mg | 50.00 kg |

The microcrystalline cellulose, croscarmellose sodium, and Compound A components are passed through a #30 mesh screen (about 430μ to about 655μ). The Pluronic F-68® (manufactured by JRH Biosciences, Inc. of Lenexa, Kans.) surfactant is passed through a #20 mesh screen (about 457% to about 1041μ). The Pluronic F-68® surfactant and 0.5 kgs of croscarmellose sodium are loaded into a 16 qt. twin shell tumble blender and are mixed for about 5 minutes. The mix is then transferred to a 3 cubic foot twin shell tumble blender where the microcrystalline cellulose is added and blended for about 5 minutes. The solid form comprising Compound A is added and blended for an additional 25 minutes. This pre-blend is passed through a roller compactor with a hammer mill attached at the discharge of the roller compactor and moved back to the tumble blender. The remaining croscarmellose sodium and magnesium stearate is added to the tumble blender and blended for about 3 minutes. The final mixture is compressed on a rotary tablet press with 250 mg per tablet (200,000 tablet batch size).

While the invention has been described with respect to the particular embodiments, it will be apparent to those skilled in the art that various changes and modifications may be made without departing from the spirit and scope of the invention as defined in the claims. Such modifications are also intended to fall within the scope of the appended claims.

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672244

JTX-5_66

US 7,893,101 B2

59

60

What is claimed is:

1. A Form B crystal form of the compound of Formula (I):

(I)



which is enantiomerically pure, and which has an X-ray powder diffraction pattern comprising peaks at about 10.1, 13.5, 20.7, and 26.9 degrees 2θ.

2. The crystal form of claim 1, which has an X-ray powder diffraction pattern further comprising peaks at about 12.4, 15.7, 18.1, and 24.7 degrees 2θ.

3. The crystal form of claim 2, which has an X-ray powder diffraction pattern further comprising peaks at about 16.3, 22.5, 26.2, and 29.1 degrees 2θ.

4. The crystal form of claim 1, which has an X-ray powder diffraction pattern matching the pattern depicted in FIG. 5.

5. The crystal form of claim 1, which has a differential scanning calorimetry plot comprising an endothermic event with an onset temperature of about 154° C.

6. The crystal form of claim 1, which has a differential scanning calorimetry plot matching the plot depicted in FIG. 6.

7. The crystal form of claim 1, which has a thermal gravimetric analysis plot comprising a mass loss of less than about 1% when heated from about 25° C. to about 140° C.

8. The crystal form of claim 7, wherein the mass loss is about 0.25%.

9. The crystal form of claim 1, which has a thermal gravimetric analysis plot matching the plot depicted in FIG. 7.

10. The crystal form of claim 1, which exhibits a mass increase of less than about 1% when subjected to an increase in relative humidity from about 0% to about 95% relative humidity.

11. The crystal form of claim 10, wherein the mass increase is about 0.6%.

12. The crystal form of claim 1, which has a moisture sorption isotherm plot matching the plot depicted in FIG. 8.

13. The crystal form of claim 1, which is stable upon exposure to about 40° C. and about 75% relative humidity for about 4 weeks.

14. The crystal form of any one of claims 1 and 2 to 13, which is substantially pure.

15. A solid pharmaceutical composition comprising the crystal form of any one of claims 1 and 2 to 13.

* * * * *

Copy provided by USPTO from the PIRS Image Database on 07-06-2018

CEL-OTZ-00672245

JTX-5_67

Appx10595



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

October 11, 2018

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM
THE RECORDS OF THIS OFFICE OF:

U.S. PATENT:  *10,092,541*
ISSUE DATE:  *October 09, 2018*

By Authority of the

Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office



P. SWAIN
Certifying Officer

JOINT
EXHIBIT

CASE
NO  18-cv-11026 (Consol.)

EXHIBIT
NO  **JTX-13**

CEL-OTZ-00673671



US010092541B2

(12) **United States Patent**      (10) Patent No.:     **US 10,092,541 B2**
Day                                  (45) Date of Patent:         *Oct. 9, 2018

(54) **METHODS FOR THE TREATMENT OF DISEASES AMELIORATED BY PDE4 INHIBITION USING DOSAGE TITRATION OF APREMILAST**

(71) Applicant: **CELGENE CORPORATION**, Summit, NJ (US)

(72) Inventor: **Robert Day**, Newtown, PA (US)

(73) Assignee: **Celgene Corporation**, Summit, NJ (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/826,027**

(22) Filed: **Aug. 13, 2015**

(65) **Prior Publication Data**

US 2016/0045475 A1     Feb. 18, 2016

**Related U.S. Application Data**

(60) Provisional application No. 62/038,176, filed on Aug. 15, 2014.

(51) Int. Cl.
| | |
|---|---|
| *A61K 31/4035* | (2006.01) |
| *A61K 45/06* | (2006.01) |
| *A61K 31/519* | (2006.01) |
| *A61K 31/635* | (2006.01) |
| *A61K 31/42* | (2006.01) |
| *A61K 39/395* | (2006.01) |
| *A61K 31/573* | (2006.01) |
| *A61K 38/13* | (2006.01) |
| *A61K 38/21* | (2006.01) |

(52) U.S. Cl.
CPC .......... *A61K 31/4035* (2013.01); *A61K 31/42* (2013.01); *A61K 31/519* (2013.01); *A61K 31/573* (2013.01); *A61K 31/635* (2013.01); *A61K 38/13* (2013.01); *A61K 38/21* (2013.01); *A61K 39/3955* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 3,536,809 | A | 10/1970 | Applezweig |
| 3,598,123 | A | 8/1971 | Zaffaroni |
| 3,845,770 | A | 11/1974 | Theeuwes et al. |
| 3,916,899 | A | 11/1975 | Theeuwes et al. |
| 4,008,719 | A | 2/1977 | Theeuwes et al. |
| 5,059,595 | A | 10/1991 | Le Grazie |
| 5,073,543 | A | 12/1991 | Marshall et al. |
| 5,120,548 | A | 6/1992 | McClelland et al. |
| 5,354,556 | A | 10/1994 | Sparks et al. |

| | | | |
|---|---|---|---|
| 5,591,767 | A | 1/1997 | Mohr et al. |
| 5,639,476 | A | 6/1997 | Oshlack et al. |
| 5,674,533 | A | 10/1997 | Santus et al. |
| 5,733,566 | A | 3/1998 | Lewis |
| 6,020,358 | A | 2/2000 | Muller et al. |
| 6,962,940 | B2 | 11/2005 | Muller et al. |
| 7,208,516 | B2 | 4/2007 | Muller et al. |
| 7,276,529 | B2 | 10/2007 | Muller et al. |
| 7,358,272 | B2 | 4/2008 | Muller et al. |
| 7,427,638 | B2 | 9/2008 | Muller et al. |
| 7,507,759 | B2 | 3/2009 | Muller et al. |
| 7,659,302 | B2 | 2/2010 | Muller et al. |
| 7,659,303 | B2 | 2/2010 | Muller et al. |
| 7,893,101 | B2 | 2/2011 | Muller et al. |
| 8,093,283 | B2 | 1/2012 | Muller et al. |
| 8,455,536 | B2 * | 6/2013 | Muller .............. A61K 31/4035 514/417 |
| 8,629,173 | B2 | 1/2014 | Muller et al. |
| 2006/0148882 | A1 | 7/2006 | Zeldis et al. |
| 2006/0183787 | A1 | 8/2006 | Muller et al. |
| 2008/0234359 | A1 | 9/2008 | Muller et al. |
| 2009/0186923 | A1 | 7/2009 | Amer et al. |
| 2009/0239926 | A1 | 11/2009 | Schafer et al. |
| 2010/0168475 | A1 | 7/2010 | Saindane et al. |
| 2014/0024695 | A1 | 1/2014 | Muller et al. |
| 2014/0100259 | A1 | 4/2014 | Muller et al. |

**FOREIGN PATENT DOCUMENTS**

| | | |
|---|---|---|
| WO | WO 03/080049 A1 | 10/2003 |
| WO | WO 2006/065814 A1 | 6/2006 |
| WO | WO 2012/149251 A1 | 11/2012 |
| WO | WO 2014/151180 A1 | 9/2014 |

OTHER PUBLICATIONS

Papp et al. (The Lancet, 380(9843), 738-746, 2012).*
Schett et al. (Arthritis & Rheumatism, 64(10): 3156-03167, 2012).*
FDA label for Otezla® (apremilast) tablets (Mar. 2014).*
"Clinical Pharmacology Review NDA 205437 Apremilast Application No. 205437Orig1s000," Clinical Pharmacology and Biopharmaceutics Review(s), Nov. 21, 2013, Retrieved from the Internet: URL:http://www.accessdata.fda.gov/drugsatfda_docs/nda/2014/205437Orig1s000ClinPharmR.pdf, retrieved on Sep. 22, 2015, 114 pages.
Anonymous, "Highlights of prescribing information—Otezla," Mar. 1, 2014, Retrieved from the Internet: URL:http://web.archive.org/web/20140327021029/http://www.otezla.com/otezla-prescribing-information.pdf, retrieved on Sep. 22, 2015 9 pages.

(Continued)

*Primary Examiner* — Bong-Sook Baek

(74) *Attorney, Agent, or Firm* — Jones Day

(57) **ABSTRACT**

Methods of treating, managing or preventing diseases ameliorated by inhibiting PDE4 such as psoriasis, ankylosing spondylitis, Behcet's disease, rheumatoid arthritis, atopic dermatitis, Crohn's disease, and ulcerative colitis are disclosed. Specific methods encompass the administration of apremilast in specific dosage titration schedule, alone or in combination with a second active agent.

**24 Claims, No Drawings**

Copy provided by USPTO from the PIRS Image Database on 10-10-2018

US 10,092,541 B2

Page 2

(56)    References Cited

OTHER PUBLICATIONS

Anonymous, "Oral Otezla® (apremilast) demostrated clinically meaningful and sustained improvements in skin, nail and scalp of adult patients with moderate to severe plaque psoriasis," Mar. 23, 2014, Retrieved from the Internet: URL:http://ir.celgene.com/releasedetail.cfm?releaseid=834900, retrieved on Sep. 22, 2015, pp. 1-6.

Baughman et al., "Release of tumor necrosis factor by alvoolar macrophages of patients with sarcoidosis," J. Lab. Clin. Med. 115:36-42 (1990).

Beavo and Reifsnyder, "Primary sequence of cyclic nucleotide phosphodiesterase isozymes and the design of selective inhibitors," Trends in Pharm., 11(4):150-155 (1990).

Bertolini et al., "Stimulation of bone resorption and inhibition of bone formation in vitro by human tumour necrosis factors," Nature, 319(6053):516-518 (1986).

Bissonnette et al., "Pulmonary inflammation and fibrosis in a murine model of asbestosis and silicosis. Possible role of tumor necrosis factor," Inflammation 13:329-339 (1989).

Carstensen, Drug Stability: Principles & Practices, Second Edition, Marcel Dekker, New York, NY, pp. 379-389 (1995).

Clouse et al., "Monokine regulation of human immunodeficiency virus-1 expression in a chronically infected human T cell clone," J. Immunol. 142:431-438 (1989).

Dezube et al., "Pentoxifylline and wellbeing in patients with cancer," Lancet, 335(8690):662 (1990).

Duh et al., "Tumor necrosis factor alpha activates human immunodeficiency virus type 1 through induction of nuclear factor binding to the NF-kappa B sites in the long terminal repeat," Proc. Nat. Acad. Sci. USA, 86:5974-5978 (1989).

Elliot et al., "TNF alpha blockade in rheumatoid arthritis: rationale, clinical outcomes and mechanisms of action," Int. J. Immunopharmacol., 17:141-145 (1995).

Ferrari-Baliviera et al., "Tumor necrosis factor induces adult respiratory distress syndrome in rats," Arch. Surg., 124(12):1400-1405 (1989).

Folks et al., "Tumor necrosis factor alpha induces expression of human immunodeficiency virus in a chronically infected T-cell clone," Proc. Natl. Acad. Sci. USA, 86(7):2365-2368 (1989).

Gottlieb et al., "Efficacy, tolerability, and pharmacodynamics of apremilast in recalcitrant plaque psoriasis: a phase II open-label study," J. Drugs Dermatology, 12(8):888-897 (2013).

Grau et al., "Tumor necrosis factor and disease severity in children with falciparum malaria," N. Engl. J. Med., 320(24):1586-1591 (1989).

Hinshaw et al., "Survival of primates in LD100 septic shock following therapy with antibody to tumor necrosis factor (TNF alpha)," Circ. Shock 30:279-292 (1990).

Holler et al., "Increased serum levels of tumor necrosis factor alpha precede major complications of bone marrow transplantation," Blood, 75(4):1011-1016 (1990).

Johnson et al., "Tumors producing human tumor necrosis factor induced hypercalcemia and osteoclastic bone resorption in nude mice," Endocrinology 124:1424-1427 (1989).

Kavanaugh et al., "Treatment of psoriatic arthritis in a phase 3 randomised, placebo-controlled trial with apremilast, an oral phosphodiesterase 4 inhibitor," Ann. Rheum. Dis., 73:1020-1026 (2014).

Lowe et al., Drugs of the Future, 17(9):799-807 (1992).

Lowe, "Tumour necrosis factor-α antagonists and their therapeutic applications," Exp. Opin. Ther. Patents, 8:1309-1322 (1998).

Millar et al., "Tumour necrosis factor in bronchopulmonary secretions of patients with adult respiratory distress syndrome," Lancet, 2(8665):712-714 (1989).

Monte et al., "Productive human immunodeficiency virus-1 infection of megakaryocytic cells is enhanced by tumor necrosis factor-alpha," Blood 79:2670-2679 (1992).

Nikolov, "Application No. 205437Orig1s000 Cross discipline team leader review," Center for Drug Evaluation and Research, Feb. 6, 2014, Retrieved from the Internet: URL:http://www.accessdata.fda.gov/drugsatfda_docs/nda/2014/205437Orig1s000CrossR.pdf, retrieved on Sep. 24, 2015, 42 pages.

Papp et al., "Efficacy of apremilast in the treatment of moderate to severe psoriasis: a randomised controlled trial," Lancet, 380:738-746 (2012).

Piguet et al., "Requirement of tumour necrosis factor for development of silica-induced pulmonary fibrosis," Nature, 344:245-247 (1990).

Poli et al., "The effect of cytokines and pharmacologic agents on chronic HIV infection," AIDS Res. Hum. Retrovirus., 8(2):191-197 (1992).

Poli et al., "Tumor necrosis factor alpha functions in an autocrine manner in the induction of human immunodeficiency virus expression," Proc. Nat. Acad. Sci. USA, 87(2):782-785 (1990).

The Merck Manual, 17th Edition, Merck & Company, West Point, PA, pp. 448, 944-952 (1999).

Tracey et al., "Anti-cachectin/TNF monoclonal antibodies prevent septic shock during lethal bacteraemia," Nature, 330(6149):662-664 (1987).

Van Dullemen et al., "Treatment of Crohn's disease with anti-tumor necrosis factor chimeric monoclonal antibody (cA2)," Gastroenterology, 109:129-135 (1995).

Verghese et al., "Differential regulation of human monocyte-derived TNF alpha and IL-1 beta by type IV cAMP-phosphodiesterase (cAMP-PDE) inhibitors," J. Pharmacol. Exp. Ther., 272(3), 1313-1320 (1995).

Wolff ed., Burger's Medicinal Chemistry and Drug Discovery, 5th Edition, John Wiley & Sons, Inc., pp. 172-178, 949-982 (1995).

U.S. Appl. No. 60/366,515, filed Mar. 20, 2002, Schafer et al.

U.S. Appl. No. 60/438,450, filed Jan. 7, 2003, Schafer et al.

U.S. Appl. No. 60/634,982, filed Dec. 13, 2004, Zeldis et al.

Anonymous, "A Phase 3, Multicenter, Randomized, Double-Blind, Placebo-Controlled, Parallel-Group, Efficacy and Safety Study of Two Doses of Apremilast (CC-10004) in Subjects With Active Psoriatic Arthritis Who Have Not Been Previously Treated With Disease Modifying Anti-rheumatic Drugs," retrieved from http://clinicaltrials.gov/archive/NCT01307423/2012_09_06 on May 22, 2014.

STN File CA, Registry No. 608141-41-9, entered STN on Oct. 23, 2003, Chemical Abstracts Index Name "Acetamide, N-[2-[(1S)-1-(3-ethoxy-4-methoxyphenyl)-2-(methylsulfonyl)ethyl]-2,3-dihydro-1,3-dioxo-1H-isoindol-4-yl]".

Deng et al., "Inhibition of PDE3, PDE4 and PDE7 potentiates glucocorticoid-induced apoptosis and overcomes glucocorticoid resistance in CEM T leukemic cells," Biochem. Pharmacol., 79(3):321-329 (2010).

Fox et al., "Combined oral cyclosporin and methotrexate therapy in patients with rheumatoid arthritis elevates methotrexate levels and reduces 7-hydroxymethotrexate levels when compared with methotrexate alone," Rheumatology (Oxford), 42(8):989-994 (2003).

Gladman et al., Kelley's Textbook of Rheumatology, 2 vols. 6th Edition, W. B. Saunders Company, Chapter 71, pp. 1071-1077 (2001).

Gladman, "Current concepts in psoriatic arthritis," Curr. Opin. Rheumatol., 14(4):361-366 (2002).

Kowalczyk et al., "Effect of phosphodiesterase antagonists on glucocorticoid mediated growth inhibition in murine skin cell lines," Eur. J. Pharmacol., 610(1-3):29-36 (2009).

Long et al., "Human articular chondrocytes produce IL-7 and respond to IL-7 with increased production of matrix metalloproteinase-13," Arthritis Res. Ther., 10(1):R23 (2008).

McCann et al., "Apremilast, a novel PDE4 inhibitor, inhibits spontaneous production of tumour necrosis factor-alpha from human rheumatoid synovial cells and ameliorates experimental arthritis," Arthritis Res. Ther., 12(3):R107 (2010).

Meyers et al., "Phosphodiesterase 4 inhibitors augment levels of glucocorticoid receptor in B cell chronic lymphocytic leukemia but not in normal circulating hematopoietic cells," Clin. Cancer Res., 13(16):4920-4927 (2007).

Patel et al., "Psoriatic arthritis—emerging concepts," Rheumatology (Oxford), 40(3):243-246 (2001).

Copy provided by USPTO from the PIRS Image Database on 10-10-2018

US 10,092,541 B2

Page 3

(56)         References Cited

OTHER PUBLICATIONS

Rihl et al., "Identification of interleukin-7 as a candidate disease
mediator in spondylarthritis," Arthritis Rheum., 58(11):3430-3435
(2008).
Tierney et al. (eds), Current Medical Diagnosis & Treatment 1998,
37th Edition, Appleton & Lange, Stamford, CT, p. 793 (1998).
Wilen et al., "Strategies in optical resolutions," Tetrahedron, 33:2725-
2736 (1977).
Wilen, Tables of Resolving Agents and Optical Resolutions, (E.L.
Eliel, Ed.), University of Notre Dame Press, Notre Dame, IN, p. 268
(1972).

* cited by examiner

Copy provided by USPTO from the PIRS Image Database on 10-10-2018

CEL-OTZ-00673674
JTX-13_4

US 10,092,541 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# METHODS FOR THE TREATMENT OF DISEASES AMELIORATED BY PDE4 INHIBITION USING DOSAGE TITRATION OF APREMILAST

This application claims priority to U.S. Provisional Patent Application No. 62/038,176, filed Aug. 15, 2014, the entirety of which is incorporated herein by reference.

## 1. FIELD

Provided herein are methods for treating, preventing and/or managing diseases ameliorated by PDE4 inhibition such as psoriasis, ankylosing spondylitis, Behcet's disease, rheumatoid arthritis, atopic dermatitis, Crohn's disease, and ulcerative colitis by administering apremilast in a specific dosage titration schedule. Also provided herein are pharmaceutical compositions and dosage forms comprising specific amounts of apremilast suitable for use in methods of treating, preventing and/or managing psoriasis, ankylosing spondylitis, Behcet's disease, rheumatoid arthritis, atopic dermatitis, Crohn's disease, and ulcerative colitis. The compounds disclosed herein are for use in the methods of the invention.

## 2. BACKGROUND

Adenosine 3',5'-cyclic monophosphate (cAMP) plays a role in many diseases and conditions, such as but not limited to inflammation, and other conditions (Lowe and Cheng, *Drugs of the Future,* 17(9), 799-807, 1992). It has been shown that the elevation of cAMP in inflammatory leukocytes inhibits their activation and the subsequent release of inflammatory mediators, including TNF-α and NF-κB.

It is believed that the primary cellular mechanism for the inactivation of cAMP is the breakdown of cAMP by a family of isoenzymes referred to as cyclic nucleotide phosphodiesterases (PDE) (Beavo and Reitsnyder, *Trends in Pharm.,* 11, 150-155, 1990). It is recognized, for example, that the inhibition of PDE type IV is particularly effective in the inhibition of inflammatory mediator release (Verghese, et al., *Journal of Pharmacology and Experimental Therapentics,* 272(3), 1313-1320, 1995). Thus, compounds that inhibit PDE4 (PDE IV) specifically may inhibit inflammation with a minimum of unwanted side effects such as cardiovascular or anti-platelet effects.

Inflammatory diseases such as arthritis, related arthritic conditions (e.g., ankylosing spondylitis, osteoarthritis and rheumatoid arthritis), Behcet's disease, inflammatory bowel disease (e.g., Crohn's disease and ulcerative colitis), psoriasis, atopic dermatitis and contact dermatitis are prevalent and problematic ailments. TNF-α plays a central role in the inflammatory response and the administration of their antagonists block chronic and acute responses in animal models of inflammatory disease. Enhanced or unregulated TNF-α production has been implicated in a number of diseases, for example psoriasis, ankylosing spondylitis, Behcet's disease, rheumatoid arthritis, atopic dermatitis, Crohn's disease, and ulcerative colitis. Tracey et al., 1987, *Nature* 330:662-664 and Hinshaw et al., 1990, *Circ. Shock* 30:279-292 (endotoxic shock); Dezube et al., 1990, *Lancet,* 335:662 (cachexia); Millar et al., 1989, *Lancet* 2:712-714 and Ferrai-Baliviera et al., 1989, *Arch. Surg.* 124:1400-1405 (adult respiratory distress syndrome); Bertolini et al., 1986, *Nature* 319:516-518, Johnson et al., 1989, *Endocrinology* 124:1424-1427, Holler et al., 1990, *Blood* 75:1011-1016, and Grau et al., 1989, *N. Engl. J. Med.* 320:1586-1591 (bone resorption diseases); Pignet et al., 1990, *Nature,* 344:245-

247, Bissonnette et al., 1989, *Inflammation* 13:329-339 and Baughman et al., 1990, *J. Lab. Clin. Med.* 115:36-42 (chronic pulmonary inflammatory diseases); Elliot et al., 1995, *Int. J. Pharmac.* 17:141-145 (rheumatoid arthritis); von Dullemen et al., 1995, *Gastroenterology,* 109:129-135 (Crohn's disease); Duh et al., 1989, *Proc. Nat. Acad. Sci.* 86:5974-5978, Poll et al., 1990, *Proc. Nat. Acad. Sci.* 87:782-785, Monto et al., 1990, *Blood* 79:2670, Clouse et al., 1989, *J. Immunol.* 142, 431-438, Poll et al., 1992, *AIDS Res. Hum. Retroviru,* 191-197, Poli et al. 1990, *Proc. Natl. Acad. Sci.* 87:782-784, Folks et al., 1989, *PNAS* 86:2365-2368 (HIV and opportunistic infections resulting from HIV).

Therefore, pharmaceutical compounds that can inhibit PDE4 or TNF-α, may be beneficial therapeutics. Small-molecule inhibitors have demonstrated an ability to treat or prevent inflammatory diseases implicated by PDE4 or TNF-α (for a review, see Lowe, 1998 *Exp. Opin. Ther. Patents* 8:1309-1332). One such class of molecules is the substituted phenethylsulfones described in U.S. Pat. No. 6,020,358.

There is a significant need for safe and effective methods of treating, preventing and managing psoriasis, ankylosing spondylitis, Behcet's disease, rheumatoid arthritis, atopic dermatitis, Crohn's disease, and ulcerative colitis, particularly for patients that are refractory to conventional treatments. In addition, there is a need to treat such disease while reducing or avoiding the toxicity and/or side effects associated with conventional therapies.

## 3. SUMMARY

Provided herein are methods of treating, preventing and/or managing psoriasis, ankylosing spondylitis, Behcet's disease, rheumatoid arthritis, atopic dermatitis, Crohn's disease, and ulcerative colitis in humans in need thereof using specific dosage titration schedule of apremilast. The methods comprise administering to a patient in need of such treatment, prevention or management a therapeutically or prophylactically effective amount of apremilast, or a pharmaceutically acceptable prodrug, metabolite, polymorph, salt, solvate (e.g., hydrate) or clathrate thereof in specific dosage titration schedule.

In some embodiments, provided herein are methods of treating psoriasis, ankylosing spondylitis, Behcet's disease, rheumatoid arthritis, atopic dermatitis, Crohn's disease, and ulcerative colitis, which comprises orally administering to a patient having psoriasis, ankylosing spondylitis, Behcet's disease, rheumatoid arthritis, atopic dermatitis, Crohn's disease, or ulcerative colitis escalating doses of stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione, or a pharmaceutically acceptable prodrug, polymorph, salt, or solvate thereof, wherein a starting dose is between about 10 mg/day and about 20 mg/day, and a maximum dose is between about 40 mg/day and about 100 mg/day.

In some embodiments, the method comprises the following initial titration schedule:

(i) 10 mg in the morning on the first day of administration;

(ii) 10 mg in the morning and 10 mg after noon on the second day of administration;

(iii) 10 mg in the morning and 20 mg after noon on the third day of administration;

(iv) 20 mg in the morning and 20 mg after noon on the fourth day of administration;

(v) 20 mg in the morning and 30 mg after noon on the fifth day of administration; and

Copy provided by USPTO from the PIRS Image Database on 10-10-2018

CEL-OTZ-00673675

**JTX-13_5**

US 10,092,541 B2

3

(vi) 30 mg in the morning and 30 mg after noon on the sixth and every subsequent day of administration.

In some embodiments, the methods further comprise the administration of a therapeutically or prophylactically effective amount of at least a second active agent, including but not limited to, an anti-inflammatory agent, an immunosuppressant, mycophenolate mofetil, a biologic agent, or a Cox-2 inhibitor.

In another embodiment, apremilast, or a pharmaceutically acceptable prodrug, metabolite, polymorph, salt, solvate (e.g., hydrate) or clathrate thereof is administered orally in a dosage form such as a tablet and a capsule.

### 4. DETAILED DESCRIPTION

#### 4.1 Definitions

As used herein, the term "apremilast" refers to (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione, also known as N-[2-[(1S)-1-(3-ethoxy-4-methoxyphenyl)-2-(methylsulfonyl)ethyl]-2,3-dihydro-1,3-dioxo-1H-isoindol-4-yl]acetamide. Apremilast has the following structure:



As used herein and unless otherwise indicated, the term "pharmaceutically acceptable salt" includes, but is not limited to, salts prepared from pharmaceutically acceptable non-toxic acids or bases including inorganic acids and bases and organic acids and bases. Suitable pharmaceutically acceptable base addition salts provided herein include metallic salts made from aluminum, calcium, lithium, magnesium, potassium, sodium and zinc or organic salts made from lysine, N,N'-dibenzylethylenediamine, chloroprocaine, choline, diethanolamine, ethylenediamine, meglumine (N-methylglucamine) and procaine. Suitable non-toxic acids include, but are not limited to, inorganic and organic acids such as acetic, alginic, anthranilic, benzenesulfonic, benzoic, camphorsulfonic, citric, ethenesulfonic, formic, fumaric, furoic, galacturonic, gluconic, glucuronic, glutamic, glycolic, hydrobromic, hydrochloric, isethionic, lactic, maleic, malic, mandelic, methanesulfonic, mucic, nitric, pamoic, pantothenic, phenylacetic, phosphoric, propionic, salicylic, stearic, succinic, sulfanilic, sulfuric, tartaric acid, and p-toluenesulfonic acid. Specific non-toxic acids include hydrochloric, hydrobromic, phosphoric, sulfuric, and methanesulfonic acids. Examples of specific salts thus include hydrochloride and mesylate salts.

As used herein and unless otherwise indicated, the term "hydrate" means a compound provided herein or a salt thereof that further includes a stoichiometric or non-stoichiometric amount of water bound by non-covalent intermolecular forces.

4

As used herein and unless otherwise indicated, the term "solvate" means a solvate formed from the association of one or more solvent molecules to a compound provided herein. The term "solvate" includes hydrates (e.g., monohydrate, dihydrate, trihydrate, tetrahydrate and the like).

As used herein and unless otherwise indicated, the term "polymorph" means solid crystalline forms of a compound provided herein or complex thereof. Different polymorphs of the same compound can exhibit different physical, chemical and/or spectroscopic properties.

As used herein and unless otherwise specified, the term "prodrug" means a derivative of a compound that can hydrolyze, oxidize, or otherwise react under biological conditions (in vitro or in vivo) to provide the compound. Examples of prodrugs include, but are not limited to, derivatives and metabolites of apremilast that include biohydrolyzable moieties such as biohydrolyzable amides, biohydrolyzable esters, biohydrolyzable carbamates, biohydrolyzable carbonates, biohydrolyzable ureides, and biohydrolyzable phosphate analogues. Prodrugs can typically be prepared using well-known methods, such as those described by 1 Burger's Medicinal Chemistry and Drug Discovery, 172-178, 949-982 (Manfred E. Wolff ed., 5th ed. 1995).

As used herein, and unless otherwise specified, the term "enantiomer," "isomer" or "stereoisomer" encompasses all enantiomerically/stereomerically pure and enantiomerically/stereomerically enriched compounds provided herein.

As used herein, and unless otherwise indicated, the term "stereomerically pure" or "enantiomerically pure" means that a compound comprises one stereoisomer and is substantially free of its counter stereoisomer or enantiomer. For example, a compound is stereomerically or enantiomerically pure, when the compound contains greater than or equal to 80%, 90%, 95%, 96%, 97%, 98% or 99% of one stereoisomer, and 20%, 10%, 5%, 4%, 3%, 2%, 1% or less of the counter stereoisomer. "Substantially free of its (R) enantiomer" is encompassed by the term stereomerically pure or enantiomerically pure.

As used herein, term "adverse effect" includes, but is not limited to gastrointestinal, renal and hepatic toxicities, leukopenia, increases in bleeding times due to, e.g., thrombocytopenia, and prolongation of gestation, nausea, vomiting, somnolence, asthenia, dizziness, teratogenicity, extra-pyramidal symptoms, akathisia, cardiotoxicity including cardiovascular disturbances, inflammation, male sexual dysfunction, and elevated serum liver enzyme levels. The term "gastrointestinal toxicities" includes but is not limited to gastric and intestinal ulcerations and erosions. The term "renal toxicities" includes but is not limited to such conditions as papillary necrosis and chronic interstitial nephritis.

As used herein, the term "patient" refers to a mammal, particularly a human. In some embodiments, the patient is a female. In further embodiments, the patient is a male. In further embodiments, the patient is a pediatric (a newborn, an infant, a child, or an adolescent).

As used herein and unless otherwise specified, the term "pediatrics" or "pediatric medicine" refers to the branch of medicine that deals with the medical care of newborns, infants, children, and adolescents. The approximate age range of a newborn is from birth to 1 month of age. The approximate age range of an infant is greater than 1 month to 2 years of age. The approximate age range of a child is greater than 2 years to 12 years of age. The approximate age range of an adolescent is greater than 12 years to 21 years of age.

As used herein, and unless otherwise specified, the terms "treat," "treating" and "treatment" contemplate an action

Copy provided by USPTO from the PIRS Image Database on 10-10-2018

CEL-OTZ-00673676
JTX-13_6

Appx10624

US 10,092,541 B2

5

that occurs while a patient is suffering from the specified disease or disorder, which reduces the severity or symptoms of the disease or disorder, or retards or slows the progression or symptoms of the disease or disorder.

As used herein, unless otherwise specified, the terms "prevent," "preventing" and "prevention" contemplate an action that occurs before a patient begins to suffer from the specified disease or disorder, which inhibits or reduces the severity or symptoms of the disease or disorder.

As used herein, and unless otherwise indicated, the terms "manage," "managing," and "management" encompass preventing the recurrence of the specified disease or disorder in a patient who has already suffered from the disease or disorder, and/or lengthening the time that a patient who has suffered from the disease or disorder remains in remission. The terms encompass modulating the threshold, development and/or duration of the disease or disorder, or changing the way that a patient responds to the disease or disorder.

### 4.2 Methods of Treatment and Prevention

Provided herein are methods of treating, managing and/or preventing psoriasis, ankylosing spondylitis, Behcet's disease, rheumatoid arthritis, atopic dermatitis, Crohn's disease, and ulcerative colitis, which comprise administering to a patient in need of such treatment, management or prevention a therapeutically or prophylactically effective amount of apremilast, or a pharmaceutically acceptable prodrug, metabolite, polymorph, salt, solvate or clathrate thereof in a specific dosage titration schedule. Apremilast, or a pharmaceutically acceptable prodrug, metabolite, polymorph, salt, solvate or clathrate thereof, is provided for use in the methods of treatment, management and/or prevention disclosed herein.

Provided herein are methods of treating psoriasis, which comprise administering to a patient in need of such treatment a therapeutically effective amount of apremilast, or a pharmaceutically acceptable prodrug, metabolite, polymorph, salt, solvate or clathrate thereof in a specific dosage titration schedule.

Provided herein are methods of treating ankylosing spondylitis, which comprise administering to a patient in need of such treatment a therapeutically effective amount of apremilast, or a pharmaceutically acceptable prodrug, metabolite, polymorph, salt, solvate or clathrate thereof in a specific dosage titration schedule.

Provided herein are methods of treating Behcet's disease, which comprise administering to a patient in need of such treatment a therapeutically effective amount of apremilast, or a pharmaceutically acceptable prodrug, metabolite, polymorph, salt, solvate or clathrate thereof in a specific dosage titration schedule.

Provided herein are methods of treating rheumatoid arthritis, which comprise administering to a patient in need of such treatment a therapeutically effective amount of apremilast, or a pharmaceutically acceptable prodrug, metabolite, polymorph, salt, solvate or clathrate thereof in a specific dosage titration schedule.

Provided herein are methods of treating atopic dermatitis, which comprise administering to a patient in need of such treatment a therapeutically effective amount of apremilast, or a pharmaceutically acceptable prodrug, metabolite, polymorph, salt, solvate or clathrate thereof in a specific dosage titration schedule.

Provided herein are methods of treating Crohn's disease, which comprise administering to a patient in need of such treatment a therapeutically effective amount of apremilast,

6

or a pharmaceutically acceptable prodrug, metabolite, polymorph, salt, solvate or clathrate thereof in a specific dosage titration schedule.

Provided herein are methods of treating ulcerative colitis, which comprise administering to a patient in need of such treatment a therapeutically effective amount of apremilast, or a pharmaceutically acceptable prodrug, metabolite, polymorph, salt, solvate or clathrate thereof in a specific dosage titration schedule.

Apremilast is provided for use in the methods of treatment of the invention.

In some embodiments apremilast is provided for use in the methods of treatment, management and/or prevention of a disease disclosed herein.

In some embodiments the disease is psoriasis. In some embodiments the disease is ankylosing spondylitis. In some embodiments the disease is Behcet's disease. In some embodiments the disease is rheumatoid arthritis. In some embodiments the disease is atopic dermatitis. In some embodiments the disease is Crohn's disease. In some embodiments the disease is ulcerative colitis.

In some embodiments apremilast is present as a pharmaceutically acceptable prodrug thereof. In some embodiments apremilast is present as a pharmaceutically acceptable metabolite thereof. In some embodiments apremilast is present as a pharmaceutically acceptable polymorph thereof. In some embodiments apremilast is present as a pharmaceutically acceptable salt thereof. In some embodiments apremilast is present as a pharmaceutically acceptable solvate thereof. In some embodiments apremilast is present as a pharmaceutically acceptable clathrate thereof.

In some embodiments, the methods also encompass inhibiting or averting signs and symptoms of psoriasis, ankylosing spondylitis, Behcet's disease, rheumatoid arthritis, atopic dermatitis, Crohn's disease, or ulcerative colitis as well as addressing the disease itself, prior to the onset of symptoms by administering apremilast, or a pharmaceutically acceptable prodrug, metabolite, polymorph, salt, solvate or clathrate thereof in a specific dosage titration schedule. Patients having history of psoriasis, ankylosing spondylitis, Behcet's disease, rheumatoid arthritis, atopic dermatitis, Crohn's disease, or ulcerative colitis are preferred candidates for preventive regimens. In some embodiments, apremilast, or a pharmaceutically acceptable prodrug, metabolite, polymorph, salt, solvate or clathrate thereof is provided for use in the methods of inhibiting or averting signs and symptoms of psoriasis, ankylosing spondylitis, Behcet's disease, rheumatoid arthritis, atopic dermatitis, Crohn's disease, or ulcerative colitis as well as addressing the disease itself, prior to the onset of symptoms.

In certain embodiments, apremilast is orally administered to a patient having psoriasis, ankylosing spondylitis, Behcet's disease, rheumatoid arthritis, atopic dermatitis, Crohn's disease, or ulcerative colitis in a twice daily dose of 30 mg per day (i.e., 60 mg per day). In certain embodiments, apremilast is for use in the methods of oral administration.

In some embodiments, the patient is an adult.

In some embodiments, the patient is a newborn.

In some embodiments, the patient is an infant.

In some embodiments, the patient is a child.

In some embodiments, the patient is an adolescent.

In some embodiments, provided herein are methods of treating psoriasis, ankylosing spondylitis, Behcet's disease, rheumatoid arthritis, atopic dermatitis, Crohn's disease, and ulcerative colitis, which comprises orally administering to a patient having psoriasis, ankylosing spondylitis, Behcet's disease, rheumatoid arthritis, atopic dermatitis, Crohn's dis-

Copy provided by USPTO from the PIRS Image Database on 10-10-2018

CEL-OTZ-00673677
JTX-13_7

Appx10625

US 10,092,541 B2

7

ease, or ulcerative colitis escalating doses of stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione, or a pharmaceutically acceptable prodrug, polymorph, salt, or solvate thereof, wherein a starting dose is between about 10 mg/day and about 20 mg/day, and a maximum dose is between about 40 mg/day and about 100 mg/day. Stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione, or a pharmaceutically acceptable prodrug, polymorph, salt, or solvate thereof, is provided for use in the methods of treatment disclosed herein above.

In some embodiments, the method comprises the following initial titration schedule:

(i) 10 mg in the morning on the first day of administration;

(ii) 10 mg in the morning and 10 mg after noon on the second day of administration;

(iii) 10 mg in the morning and 20 mg after noon on the third day of administration;

(iv) 20 mg in the morning and 20 mg after noon on the fourth day of administration;

(v) 20 mg in the morning and 30 mg after noon on the fifth day of administration; and

(vi) 30 mg in the morning and 30 mg after noon on the sixth and every subsequent day of administration.

In some embodiments, the dosing schedule may be represented as follows:

| Day 1 | Day 2 | | Day 3 | | Day 4 | | Day 5 | | Day 6 & thereafter | |
|---|---|---|---|---|---|---|---|---|---|---|
| AM | AM | PM | AM | PM | AM | PM | AM | PM | AM | PM |
| 10 mg | 10 mg | 10 mg | 10 mg | 20 mg | 20 mg | 20 mg | 20 mg | 30 mg | 30 mg | 30 mg |

In some embodiments, the method comprises the following initial titration schedule:

(i) 10 mg in the morning on the first day of administration;

(ii) 10 mg in the morning and 10 mg after noon on the second day of administration;

(iii) 10 mg in the morning and 20 mg after noon on the third day of administration;

(iv) 20 mg in the morning and 20 mg after noon on the fourth day of administration;

(v) 20 mg in the morning and 30 mg after noon on the fifth day of administration;

(vi) 30 mg in the morning and 30 mg after noon on the sixth day of administration;

(vii) 30 mg in the morning and 40 mg after noon on the seventh day of administration;

(viii) 40 mg in the morning and 40 mg after noon on the eighth and every subsequent day of administration.

In some embodiments, the method comprises the following initial titration schedule:

(i) 10 mg in the morning on the first day of administration;

(ii) 10 mg in the morning and 10 mg after noon on the second day of administration;

(iii) 10 mg in the morning and 20 mg after noon on the third day of administration;

(iv) 20 mg in the morning and 20 mg after noon on the fourth and every subsequent day of administration.

In some embodiments, the method comprises the following initial titration schedule:

(i) 10 mg in the morning and 10 mg after noon on the first and second day of administration;

8

(ii) 20 mg in the morning and 20 mg after noon on the third and fourth day of administration;

(iii) 30 mg in the morning and 30 mg after noon on the fifth and every subsequent day of administration.

In one embodiment, stereomerically pure apremilast, (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione, is administered according the above schedule. In one embodiment, stereomerically pure apremilast, (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione is provided for use in methods of administration according to the above schedules.

In one embodiment, the dosage of apremilast, (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione, may be reduced to 30 mg once daily in patients with severe renal impairment.

In one embodiment, apremilast, (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione, can be administered without regard to meals according the above schedule.

In some embodiments, the stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione comprises greater than about 90% by weight of (+) isomer based on the total weight percent of the compound.

In some embodiments, the stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione comprises greater than about 95% by weight of (+) isomer based on the total weight percent of the compound.

In some embodiments, the stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione comprises greater than about 96% by weight of (+) isomer based on the total weight percent of the compound.

In some embodiments, the stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione comprises greater than about 97% by weight of (+) isomer based on the total weight percent of the compound.

In some embodiments, the stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione comprises greater than about 98% by weight of (+) isomer based on the total weight percent of the compound.

In some embodiments, the stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione comprises greater than about 99% by weight of (+) isomer based on the total weight percent of the compound.

In some embodiments, the stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione is administered in an amount of about 20 mg twice a day following the initial titration schedule.

In some embodiments, the stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-

Copy provided by USPTO from the PIRS Image Database on 10-10-2018

CEL-OTZ-00673678

JTX-13_8

Appx10626

US 10,092,541 B2

9

acetylaminoisoindoline-1,3-dione is administered in an amount of about 30 mg twice a day following the initial titration schedule.

In some embodiments, the stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione is administered once or twice daily.

In some embodiments, the stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione is administered in tablet form. In some embodiments, the tablet comprises a 10 mg, 20 mg or 30 mg dose of stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione.

In some embodiments, the methods provided herein, further comprise administering to the patient a therapeutically effective amount of a second active agent. In some embodiments, the second active agent is an anti-inflammatory agent, an immunosuppressant, mycophenolate mofetil, a biologic agent, or a Cox-2 inhibitor. In some embodiments, the second active agent is a nonsteroidal anti-inflammatory agent. In some embodiments, the second active agent is a disease-modifying anti-rheumatic agent. In some embodiments, the second active agent is methotrexate. In some embodiments, the second active agent is sulfasalazine. In some embodiments, the second active agent is leflunomide. In some embodiments, the second active agent is etanercept. In some embodiments, the second active agent is an oral corticosteroid. In some embodiments, the second active agent is prednisone. In some embodiments, a second active agent is provided for administration in the methods disclosed herein.

In some embodiments, the patient has received prior treatment for psoriasis, ankylosing spondylitis, Behcet's disease, rheumatoid arthritis, atopic dermatitis, Crohn's disease, or ulcerative colitis. In some embodiments, the prior treatment is with a disease-modifying antirheumatic drug. In some embodiments, the psoriasis, ankylosing spondylitis, Behcet's disease, rheumatoid arthritis, atopic dermatitis, Crohn's disease, or ulcerative colitis is refractory to the prior treatment.

In some embodiments, the method comprises administering stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione, substantially free of any salt, solvate, or prodrug forms of (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione.

In some embodiments, the method comprises administering a pharmaceutically acceptable salt of stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione.

In some embodiments, the method comprises administering a pharmaceutically acceptable solvate of stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione.

### 4.2.1 Combination Therapy

In particular methods encompassed by this embodiment, apremilast is administered in combination with another drug ("second active agent") for treating, managing and/or preventing psoriasis, ankylosing spondylitis, Behcet's disease, rheumatoid arthritis, atopic dermatitis, Crohn's disease, or ulcerative colitis. In some embodiments, apremilast is provided for use in methods of treatment, management, and/or prevention any of the above diseases, wherein the method

10

comprises administering apremilast in combination with another drug ("second active agent").

In certain embodiments, the methods encompass synergistic combinations for the treatment, prevention and/or management of psoriasis, ankylosing spondylitis, Behcet's disease, rheumatoid arthritis, atopic dermatitis, Crohn's disease, or ulcerative colitis. Apremilast may also be used to alleviate adverse effects associated with some second active agents.

One or more second active agents can be used in the methods together with apremilast. Second active agents can be administered before, after or simultaneously with apremilast. In some embodiments, the one or more second active agents are selected from the group consisting of anti-inflammatories such as nonsteroidal anti-inflammatory drugs (NSAIDs), immunosuppressants, topical corticosteroids, calcineurin inhibitors, Cox-2 inhibitors, TNF-alpha inhibitors, antirheumatics, antipsoriatics, interleukin inhibitors, narcotic analgesic combinations, salicylates, glucocorticoids and topical rubefacients.

In one embodiment, the second active agent is selected from the group consisting of an anti-inflammatory agent, an immunosuppressant, mycophenolate mofetil, a biologic agent, or a Cox-2 inhibitor.

In one embodiment, the second active agent is sulfasalazine.

In one embodiment, the second active agent is leflunomide.

In one embodiment, the second active agent is an oral corticosteroid.

In one embodiment, the second active agent is etanercept.

In some embodiments, the second active agents may include, but are not limited to, anti-inflammatories such as NSAIDs including, but not limited to, diclofenac (e.g., ARTHROTEC®), diflunisal (e.g., DOLOBID®), etodolac (e.g., LODINE®), fenoprofen (e.g., NALFON®), ibuprofen (e.g., ADVIL, CHILDREN'S ADVIL/MOTRIN, MEDIPREN, MOTRIN, NUPRIN or PEDIACARE FEVER®), indomethacin (e.g., ARTHREXIN®), ketoprofen (e.g., ORUVAIL®), ketorolac (e.g., TORADOL®), fosfomycin tromethamine (e.g., MONURAL®), meclofenamate (e.g., Meclomen®), nabumetone (e.g., RELAFEN®), naproxen (e.g., ANAPROX®, ANAPROX® DS, EC-NAPROSYN®, NAPRELAN® or NAPROSYN®), oxaprozin (e.g., DAYPRO®), piroxicam (e.g., FELDENE®), sulindac (e.g., CLINORIL®), and tolmetin (e.g., TOLECTIN® DS or TOLECTIN®).

In other embodiments, the second active agents may include, but are not limited to, disease-modifying antirheumatic drugs (DMARDs) or immunosuppressants such as, but not limited to, methotrexate (Rheumatrex®), sulfasalazine (Azulfidine®), leflunomide (Arava®), and cyclosporine (Sandimmune® or Neoral®).

In other embodiments, the second active agent is an oral corticosteroid, such as, but not limited to, budesonide (Entocort®), dexamethasone, fludrocortisone (Florinef®, Florinef® acetate), hydrocortisone, methylprednisone, prednisolone, and prednisone.

In other embodiments, the second active agents may include, but are not limited to, mycophenolate mofetil (CellCept®), an immunosuppressive agent widely used in organ transplantation and gaining favor in treating autoimmune and inflammatory skin disorders.

In further embodiments, the second active agents may include, but are not limited to, biologic agents such as etanercept (Enbrel®), infliximab (Remicade®) and adalimumab (Humira®).

Copy provided by USPTO from the PIRS Image Database on 10-10-2018

CEL-OTZ-00673679

JTX-13_9

Appx10627

US 10,092,541 B2

11                                                    12

In further embodiments, the second active agents may include, but are not limited to, Cox-2 inhibitors such as celecoxib (Celebrex®), valdecoxib (Bextra®) and meloxicam (Mobic®).

In some embodiments, the one or more selective active agents is selected from the group consisting of acitretin, adalimumab, alclometasone, alefacept, aloe vera, amcinonide, ammonium lactate/urea, ammonium lactate/halobetasol, anthralin, benzocaine/pyrilamine/zinc oxide, betamethasone, betamethasone/calcipotriene, calcipotriene, clobetasol, clocortolone, coal tar, coal tar/salicylic acid, corticotropin, cyclosporine, desonide, desoximetasone, diflorasone, fluocinonide, flurandrenolide, halcinonide, halobetasol, hydrocortisone, hydrocortisone/pramoxine, hydroxyurea, infliximab, methotrexate, methoxsalen, mometasone, pramoxine, prednisone, prednisolone, prednicarbate, resorcinol, tazarotene, triamcinolone and ustekinumab.

In some embodiments, the one or more selective active agents is selected from the group consisting of abatacept, acetaminophen, acetaminophen/hydrocodone, acetaminophen/tramadol, adalimumab, alemtuzumab, aluminum hydroxide/aspirin/calcium carbonate/magnesium hydroxide, anakinra, aspirin, auranofin, aurothioglucose, atorvastatin, azathioprine, celecoxib, certolizumab, chondroitin, cortisone, corticotropin, cyclophosphamide, cyclosporine, daclizumab, dexamethasone, diclofenac, diclofenac/misoprostol, diflunisal, doxycycline, esomeprazole, esomeprazole/naproxen, etanercept, etodolac, famotidine, famotidine/ibuprofen, fenoprofen, flurbiprofen, glucosamine, gold sodium thiomalate, golimumab, hydroxychloroquine, ibuprofen, indomethacin, infliximab, interferon, interferon gamma-1b, ketoprofen, lansoprazole, lansoprazole/naproxen, leflunomide, levamisole, meclofenamate, meloxicam, methotrexate, methylprednisone, methylprednisolone, methyl salicylate, minocycline, mycophenolate mofetil, nabumetone, naproxen, oxaprozin, penicillamine, phenytoin, piroxicam, prednisone, primrose oil, rituximab, rofecoxib, salsalate, sulfasalazine, tetracycline, tocilizumab, tofacitinib, tolmetin, tramadol, triamcinolone, trolamine salicylate, valdecoxib and pharmaceutically acceptable prodrugs and salts thereof.

In some embodiments, the one or more selective active agents is selected from the group consisting of abatacept, acetaminophen, acetaminophen/hydrocodone, acetaminophen/tramadol, acitretin, adalimumab, alclometasone, alefacept, alemtuzumab, aloe vera, aluminum hydroxide/aspirin/calcium carbonate/magnesium hydroxide, amcinonide, ammonium lactate/urea, ammonium lactate/halobetasol, anakinra, anthralin, aspirin, auranofin, aurothioglucose, atorvastatin, azathioprine, benzocaine/pyrilamine/zinc oxide, betamethasone, betamethasone/calcipotriene, calcipotriene, celecoxib, certolizumab, chondroitin, clobetasol, clocortolone, coal tar, coal tar/salicylic acid, corticotropin, cortisone, cyclophosphamide, cyclosporine, daclizumab, desonide, desoximetasone, dexamethasone, diclofenac, diclofenac/misoprostol, diflorasone, diflunisal, doxycycline, esomeprazole, esomeprazole/naproxen, etanercept, etodolac, famotidine, famotidine/ibuprofen, fenoprofen, fluocinonide, flurandrenolide, flurbiprofen, fostamatinib, glucosamine, gold sodium thiomalate, golimumab, halcinonide, halobetasol, hydrocortisone, hydrocortisone/pramoxine, hydroxyurea, hydroxychloroquine, ibuprofen, indomethacin, infliximab, interferon, interferon gamma-1b, ibrutinib, ketoprofen, lansoprazole, lansoprazole/naproxen, leflunomide, lenalidomide, levamisole, meclofenamate, meloxicam, methotrexate, methoxsalen, methylprednisone, methylprednisolone, methyl salicylate, minocycline, mometasone, mycophenolate mofetil, nabumetone, naproxen, oxaprozin, penicillamine, phenytoin, piroxicam, pomalidomide, pramoxine, prednisone, prednisolone, prednicarbate, primrose oil, resorcinol, rituximab, rofecoxib, salsalate, sulindac, sulfasalazine, tazarotene, tetracycline, tocilizumab, tofacitinib, tolmetin, tramadol, triamcinolone, trolamine salicylate, ustekinumab, valdecoxib, 3-(5-amino-2-methyl-4-oxo-4H-quinazolin-3-yl)-piperidine-2,6-dione, (S)-3-(4-((4-(morpholinomethyl)benzyl)oxy)-1-oxoisoindolin-2-yl)piperidine-2,6-dione and pharmaceutically acceptable prodrugs and salts thereof.

In some embodiments, the one or more selective active agents is selected from the group consisting of a PDE7 inhibitor, a Btk inhibitor, a cereblon targeting agent, a Tyk2 inhibitor, a Syk inhibitor, a JAK inhibitor, a JNK inhibitor, a MK2 inhibitor, an ERP5 inhibitor, a PD-1 inhibitor, a TIMP-3 inhibitor, an IL23p19 inhibitor, an IL-17 blocker, an IKK-2 inhibitor, a LH2B inhibitor, a PKC-theta inhibitor, an IRAK4 inhibitor, a ROCK inhibitor, and a ROR-gamma-T inhibitor.

Administration of apremilast and a second active agent to a patient can occur simultaneously or sequentially by the same or different routes of administration. The suitability of a particular route of administration employed for a particular second active agent will depend on the second active agent itself (e.g., whether it can be administered orally or topically without decomposing) and the subject being treated. Particular routes of administration for the second active agents or ingredients are known to those of ordinary skill in the art. See, e.g., *The Merck Manual*, 448 (17th ed., 1999).

The amount of second active agent administered can be determined based on the specific agent used, the subject being treated, the severity and stage of disease and the amount(s) of apremilast and any optional additional second agents concurrently administered to the patient. Those of ordinary skill in the art can determine the specific amounts according to conventional procedures known in the art. In the beginning, one can start from the amount of the second active agent that is conventionally used in the therapies and adjust the amount according to the factors described above. See, e.g., *Physician's Desk Reference* (59th Ed., 2005).

In certain embodiments, the second active agent is administered orally, topically, transdermally, intravenously or subcutaneously. In certain embodiments, the second active agent is administered once to four times daily. In certain embodiments, the second active agent is administered once to four times monthly. In certain embodiments, the second active agent is administered once every week. In certain embodiments, the second active agent is administered once every other week. In certain embodiments, the second active agent is administered once every month. In certain embodiments, the second active agent is administered once every two months. In certain embodiments, the second active agent is administered once every three months. In certain embodiments, the second active agent is administered in an amount of from about 1 to about 1,000 mg, from about 5 to about 500 mg, from about 10 to about 350 mg or from about 50 to about 200 mg. The specific amount of the second active agent will depend on the specific agent used, the age of the subject being treated, the severity and stage of disease and the amount(s) of apremilast and any optional additional second active agents concurrently administered to the patient.

### 4.3 Apremilast

Apremilast is an inhibitor of phosphodiesterase 4 (PDE4) specific for cyclic adenosine monophosphate (cAMP).

Copy provided by USPTO from the PIRS Image Database on 10-10-2018

CEL-OTZ-00673680

JTX-13_10

Appx10628

US 10,092,541 B2

<table>
<tr><td>13</td><td>14</td></tr>
</table>

PDE4 inhibition results in increased intracellular cAMP levels and is effective in the inhibition of inflammatory mediator release.

Without being limited by theory, apremilast is believed to be (+) enantiomer of 2-[1-(3-ethoxy-4-methoxyphenyl)-2-methanesulfonylethyl]-4-acetylaminoisoindolin-1,3-dione having the following structure:



Apremilast may be prepared according to methods disclosed in U.S. Pat. Nos. 6,962,940; 7,208,516; 7,427,638; or 7,893,101, the entirety of each which is incorporated herein by reference. In a specific method, apremilast may be prepared, for example, by the following process.

A stirred solution of 1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethylamine (1.0 g, 3.7 mmol) and 3-acetamidophthalic anhydride (751 mg, 3.66 mmol) in acetic acid (20 mL) was heated at reflux for 15 h. The solvent was removed in vacuo to yield an oil. Chromatography of the resulting oil yielded the product as a yellow solid (1.0 g, 59% yield): mp, 144° C.; $^1$H NMR (CDCl$_3$) δ: 1.47 (t, J=7.0 Hz, 3H, CH$_3$), 2.26 (s, 3H, CH$_3$), 2.88 (s, 3H, CH$_3$), 3.75 (dd, J=4.4, 14.3 Hz, 1H, CH), 3.85 (s, 3H, CH3), 4.11 (q, J=7 Hz, 2H, CH$_2$), 5.87 (dd, J=4.3, 10.5 Hz, 1H, NCH), 6.82-6.86 (m, 1H, Ar), 7.09-7.11 (m, 2H, Ar), 7.47 (d, J=7 Hz, 1H, Ar), 7.64 (t, J=8 Hz, 1H, Ar), 8.74 (d, J=8 Hz, 1H, Ar), 9.49 (br s, 1H, NH); $^{13}$C NMR (CDCl$_3$) δ: 14.61, 24.85, 41.54, 48.44, 54.24, 55.85, 64.43, 111.37, 112.34, 115.04, 118.11, 120.21, 124.85, 129.17, 130.96, 136.01, 137.52, 148.54, 149.65, 167.38, 169.09, 169.40; Anal Calc'd. for C$_{22}$H$_{24}$N$_2$O$_7$S: C, 57.38; H, 5.25; N, 6.08. Found: C, 57.31; H, 5.34; N, 5.83.

Preparation of 3-aminophthalic acid: 10% Pd/C (2.5 g), 3-nitrophthalic acid (75.0 g, 355 mmol) and ethanol (1.5 L) were charged to a 2.5 L Parr hydrogenator under a nitrogen atmosphere. Hydrogen was charged to the reaction vessel for up to 55 psi. The mixture was shaken for 13 hours, maintaining hydrogen pressure between 50 and 55 psi. Hydrogen was released and the mixture was purged with nitrogen 3 times. The suspension was filtered through a celite bed and rinsed with methanol. The filtrate was concentrated in vacuo. The resulting solid was resurried in ether and isolated by vacuum filtration. The solid was dried in vacuo to a constant weight, affording 54 g (84% yield) of 3-aminopthalic acid as a yellow product. $^1$H-NMR (DMSO-d6) δ: 3.17 (s, 2H), 6.67 (d, 1H), 6.82 (d, 1H), 7.17 (t, 1H), 8-10 (br, s, 1H); $^{13}$C-NMR (DMSO-d6) δ: 112.00, 115.32, 118.20, 131.28, 135.86, 148.82, 169.15, 170.09.

Preparation of 3-aminophthalic anhydride: A 1 L 3-necked round bottom flask was equipped with a mechanical stirrer, thermometer, and condenser and charged with 3-aminophthalic acid (108 g, 596 mmol) and acetic anhydride (550 mL). The reaction mixture was heated to reflux for 3 hours and cooled to about 25° C. and further to 0-5° C.

for another 1 hour. The crystalline solid was collected by vacuum filtration and washed with ether. The solid product was dried in vacuo at ambient temperature to a constant weight, giving 75 g (61% yield) of 3-acetamidophthalic anhydride as a white product. $^1$H-NMR (CDCl$_3$) δ: 2.21 (s, 3H), 7.76 (d, 1H), 7.94 (t, 1H), 8.42 (d, 1H), 9.84 (s, 1H).

Resolution of 2-(3-ethoxy-4-methoxyphenyl)-1-(methylsulphonyl)-eth-2-ylamine: A 3 L 3-necked round bottom flask was equipped with a mechanical stirrer, thermometer, and condenser and charged with 2-(3-ethoxy-4-methoxy-phenyl)-1-(methylsulphonyl)-eth-2-ylamine (137.0 g, 500 mmol), N-acetyl-L-leucine (52 g, 300 mmol), and methanol (1.0 L). The stirred slurry was heated to reflux for 1 hour. The stirred mixture was allowed to cool to ambient temperature and stirring was continued for another 3 hours at ambient temperature. The slurry was filtered and washed with methanol (250 L). The solid was air-dried and then dried in vacuo at ambient temperature to a constant weight, giving 109.5 g (98% yield) of the crude product (85.8% ee). The crude solid (55.0 g) and methanol (440 mL) were brought to reflux for 1 hour, cooled to room temperature and stirred for an additional 3 hours at ambient temperature. The slurry was filtered and the filter cake was washed with methanol (200 mL). The solid was air-dried and then dried in vacuo at 30° C. to a constant weight, yielding 49.6 g (90% recovery) of (S)-2-(3-ethoxy-4-methoxyphenyl)-1-(methylsulphonyl)-eth-2-ylamine-N-acetyl-L-leucine salt (98.4% ee). Chiral HPLC (1/99 EtOH/20 mM KH$_2$PO$_4$ @ pH 7.0, Ultron Chiral ES-OVS from Agilent Technologies, 150 mm×4.6 mm, 0.5 mL/min., @ 240 nm): 18.4 min (S-isomer, 99.2%), 25.5 min (R-isomer, 0.8%).

Final preparation of apremilast: A 500 mL 3-necked round bottom flask was equipped with a mechanical stirrer, thermometer, and condenser. The reaction vessel was charged with (S)-2-(3-ethoxy-4-methoxyphenyl)-1-(methylsulphonyl)-eth-2-yl amine N-acetyl-L-leucine salt (25 g, 56 mmol, 98% ee), 3-acetamidophthalic anhydride (12.1 g, 58.8 mmol), and glacial acetic acid (250 mL). The mixture was refluxed over night and then cooled to <50° C. The solvent was removed in vacuo, and the residue was dissolved in ethyl acetate. The resulting solution was washed with water (250 mL×2), saturated aqueous NaHCO$_3$ (250 mL×2), brine (250 mL×2), and dried over sodium sulphate. The solvent was evaporated in vacuo, and the residue recrystallized from a binary solvent containing ethanol (150 mL) and acetone (75 mL). The solid was isolated by vacuum filtration and washed with ethanol (100 mL×2). The product was dried in vacuo at 60° C. to a constant weight, affording 19.4 g (75% yield) of apremilast with 98% ee. Chiral HPLC (15/85 EtOH/20 mM KH$_2$PO$_4$ @ pH 5, Ultron Chiral ES-OVS from Agilent Technology, 150 mm×4.6 mm, 0.4 mL/min, @ 240 nm): 25.4 min (S-isomer, 98.7%), 29.5 min (R-isomer, 1.2%). $^1$H-NMR (CDCl$_3$) δ: 1.47 (t, 3H), 2.26 (s, 3H), 2.87 (s, 3H), 3.68-3.75 (dd, 1H), 3.85 (s, 3H), 4.07-4.15 (q, 2H), 4.51-4.61 (dd, 1H), 5.84-5.90 (dd, 1H), 6.82-8.77 (m, 6H), 9.46 (s, 1H); $^{13}$C-NMR (DMSO-d6) δ: 14.66, 24.92, 41.61, 48.53, 54.46, 55.91, 64.51, 111.44, 112.40, 115.10, 118.20, 120.28, 124.94, 129.22, 131.02, 136.09, 137.60, 148.62, 149.74, 167.46, 169.14, 169.48.

Pharmaceutical Compositions and Dosage Forms

Pharmaceutical compositions can be used in the preparation of individual, single unit dosage forms. Pharmaceutical compositions and dosage forms can comprise apremilast or a pharmaceutically acceptable salt or solvate thereof and a second active agent. Examples of the optional second active agents are disclosed herein (see, e.g., section 4.2.1). Phar-

Copy provided by USPTO from the PIRS Image Database on 10-10-2018

CEL-OTZ-00673681

JTX-13_11

Appx10629

US 10,092,541 B2

15

maceutical compositions and dosage forms can further comprise one or more carriers, excipients or diluents.

The pharmaceutical compositions provided herein are suitable for oral administration can be presented as discrete dosage forms, such as, but not limited to, tablets (e.g., chewable tablets), caplets, capsules and liquids (e.g., flavored syrups). Such dosage forms contain predetermined amounts of active ingredients and can be prepared by methods of pharmacy well known to those skilled in the art. See generally, *Remington's Pharmaceutical Sciences*, 20th ed., Mack Publishing, Easton Pa. (2,000).

Typical oral dosage forms are prepared by combining the active ingredients in an intimate admixture with at least one excipient according to conventional pharmaceutical compounding techniques. Excipients can take a wide variety of forms depending on the form of preparation desired for administration. Non-limiting examples of excipients suitable for use in oral liquid or aerosol dosage forms include water, glycols, oils, alcohols, flavoring agents, preservatives and coloring agents. Non-limiting examples of excipients suitable for use in solid oral dosage forms (e.g., powders, tablets, capsules and caplets) include starches, sugars, microcrystalline cellulose, diluents, granulating agents, lubricants, binders and disintegrating agents.

Because of their ease of administration, tablets and capsules represent the most advantageous oral dosage unit forms, in which case solid excipients are employed. If desired, tablets can be coated by standard aqueous or nonaqueous techniques. Such dosage forms can be prepared by any of the methods of pharmacy. In general, pharmaceutical compositions and dosage forms are prepared by uniformly and intimately admixing the active ingredients with liquid carriers, finely divided solid carriers or both and then shaping the product into the desired presentation if necessary.

For example, a tablet can be prepared by compression or molding. Compressed tablets can be prepared by compressing in a suitable machine the active ingredients in a free-flowing form such as powder or granules, optionally mixed with an excipient. Molded tablets can be made by molding in a suitable machine a mixture of the powdered compound moistened with an inert liquid diluent.

Non-limiting examples of excipients that can be used in oral dosage forms include binders, fillers, disintegrants and lubricants. Non-limiting examples of binders suitable for use in pharmaceutical compositions and dosage forms include corn starch, potato starch or other starches, gelatin, natural and synthetic gums such as *acacia*, sodium alginate, alginic acid, other alginates, powdered tragacanth, guar gum, cellulose and its derivatives (e.g., ethyl cellulose, cellulose acetate, carboxymethyl cellulose calcium, sodium carboxymethyl cellulose), polyvinyl pyrrolidone, methyl cellulose, pre-gelatinized starch, hydroxypropyl methyl cellulose, (e.g., Nos. 2208, 2906, 2910), microcrystalline cellulose and mixtures thereof.

Non-limiting examples of suitable forms of microcrystalline cellulose include, but are not limited to, the materials sold as AVICEL® (microcrystalline cellulose) PH-101, AVICEL® (microcrystalline cellulose) PH-103, AVICEL RC-5810 (crystalline cellulose and carboxymethylcellulose sodium), AVICEL® (microcrystalline cellulose) PH-105 (available from FMC Corporation, American Viscose Division, Avicel Sales, Marcus Hook, Pa.), and mixtures thereof. A specific binder is a mixture of microcrystalline cellulose and sodium carboxymethyl cellulose sold as AVICEL RC-581® (crystalline cellulose and carboxymethylcellulose sodium). Suitable anhydrous or low moisture excipients or

16

additives include AVICEL-PH-103® (microcrystalline cellulose) PH-103 and Starch 1500® LM (pre gelatinized starch).

Non-limiting examples of fillers suitable for use in the pharmaceutical compositions and dosage forms disclosed herein include talc, calcium carbonate (e.g., granules or powder), microcrystalline cellulose, powdered cellulose, dextrates, kaolin, mannitol, silicic acid, sorbitol, starch, pre-gelatinized starch and mixtures thereof. The binder or filler in pharmaceutical compositions is typically present in from about 50 to about 99 weight percent of the pharmaceutical composition or dosage form.

Disintegrants are used in the compositions to provide tablets that disintegrate when exposed to an aqueous environment. Tablets that contain too much disintegrant may disintegrate in storage, while those that contain too little may not disintegrate at a desired rate or under the desired conditions. Thus, a sufficient amount of disintegrant that is neither too much nor too little to detrimentally alter the release of the active ingredients should be used to form solid oral dosage forms. The amount of disintegrant used varies based upon the type of formulation and is readily discernible to those of ordinary skill in the art. Typical pharmaceutical compositions comprise from about 0.5 to about 15 weight percent of disintegrant, preferably from about 1 to about 5 weight percent of disintegrant.

Non-limiting examples of disintegrants that can be used in pharmaceutical compositions and dosage forms include agar-agar, alginic acid, calcium carbonate, microcrystalline cellulose, croscarmellose sodium, crospovidone, polacrilin potassium, sodium starch glycolate, potato or tapioca starch, other starches, pre-gelatinized starch, other starches, clays, other algins, other celluloses, gums and mixtures thereof.

Non-limiting examples of lubricants that can be used in pharmaceutical compositions and dosage forms include calcium stearate, magnesium stearate, mineral oil, light mineral oil, glycerin, sorbitol, mannitol, polyethylene glycol, other glycols, stearic acid, sodium lauryl sulfate, talc, hydrogenated vegetable oil (e.g., peanut oil, cottonseed oil, sunflower oil, sesame oil, olive oil, corn oil and soybean oil), zinc stearate, ethyl oleate, ethyl laureate, agar and mixtures thereof. Additional lubricants include, for example, a syloid silica gel (AEROSIL200® (silica), manufactured by W.R. Grace Co. of Baltimore, Md.), a coagulated aerosol of synthetic silica (marketed by Degussa Co. of Plano, Tex.), CAB-O-SIL® (fumed silica) (a pyrogenic silicon dioxide product sold by Cabot Co. of Boston, Mass.) and mixtures thereof. If used at all, lubricants are typically used in an amount of less than about 1 weight percent of the pharmaceutical compositions or dosage forms into which they are incorporated.

Non-limiting examples of dosage forms include tablets; caplets; capsules, such as soft elastic gelatin capsules; cachets; troches; lozenges; dispersions; suppositories; powders; aerosols (e.g., nasal sprays or inhalers); gels; liquid dosage forms suitable for oral or mucosal administration to a patient, including suspensions (e.g., aqueous or non-aqueous liquid suspensions, oil-in-water emulsions or a water-in-oil liquid emulsions), solutions and elixirs.

The composition, shape and type of dosage forms will typically vary depending on their use. For example, a dosage form used in the acute treatment of a disease may contain larger amounts of one or more of the active ingredients it comprises than a dosage form used in the chronic treatment of the same disease. These and other ways in which specific dosage forms will vary from one another will be readily

Copy provided by USPTO from the PIRS Image Database on 10-10-2018

CEL-OTZ-00673682

JTX-13_12

Appx10630

US 10,092,541 B2

17

apparent to those skilled in the art. See, e.g., *Remington's Pharmaceutical Sciences*, 20th ed., Mack Publishing, Easton Pa. (2,000).

Typical pharmaceutical compositions and dosage forms comprise one or more excipients. Suitable excipients are well known to those skilled in the art of pharmacy and non-limiting examples of suitable excipients are provided herein. Whether a particular excipient is suitable for incorporation into a pharmaceutical composition or dosage form depends on a variety of factors well known in the art including, but not limited to, the way in which the dosage form will be administered to a patient. The suitability of a particular excipient may also depend on the specific active ingredients in the dosage form. For example, the decomposition of some active ingredients can be accelerated by some excipients such as lactose or when exposed to water. Active ingredients that comprise primary or secondary amines are particularly susceptible to such accelerated decomposition.

In certain embodiments, provided herein are anhydrous pharmaceutical compositions and dosage forms comprising active ingredients, since water can facilitate the degradation of some compounds. For example, the addition of water (e.g., 5%) is widely accepted in the pharmaceutical arts as a means of simulating long-term storage in order to determine characteristics such as shelf-life or the stability of formulations over time. See, e.g., Jens T. Carstensen, *Drug Stability: Principles & Practice*, 2d. Ed., Marcel Dekker, NY, N.Y., 1995, pp. 379-80. In effect, water and heat accelerate the decomposition of some compounds. Thus, the effect of water on a formulation can be of great significance since moisture and/or humidity are commonly encountered during manufacture, handling, packaging, storage, shipment and use of formulations.

Anhydrous pharmaceutical compositions and dosage forms can be prepared using anhydrous or low moisture containing ingredients and low moisture or low humidity conditions. Pharmaceutical compositions and dosage forms that comprise lactose and at least one active ingredient that comprises a primary or secondary amine are preferably anhydrous if substantial contact with moisture and/or humidity during manufacturing, packaging and/or storage is expected.

An anhydrous pharmaceutical composition should be prepared and stored such that its anhydrous nature is maintained. Accordingly, anhydrous compositions are preferably packaged using materials known to prevent exposure to water such that they can be included in suitable formulary kits. Non-limiting examples of suitable packaging include hermetically sealed foils, plastics, unit dose containers (e.g., vials), blister packs and strip packs.

Also provided herein are pharmaceutical compositions and dosage forms that comprise one or more compounds that reduce the rate by which an active ingredient will decompose. Such compounds, which are referred to herein as "stabilizers," include, but are not limited to, antioxidants such as ascorbic acid, pH buffers or salt buffers. Like the amounts and types of excipients, the amounts and specific types of active ingredients in a dosage form may differ depending on factors such as, but not limited to, the route by which it is to be administered to patients. However, typical oral dosage forms comprise apremilast in an amount of 10 mg, 20 mg or 30 mg. In a particular embodiments, the oral dosage forms are 10 mg, 20 mg or 30 mg tablets. Each tablet contains apremilast as the active ingredient and the following inactive ingredients: lactose monohydrate, microcrystalline cellulose, croscarmellose sodium, magnesium stearate, polyvinyl alcohol, titanium dioxide, polyethylene glycol,

18

talc, iron oxide red, iron oxide yellow (20 and 30 mg only), and iron oxide black (30 mg only).

Delayed Release Dosage Forms

In certain embodiments, active ingredients can be administered by controlled release means or by delivery devices that are well known to those of ordinary skill in the art. Non-limiting examples of controlled release means or delivery devices include those described in U.S. Pat. Nos. 3,845,770; 3,916,899; 3,536,809; 3,598,123; and 4,008,719, 5,674,533, 5,059,595, 5,591,767, 5,120,548, 5,073,543, 5,639,476, 5,354,556 and 5,733,566, each of which is incorporated herein by reference. Such dosage forms can be used to provide slow or controlled-release of one or more active ingredients using, for example, hydropropylmethyl cellulose, other polymer matrices, gels, permeable membranes, osmotic systems, multilayer coatings, microparticles, liposomes, microspheres or a combination thereof to provide the desired release profile in varying proportions. Suitable controlled-release formulations known to those of ordinary skill in the art, including those described herein, can be readily selected for use with the active ingredients. In certain embodiments, provided herein are single unit dosage forms suitable for oral administration such as, but not limited to, tablets, capsules, gelcaps and caplets that are adapted for controlled-release.

All controlled-release pharmaceutical products have a common goal of improving drug therapy over that achieved by their non-controlled counterparts. Ideally, the use of an optimally designed controlled-release preparation in medical treatment is characterized by a minimum of drug substance being employed to cure or control the condition in a minimum amount of time. Advantages of controlled-release formulations include extended activity of the drug, reduced dosage frequency and increased patient compliance. In addition, controlled-release formulations can be used to affect the time of onset of action or other characteristics, such as blood levels of the drug and can thus affect the occurrence of side (e.g., adverse) effects.

Most controlled-release formulations are designed to initially release an amount of drug (active ingredient) that promptly produces the desired therapeutic effect and gradually and continually release of other amounts of drug to maintain this level of therapeutic or prophylactic effect over an extended period of time. In order to maintain this constant level of drug in the body, the drug must be released from the dosage form at a rate that will replace the amount of drug being metabolized and excreted from the body. Controlled-release of an active ingredient can be stimulated by various conditions including, but not limited to, pH, temperature, enzymes, water or other physiological conditions or compounds.

## 5. EXAMPLES

Some embodiments are illustrated by the following non-limiting examples. The examples should not be construed as a limitation in the scope thereof.

The recommended dose of apremilast is 30 mg twice daily taken orally for treating patients with psoriasis, ankylosing spondylitis, Behcet's disease, rheumatoid arthritis, atopic dermatitis, Crohn's disease or ulcerative colitis. The recommended dosage titration schedule is described below.

(i) 10 mg in the morning on the first day of administration;

(ii) 10 mg in the morning and 10 mg after noon on the second day of administration;

(iii) 10 mg in the morning and 20 mg after noon on the third day of administration;

Copy provided by USPTO from the PIRS Image Database on 10-10-2018

CEL-OTZ-00673683

JTX-13_13

Appx10631

(iv) 20 mg in the morning and 20 mg after noon on the fourth day of administration;

(v) 20 mg in the morning and 30 mg after noon on the fifth day of administration; and

(vi) 30 mg in the morning and 30 mg after noon on the sixth and every subsequent day of administration.

Other titration schedules with a target dose of 20 mg BID and 40 mg BID are also described herein. The dosage titration schedule can be used for patients with psoriasis, ankylosing spondylitis, Behcet's disease, rheumatoid arthritis, atopic dermatitis, or ulcerative colitis.

This dosage titration is intended to reduce the gastrointestinal symptoms that may be associated with initial treatment. Apremilast can be administered without regard to meals.

5.1. Clinical Activity of Apremilast in Patients with Psoriasis in a Clinical Study (Esteem 1)

A randomized, double-blind, placebo controlled, multicenter clinical study was performed in patients with moderate to severe plaque psoriasis who had a body surface area (BSA) involvement of ≥10%, static Physician Global Assessment (sPGA) of ≥3 (moderate or severe disease), Psoriasis Area and Severity Index (PASI) score≥12, and who were candidates for phototherapy or systemic therapy. In the study 844 patients were enrolled; patients ranged in age from 18 to 83 years, with an overall median age of 46 years. The mean baseline body surface area (BSA) involvement was 25.19% (median 21.0%), the mean baseline PASI score was 19.07 (median 16.80), and the proportion of patients with sPGA score of 3 (moderate) and 4 (severe) at Baseline were 70.0% and 29.8%, respectively. Patients were randomized to Apremilast, in an amount of 30 mg twice per day (after the initial dose titration schedule) or placebo for the first 16 weeks, and from Weeks 16 to 32, all patients received Apremilast in an amount of 30 mg twice per day.

Dose Titration Schedule:

Target Dose: 30 mg (po) BID

Day 1: 10 mg in the morning

Day 2: 10 mg morning; 10 mg after noon

Day 3: 10 mg morning; 20 mg after noon

Day 4: 20 mg morning; 20 mg after noon

Day 5: 20 mg morning; 30 mg after noon

Day 6 onward: 30 mg BID

During the Randomized Treatment Withdrawal Phase (Weeks 32-52), patients originally randomized to Apremilast who achieved at least a 75% reduction in PASI score (PASI-75) at Week 32 were re-randomized to either placebo or Apremilast 30 mg BID. Patients who were re-randomized to placebo and who lost PASI-75 response at Week 32 compared to Baseline, were retreated with Apremilast 30 mg BID. Patients who did not achieve the designated PASI response by Week 32, or who were initially randomized to placebo, remained on Apremilast until Week 52.

Results:

The primary endpoint, PASI 75 at Week 16, was achieved by a significantly greater proportion of patients randomized to apremilast (186 [33.1%]) than placebo (15 [5.3%]; 95% CI 23.1-32.5; p<0.0001; Table 1). An sPGA score of 0 or 1 at Week 16, the major secondary endpoint, was achieved by a significantly greater proportion of patients randomized to apremilast than placebo (122 [21.7%] versus 11 [3.9%]; 95% CI 13.7-21.9; p<0.0001). Similar results were obtained in sensitivity analyses including nonresponder imputation for PASI 75 (p<0.0001) and sPGA (p<0.0001) responses. Non-overlapping confidence intervals (representing a clinically meaningful difference) between apremilast and placebo in the mean percentage improvement in PASI from baseline were detected as early as Week 2. Other endpoints at Week 16, including PASI-50 and PASI-90 response, mean percentage change in PASI score, NAPSI score, mean change from baseline in DLQI score, and DLQI response (decrease of at least five points in DLQI total score), were all significantly greater with apremilast than placebo (all p<0.0001). For patients with nail and scalp psoriasis at baseline, at least a 50% improvement in baseline NAPSI (NAPSI 50) response and ScPGA response (score of 0 [clear] or 1 [minimal]) were achieved by a significantly greater proportion of patients randomized to apremilast than placebo at Week 16 (both NAPSI-50 and ScPGA p<0.0001).

Responses to apremilast were generally maintained from Weeks 16 to 32. At Week 32, patients initially randomized to placebo at baseline who were switched to apremilast at Week 16 had similar response rates as those receiving apremilast from baseline. PASI 50 responses and DLQI scores at Week 32 showed similar time-response profiles.

In the randomized treatment withdrawal phase, 154 patients randomized to apremilast at baseline who achieved PASI 75 responses at Week 32 were re-randomized to continue apremilast (n=77) or switch to placebo (n=77). Of the 77 patients re-randomized to apremilast at Week 32, 47 (61.0%) had PASI-75 response at Week 52, and 58 (75.3%) had at least 70% improvement in PASI score from baseline. Mean PASI responses were generally maintained through Week 52 in patients re-randomized to apremilast. Mean percentage change from baseline in PASI score at Week 52 was 80.5%. Among patients re-randomized to placebo, 13 (16.9%) did not resume apremilast before Week 52. At Week 52, mean percentage change in PASI score from baseline in these 13 patients was 88.1%; nine (11.7%) patients re-randomized to placebo achieved PASI 75 response at Week 52. 64 patients re-initiated apremilast before Week 52 after losing PASI 75 responses; of these, 45 (70.3%) regained PASI 75 response after re-treatment (re-treatment time ranged from 3.4 to 22.1 weeks). Median time to first loss of PASI 75 after re-randomization was 5.1 weeks for patients re-randomized to placebo and 17.7 weeks for patients re-randomized to apremilast.

The 5 most common adverse events (AEs) were diarrhea, nausea, upper respiratory tract infection, tension headache, and headache. Discontinuations due to AEs were nausea (1.2%), diarrhea (0.8%), headache (0.4%), and tension headache (0.2%). No patient discontinued due to upper respiratory tract infection.

Conclusion

The study results showed that Apremilast significantly improved signs and symptoms of psoriasis. The majority of adverse events was mild to moderate and did not lead to discontinuation. The results were very promising with respect to efficacy and safety of Apremilast in psoriasis patients.

Copy provided by USPTO from the PIRS Image Database on 10-10-2018

US 10,092,541 B2

**21**

TABLE 1

Clinical response across efficacy endpoints

| | Placebo-controlled phase (Week 16) | |
| --- | --- | --- |
| | Placebo n = 282 | Apremilast 30 mg twice daily n = 562 |
| **Primary endpoint** | | |
| PASI-75 | 15 (5.3%) | 186 (33.1%)* |
| **Major secondary endpoint** | | |
| sPGA response§ | 11 (3.9%) | 122 (21.7%)* |
| **Other endpoints** | | |
| PASI-50 | 48 (17.0%) | 330 (58.7%)* |
| PASI-90 | 1 (0.4%) | 55 (9.8%)* |
| Percentage change in PASI score, mean (SD) | −16.7 (31.52) | −52.1 (32.81)* |
| Percentage change in PASI score, median (range) | −14.0 (−91 to 72) | −59.0 (−100 to 86) |
| Mean Change in DLQI score | −2.1 (5.69) | −6.6 (6.66)* |
| **Patients with baseline DLQI >5** | n = 236 | n = 459 |
| DLQI response‡ | 79 (33.5%) | 322 (70.2%)* |
| DLQI + PASI-50 response∥ | 26 (11.0%) | 221 (48.1%)* |
| **Patients with nail psoriasis at baseline** | n = 195 | n = 363 |
| Percentage change in NAPSI score¶ | 6.5 (60.57) | −22.5 (54.86)* |
| NAPSI-50¶ | 29 (14.9%) | 121 (33.3%)* |
| **Patients with scalp psoriasis at baseline** | n = 189 | n = 374 |
| ScPGA score 0-1# | 33 (17.5%) | 174 (46.5%)* |

Data are n (%), mean (SD), or median (range).
PASI-75 = 75% reduction from baseline psoriasis area and severity index score;
sPGA = static physician global assessment;
PASI-50 = 50% reduction from baseline psoriasis area and severity index score;
PASI-90 = 90% reduction from baseline psoriasis area and severity index score;
DLQI = dermatology life quality index; NAPSI = nail psoriasis severity index;
NAPSI-50 = at least a 50% improvement from baseline nail psoriasis severity index score;
ScPGA = scalp physician global assessment.
Week 16 missing data were handled with last-observation-carried-forward methodology.
*P < 0.0001 versus placebo.
§sPGA score of clear (0) or almost clear (1) with at least a two-point reduction from baseline.
‡Decrease of at least five points in DLQI total score in patients with baseline total DLQI score greater than 5. A reduction in score indicated improvement.
∥Decrease of at least five points in DLQI total score and PASI-50 achievement in patients with baseline total DLQI score greater than 5.
¶Patients with nail psoriasis (score of at least 1) at baseline. A reduction in the NAPSI score indicated improvement.
#Patients with ScPGA score of at least 3 at baseline.

### 5.2. Clinical Activity of Apremilast in Patients with Psoriasis in a Clinical Study (Esteem 2)

A randomized, double-blind, placebo controlled, multi-center clinical study was performed in patients with moderate to severe plaque psoriasis who had a body surface area (BSA) involvement of ≥10%, static Physician Global Assessment (sPGA) of ≥3 (moderate or severe disease), Psoriasis Area and Severity Index (PASI) score≥12, and who were candidates for phototherapy or systemic therapy. In the study 413 patients were evaluated; patients ranged in age from 18 to 83 years, with an overall median age of 46 years. The mean baseline body surface area (BSA) involvement was 25.19% (median 21.0%), the mean baseline PASI score was 19.07 (median 16.80), and the proportion of patients

**22**

with sPGA score of 3 (moderate) and 4 (severe) at Baseline were 70.0% and 29.8%, respectively. Patients were randomized to Apremilast in an amount of 30 mg twice per day (after the initial dose titration schedule) or placebo for the first 16 weeks, and from Weeks 16 to 32, all patients received Apremilast in an amount of 30 mg twice per day.

Dose Titration Schedule:
Target Dose: 30 mg (po) BID
Day 1: 10 mg in the morning
Day 2: 10 mg morning; 10 mg after noon
Day 3: 10 mg morning; 20 mg after noon
Day 4: 20 mg morning; 20 mg after noon
Day 5: 20 mg morning; 30 mg after noon
Day 6 onward: 30 mg BID

During the Randomized Treatment Withdrawal Phase (Weeks 32-52), patients originally randomized to Apremilast who achieved at least a 50% reduction in PASI score (PASI-50) were re-randomized to placebo or Apremilast 30 mg BID. Patients who were re-randomized to placebo and who lost 50% of the improvement in PASI at Week 32 compared to Baseline, were retreated with Apremilast 30 mg BID. Patients who did not achieve the designated PASI response by Week 32, or who were initially randomized to placebo, remained on Apremilast until Week 52.

Results:

Placebo-controlled phase (Weeks 0 to 16). At Week 16, significantly more patients receiving apremilast achieved a PASI-75 response (primary endpoint) vs. placebo (28.8% vs. 5.8%; P<0.0001; Table 2). The major secondary endpoint, sPGA score of 0 or 1 at Week 16, was also achieved by significantly more patients receiving apremilast vs. placebo (20.4% vs. 4.4%; P<0.0001). Significantly more patients receiving apremilast achieved PASI-50 and PASI-90 responses vs. placebo (55.5% vs. 19.7%; P<0.0001 and 8.8% vs. 1.5%; P=0.0042) at Week 16. Results of the NRI sensitivity analysis were similar to the primary analysis (Table 2). The mean/median percent change from baseline in PASI score was −50.9%/−56.0% for apremilast vs. −15.8%/−18.0% for placebo (P<0.0001, mean change) at Week 16. Non-overlapping confidence intervals (representing a clinically meaningful difference) between apremilast and placebo in the mean percentage improvement in PASI from baseline were detected as early as Week 2, the first post-baseline visit.

Significant improvements at Week 16 were seen with Apremilast vs. placebo based on other efficacy endpoints, including PASI response and Dermatology Life Quality Index (DLQI) score and response (all P<0.0001; Table 2). At Week 16, among patients with nail psoriasis (Nail Psoriasis Severity Index [NAPSI]≥1), NAPSI-50 response was achieved by significantly more patients receiving apremilast vs. placebo (44.6% vs. 18.7%; P<0.0001; Table 2). Similarly, among patients with scalp psoriasis (Scalp Physician Global Assessment [ScPGA]≥3) at baseline, ScPGA score of 0 (clear) or 1 (minimal) was achieved by significantly more patients receiving apremilast vs. placebo (40.9% vs. 17.2%; P<0.0001; Table 2) and among patients with palmoplantar psoriasis at baseline (Palmoplantar Psoriasis Physician Global Assessment [PPPGA]≥3), a score of 0 (clear) or 1 (almost clear) was achieved by significantly more patients receiving apremilast vs. placebo (65.4% vs. 31.3%; P=0.0315; Table 2).

At Week 16, mean improvements from baseline in pruritus visual analog scale (VAS; mm) scores were significantly greater with apremilast vs. placebo (−33.5 vs. −12.2; P<0.0001). Mean changes from baseline with apremilast represented a decrease of nearly 50% in pruritus severity. At

Copy provided by USPTO from the PIRS Image Database on 10-10-2018

CEL-OTZ-00673685
JTX-13_15

Appx10633

US 10,092,541 B2

23

Week 16, mean improvements in skin discomfort/pain VAS (mm) scores were also significantly greater with apremilast vs. placebo (−28.5 vs. −9.5; P<0.0001; Table 2), which also represented a decrease of nearly 50% in severity from baseline. Non-overlapping confidence intervals (representing a clinically meaningful difference) between apremilast and placebo in improvement in pruritus and skin discomfort/pain from baseline were detected as early as Week 2.

Maintenance Phase (Weeks 16 to 32).

PASI-50, PASI-75, and PASI-90 responses were generally maintained from Weeks 16 to 32 in patients treated with apremilast from baseline. PASI, sPGA, and DLQI responses were also generally maintained from Weeks 16 to 32 in patients treated with apremilast from baseline and placebo patients who switched to apremilast at Week 16 had response rates similar to those in patients receiving apremilast in both treatment periods.

Randomized Treatment Withdrawal Phase (Weeks 32 to 52).

For the randomized treatment withdrawal phase, among the 123 patients initially randomized to apremilast who achieved≥PASI-50 at Week 32, 61 and 62 patients were re-randomized to apremilast and placebo, respectively. Of patients re-randomized to apremilast, 80.3% had a PASI-50 response and 60.7% had ≥70% improvement from baseline in PASI score at Week 52; mean percent change in PASI at Week 52 was −74.4%. Among the 36 patients re-randomized to apremilast who were also PASI-75 responders at Week 32, 66.7% had PASI-75 at Week 52. Among patients initially randomized to placebo at baseline who switched to apremilast at Week 16 and achieved PASI-50 at Week 32, 83.1% had PASI-50 at Week 52; mean percent change in PASI from baseline was −71.8%.

Of the 62 patients re-randomized to placebo at Week 32, 30 did not resume treatment with apremilast before Week 52 (these patients did not lose 50% of their PASI improvement prior to Week 52). Among patients re-randomized to placebo, 24.2% had a PASI-50 response at Week 52. Thirty-two (32) patients re-randomized to placebo lost 50% of their PASI improvement and re-initiated treatment with apremilast before Week 52; 65.6% of these patients regained PASI-50 response after re-treatment (re-treatment time ranged from 2.6 to 18.3 weeks). The median time to first loss of 50% of the PASI improvement obtained at Week 32 was 12.4 weeks among patients re-randomized to placebo and 21.9 weeks among patients re-randomized to apremilast (P<0.0001).

Most patients initially randomized to apremilast who did not achieve PASI-50 at Week 32 continued to experience mean PASI improvements through Week 52. At Week 52, PASI-50 was achieved by 32.8% of these patients; mean percent change from baseline in PASI score was −45.7%. Among patients randomized to placebo at baseline who switched to apremilast at Week 16 and who did not achieve PASI-50 at Week 32, 16.0% achieved PASI-50 at Week 52; mean percent change from baseline was −24.7%.

The 5 most common adverse events (AEs) were diarrhea, nausea, upper respiratory tract infection, tension headache, and headache. Discontinuations due to AEs were nausea (1.2%), diarrhea (0.8%), headache (0.4%), and tension headache (0.2%). No patient discontinued due to upper respiratory tract infection.

Conclusion

The study results showed that Apremilast significantly improved signs and symptoms of psoriasis. The majority of

24

adverse events was mild to moderate and did not lead to discontinuation. The results were very promising and consistent with efficacy and safety of Apremilast in psoriasis patients.

TABLE 2

Clinical response across efficacy endpoints at Week 16 (placebo-controlled phase)

| | Placebo n = 137 | Apremilast 30 mg BID n = 274 |
|---|---|---|
| Primary endpoint | | |
| PASI-75, % (LOCF) | 5.8 | 28.8* |
| PASI-75, % (NRI) | 5.1 | 28.1* |
| Major secondary endpoint | | |
| sPGA score 0 (clear) or 1 (almost clear)§, % (LOCF) | 4.4 | 20.4* |
| sPGA score 0 (clear) or 1 (almost clear), % (NRI) | 3.6 | 19.7* |
| Other endpoints | | |
| PASI-50, % (LOCF) | 19.7 | 55.5* |
| PASI-50, % (NRI) | 17.5 | 53.6* |
| PASI-90, % (LOCF) | 1.5 | 8.8‡ |
| Mean % change in PASI score | −15.8 | −50.9* |
| Median % change in PASI score | −18.0 | −56.0 |
| Mean change in DLQI score | −2.8 | −6.7* |
| Mean change in pruritus VAS score, mm | −12.2 | −33.5* |
| Mean change in skin discomfort/pain VAS score, mm | −9.5 | −28.5* |
| Patients with baseline DLQI >5 | n = 119 | n = 226 |
| DLQI response (decrease of ≥5 points)ǁ, % | 42.9 | 70.8* |
| DLQI (decrease of ≥5 points) + PASI-50 response¶, % | 13.4 | 49.1* |
| Patients with nail psoriasis | n = 91 | n = 175 |
| Mean % change in NAPSI score† | −7.1 | −29.0** |
| NAPSI-50ǁ, % | 18.7 | 44.6* |
| Patients with scalp psoriasis | n = 93 | n = 176 |
| ScPGA score 0 (clear) or 1 (minimal)§§, % | 17.2 | 40.9* |
| Patients with palmoplantar psoriasis | n = 16 | n = 26 |
| PPPGA score 0 (clear) or 1 (almost clear)‡‡, % | 31.3 | 65.4ǁǁ |

Note:
Week 16 missing data were handled with last-observation-carried-forward methodology, except where noted for non-responder imputation. Decreases in DLQI score, pruritus VAS score, skin discomfort/pain VAS score, and NAPSI score indicate improvement.
*P < 0.0001 vs. placebo.
§sPGA score of 0 (clear) or 1 (almost clear) with a ≥2-point reduction from baseline.
‡P = 0.0042 vs. placebo.
ǁDecrease of ≥5 points in DLQI total score in patients with a baseline total DLQI score >5.
¶Decrease of ≥5 points in DLQI total score and PASI-50 achievement in patients with baseline total DLQI score >5.
†Patients with nail psoriasis (score ≥1) at baseline.
**P = 0.0052 vs. placebo.
§§Patients with ScPGA score of ≥3 (moderate to very severe) at baseline.
‡‡Patients with PPPGA score of ≥3 (moderate to severe) at baseline.
ǁǁP = 0.0315 vs. placebo.
DLQI, Dermatology Life Quality Index;
LOCF, last observation carried forward;
NAPSI, Nail Psoriasis Severity Index;
NRI, non-responder imputation;
PASI, Psoriasis Area and Severity Index;
PPPGA, Palmoplantar Psoriasis Physician Global Assessment;
ScPGA, Scalp Physician Global Assessment;
sPGA, static Physician Global Assessment;
VAS = visual analog scale.

Copy provided by USPTO from the PIRS Image Database on 10-10-2018

25

### 5.3. Clinical Activity of Apremilast in Patients with Atopic Dermatitis in a Clinical Study

An open-label pilot study examining 2 doses of apremilast was performed in patients with adult atopic dermatitis. A total of 16 patients with moderate to severe atopic dermatitis were treated with apremilast in 2 different cohorts. Cohort 1 consisted of 6 adult patients treated with apremilast according to the dosing schedule below, 20 mg twice a day, for a total of 3 months. At the conclusion of this cohort, the US Food and Drug Administration (FDA) approved a higher dose and longer treatment course for apremilast. Thus, a second cohort was initiated. Cohort 2 consisted of 10 adult patients treated with apremilast according to the dosing schedule below, 30 mg twice a day, for a total of 6 months. A diagnosis of atopic dermatitis was determined by the Hanifin-Rajka criteria.

Dose Titration Schedule:
Target Dose: 20 mg (po) BID
Day 1: 10 mg in the morning
Day 2: 10 mg BID
Day 3: 10 mg morning; 20 mg after noon
Day 4 onward: 20 mg BID
Dose Titration Schedule:
Target Dose: 30 mg (po) BID
Day 1: 10 mg in the morning
Day 2: 10 mg BID
Day 3: 10 mg morning; 20 mg after noon
Day 4: 20 mg BID
Day 5: 20 mg morning; 30 mg after noon
Day 6 onward: 30 mg BID

In certain patients, a dosing schedule with an amount up to 40 mg BID is used.

Efficacy of apremilast was assessed at each study visit using the Eczema Area and Severity Index (EASI), Dermatology Life Quality Index (DLQI), investigator global assessment (IGA), and the visual analog scale (VAS) for pruritus. Patients were monitored for adverse events (AEs) and improvement in eczema as determined by the EASI, DLQI, and VAS for pruritus at 1 week, 2 weeks, 4 weeks, and every 4 weeks thereafter in cohort 1 and at 2 weeks, 4 weeks, and every 4 weeks thereafter in cohort 2. After the last dose of medication, patients in both cohorts were asked to return for a 4-week follow-up visit.

To participate in the study, patients must have met the following inclusion criteria: age of at least 18 years at time of consent, disease severity of at least 6 on the Rajka-Langeland severity scoring system, EASI score of at least 11, and be a candidate for or previously receiving systemic therapy. In addition, patients were required to remain on a stable regimen of triamcinolone acetonide ointment, 0.1%, for 2 weeks prior to the start of the study and throughout the trial. Most patients applied the ointment twice a day 2 times a week. No other topical therapy except emollients was allowed.

Patients were excluded if they had a history of active mycobacterial infection with any species (including *Mycobacterium tuberculosis*) within 3 years prior to the screening visit, latent or incompletely treated *M tuberculosis* infection, as indicated by a positive purified protein derivative skin test. Patients were not allowed to participate in the trial if they had at least 3 major bacterial infections resulting in hospitalization and/or requiring intravenous antibiotic treatment within the past 2 years; clinically significant abnormality on chest radiography at screening; use of any investigational medication or systemic medication within 4 weeks prior to the start of the study drug or 5 pharmacokinetic/

26

pharmacodynamic half-lives (whichever was longer); any clinically significant abnormality on 12-lead electrocardiogram at screening; a history of congenital or acquired immunodeficiency; positive results at screening for antinuclear antibody, hepatitis B surface antigen or hepatitis B core antibody, or antibodies to hepatitis C; a history of human immunodeficiency virus infection; malignant disease or a history of malignant disease (except for treated [i.e., cured] basal cell skin carcinomas>3 years prior to screening); systemic corticosteroid—dependent asthma; or active infection of any type at the time of enrollment.

As an exploratory end point to potentially identify immune pathways affected by apremilast, peripheral whole blood was obtained for differential gene expression analyses at baseline and after 3 (cohort 1) and 6 (cohort 2) months of treatment to determine apremilast's potential mechanism of action in patients with atopic dermatitis. RNA isolation and microarray analyses were performed in the Oregon Health and Science University Gene Microarray Shared Resource. Total RNA was isolated from PAXGene tubes using the PAXGene Blood RNA Isolation kit (QIAGEN Inc). RNA quantity was measured by spectrophotometric analysis; RNA quality was evaluated by size analysis on the Bioanalyzer 2100 (Agilent Technologies Inc). All samples passed RNA quality assessment review.

RNA samples were labeled using the OvationWTAPico Amplification and Labeling System (NuGEN Technologies Inc). Fifty nanograms of each sample were amplified with the Ovation WTA Pico kit, converted to sense complementary DNA (cDNA) with the WT-Ovation Exon Module, version 1 kit, and labeled with the Encore Biotin Module kit. Hybridization and array processing were performed as described in the NuGEN Encore Biotin Module User Guide http://www.nugeninc.com/tasks/sites/nugen/assets/File/user_guides/userguide_encore_biotin.pdf). Two micrograms of each labeled cDNA target werehybridized with the GeneChip Human Gene 1.0 ST array (Affymetrix) and scanned on the Affymetrix GeneChip 3000 Scanner. The array image was processed with Affymetrix Command Console (version 3.1.1). Data were normalized using the robust multichip average method.

Differential expression analyses were performed on 16 paired samples. All putatively differentially expressed genes were based on false discovery rate-adjusted P values<0.05. Based on the putative differentially expressed gene list, both enriched pathways and functional gene ontologic characteristics were identified (P<0.05 for hypergeometric test) in the GoStats package within the Bioconductor statistical programming environment (http://www.bioconductor.org).

In both cohorts 1 and 2, a trend toward improvement was seen in all outcomes. Intent-to-treat analyses performed at 3 months revealed significant reduction of itch from baseline (VAS) and improvement in quality of life (DLQI) in cohort 1 (P=0.02 and P=0.003, respectively). Disease severity (EASI) and quality of life (DLQI) improved in cohort 2 (P=0.008 and P=0.01, respectively). Statistically significant clinical improvement in atopic dermatitis was noted within the first 2 weeks of study drug in cohort 2 (P=0.03). Patients experienced an average reduction in itch of 49% using a VAS, from a mean baseline of 62.3 mm to 30.5 mm in cohort 1 and a 25% reduction in cohort 2, from 45.8 mm to 32.4 mm. The EASI scores reduced an average of 19% in cohort 1 from a mean baseline of 30.9 to 22.1 and an average of 35% in cohort 2, from a mean baseline of 21.4 to 13.2 at 3 months. The DLQI scores reduced an average of 55% in cohort 1, from a mean baseline of 14.2 to 6.2 and an average of 58% in cohort 2, from a mean baseline of 10.1 to 3.8. In

Copy provided by USPTO from the PIRS Image Database on 10-10-2018

US 10,092,541 B2

27

cohort 1, patients reported a statistically significant decline in pruritus within the first 2 weeks of use (P=0.045) with a trend for a decline in pruritus in cohort 2 (P=0.06). In cohort 1, 1 of 6 patients reduced their IGA score by 1 U (e.g., from very severe to severe). Two of 10 patients in cohort 2 reduced their IGA score by 1 U. No patient in either cohort reached an IGA score of clear or almost clear at the 3-month time point. One patient achieved an IGA score of mild in cohort 2.

Evaluation of cohort 1 was concluded at 3 months; consequently, no 6-month data were available for that cohort. Statistically significant improvement was seen in all outcomes at 6 months in cohort 2. Intent to treat analyses revealed significant reduction in EASI, from 21.1 to 11.6 (P=0.002); VAS, from 45.8 mm to 25.3 mm (P=0.03); and the DLQI, from 10.1 mm to 4.2 mm (P=0.03). Per protocol, EASI reduced from 21.1 to 10.4 (P=0.001), VAS from 45.8 to 22.7 (P=0.01), and DLQI from 10.1 to 4.0 (P=0.02). Five patients (50%) improved at least 1 U in the IGA at 6 months. Four of these 5 reached an IGA of mild, and 1 achieved an IGA of almost clear.

Post hoc intent-to-treat analyses performed on combined data from both cohorts were performed to improve the power of our analyses. The data from both cohorts combined showed statistically significant improvement in all outcomes. The EASI score was reduced from a mean baseline of 24.8 to 16.2 (P=0.002), the VAS was reduced from a mean baseline of 52.0 mm to 31.7 mm (P=0.003), and the DLQI was reduced from a mean baseline of 11.6 to 4.7 (P=0.001). Post hoc per-protocol analyses, which included data from all patients who were able to finish the study, also revealed significance in all outcomes (EASI, P=0.001; VAS, P=0.007; DLQI, P=0.001).

In cohort 1, gene expression data revealed significant differential expression of the cAMP response element binding (CREB) pathway (P=3.19×$10^4$) and BAD (bcl-2 antagonist of cell death) phosphorylation pathway (P=2.54×$10^3$). In addition, gene ontologic analyses of biological processes revealed significant differential expression of chemokine-mediated signaling (P=9.5×$10^6$), IL-12 signaling (P<0.05), cytoskeleton remodeling (P<0.05), and regulation of immune complex clearing by monocytes and macrophages (P=1.9×$10^6$). In cohort 2, there was significant differential expression of CCR3 signaling in eosinophils (P=5 0.497× $10^2$).

### 5.4. Clinical Activity of Apremilast in Patients with Ankylosing Spondylitis in a Clinical Study

A 24-week open-label clinical study of adult subjects with moderate to severe ankylosing spondylitis is conducted to assess the ability of an oral formulation comprising apremilast to treat patients having ankylosing spondylitis. All subjects will receive apremilast at a dose of 30 mg twice daily for a total of 24 weeks after the initial dosing schedule. The dose may be reduced to 30 mg per day if significant adverse events develop that lead to poor tolerability. After the last dose of apremilast, there will be a 4-week follow-up period. Subjects will be evaluated on Days 169 and 197.

Adult male and female subjects 18 years of age or older will participate in this study after the objectives, methods, and potential hazards of the study have been fully explained, and after they have signed the informed consent form. The Investigator is responsible for keeping a record of all subjects who sign an informed consent form for entry into this study. Screening procedures will be followed. To be enrolled

28

into the study, subjects must meet the inclusion/exclusion criteria, which includes a diagnosis of ankylosing spondylitis.

Dose Titration Schedule:

Target Dose: 30 mg (po) BID

Day 1: 10 mg in the morning

Day 2: 10 mg BID

Day 3: 10 mg morning; 20 mg after noon

Day 4: 20 mg BID

Day 5: 20 mg morning; 30 mg after noon

Day 6 onward: 30 mg BID

In certain patients, a dosing schedule with an amount up to 20 mg BID is used.

Subjects will take apremilast tablets twice daily (BID). If at any time during the study a subject encounters overt study medication-related adverse effects, dose reduction will be allowed following discussions between the subject and the investigator.

Study medication should be taken at approximately the same time every day, 12 hours apart, once in the morning and once in the after noon. If a subject reports GI side effects when taking the study medication prior to meals, the subject will be advised to switch to the postprandial dosing schedule.

### 5.5. Clinical Activity of Apremilast in Patients with Rheumatoid Arthritis in a Clinical Study

A 24-week open-label clinical study of adult subjects with moderate to severe rheumatoid arthritis is conducted to assess the ability of an oral formulation comprising apremilast to treat patients having rheumatoid arthritis. All subjects will receive apremilast at a dose of 30 mg twice daily for a total of 24 weeks after the initial dosing schedule. The dose may be reduced to 30 mg per day if significant adverse events develop that lead to poor tolerability. After the last dose of apremilast, there will be a 4-week follow-up period. Subjects will be evaluated on Days 169 and 197.

Adult male and female subjects 18 years of age or older will participate in this study after the objectives, methods, and potential hazards of the study have been fully explained, and after they have signed the informed consent form. The Investigator is responsible for keeping a record of all subjects who sign an informed consent form for entry into this study. Screening procedures will be followed. To be enrolled into the study, subjects must meet the inclusion/exclusion criteria, which includes a diagnosis of rheumatoid arthritis.

Dose Titration Schedule:

Target Dose: 30 mg (po) BID

Day 1: 10 mg in the morning

Day 2: 10 mg BID

Day 3: 10 mg morning; 20 mg after noon

Day 4: 20 mg BID

Day 5: 20 mg morning; 30 mg after noon

Day 6 onward: 30 mg BID

In certain patients, a dosing schedule with an amount up to 20 mg BID is used.

Subjects will take apremilast tablets twice daily (BID). If at any time during the study a subject encounters overt study medication-related adverse effects, dose reduction will be allowed following discussions between the subject and the investigator.

Study medication should be taken at approximately the same time every day, 12 hours apart, once in the morning and once in the after noon. If a subject reports GI side effects

Copy provided by USPTO from the PIRS Image Database on 10-10-2018

US 10,092,541 B2

<table>
<tr><td>29</td><td>30</td></tr>
</table>

when taking the study medication prior to meals, the subject will be advised to switch to the postprandial dosing schedule.

### 5.6. Clinical Activity of Apremilast in Patients with Behcet's Disease in a Clinical Study

A 24-week open-label clinical study of adult subjects with moderate to severe Behcet's disease is conducted to assess the ability of an oral formulation comprising apremilast to treat patients having Behcet's disease. All subjects will receive apremilast at a dose of 30 mg twice daily for a total of 24 weeks after the initial dosing schedule. The dose may be reduced to 30 mg per day if significant adverse events develop that lead to poor tolerability. After the last dose of apremilast, there will be a 4-week follow-up period. Subjects will be evaluated on Days 169 and 197.

Adult male and female subjects 18 years of age or older will participate in this study after the objectives, methods, and potential hazards of the study have been fully explained, and after they have signed the informed consent form. The Investigator is responsible for keeping a record of all subjects who sign an informed consent form for entry into this study. Screening procedures will be followed. To be enrolled into the study, subjects must meet the inclusion/exclusion criteria, which includes a diagnosis of Behcet's disease.

Dose Titration Schedule:
Target Dose: 30 mg (po) BID
Days 1-2: 10 mg in the morning and 10 mg after noon
Days 3-4: 20 mg in the morning and 20 mg after noon
Days 5-onwards: 30 mg in the morning and 30 mg after noon.

Other dose titration schedules described herein, for example the titration schedules for patients with psoriasis in Example 5.1, can also be used. Subjects will take apremilast tablets twice daily (BID). If at any time during the study a subject encounters overt study medication-related adverse effects, dose reduction will be allowed following discussions between the subject and the investigator.

Study medication should be taken at approximately the same time every day, 12 hours apart, once in the morning and once in the after noon. If a subject reports GI side effects when taking the study medication prior to meals, the subject will be advised to switch to the postprandial dosing schedule.

### 5.7. Clinical Activity of Apremilast in Patients with Ulcerative Colitis in a Clinical Study

A 24-week open-label clinical study of adult subjects with moderate to severe ulcerative colitis is conducted to assess the ability of an oral formulation comprising apremilast to treat patients having ulcerative colitis. All subjects will receive apremilast at a dose of 30 mg or 40 mg twice daily for a total of 24 weeks after the initial dosing schedule. The dose may be reduced by half if significant adverse events develop that lead to poor tolerability. After the last dose of apremilast, there will be a 4-week follow-up period. Subjects will be evaluated on Days 169 and 197.

Adult male and female subjects 18 years of age or older will participate in this study after the objectives, methods, and potential hazards of the study have been fully explained, and after they have signed the informed consent form. The Investigator is responsible for keeping a record of all subjects who sign an informed consent form for entry into this study. Screening procedures will be followed. To be enrolled

into the study, subjects must meet the inclusion/exclusion criteria, which includes a diagnosis of ulcerative colitis.

Dose Titration Schedule:
Target Dose: 30 mg (po) BID
Day 1: 10 mg in the morning
Day 2: 10 mg BID
Day 3: 10 mg morning; 20 mg after noon
Day 4: 20 mg BID
Day 5: 20 mg morning; 30 mg after noon
Day 6 onward: 30 mg BID
Dose Titration Schedule:
Target Dose: 40 mg (po) BID
Day 1: 10 mg in the morning
Day 2: 10 mg BID
Day 3: 10 mg morning; 20 mg after noon
Day 4: 20 mg BID
Day 5: 20 mg morning; 30 mg after noon
Day 6: 30 mg BID
Day 7: 30 mg morning; 40 mg after noon
Day 8 onward: 40 mg BID

Subjects will take apremilast tablets twice daily (BID). If at any time during the study a subject encounters overt study medication-related adverse effects, dose reduction will be allowed following discussions between the subject and the investigator.

Study medication should be taken at approximately the same time every day, 12 hours apart, once in the morning and once in the after noon. If a subject reports GI side effects when taking the study medication prior to meals, the subject will be advised to switch to the postprandial dosing schedule.

All of the references cited herein are incorporated by reference in their entirety. While the methods provided herein have been described with respect to the particular embodiments, it will be apparent to those skilled in the art that various changes and modifications can be made without departing from the spirit and scope as recited by the appended claims.

The embodiments described above are intended to be merely exemplary and those skilled in the art will recognize or will be able to ascertain using no more than routine experimentation, numerous equivalents of specific compounds, materials and procedures. All such equivalents are considered to be within the scope and are encompassed by the appended claims.

What is claimed is:

1. A method for treating a patient with stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione, wherein the patient is suffering from psoriasis, the method consisting of:

(a) administering to the patient stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione in an initial titration dosing schedule consisting of

(i) 10 mg in the morning on the first day of administration;

(ii) 10 mg in the morning and 10 mg after noon on the second day of administration;

(iii) 10 mg in the morning and 20 mg after noon on the third day of administration;

(iv) 20 mg in the morning and 20 mg after noon on the fourth day of administration;

(v) 20 mg in the morning and 30 mg after noon on the fifth day of administration; and

(b) on the sixth and every subsequent day, administering to the patient stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acety-

Copy provided by USPTO from the PIRS Image Database on 10-10-2018

US 10,092,541 B2

31

laminoisoindoline-1,3-dione at a dose of between about 40 mg/day and about 100 mg/day.

2. A method for treating a patient with stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione, wherein the patient is suffering from psoriasis, the method consisting of:

(a) administering to the patient stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione in an initial titration dosing schedule consisting of

  (i) 10 mg in the morning on the first day of administration;

  (ii) 10 mg in the morning and 10 mg after noon on the second day of administration;

  (iii) 10 mg in the morning and 20 mg after noon on the third day of administration;

  (iv) 20 mg in the morning and 20 mg after noon on the fourth day of administration;

  (v) 20 mg in the morning and 30 mg after noon on the fifth day of administration; and

(b) on the sixth and every subsequent day, administering to the patient 30 mg in the morning and 30 mg after noon of stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione.

3. A method for treating a patient with stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione, wherein the patient is suffering from ankylosing spondylitis, the method consisting of:

(a) administering to the patient stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione in an initial titration dosing schedule consisting of

  (i) 10 mg in the morning on the first day of administration;

  (ii) 10 mg in the morning and 10 mg after noon on the second day of administration;

  (iii) 10 mg in the morning and 20 mg after noon on the third day of administration;

  (iv) 20 mg in the morning and 20 mg after noon on the fourth day of administration;

  (v) 20 mg in the morning and 30 mg after noon on the fifth day of administration; and

(b) on the sixth and every subsequent day, administering to the patient stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione at a dose of between about 40 mg/day and about 100 mg/day.

4. A method for treating a patient with stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione, wherein the patient is suffering from ankylosing spondylitis, the method consisting of:

(a) administering to the patient stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione in an initial titration dosing schedule consisting of

  (i) 10 mg in the morning on the first day of administration;

  (ii) 10 mg in the morning and 10 mg after noon on the second day of administration;

  (iii) 10 mg in the morning and 20 mg after noon on the third day of administration;

  (iv) 20 mg in the morning and 20 mg after noon on the fourth day of administration;

32

  (v) 20 mg in the morning and 30 mg after noon on the fifth day of administration; and

(b) on the sixth and every subsequent day, administering to the patient 30 mg in the morning and 30 mg after noon of stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione.

5. A method for treating a patient with stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione, wherein the patient is suffering from Behcet's disease, the method consisting of:

(a) administering to the patient stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione in an initial titration dosing schedule consisting of

  (i) 10 mg in the morning on the first day of administration;

  (ii) 10 mg in the morning and 10 mg after noon on the second day of administration;

  (iii) 10 mg in the morning and 20 mg after noon on the third day of administration;

  (iv) 20 mg in the morning and 20 mg after noon on the fourth day of administration;

  (v) 20 mg in the morning and 30 mg after noon on the fifth day of administration; and

(b) on the sixth and every subsequent day, administering to the patient stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione at a dose of between about 40 mg/day and about 100 mg/day.

6. A method for treating a patient with stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione, wherein the patient is suffering from Behcet's disease, the method consisting of:

(a) administering to the patient stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione in an initial titration dosing schedule consisting of

  (i) 10 mg in the morning on the first day of administration;

  (ii) 10 mg in the morning and 10 mg after noon on the second day of administration;

  (iii) 10 mg in the morning and 20 mg after noon on the third day of administration;

  (iv) 20 mg in the morning and 20 mg after noon on the fourth day of administration;

  (v) 20 mg in the morning and 30 mg after noon on the fifth day of administration; and

(b) on the sixth and every subsequent day, administering to the patient 30 mg in the morning and 30 mg after noon of stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione.

7. A method for treating a patient with stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione, wherein the patient is suffering from rheumatoid arthritis, the method consisting of:

(a) administering to the patient stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione in an initial titration dosing schedule consisting of

  (i) 10 mg in the morning on the first day of administration;

Copy provided by USPTO from the PIRS Image Database on 10-10-2018

CEL-OTZ-00673690

JTX-13_20

US 10,092,541 B2

<table>
<tr><td>33</td><td>34</td></tr>
</table>

(ii) 10 mg in the morning and 10 mg after noon on the second day of administration;

(iii) 10 mg in the morning and 20 mg after noon on the third day of administration;

(iv) 20 mg in the morning and 20 mg after noon on the fourth day of administration;

(v) 20 mg in the morning and 30 mg after noon on the fifth day of administration; and

(b) on the sixth and every subsequent day, administering to the patient stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione at a dose of between about 40 mg/day and about 100 mg/day.

8. A method for treating a patient with stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione, wherein the patient is suffering from rheumatoid arthritis, the method consisting of:

(a) administering to the patient stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione in an initial titration dosing schedule consisting of

(i) 10 mg in the morning on the first day of administration;

(ii) 10 mg in the morning and 10 mg after noon on the second day of administration;

(iii) 10 mg in the morning and 20 mg after noon on the third day of administration;

(iv) 20 mg in the morning and 20 mg after noon on the fourth day of administration;

(v) 20 mg in the morning and 30 mg after noon on the fifth day of administration; and

(b) on the sixth and every subsequent day, administering to the patient 30 mg in the morning and 30 mg after noon of stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione.

9. A method for treating a patient with stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione, wherein the patient is suffering from atopic dermatitis, the method consisting of:

(a) administering to the patient stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione in an initial titration dosing schedule consisting of

(i) 10 mg in the morning on the first day of administration;

(ii) 10 mg in the morning and 10 mg after noon on the second day of administration;

(iii) 10 mg in the morning and 20 mg after noon on the third day of administration;

(iv) 20 mg in the morning and 20 mg after noon on the fourth day of administration;

(v) 20 mg in the morning and 30 mg after noon on the fifth day of administration; and

(b) on the sixth and every subsequent day, administering to the patient stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione at a dose of between about 40 mg/day and about 100 mg/day.

10. A method for treating a patient with stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione, wherein the patient is suffering from atopic dermatitis, the method consisting of:

(a) administering to the patient of stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione in an initial titration dosing schedule consisting of

(i) 10 mg in the morning on the first day of administration;

(ii) 10 mg in the morning and 10 mg after noon on the second day of administration;

(iii) 10 mg in the morning and 20 mg after noon on the third day of administration;

(iv) 20 mg in the morning and 20 mg after noon on the fourth day of administration;

(v) 20 mg in the morning and 30 mg after noon on the fifth day of administration; and

(b) on the sixth and every subsequent day, administering to the patient 30 mg in the morning and 30 mg after noon of stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione.

11. A method for treating a patient with stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione, wherein the patient is suffering from Crohn's disease, the method consisting of:

(a) administering to the patient stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione in an initial titration dosing schedule consisting of

(i) 10 mg in the morning on the first day of administration;

(ii) 10 mg in the morning and 10 mg after noon on the second day of administration;

(iii) 10 mg in the morning and 20 mg after noon on the third day of administration;

(iv) 20 mg in the morning and 20 mg after noon on the fourth day of administration;

(v) 20 mg in the morning and 30 mg after noon on the fifth day of administration; and

(b) on the sixth and every subsequent day, administering to the patient stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione at a dose of between about 40 mg/day and about 100 mg/day.

12. A method for treating a patient with stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione, wherein the patient is suffering from Crohn's disease, the method consisting of:

(a) administering to the patient stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione in an initial titration dosing schedule consisting of

(i) 10 mg in the morning on the first day of administration;

(ii) 10 mg in the morning and 10 mg after noon on the second day of administration;

(iii) 10 mg in the morning and 20 mg after noon on the third day of administration;

(iv) 20 mg in the morning and 20 mg after noon on the fourth day of administration;

(v) 20 mg in the morning and 30 mg after noon on the fifth day of administration; and

(b) on the sixth and every subsequent day, administering to the patient 30 mg in the morning and 30 mg after noon of stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione.

Copy provided by USPTO from the PIRS Image Database on 10-10-2018

CEL-OTZ-00673691

JTX-13_21

Appx10639

US 10,092,541 B2

35

36

13. A method for treating a patient with stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione, wherein the patient is suffering from ulcerative colitis, the method consisting of:

(a) administering to the patient stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione in an initial titration dosing schedule consisting of

    (i) 10 mg in the morning on the first day of administration;

    (ii) 10 mg in the morning and 10 mg after noon on the second day of administration;

    (iii) 10 mg in the morning and 20 mg after noon on the third day of administration;

    (iv) 20 mg in the morning and 20 mg after noon on the fourth day of administration;

    (v) 20 mg in the morning and 30 mg after noon on the fifth day of administration; and

(b) on the sixth and every subsequent day, administering to the patient stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione at a dose of between about 40 mg/day and about 100 mg/day.

14. A method for treating a patient with stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione, wherein the patient is suffering from ulcerative colitis, the method consisting of:

(a) administering to the patient stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione in an initial titration dosing schedule consisting of

    (i) 10 mg in the morning on the first day of administration;

    (ii) 10 mg in the morning and 10 mg after noon on the second day of administration;

    (iii) 10 mg in the morning and 20 mg after noon on the third day of administration;

    (iv) 20 mg in the morning and 20 mg after noon on the fourth day of administration;

    (v) 20 mg in the morning and 30 mg after noon on the fifth day of administration; and

(b) on the sixth and every subsequent day, administering to the patient 30 mg in the morning and 30 mg after noon of stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione.

15. A method as in any one of claims 1-14, wherein the stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione comprises greater than about 90% by weight of the (+) isomer of 2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione based on the total weight percent of 2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione.

16. A method as in any one of claims 1-14, wherein the stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione

comprises greater than about 95% by weight of the (+) isomer of 2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione based on the total weight percent of 2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione.

17. A method as in any one of claims 1-14, wherein the stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione comprises greater than about 96% by weight of the (+) isomer of 2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione based on the total weight percent of 2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione.

18. A method as in any one of claims 1-14, wherein the stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione comprises greater than about 97% by weight of the (+) isomer of 2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione based on the total weight percent of 2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione.

19. A method as in any one of claims 1-14, wherein the stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione comprises greater than about 98% by weight of the (+) isomer of 2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione based on the total weight percent of 2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione.

20. A method as in any one of claims 1-14, wherein the stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione comprises greater than about 99% by weight of the (+) isomer of 2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione based on the total weight percent of 2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione.

21. A method as in any one of claims 1-14, wherein the stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione is administered in tablet form.

22. A method as in any one of claims 1-14, which comprises administering stereomerically pure (+)-2-[1-(3-ethoxy-4-m ethoxyphenyl)-2-methyl sulfonylethyl]-4-acetylaminoisoindoline-1,3-dione, substantially free of any salt, or solvate forms of (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione.

23. A method as in any one of claims 1-14, which comprises administering a pharmaceutically acceptable salt of stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methyl sulfonylethyl]-4-acetylaminoisoindoline-1,3-dione.

24. A method as in any one of claims 1-14, which comprises administering a pharmaceutically acceptable solvate of stereomerically pure (+)-2-[1-(3-ethoxy-4-methoxyphenyl)-2-methylsulfonylethyl]-4-acetylaminoisoindoline-1,3-dione.

* * * * *

Copy provided by USPTO from the PIRS Image Database on 10-10-2018

## CERTIFICATE OF SERVICE

I certify that, on January 31, 2022, true and correct copies of the foregoing corrected brief were filed with the Clerk of Court and caused to be served on all parties through the Court's electronic filing system.  I further certify that all parties required to be served have been served.


/s/ Maureen L. Rurka
MAUREEN L. RURKA

January 31, 2022

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE
## REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.      This brief complies with the type-volume limitation of Federal Rule of

Appellate Procedure 32(a)(7)(B) because it contains 13,694 words, excluding the

parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii)

and Federal Circuit Rule 32(b).

2.      This brief complies with the typeface requirements of Federal Rule of

Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of

Appellate Procedure 32(a)(6) because this brief has been prepared in 14-point

Times New Roman, a proportionally spaced typeface, using Microsoft Word 2016.


/s/ Maureen L. Rurka
MAUREEN L. RURKA

January 31, 2022